**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| IN RE FRONTIER COMMUNICATIONS CORPORATION SECURITIES LITIGATION | No. 3:17-cv-01617-VAB<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>ECF CASE |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................................... 6

III.   PARTIES ............................................................................................................ 7

       A.   Lead Plaintiffs ......................................................................................... 7

       B.   The Frontier Defendants ......................................................................... 8

IV.    SUBSTANTIVE ALLEGATIONS ................................................................... 10

       A.   Before The Class Period, Defendants Aggressively Grow Frontier And Cultivate
            A Reputation As Pioneers Of "Flash Cut" Conversions ....................................... 10

            1.   The West Virginia Flash Cut ....................................................... 12

            2.   The Connecticut Acquisition ....................................................... 13

       B.   The Class Period Starts As Defendants Announce The CTF Acquisition,
            Frontier's Biggest Acquisition Yet And The Largest Flash Cut Ever ................. 15

       C.   Defendants Raise Billions From Investors As They Assure That The CTF
            Acquisition Is On Track ........................................................................ 20

       D.   Defendants Continue To Promise That The CTF Flash Cut Will Be A Seamless
            Transition .............................................................................................. 22

       E.   Defendants Sold The "Transformational" CTF Acquisition With Lies ................ 23

            1.   In Fact, Defendants' "Track Record" Was Disastrous ............................. 24

            2.   Frontier Did Not Have A "Seasoned Integration Team" ......................... 35

            3.   Defendants Knew That The CTF Acquisition Required More Than Double
                 The Integration Costs Announced ............................................. 38

            4.   Defendants Knew The CTF Acquisition Would Not Be A "Smooth
                 Transition"—By Design ........................................................... 41

       F.   Defendants Double Down While The CTF Flash Cut Crashes And Burns .......... 45

            1.   Defendants Falsely Claim That The CTF Flash Cut Was A Success ....... 45

            2.   Defendants Misrepresent That Issues From The CTF Flash Cut  Impacted
                 Just One Percent Of Customers ................................................ 52

            3.   Defendants Continue To Misrepresent That The  CTF Flash Cut Was A
                 Success .................................................................................. 56

V.     THE TRUTH GRADUALLY EMERGES ....................................................... 64

       A.   Frontier's Third Quarter 2016 Results Begin To Expose The Truth About The
            CTF Acquisition .................................................................................. 64

       B.   Defendants Blame Undisclosed "Clean Up" Of "Non-Paying Accounts" From

The CTF Acquisition As Frontier's Year-End 2016 Results Disappoint ............ 67

C.      Ongoing Declines In CTF Operations Force Frontier To Cut Its Prized Dividend ............................................................................................................... 71

D.      Defendants Unexpectedly Announce That  Frontier Will Miss Its EBITDA Target ............................................................................................................... 73

E.      Defendants' Failed CTF Acquisition Forces  Frontier To Cancel Its Prized Dividend Altogether ................................................................................. 75

VI.     POST CLASS PERIOD EVENTS .................................................................... 76

VII.    THE FRONTIER DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...... 77

A.      Defendants Claim That Frontier Has A "Proven Track Record" Of Completing Flash Cuts .................................................................................. 77

B.      Defendants Claim That A "Seasoned Integration Team"  Is Leading the CTF Acquisition .................................................................................... 83

C.      Defendants Claim That The Estimated Integration Costs  Of The CTF Acquisition Will Be $450 Million ................................................................ 85

D.      Defendants Claim That The CTF Acquisition Is Progressing Towards The Promised "Seamless" Or "Smooth" Transition ...................................... 87

E.      Defendants Claim That The CTF Flash Cut Was a Success ................................ 90

F.      Defendants Claim That The CTF Flash Cut Affected 1% Of Customers ............ 94

G.      Defendants Claim That "Non-Paying Accounts" Acquired From Verizon Are To Blame For Severe Revenue Decline ...................................... 97

H.      Defendants Claim To Have Prepared Frontier's Financial Statements In Accordance With Generally Accepted Accounting Principles ......................... 99

VIII.   LOSS CAUSATION ..................................................................................... 100

IX.     PRESUMPTION OF RELIANCE .................................................................. 103

X.      INAPPLICABILITY OF STATUTORY SAFE HARBOR ................................... 105

XI.     SUMMARY OF SCIENTER ALLEGATIONS ................................................. 106

A.      Unreleased Internal Information Directly Contradicted The Frontier Defendants' Public Statements .................................................................... 106

B.      Defendant McCarthy Had Personal Knowledge That More Than 1% Of CTF Customers Were Impacted By The CTF Flash Cut And That The Flash Cut Was Not Successful ................................................................. 108

C.      The Critical Importance Of The CTF Acquisition ............................................. 108

D.      Defendants' Involvement In A Highly Regulated Industry ............................... 110

E.      The Direct Oversight By Certain Individual Frontier Defendants Of Frontier's "Proven Track Record" ..................................................................... 111

F. The West Virginia Settlement ................................................................ 112

G. Defendants' Compensation Uniquely Incentivized The Fraud ........................ 113

H. The Suspicious Timing Of Jureller's Departure ...................................... 114

XII. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT .............................. 115

XIII. CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT ............................. 123

A. Securities Act Defendants ................................................................. 124

    1. The Securities Act Individual Defendants ............................................ 125

    2. The Underwriter Defendants ........................................................... 129

B. The Offering Documents Included Material Misstatements And Omissions ..... 131

    1. Proven Track Record ..................................................................... 131

    2. Seasoned Integration Team .............................................................. 133

    3. Estimated Integration Costs ............................................................. 134

C. The Securities Act Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offering ........... 135

XIV. CLASS ACTION ALLEGATIONS ................................................................ 142

XV. PRAYER FOR RELIEF ............................................................................. 144

XVI. JURY DEMAND ..................................................................................... 144

1.      Lead Plaintiffs Arkansas Teacher Retirement System ("ATRS") and Carlos Lagomarsino ("Lagomarsino," with ATRS, "Lead Plaintiffs" or "Plaintiffs"), by and through their counsel, bring this action individually and on behalf of all persons and entities who: (i) purchased or otherwise acquired the publicly traded common stock of Frontier Communications Corporation ("Frontier" or the "Company") between February 6, 2015 and February 28, 2018, inclusive (the "Class Period"); and/or (ii) purchased or otherwise acquired Frontier common stock or Mandatory Convertible Preferred Stock (collectively, "Frontier Securities") either in or traceable to the Company's offerings of common and preferred stock conducted on or about June 2, 2015 and June 8, 2015. Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which Lead Plaintiffs allege upon personal knowledge. Lead Plaintiffs' information and belief are based upon Lead Counsel's investigation, which included review and analysis of, *inter alia*: (i) regulatory filings made by Frontier with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and public statements by the Company; (iii) analyst reports concerning Frontier; (iv) interviews with former Frontier employees and contractors; and (v) other public information regarding the Company. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.   INTRODUCTION

2.      This case arises from Frontier's disastrous April 2016 acquisition of the California, Texas, and Florida wireline operations of Verizon Communications Inc. ("Verizon") for $10.5 billion (the "CTF Acquisition"). In June 2015, Defendants raised $2.75 billion from public

investors to fund the CTF Acquisition (the "Offerings"), principally by assuring the public in their Form S-3 registration statement and prospectus, as supplemented by preliminary prospectuses dated June 2, 2015 and June 8, 2015 (collectively, the "Offering Documents"), that Frontier's "seasoned integration team"—and its "proven track record" of "successfully integrating acquired properties"—ensured a "smooth" transition for Verizon customers and a "transformative" triumph for Frontier. After closing, Defendants quickly deemed the CTF Acquisition yet another success. Months later, however, investors began to learn the truth: Frontier's inexperienced and unprepared integration team had caused months of months of service issues that drove customers away, caused revenue to plummet, and propelled acquisition and integration costs to nearly $1 billion—***twice*** the estimate previously given to investors to sell the CTF Acquisition but nearly identical to the amount that Frontier had internally (and secretly) calculated.

3.      By way of background, at all relevant times Frontier was a provider of wireline (or "landline") telecommunications services, and historically had principally served rural communities. However, Frontier's rural wireline focus had tethered the Company to outdated business models—such as providing landline phone service—with declining revenue streams. Defendants responded by pursuing an acquisition-based growth strategy, and in 2010 tripled the size of the Company by purchasing from Verizon nearly five million access lines in fourteen states (the "2010 Verizon Acquisition"). While the size of the 2010 Verizon Acquisition made Frontier the nation's largest pure rural communications service provider, it did not fundamentally alter the Company's historical customer base. This began to change in 2014, when Frontier purchased all of AT&T's wireline business in Connecticut (the "Connecticut Acquisition"). While the Connecticut Acquisition was much smaller in terms of size, it brought Frontier to denser suburban and even light urban markets for the first time in the Company's history. Having been directly

involved in one or both of these acquisitions, Defendants Wilderotter (Frontier's Chief Executive Officer ("CEO") for the first several months of the Class Period), McCarthy (Wilderotter's successor as CEO), and Jureller (Frontier's Chief Financial Officer ("CFO") until he "resigned" suddenly just after the CTF Flash Cut) claimed the purchases had been major successes—and pocketed millions of dollars in acquisition bonuses.

4.     On February 5, 2015—the day before the start of the Class Period, and just months after the close of the Connecticut Acquisition—Defendants announced the CTF Acquisition, which they called "transformational." Not only would the CTF Acquisition more than double the size of the Company and increase its customer base by millions, it would also fundamentally alter the Company for at least two reasons. First, the CTF Acquisition pivoted the Company dramatically away from its rural roots, bringing Frontier for the first time to major metropolitan markets, such as Tampa and Los Angeles, at a major scale. Second, the CTF Acquisition would more than double the Company's fiber network assets, increasing its ability to meet modern demand for video and internet services in a way the Company's predominantly copper network could not.

5.     Defendants also announced that the Company would undertake this transformation literally overnight, using a technique known as a "flash cut" (the "CTF Flash Cut"). In a flash cut, the acquiring company transfers the acquired assets in one immediate—and irreversible— "cutover" that is complete in a number of hours. Accordingly, as Defendant McCarthy himself acknowledged, flash cuts are "a very, very heavy lift," and Frontier is "probably the only player in the industry really who goes for a flash cut." Yet, Frontier had never attempted anything on the scale of the CTF Flash Cut before: involving states with over 27% of the United States population, the CTF Flash Cut would be the largest attempted in history.

6. Defendants rightly understood that investors would have concerns about the epic scale—and risky means—of the CTF Acquisition. In response, from first announcing the acquisition, Defendants stressed their "proven track record" of the 2010 Verizon Acquisition and the Connecticut Acquisition, and claimed that their "seasoned integration team" would deliver estimated acquisition and integration costs of just $450 million. Consequentially, Defendants assured, the CTF Acquisition would be a seamless handoff—with Wilderotter explicitly "emphasiz[ing] that we will have the experience to create a smooth transition for customers with no disruption to service." Defendants' plan worked. Defendants raised $2.75 billion from investors in public offerings to help fund the CTF Acquisition.

7. However, Defendants' claims were lies. In fact, former Frontier employees and contractors have revealed that, internally, Frontier understood that its "proven track record" of the 2010 Verizon Acquisition and the Connecticut Acquisition were actually major missteps, which resulted in widespread service outages and loss of customers. Moreover, Defendants had commissioned—but concealed—an internal analysis (the "Gap Analysis") showing that their public "estimate" of $450 million for acquisition and integration spending radically understated the true estimate to provide the promised seamless transition: in reality, the Gap Analysis estimated costs *closer to $1 billion*. Nonetheless, even as Defendants continued to tell investors, customers, and regulators that the CTF Acquisition would be "seamless," they in fact deliberately moved forward knowing that significant functionality would be missing.

8. Ultimately, even after internal management advised to postpone the cutover, Defendants moved forward with the CTF Flash Cut on April 1, 2016—and in doing so caused so much havoc that it immediately prompted widespread press coverage and even regulatory inquiry, with the City of Glendale noting in a May 12, 2016 letter that the service disruptions "in today's

world is both an economic burden and public safety concern." Confronted face-to-face with the disaster during a tour of Florida operations, McCarthy internally admitted that—contrary to what he and Defendants had told investors—"***we knew there was going to be a problem***, ***but we didn't know it was going to be this bad***." Yet, instead of admitting how "bad" it had gone, ***Defendants doubled down***: they told investors that the cutover had been a success, and claimed that the widely reported service disruptions had been resolved quickly and regardless only impacted 1% of customers. Yet again, Defendants lied: former employees report that Defendants ***knew*** that the CTF Acquisition was a colossal failure—with hordes of customers losing service and/or facing a multitude of billing and other issues—but Frontier's senior executives deliberately manipulated customer data in order to manufacture the "1%" figure so as to placate regulators and investors.

9.     After months of frantically concealing the reality of the CTF Acquisition, eventually Defendants could not push off the moment of truth any longer. After terminating Defendant Jureller in October 2016, the Company began in November 2016 to slowly reveal the full scope of the facts and the risks previously concealed by Defendants. In November 2016, Defendants announced that, rather than providing "strong revenues" as promised, Frontier's revenue had actually declined by $84 million in large part due to the CTF Acquisition. Moreover, the integration costs of the CTF Acquisition had exploded to $750 million—66% more than Defendants had led investors to anticipate. Three months later, in February 2017, Defendants announced an even more dramatic plunge of $100 million in revenue, alongside an astonishing loss of over 128,000 customers, which Defendants (falsely) blamed on non-paying customers purportedly acquired from Verizon. Then, in May 2017, Defendants announced that, far from the promised "dividend sustainability," the growing bloodshed from the CTF Acquisition had caused

Frontier to slash its dividend by half. Finally, in October 2017, Frontier announced that it would altogether miss its EBITDA target for 2017—despite having reaffirmed that target all year.

10.     Yet, throughout the barrage of bad news, Frontier claimed that stabilization was just ahead. However, not until February 28, 2018—the last day of the Class Period—did Defendants disclose that integration of the CTF Acquisition was finally complete, revealing the final price tag for the acquisition and integration costs: $962 million in total, more than double Defendants' prior guidance to investors—nearly the exact amount in Defendants' still-concealed Gap Analysis. Further, despite having begun the Class Period promising that the CTF Acquisition would deliver "dividend stabilization," Defendants also revealed that day that Frontier was cancelling completely its prized dividend—the final consequence of their fraudulent acquisition strategy.

11.     As a result of the fraud alleged herein, the price of Frontier's stock fell from $115.50[1] at the close on February 5, 2015, to just $7.03 at the close on February 28, 2018—*a decline of nearly 94%*, causing massive losses to investors.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to: (i) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5); and (ii) Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

13.     This Court has jurisdiction over the claims asserted in this Complaint pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1331.

---

[1] Stock prices have been adjusted to reflect the Company's 1-for-15 reverse stock split, completed on July 10, 2017.

14.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b). Frontier maintains its corporate headquarters and principal place of business in this District and did so at all relevant times, and many of the acts and conduct that constitute the violation of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

15.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means an instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ Stock Market, a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

16.     Co-Lead Plaintiff ATRS is a public pension fund headquartered in Little Rock, Arkansas that was founded in 1937 to provide retirement, disability, and survivor benefit programs to active and retired public school teachers of the State of Arkansas. ATRS is responsible for the retirement income of these employees and their beneficiaries. ATRS manages more than $16 billion in assets for the benefit of its approximately 128,000 active and retired members. As shown in its previously-filed Certification (ECF No. 50-3), ATRS purchased a significant amount of Frontier Securities during the Class Period, and suffered substantial losses as a result of the violations of the federal securities laws as alleged in this action.

17.     Co-Lead Plaintiff Lagomarsino founded and served as the CEO of HomeInsurance.com LLC. As shown in his previously-filed Certification (ECF No. 50-3), Lagomarsino purchased a significant amount of Frontier Securities during the Class Period, and

suffered substantial losses as a result of the violations of the federal securities laws as alleged in this action.

**B.      The Frontier Defendants**

18.      Defendant Frontier is a Delaware Corporation based in Connecticut, where it has maintained its headquarters since 1948. Frontier presently maintains its principal executive offices at 3 High Ridge Park, Stamford, Connecticut 06905.

19.      Defendant Mary Agnes Wilderotter ("Wilderotter") served as Frontier's CEO from November 2004 to April 2015. On March 3, 2015, Frontier announced Wilderotter's resignation as CEO effective April 3, 2015. In addition, at all relevant times until April 2016, Wilderotter served as a member of the Company's Board of Directors and, from April 2015 to April 2016, she served as the Company's Executive Chairman. As Executive Chairman, Wilderotter signed the Company's Offering Documents and was serving in this role on the dates of the Offerings. Both as CEO and as Executive Chairman, Wilderotter was integral in developing Frontier's acquisition strategy, and she oversaw the 2010 Verizon Acquisition, the Connecticut Acquisition, and the Company's entry into, and announcement, of the CTF Acquisition.

20.      Defendant Daniel J. McCarthy ("McCarthy") has held numerous roles at Frontier since beginning work there in 1990. From January 2006 to April 2012, he was Executive Vice President and Chief Operating Officer, then served as Frontier's President and Chief Operating Officer from April 2012 to April 2015. Since April 3, 2015, he has served as the Company's President and CEO. In addition, throughout the Class Period, McCarthy also served as a member of the Company's Board of Directors. As a Director, President, and CEO of Frontier, McCarthy signed the Company's Offering Documents and was serving in these roles on the dates of the Offerings. In each of his roles at the Company, McCarthy was involved in all of the major

acquisitions described herein. Notably, McCarthy oversaw the 2010 Verizon Acquisition, the Connecticut Acquisition, and the CTF Acquisition.

21.     Defendant John M. Jureller ("Jureller") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from January 2013 to November 4, 2016. In this role, Jureller oversaw the Connecticut Acquisition and (until his departure) the CTF Acquisition. As Executive Vice President and CFO, Jureller signed the Company's Offering Documents, and he was serving in this role on the dates of the Offerings. On September 12, 2016, Frontier announced the sudden departure of Jureller from the Company and the appointment of Defendant McBride as Jureller's replacement. The Company provided no explanation for Jureller's departure.

22.     Defendant Ralph Perley McBride ("McBride") served as the Company's CFO from November 4, 2016 through the end of the Class Period, replacing Defendant Jureller. In this role, McBride oversaw the continuing integration of the CTF Acquisition. Prior to serving as Frontier's CFO, McBride had served in various senior financial management roles at Frontier between 1994 and 1997 and between 1999 and 2010.

23.     Defendant John Gianukakis ("Gianukakis") served as the Company's Vice President and Treasurer from May 27, 2014 through April 2017. Reporting to the CFO, Gianukakis directly oversaw the Company's treasury operations during the Connecticut Acquisition and (until his departure) the CTF Acquisition.

24.     The Defendants referenced in ¶¶18-23 above are referred to herein as "Defendants" or the "Frontier Defendants," with Defendants Wilderotter, McCarthy, Jureller, McBride, and Gianukakis referred to herein as the "Individual Frontier Defendants."

25.     During the Class Period, the Individual Frontier Defendants regularly spoke in public, at investor conferences, on earnings calls, and to the media about the Company's

acquisition strategy, previous acquisitions, technical expertise, experienced personnel, acquisition and integration costs, the Offerings, and/or other relevant subjects as discussed herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Before The Class Period, Defendants Aggressively Grow Frontier And Cultivate A Reputation As Pioneers Of "Flash Cut" Conversions

26.    At all relevant times, Frontier was a telecommunications company that sought to generate revenue by providing wireline (or landline) services, including telephone service, cable or video service, and internet access.

27.    In the years leading up to the Class Period, Frontier pursued an acquisition-based growth strategy, purchasing millions of customers and billions of dollars' worth of wireline infrastructure from other telecommunications companies, who were increasingly jettisoning the wireline business in favor of more profitable, technologically advanced telecommunications services. As McCarthy stated in a February 23, 2016 press release, Defendants understood in doing so the importance that Defendants "maintain the sustainable, attractive dividend and dividend payout ratio that our investors have come to rely upon from Frontier."

28.    As Defendants themselves acknowledged, large acquisitions are high-risk situations for a telecommunications company. In a June 15, 2011 presentation entitled "Anatomy of a Successful Billing Conversion: A Frontier/ProCom Case Study" (the "Case Study"), Frontier executives[2] described these acquisitions as "the corporate equivalent of brain surgery—a *life or*

---

[2] Paul Treasure (Frontier Vice President, Information Services, from 2016 to the present) and Monica Braden (Frontier Associate Vice President, Business Operations) delivered the presentation on behalf of Frontier, along with Ardeth Smith, Vice-President, Client Delivery and Strategies, of ProCom Consulting ("ProCom"), an information technology and management consulting firm. Frontier retained ProCom Consulting in connection with the three acquisitions discussed herein, the 2010 Verizon Acquisition, the Connecticut Acquisition, and the CTF Acquisition.

***death operation***,"[3] as "the conversion of billing and OSS ["operation support systems"] in a merger or acquisition situation usually results in a major organizational transformation that can make or break a company."

29.     Typically, telecommunications companies accomplish such acquisitions through a method referred to as a "lease back," in which the acquiring company leases the acquired company's equipment and facilities over an extended period of time, gradually merging the acquired systems into its own. The lease back method is considered industry standard because the methodical and measured transition between systems allows errors, incompatibilities, and bugs to be identified and addressed as they are discovered—and before they cause issues that impact customer service, including "911" service, a requirement imposed on telecommunications providers by regulators.

30.     In addition to the lease back method, there is another, far less conventional technique for accomplishing acquisitions, known as a "flash cut." A flash cut literally cuts all of the acquired company's assets over to the acquirer in one immediate transfer at the close of the acquisition (sometimes referred to as the "cutover"), without any phase-in periods. Theoretically, flash cuts lower the cost of integration by precluding the costs of leasing equipment after closing. Nevertheless, flash cuts also carry significant risks. During a February 29, 2016 conference, Defendant McCarthy described the "pros and cons of doing a flash cut":

> The cons are that it is a heavy lift from the time you sign the deal until the time that you close. So it is a lot of effort and if you were starting from scratch, it would be a very, very heavy lift. . . . When you look at the real challenge, it is making sure that every component of your systems actually marries up perfectly. It is kind of like unbolting . . . and then just ***perfectly mating it up on that first night with our own system***. So that is the challenges. The positive side of doing it is there is no transition service agreement so no ongoing relationship with the person who is selling you the properties[.]

---

[3] Throughout this document, all emphasis is added to quotations unless otherwise noted.

Accordingly, flash cut conversions are rare. As McCarthy stated during that same conference, Frontier is "probably the only player in the industry really who goes for a flash cut."

31.     In the five years before the Class Period began, Frontier completed two massive acquisitions that more than doubled the size of the Company. In both of these acquisitions, Frontier utilized a flash cut—the same aggressive conversion approach that the Company later used in the CTF Acquisition.

### 1.     The West Virginia Flash Cut

32.     In July 2010, Frontier—with Defendants Wilderotter and McCarthy at its helm—embarked on what was then the Company's largest purchase to date: the 2010 Verizon Acquisition. The 2010 Verizon Acquisition tripled Frontier's size by adding nearly five million wireline customers across fourteen states.

33.     For thirteen of the fourteen states acquired in the 2010 Verizon Acquisition, Frontier used the industry-standard "lease back" method described above. However, on July 1, 2010, Frontier broke from industry convention and employed the flash cut method to acquire the fourteenth state, West Virginia, which constituted more than 10% of the transaction (the "West Virginia Flash Cut").

34.     Defendants quickly labeled the West Virginia Flash Cut a triumph. During the Company's first earnings call following the West Virginia Flash Cut, on August 4, 2010, Defendant Wilderotter described the West Virginia Flash Cut as a "success[]." Wilderotter went further during a September 21, 2010 Goldman Sachs conference, calling it "the best systems conversion we've ever done." Within months of the West Virginia Flash Cut, the Company awarded Defendants Wilderotter and McCarthy bonuses totaling $2.75 million and $800,000 (respectively) for the "successful closing" of the 2010 Verizon Acquisition, including the West Virginia Flash Cut.

2.        **The Connecticut Acquisition**

35.        On December 17, 2013, Frontier announced its next major acquisition, the Connecticut Acquisition, in which Frontier purchased all of AT&T's wireline business and its statewide fiber optics network in Connecticut for $2 billion in cash. Frontier announced that it would again use a flash cut, promising customers a "seamless transition." Wilderotter cited the West Virginia Flash Cut as proof that Frontier had the expertise necessary to make the Connecticut Acquisition a success, stating that day, "We are very confident in our ability to integrate this property successfully and efficiently on this rapid schedule just as we did the flash cut of West Virginia back in 2010."

36.        However, Wilderotter's comparison minimized key differences between the West Virginia Flash Cut and the Connecticut Acquisition that greatly increased the risk and difficulty in executing the conversion. First, the Connecticut Acquisition would flash cut over twice as many lines and assets as West Virginia. Second, whereas—consistent with the Company's historical rural focus—the West Virginia Flash Cut concerned a nearly "pure rural" area, 48% of the assets Frontier acquired in the Connecticut Acquisition were in rural/"light" suburban areas, with the rest in denser, suburban, and light urban areas. This shift introduced a new and meaningful risk for Frontier because, as Defendant McCarthy later acknowledged, non-rural markets "typically are more competitive than the more rural markets" that Frontier historically served, where the Company had frequently been the only service provider. In other words, rural consumers had no free market choice but to suffer through any service disruptions, as had in fact been the case in West Virginia, where Frontier was the ***only*** substantial provider in the state after the West Virginia Flash Cut and controlled nearly 99% of the access lines. However, as markets became less rural, consumers confronted with disruptions or inadequate service have ready access to competitors eager to take advantage of service disruptions and poach Frontier's customers.

37.     At the same time, as markets became less rural, they, correspondingly, demanded far greater technical sophistication than Frontier typically had experience with. This not only compounded the risk the Company faced from its newfound competitors, but also increased the difficulty of the flash cut itself. Most prominently, the West Virginia Flash Cut involved only copper lines, while the Connecticut Acquisition required the Company to flash cut ***both*** copper and fiber-optic lines, a significantly more complicated technology. While the use of copper lines to transmit data is relatively simple and has been in use since 1948, fiber-optic lines are a comparatively recent technology that pulse light through millions of tiny strands of glass—providing much faster service and greater bandwidth than copper, but also requiring much greater technical sophistication to install and maintain.

38.     Defendants executed the Connecticut Acquisition flash cut on October 25, 2014, and—just as they had after the West Virginia Flash Cut—immediately began describing the Connecticut Acquisition as a success. On October 27, 2014, Ken Arndt, Frontier's East Region President, stated, "Given the magnitude of this conversion, we are very pleased that the overwhelming majority of customers, ***approximately 99 percent***, experienced a seamless transition from AT&T's service to Frontier." On December 8, 2014, Jureller likewise claimed that "***probably 99%***-plus of our [Connecticut] customers had a great experience. We had some issues that we dealt with, we dealt with them in a very expeditious way, and we are on a good path now." On December 11, 2014, Wilderotter announced that Frontier's board had voted to increase its dividend, "reflect[ing] the Board's confidence in Frontier's business and financial strength and our solid execution performance in integrating the Connecticut acquisition." Later, the Company awarded a total of $1 million in bonuses to Wilderotter, McCarthy, and Jureller for the acquisition.

**B.**    **The Class Period Starts As Defendants Announce The CTF Acquisition, Frontier's Biggest Acquisition Yet And The Largest Flash Cut Ever**

39.    After the close of the market on February 5, 2015, Defendants issued a press release announcing the CTF Acquisition—Frontier's purchase of Verizon's wireline assets in California, Texas, and Florida for $10.5 billion. Defendants also stated at that time that they would use the CTF Flash Cut to complete the acquisition overnight, proudly noting that it would be the largest flash cut in history. Frontier's stock price soared from $115.50 per share to over $125 per share within days of the announcement.

40.    As a BMO Capital Markets analyst noted the following day, "the deal [was] more financial than strategic" for Frontier, as the "markets aren't adjacent or even close to existing Frontier markets." Later, during a March 3, 2015 investor call, Jureller revealed that Defendants "shook hands on the framework" of the CTF Acquisition upon completing the Connecticut Acquisition in October 2014, giving Frontier "just over three months" of due diligence to assess Frontier's ability to complete the CTF Acquisition and to negotiate the deal. Earlier news reports in the *Wall Street Journal* and *Bloomberg* might explain Defendants' haste: the sale was part of a fundraising push by Verizon to help pay for new airwaves that it had recently bid on in government auctions, thus presenting Frontier with an extremely rare—and passing—opportunity to expand enormously its telecommunications foothold in just *one* acquisition. But because Verizon needed the money, Frontier had to work quickly. The CTF Acquisition agreement filed on February 5, 2016 revealed that, if Defendants did not complete the CTF Flash Cut by April 5, 2016, the agreement would likely be called off altogether.

41.    Notwithstanding the speed and scale of the CTF Acquisition, Defendants from the start assured the market that their experience in past flash cuts in West Virginia and Connecticut would ensure the success of the CTF Acquisition. For example, in Frontier's February 5, 2015

press release announcing the CTF Acquisition, Wilderotter stated that the acquisition "leverages our proven skills and established track record from previous integrations."

42.     Defendants re-emphasized these points and others during an investor presentation filed in a Form 8-K alongside the press release, describing Frontier's "Proven Integration Experience" and "Proven track record of successfully integrating acquired properties." The investor presentation included in the Form 8-K also stated that Defendants estimated total integration Operating Expenses ("OpEx") and Capital Expenditures ("CapEx") of $450 million.

## Proven Integration Experience

**Proven track record of successfully integrating acquired properties:**

- 2008 Commonwealth Telephone acquisition – PA
- 2010 Verizon acquisition – 14 states
- 2014 AT&T acquisition – Connecticut

➤ **California, Florida and Texas are the three remaining Verizon GTE platform states; Frontier converted 13 GTE platform states as part of the 2010 Verizon acquisition**

➤ **Frontier currently operates FiOS in Washington, Oregon, Indiana and South Carolina and is system ready for expanded FiOS operations**

➤ **Estimated OpEx and CapEx integration cost of approximately $450 million in 2015/2016**



7

The estimated integration costs were remarkable: despite acquiring ***more than four times*** as many connections and employees as it did in the Connecticut Acquisition, these integration costs for the

CTF Acquisition were *less than double* the estimated integration costs from the Connecticut Acquisition.

## Transaction Accelerates Frontier's Value Creation Strategy

➢ **High-quality assets will generate substantial revenue and cash flow; strong accretion in year one**

➢ **Transaction will sustain current dividend, lower payout ratio and meaningfully enhance shareholder value**

➢ **Transaction will double Frontier's size**

➢ **Transaction leverages Frontier's low cost operating model**

▪ **Frontier's seasoned integration team will convert California,  Florida and Texas properties onto Frontier systems at close**

43.     Defendants Wilderotter and McCarthy personally emphasized these points when they spoke to investors on February 5, 2015. For example, Wilderotter stated:

> Because of the size of this transaction and *our integration experience*, there is even more potential to achieve even greater economies of scale. We have a *proven track record* of achieving and exceeding acquisition cost savings, and we are confident in our ability to realize them in this transaction as well. . . . [W]e will have *the experience to create a smooth transition* for customers with *no disruption to service*. We will flash-cut to Frontier's systems at closing, just as we did with Connecticut last quarter and with West Virginia assets when we converted from Verizon systems in 2010. . . . We have a *full blown team of conversion and integration experts in our Company* that are simply now going to move over to this project. So we don't have to staff up, and we can keep our basic business going with our leaders that run the business. . . .

44.     Defendant McCarthy also asserted that Frontier could achieve these substantial savings because "we are *very familiar with the systems that underlie these new markets* and have *substantial experience* with the conversion process we must execute to complete integration."

45.     In response to an analyst's question concerning "the thoughts you had about letting out your cost cut expectations and how you're setting expectations for the market," Defendants Wilderotter and McCarthy both referenced Defendants' experience again:

> [Defendant Wilderotter:] Believe me, we made sure with this transaction that we went back and looked at the lessons learned not just from the Verizon transaction previously, but also with our experience doing the AT&T Connecticut deal as well. I will say first and foremost, we made sure this was a flash cut transaction. One of the challenges we had with the Verizon acquisition last time is we round up in about 2.5 years of integration and conversion. So we weren't able to implement the Frontier go-to-market immediately, it took us several years to do that. . . .

> [Defendant McCarthy:] [W]e have spent a lot of time upgrading our operational support system and billing systems that are very compatible with the FiOS platform. That was a new system to us during the last conversion. We built it, we honed it, as we've gone through the Connecticut transaction and we'll hone it even further with this. But we feel very comfortable that we'll be able to go to market just as well as Verizon is today day one, going forward. . . .

> And the last thing I would add is that we have a lot of experience looking at non-FiOS networks. So we know exactly what equipment is there. We actually have members of our team who used to work in these markets. So they were integral to our diligence efforts. So we have very good plans on what we will do and how we'll upgrade those non-FiOS areas as well.

> [Defendant Wilderotter:] One other thing to add to this list is we just finished a very large conversion with AT&T in Connecticut. *We have a full blown team of conversion and integration experts in our Company that are simply now going to move over to this project.* So we don't have to staff up, and we can keep our basic business going with our leaders that run the business from an operating perspective on a day-to-day basis, which was different when we did the first Verizon acquisition because we had to staff up and really build a conversion and integration team then, we don't have to do that with this transaction.

46.     Defendants omitted, however, that none of their prior flash cuts remotely compared to the complexity of the CTF Acquisition. First, the CTF Acquisition involved nearly *475%* more assets than the Connecticut Acquisition and *over 1100%* more than the West Virginia Flash Cut.

Further, the asset mix that Frontier was obtaining in the CTF Acquisition was far different than anything that Frontier had acquired before. For example, while the West Virginia Flash Cut did not require Frontier to cut over any fiber optic lines, the CTF Acquisition would **double** Frontier's fiber-optic capacity, from 14% to 31%, as Defendants would acquire **1.2 million** technologically sophisticated FiOS video lines—something they had never flash cut before.[4] Likewise, Frontier flash cut just 164,000 video lines in the West Virginia Flash Cut and 180,000 video lines in the Connecticut Flash Cut—but the CTF Acquisition would require flash cutting **over 1.1 million video lines**.

47.     Second, Frontier would also face far greater competition following the CTF Acquisition. As Cowen & Company wrote on October 13, 2015, the CTF Acquisition would fundamentally "chang[e] the game" for Frontier by shifting the Company from its historical role as a "pure-play rural provider" towards "urban / suburban markets." The transaction would introduce Frontier into what Defendant McCarthy described during a May 15, 2015 conference as "fairly urban properties in Tampa and Dallas Fort-Worth and in Southern California." These areas were of the sort that, McCarthy conceded, "typically are more competitive than the more rural markets" Frontier had historically served, further compounding the demand for Frontier to deliver technical sophistication—sophistication that it never before had to deliver.

48.     Third, the Company had little-to-no presence in the CTF markets it was acquiring. While Defendant McCarthy would later assert that Defendants had a "significant presence" in the CTF regions, in reality it had only a smattering of residential customers in rural and suburban

---

[4] "FiOS" refers to a fiber-optic network technology developed by Verizon. In connection with the Connecticut Acquisition, Defendants flash cut AT&T's fiber-optic technology, called "U-Verse." Though both involve fiber-optic technology, the two are very different: FiOS directly runs fiber-optic lines to subscriber homes, while U-Verse only uses fiber-optic infrastructure between area hubs, from which it then relies on traditional copper lines to individual residences.

California, some corporate infrastructure in Texas, and a call center in Florida. In West Virginia, by contrast, Frontier and Verizon had been the only substantial telecommunications companies in place prior to the West Virginia Flash Cut, leaving Frontier as the sole meaningful presence after the cutover. Frontier also had a meaningful presence in Connecticut where it had been headquartered since 1948. This difference both compounded the threat of competition in the CTF regions (because the Frontier brand had little consumer recognition or value) and the technical burdens faced by the Company (because the Company had little experience with the actual networks and markets).

**C.     Defendants Raise Billions From Investors As They Assure That The CTF Acquisition Is On Track**

49.     In announcing the CTF Acquisition, Defendants had also stated that they intended to finance the CTF Acquisition in part through the issuance of common and preferred stock to public investors. Thus, to ensure the success of the intended offering, Defendants continued to tout their "experience" and assured the market that Frontier was on track to integrate the CTF Acquisition. For example, during the March 3, 2015 Morgan Stanley Technology, Media & Telecom Conference, Defendant Jureller addressed an analyst's skepticism about the CTF Acquisition as follows:

> [Analyst:] So, I think a lot of us were surprised that you did the Verizon transaction, announced it so soon after you closed Connecticut even though it'll take maybe a year to close, but it sort of signaled I think a confidence that you were pleased with the way that Connecticut was going on that you could handle another transaction down the road. So, can you just reflect on how internally you thought about: Yes, we can take this on. We can—we like what we're seeing so far.

> [Defendant Jureller:] [W]e're the only ones that have successfully done carve-outs and integrated from both Verizon and from AT&T and it's no easy feat to do. These are hard things to do [and] Connecticut . . . exceeded our expectations.

Defendant Jureller also claimed that the Company had a "big operational integration effort underway already to get ready for" the CTF Acquisition and that the flash cut would be "an ***easy***

*lift* on day one." Similarly, at the May 28, 2015 Sanford C. Bernstein Strategic Decisions Conference, Defendant McCarthy confidently asserted that Frontier had the ability to "do heart and lung transplants in a weekend," stating that "we've become comfortable at doing" integrations like the CTF Flash Cut, "[a]nd we know that when we're done on the other side, we can go to market the way we want to do, we can train our people on our systems. It helps with the cultural integration and it really is a competitive advantage and how we drive value."

50.     As participants in a heavily regulated industry, Defendants also worked tirelessly during this time to gain all necessary regulatory approvals for the CTF Acquisition. In those efforts, Defendants repeated—and in some instances even stated more strenuously—the same claims. For example, in Frontier and Verizon's April 28, 2015 filing to the Federal Communications Commission ("FCC"), Frontier stated that, "Existing retail and wholesale customers will continue to receive substantially the same services." As another example, in their submission to the Public Utilities Commission of the State of California (the "CPUC") on October 5, 2015, Frontier claimed it had a "proven ability to successfully transition customers to its network, as demonstrated by the [2010 Verizon Acquisition]," and emphasized that customers "should not experience any disruption in service" as a result of the CTF Acquisition, including but not limited to disruption to all-important 911 service, by "train[ing] current Verizon employees on Frontier's systems to ensure a ***seamless transition for customers***."

51.     Finally, on June 2, 2015 and June 8, 2015, Frontier filed prospectus supplements to its April 20, 2015 registration statement and prospectus filed on Form S-3. The Offering Documents each stated again that the Company "expects that it will incur approximately $450 million of operating expenses and capital expenditures in total related to acquisition and integration activities in 2015 and 2016[.]" The Offering Documents also repeated Defendants' claims of

"Proven Integration Experience" and "Proven track record of successfully integrating acquired properties."

52.     On the strength of these and similar representations around this time, Frontier raised a total of $2.75 billion in funding for the CTF Acquisition from public investors.

### D.     Defendants Continue To Promise That The CTF Flash Cut Will Be A Seamless Transition

53.     As they had in first announcing the CTF Acquisition, Defendants continued after the Offerings, in the months leading up to the CTF Flash Cut on April 1, 2016, to reassure investors and the public at large that Defendants were on track to execute the cutover with no problems, and that customers would experience a "seamless" and "smooth" transition.

54.     During the Jefferies 2016 Media & Communications Conference on February 24, 2016—as the CTF Flash Cut grew near—Jureller made clear that Defendants meant "seamless" literally: "Obviously, we want to *make sure that people have that same experience* . . . . *So 12:01 a.m. on April 1, they're having that same experience*. They also see their same video-on-demand library, the things that they've already saved and queued up."

55.     Then, on February 29, 2016, speaking at the Morgan Stanley Technology, Media & Telecom Conference, Defendant Gianukakis stated:

> [E]verything is going quite well, so we're ready to conclude the transaction on April 1. . . . I think the thing is we've done these flash-cuts in a number of instances before. Back in 2010, we had done a flash-cut on one of the states and then we did Connecticut in 2014 as a flash-cut, and so now we're going forth with our next flash-cut. We like the flash-cut strategy. We think we really get really good visibility into the business. . . .
>
> [T]hese are systems that we know very well. We have a set of playbooks and checklist and work product that we've done in the past. And of course, in any one of these flash-cuts integrations, you learn. And we certainly have learned in our prior transactions and we've gotten better. We've become more refined, we develop our own expertise on how to implement these transactions. They're quite complex. These are not simple transactions to integrate. . . .

We've got adequate workforce, we've got our call centers fully staffed. That's one of the learnings we have on prior transactions to make sure we've got enough people answering the phone. . . . We've really overstaffed the call centers . . . and we've done a lot of practice. . . .

56.     Throughout this period, analysts credited Defendants' assurances. For example, in a February 10, 2015 report, Macquarie upgraded its recommendation for Frontier stock and raised its price target after the announcement of the CTF Acquisition, noting that the "merits of the deal" related to the elements that Defendants had emphasized: "execution" and "capex." Later, in a May 27, 2015 analyst report, Morgan Stanley "double upgrad[ed] Frontier," dismissing any concerns about the CTF Acquisition because Frontier "has a dedicated integration team in place, [and] now has more experience in system flash cuts." Then, on October 13, 2015, Cowen & Company initiated analyst coverage at "Outperform," stating that Frontier "had undergone a makeover with transformative acquisitions including an upcoming and underappreciated Verizon transaction that will . . . provide additional [free cash flow] cushion for what we view as the industry's best dividend." The Cowen analyst continued, stating that Frontier's "Track Record and Similar Platform Give Us Confidence in the Integration," and that, "[w]hile we are aware of the execution risk with any telco deal, especially one of this size and with new territories, we remain confident in Frontier's ability to achieve solid returns considering," among other things, "*Frontier's prior acquisition experience and lessons learned from the [2010 Verizon Acquisition] and the [Connecticut Acquisition]*."

E.     **Defendants Sold The "Transformational" CTF Acquisition With Lies**

57.     Lead Counsel's investigation—including interviews with numerous employees who actually worked on the 2010 Verizon Acquisition, the Connecticut Acquisition, and the CTF Acquisition—has revealed that Defendants, desperate to fund and complete the CTF Acquisition,

lied about their past successes, concealed their prior failures, misrepresented their preparations, and failed to disclose explicit warnings that Frontier was not ready for the CTF Flash Cut.

### 1. In Fact, Defendants' "Track Record" Was Disastrous

58. As discussed above, from the start, Defendants sought to overcome the market's skepticism of Frontier's ability to perform an enormous integration through a risky flash cut—the largest in history—by boasting about their "proven track record of successfully integrating acquired properties," referencing explicitly the 2010 Verizon Acquisition and the Connecticut Acquisition. (*E.g.* ¶¶32-38.) However, neither acquisition was the "successful[] integrati[on]" Defendants claimed.

### a. The 2010 Verizon Acquisition and West Virginia Flash Cut

59. Though the 2010 Verizon Acquisition involved fourteen states, only one—West Virginia—involved a flash cut and therefore offered an indication of Defendants' ability to execute the audacious CTF Flash Cut. Former employees have revealed that the West Virginia Flash Cut was far from the "successful[] integrati[on]" that Defendants claimed. In announcing the West Virginia Flash Cut, Frontier had promised that it would "accelerate broadband and accelerate products and services being delivered from us to the citizens of West Virginia," "deliver . . . a differentiated customer experience . . . 24/7 customer service," and that the seamless integration of West Virginia was "very, very important . . . our sweet spot of what we do very, very well. We have a proven track record of successfully integrating properties." Frontier estimated that the acquisition and integration of the ***entire*** 2010 Verizon Acquisition—including the West Virginia Flash Cut—would cost $126 million in CapEx and $66 million in OpEx.

60.     In reality, according to Former Employee[5] ("FE") 1, a former Frontier Sales and

Project Manager with 28 years of experience in the telecommunications industry, the West Virginia

Flash Cut was a "joke." FE-1 explained:

> I came into the Company and thought that this was the worst ran company I had
> ever seen. They had no idea what they were getting into. They weren't even able to
> start billing customers for the first six months. All of their area and general
> managers were politicians and had no experience in the industry. I was in telecom
> for twenty-eight years and it was clear no one knew who was driving the bus or
> how it was going to get where it needed to be. . . . There was no way they were
> ready. They hadn't hired people to do anything yet. From a customer service
> standpoint and sales standpoint of actually hitting the street or dealing with
> customer issues, there was no one hired until after the acquisition. I had customers
> screaming at me about where their bill was and why it was different. We had people
> scrambling to try to get stuff together so we could actually send bills to customers
> and not have them all screwed up.

FE-1 explained that Frontier's failure to acquire most of the data before the cutover caused the

billing delays, such that "they didn't even have a full list of customers for almost a year" after the

cutover. All told, FE-1 estimated that the Company lost 25% of its West Virginia customers as a

result of its failure, and that it was at least a year and a half after the flash cut before the Company

stopped losing customers month over month.[6]

61.     FE-2, who was in charge of the operations and maintenance for Frontier's North

Carolina central office equipment from 2010 to 2013, also said the West Virginia Flash Cut was

unsuccessful. A year after the flash cut, FE-2 traveled to West Virginia to check on network

installation efforts, at which time s/he learned that the technicians there could not finish orders

---

[5] This complaint refers to all former employees and contractors with the shorthand of "FE," though former Frontier contractors are not technically "former employees" of Frontier. All former employees' roles are delineated when introduced and in Appendix A.

[6] Frontier did not report much granular, state-by-state performance information. This permitted the Company largely to disguise the failure of the West Virginia Flash Cut. However, one state-specific metric that Frontier *did* report corroborates FE-1's statements that Frontier quickly lost customers in West Virginia. Specifically, between 2010 and 2011, Frontier reported a 5% net decline in its aggregate number of access lines and high-speed internet subscribers for all of West Virginia (not particularized just to the customers acquired in West Virginia Flash Cut).

(such as new installations or maintenance) on time, with delays lasting **months**. According to FE-2—who had transitioned to Frontier as part of the 2010 Verizon Acquisition—West Virginia was "definitely not a good situation," as Frontier had "turned [Verizon's] automated, modern system into a manual operation" and created "a lot of bottle necks" that at times left customers without service.

62. FE-3 was Verizon's Florida Director of Operations until the CTF Acquisition, at which time s/he became Frontier's Florida Director of Operations. FE-3 personally heard of at least one step that Frontier took to conceal the full extent of its failure in West Virginia—instructing employees to delete trouble tickets, the mechanism the Company used to track and resolve customer complaints. Specifically, in October or November 2016, FE-3 traveled to West Virginia in an effort to figure out how to improve the disastrous CTF Acquisition, and learned from a Frontier supervisor based in West Virginia that she had been instructed to delete trouble tickets after the flash cut. As explained more fully below, Frontier senior management gave these same instructions to FE-3 after the CTF Flash Cut.

63. In fact, while Defendants began 2015 by touting the West Virginia Flash Cut as part of their "proven track record of successfully integrating acquired properties," by the end of the year they sang a different tune: on December 10, 2015, Frontier entered into a **$160 million settlement** with the West Virginia Attorney General (the "WVAG Settlement"). The WVAG Settlement was the largest independently-negotiated consumer protection settlement in the state's history, and occurred after state regulators had received thousands of complaints from consumers that caused serious doubt that Frontier's "seasoned integration team" had ever actually "successfully integrat[ed]" the state. Specifically, in granting Frontier permission to acquire the West Virginia lines in 2010, the West Virginia Public Service Commission ("WVPSC") required

Frontier to expand broadband access to at least 85% of the acquired households by 2014. Yet by 2014, according to a class action complaint filed in the Circuit Court of Lincoln County, West Virginia, *Sheridan v. Citizens Telecommunications Company of West Virginia*, No. 14-C-115 (W. Va. Cir. Ct., Lincoln Cnty.), Frontier provided broadband service to only 12% of their West Virginia customers. Much of the service that Frontier ***did*** provide did not qualify as "broadband." In July 2010, right as Defendants executed the West Virginia Flash Cut, the FCC issued Order FCC 10-129 defining "broadband" speed to mean at least 4 megabits/second. Yet, the WVAG Settlement revealed that Frontier frequently delivered internet service that was only 1.5 megabits/second or even slower: for example, a December 10, 2015 article by local West Virginia news organization WSAZ quoted a Frontier customer complaining that her "broadband" service was "no faster than dial up"—typically understood to be approximately .056 megabits/second, or less than 2% the qualifying speed.

64. Thus, as part of the WVAG Settlement, the Company subsequently agreed to pay $150 million just to fulfill its integration promises—on its own ***75%*** of what Defendants had said the integration costs for ***all fourteen states*** in the 2010 Verizon Acquisition would cost.[7] Further, the WVAG Settlement required that the West Virginia Attorney General monitor Frontier's compliance with the settlement—in other words, West Virginia authorities would not again trust Frontier to deliver its integration promises. Even as recently as November 2017, the West Virginia Attorney General stated publicly that it would "continue to monitor Frontier's progress to ensure compliance with the settlement's terms for the advancement of West Virginia."

---

[7] By comparison, Defendants had initially told the market that integrating the ***entire 2010 Verizon Acquisition*** (including the 13 other states) would require only ***$126 million*** in capital expenditures, which Frontier did spend at the time.

65.     FE-1 corroborated that the WVAG Settlement related directly to Frontier's failure to integrate the West Virginia Flash Cut, explaining that Frontier's failure to migrate essential customer and infrastructure data over from Verizon during the West Virginia Flash Cut prevented the Company from beginning to build any of the promised broadband infrastructure in the state for over a year.

66.     Ultimately, by the Class Period, Frontier's widespread service failures in West Virginia were internally well-known and even accepted by Frontier's senior management. FE-3 personally heard Frontier's Southeast Area President Michael Flynn shrugging off extreme outages following the CTF Flash Cut by stating, "*So what . . . we have those in West Virginia all the time*."

### b.     The Connecticut Acquisition

67.     Frontier's Connecticut Acquisition—for which Defendants had made similar promises of a "seamless" transition as they had in West Virginia and would for the CTF Acquisition—was an even *bigger* disaster. As the *Norwalk Hour* reported on October 28, 2014, "[t]he seamless transition [in Connecticut] promised by [Frontier] . . . failed to materialize." That same day, the *New Haven Register* reported customer complaints ranging from a complete failure of fiber-optic video service to missing channels, and from complete internet outages to an inability to access certain websites. The newspaper also reported complaints from customers who lost access to Frontier's digital video recording service and its video-on-demand programming. According to the *Norwalk Hour*, within days of the flash cut, customers began inquiring into obtaining credits on their bills or refunds for lost services. Yet, even in the face of this widespread outcry, as noted above, Defendants had claimed a "99%" success rate. (¶38.)

68.     In reality, many more than 1% of Frontier's customers in Connecticut faced issues with Frontier's service in the aftermath of the Connecticut Acquisition. Indeed, the Connecticut

Public Utilities Regulatory Authority ("PURA") received more complaints about Frontier in the month after the Connecticut Acquisition than it had received over the prior year for all other cable providers in the state **combined**. On November 14, 2014, Connecticut's Attorney General and Department of Consumer Protection filed a request that PURA convene a meeting at which the public could confront Frontier's officials and provide testimony regarding their complaints, which PURA held on December 22, 2014. At that meeting, Frontier executives[8] appeared before Connecticut's disgruntled customers and, as the *New Haven Register* described, outlined "the most glaring misjudgments" that plagued the Connecticut Acquisition: (1) Frontier's training only "70 of a possible 322 AT&T customer service employees . . . on the new company's systems"; (2) "[u]nderestimating the volume of customer complaints Frontier would receive by 12 percent"; and (3) "[p]roblems with loss of video-on-demand services associated licensing agreements."

69.     Weeks after the flash cut and PURA opened its inquiry into the Connecticut Acquisition, Frontier agreed to issue $10 million in credits to its Connecticut customers, acknowledging technical "glitches" and concluding that it inadequately staffed call centers to handle customer issues.

70.     Former employees of Frontier confirm that the Connecticut Acquisition was an even greater disaster than the public understood. Several former employees described particular technical problems from the Connecticut Acquisition flash cut that plagued the Company for months and even longer. For example, FE-4, who served as a Manager of Ethernet Engineering from 2009 to 2017, described the Connecticut Acquisition as "not successful at all" and "chaos."

---

[8] The *New Haven Register* states that Kathleen Abernathy (Executive Vice President of Regulatory and Government Affairs) and Paul Quick (Senior Vice President and General Manager of Connecticut operations), as well as "other company executives," participated in the December 22, 2014 PURA meeting.

FE-4 explained that s/he had been assigned to work on the Connecticut Acquisition two months before that flash cut, yet Frontier did not have any of the required data (including network designs) that FE-4 and his/her team required. Worse still, Frontier only acquired some of that data *after* the flash cut, forcing FE-4 and his/her team members to open switches[9] and gather the rest of the data themselves. FE-4 said Frontier was plagued with issues for months after the Connecticut flash cut that s/he had to dedicate at least five of his/her engineers to spend three-to-four week *after* the acquisition extracting data just to understand the basic map of the acquired network. According to FE-5, a Senior Project Manager in IT who came to Frontier as part of the 2010 Verizon Acquisition and worked at Frontier until 2017, the Connecticut Acquisition was "a disaster," the biggest piece of which was that management had made decisions to move forward with the flash cut even knowing they would be missing functionality, including video-on-demand issues that lingered for one to two months.

71.     Ultimately, just as later emerged with the West Virginia Flash Cut, the costs of the Connecticut Acquisition far exceeded Defendants' guidance. Frontier had stated—and reaffirmed throughout 2014—that it expected to incur capital expenditures of $85 million to $105 million in 2014 related to acquisition and integration activities for the Connecticut Acquisition. Yet the Company disclosed in its 2014 Form 10-K (filed with the SEC on February 25, 2015) that its capital expenditures related to the acquisition were 10% greater than projected—and not yet done. Ultimately, as reported in the Company's 2015 Form 10-K (filed with the SEC on February 25, 2016), the Company's capital expenditures related to the Connecticut Acquisition would end up at $140 million—*at least 25% higher* than guided.

---

[9] In the telecommunications industry, a "switch" is a device that transports incoming data from an input port to the output port that will take the data to its intended destination.

72.     Frontier's churn rate—a metric that captures when consumers leave the Company—further confirmed the disaster of the Connecticut Acquisition.[10] Frontier's churn rate increased ***more than 10%*** in the first quarter alone after the Connecticut Acquisition. This increase corroborated the experience of FE-6, a Director of Commercial Marketing for the West Region from 2014 to 2016, who explained that the Connecticut Acquisition "was not successful" and in fact "killed" his/her sales numbers as complaints tied up his/her call center personnel and even overflowed into other call centers. According to FE-6, the impact of the Connecticut Acquisition was so well-known that sales teams added the designation "after CT" (meaning Connecticut) to their reports as an understood explanation for the huge discrepancy in sales numbers.

73.     Eventually, Defendants acknowledged that the Connecticut Acquisition was not the triumph they claimed. Similarly, FE-4 relayed that s/he was in a meeting shortly after announcement of the CTF Acquisition in which Senior Vice President of Network and Engineering Integration Michael Golob acknowledged that the Connecticut Acquisition was a "clusterfuck" that had "gone awry." Years later—after they had already sold investors with their "proven track record" and closed the CTF Acquisition—Defendants spoke even more freely: in a conference on May 23, 2016, Defendant McCarthy spoke negatively of the Connecticut Acquisition, acknowledging that the state had suffered outages and other issues that "impact[ed]" Frontier with

---

[10] "Churn rate," also known as a company's "rate of attrition," is the percentage of subscribers to a service who voluntarily discontinue their subscription to that service within a particular time period. For instance, if one out of every 20 subscribers to a company's service discontinued his service within a year, that provider's annual churn rate would be 5%. Churn is an especially important metric in the telecommunications industry because the number of providers in the competitive markets like the CTF regions means that customers can simply and easily transfer their subscriptions from one provider to another (though to be counted as part of a company's churn rate, the customer need only discontinue his relationship with the current provider—not necessarily transfer to another). As a result, churn is a critical measurement of a provider's customer satisfaction and its competitiveness against its peers in the market.

"attendant revenue decline" after the cutover. Similarly, FE-3 heard Frontier executives including Southeast Area President Flynn play down the disastrous CTF Flash Cut by stating, "It could be worse. At least it's not Connecticut"—an attitude that FE-3, with 18 years of experience in the telecommunications industry, found "completely unacceptable."

74.     As a result, the Defendants knew, or should have known, that Frontier was unprepared and ill-equipped to undertake a transaction and flash cut as immense as the CTF Acquisition. A former Senior Network Software Engineer, FE-7, corroborated this account, explaining that he was hired in November 2015—over a *year* after the Connecticut Acquisition— into a role working with the data that Frontier acquired from AT&T in that transaction. Although he was not hired specifically to fix continuing issues and bugs from what he described as the "immense fallout" from the acquisition, FE-7 explained that this became his most pressing responsibility at the Company because, even at that time, the data was "still a mess." Moreover, FE-7 said that these bugs continued to be unresolved as the personnel working on them had to be rerouted to the CTF Acquisition, and there were still ongoing issues when s/he left in October 2017. Accordingly, "***not a single worker in IT thought [the CTF Acquisition] was a smart idea***." Likewise, FE-8, a Senior IT Administrator at Frontier from 2013 to 2015 with responsibility for vital Frontier architecture that formed the backbone of Frontier's network and who at times directly reported to then-Chief Information Officer Steve Gable (who later became Chief Technology Officer ("CTO") and had primary responsibility for the CTF Acquisition), explained that Frontier was "not at all prepared to take on" the CTF Acquisition because they were "still fighting fires" from the Connecticut Acquisition. FE-8 stated that s/he and Frontier's other senior IT staff (with whom s/he closely worked) only learned about the CTF Acquisition in connection with its public announcement. They were shocked that Frontier management would enter into the transaction—

particularly without consulting its own senior IT staff—because, at the time of both the internal and public announcements of the CTF Acquisition, many customer issues remained from the Connecticut Acquisition, including billing conversion issues that caused former AT&T customers to be billed incorrectly or not at all.

### c.   Defendants Never Actually "Successfully Integrat[ed]" Their Prior Acquisitions

75.    Neither the West Virginia Flash Cut nor the Connecticut Acquisition were the "success[]" that Defendants claimed. Rather, Frontier's employees *and* senior leadership believed that the prior conversions fell far short of the Company's expectations. FE-4 recalled that, in a private conversation with CTO Steven Gable, Gable complained, "We have to *stop doing these acquisitions* . . . We're not getting our records up to date, and we *can't stabilize the network*." FE-4 recalled that Gable repeated this same comment in front of a crowd of Frontier engineers in Allen, Texas, and that Senior Vice President of Network and Engineering Integration Golob and Senior Vice President of Network Operations Dave Frezza voiced similar complaints at the CTF Acquisition "kickoff meeting" in early 2015. So while it is clear that Defendants knew that they had not triumphed in their past attempts at "successfully integrating acquired properties," former employees have revealed an even more fundamental flaw in Defendants' supposed "proven track record"—*Defendants had never actually integrated anything*.

76.    In reality, Frontier struggled to maintain increasingly outdated and antiquated infrastructure while running the acquired systems in parallel. FE-8, FE-7, FE-9, a Senior Technical Analyst for Commercial Business Technical Support from 2015 to 2016 and led a team concerning software development, including involving Frontier's commercial sales platform, and FE-10, Frontier's ITSM Managing Engineer from 2015 to 2016, each explained that Frontier never attempted to incorporate and bring up to modern standards the incompatible systems and

infrastructure it obtained in its serial acquisitions. Both FE-8 and FE-9 described Frontier's infrastructure as limping along and causing significant instability. FE-9 elaborated that, because Frontier grew only through acquisitions, the Company never upgraded its infrastructure—rather, it "kept duct taping and putting band-aids on their system over and over to make it work . . . It was not scalable and at some point it was going to fail." FE-8 explained that Frontier's lack of integration led to such disarray that, at one point, s/he learned about dozens of different servers in Frontier's infrastructure that nobody knew the purpose of—so they just ended up throwing them out.

77.     As another example of Frontier's lack of integration, FE-10 and FE-9 explained that the Company violated industry practice by maintaining multiple, separate databases and systems to track and manage customers acquired in past transactions. FE-9 described that this unsustainable approach aggravated another problem of Frontier's outdated systems: namely that, due to Frontier's decades-old IT infrastructure, Frontier assigned its customers unique identification codes based on the customer's home (*i.e.* landline) phone numbers rather than designated account numbers. Yet, as time went on, fewer and fewer of Frontier's customers had landline phones, but Frontier was still "beholden to this system that used landline numbers." As a result, according to FE-9, Frontier created "mock phone numbers as the basis for people's account numbers." Frontier's *ad hoc* patching together its various systems made this already error-prone manual process even more complicated, because the Company sometimes assigned different "phone numbers" to the same customer across various systems, making it difficult or impossible to track that customer or link multiple accounts together.

2. **Frontier Did Not Have A "Seasoned Integration Team"**

78.     As discussed above, Defendants repeatedly assured investors that they could accomplish the CTF Acquisition because their "seasoned integration team" had a "high level of familiarity" with Verizon's systems.

79.     In fact, there was no "seasoned integration team." In fact, former employees described significant changes in leadership for the CTF Acquisition that stripped the Company of the relevant experience it claimed to have. For example, according to Frontier's own July 13, 2016 press release, Michael Golob—then Frontier's Senior Vice President of Network and Engineering Integration—had overseen the engineering efforts for the 2010 Verizon Acquisition, which included the West Virginia Flash Cut. According to FE-11, a former Senior IT Executive who reported directly to the Senior Vice President of Network and Engineering Integration, Golob, had also played a key role in the Connecticut Acquisition. However, FE-11 revealed that Frontier *re-assigned Golob away from involvement in the CTF Acquisition* after Golob (as well as Scott Mispagel, Senior Vice President of Network Planning and Engineering) had expressed concerns about Frontier's ability to execute the CTF Flash Cut, and advocated instead that Frontier should integrate the properties more gradually by migrating one state's worth of customers per month.

80.     Not only did the Company re-assign away senior employees with critical, acquisition-related experience, the Company also elevated those *without* such experience. Specifically, FE-11 and other former employees revealed that Frontier assigned the vast majority of responsibility for the CTF Acquisition to Steve Gable, whom it promoted from Chief Information Officer to CTO in April 2015, three months after the Company announced the CTF Acquisition. Yet Gable had not been in charge of *any* prior telecommunications acquisition, much less a flash-cut conversion comparable in scale to the audacious CTF Acquisition.

81.     FE-9, a former senior technical analyst with Frontier, described any claim that the Company had proven expertise at conducting large conversions as "utter bullshit." S/he explained that the Company operated with "very little coherent thought" and unlike anything else he had seen in his/her career. As an example, FE-9 noted that the Company did not even begin to create an operative organizational chart until ***approximately October 2015***. Even then, creating a chart required the Company to assign an analyst to spend ***months*** working full-time, literally calling directors to ask who worked for them, only to produce "a map the size of two men side-to-side and it looked like a giant spider web. . . . A catastrophe." FE-9 further explained that the turnover among Frontier's staff was so severe that it effectively eliminated oversight for ***entire systems*** at the Company. FE-9 explained that, in the run-up to the CTF Acquisition, his/her team suddenly became responsible for systems that were previously owned by employees who quit or were fired and that, consequentially, no one at the Company knew or understood what the systems did. FE-9 recalled, "The only way for us to figure out what the system did was literally to unplug it and see who would complain."

82.     According to FE-8, an "awful lot" of the knowledgeable senior IT staff that Frontier ***did*** employ left in frustration within weeks after learning that, without even consulting them, the Company had agreed to the CTF Acquisition while it was still putting out fires from the Connecticut Acquisition. Further, FE-8—who had twenty years of experience in the industry—felt that the majority of people working at Frontier had neither the experience nor the desire to work in a real enterprise environment, but instead had been recruited most of its staff directly out of technical colleges. FE-8 noted that Gable, who FE-8 at times reported directly to, had limited experience in only router administration that FE-8 did not believe prepared Gable to be (at the time) Chief Operating Officer of Frontier's massive telecommunication network. FE-8 also noted

36

that, in his/her experience, even the employees Frontier took on in prior acquisitions were the "bottom of the barrel." As an example, FE-8 described the experience of a former Verizon employee whose job consisted of physically changing storage tapes but who, as part of the 2010 Verizon Acquisition, was promoted Assistant Vice President of Information Technology. As a result, FE-8 explained, the employee who previously served in the "lowest level job you can have in IT" became responsible for what FE-8 called some of the most critical parts of the enterprise.

83.     The lack of "seasoned" team members pervaded throughout. FE-4 described that when his/her supervisor—Steven Jones, Frontier's Vice President of Network Provisioning and Activation—selected five employees to lead projects related to integration of the CTF assets, FE-4 believed that s/he was the only one who had any experience from the Connecticut Acquisition. Moreover, FE-4 explained, his/her own experience with the Connecticut Acquisition was severely limited as s/he "was only on the project for two months before it went live."

84.     Finally, rather than a "seasoned integration team" of Company personnel, Frontier relied on short-term contractors to undertake much of the integration of its prior acquisitions, including the West Virginia Flash Cut and the Connecticut Acquisition—and would do so again in the CTF Acquisition. This meant that the Company did not retain the institutional knowledge gained from prior acquisitions. According to FE-5, a senior IT manager who came to Frontier as part of the 2010 Verizon Acquisition and worked at Frontier until 2017, integration work for the 2010 Verizon Acquisition, the Connecticut Acquisition, and the CTF Acquisition had all been done by "worker bees," contractors whose engagements with the Company were terminated after the prior acquisitions closed. FE-5 stated that this eroded the Company's institutional knowledge, as these contractors had the most familiarity with the acquired systems. An IT Project Management Specialist from 2015 to 2016, FE-12, likewise corroborated that the Company's extensive use of

contractors severely limited the Company's expertise. FE-12 explained that turnover among the contractors at Frontier was so high that s/he personally knew of an individual whose job consisted almost exclusively of adding and removing contractors from the Company's project management software.

85.     The lack of a "seasoned integration team" left Frontier's infrastructure and systems as in dismal condition. FE-8 stated that Frontier was "the most nightmarish mess [s/he had] ever seen" in his/her two decades of experience in the industry. Similarly, FE-9, a senior technical analyst with Frontier from 2015 to 2016, described Frontier's systems as "absolutely trash." And FE-10 described Frontier as "the most untechnological [*sic*] company" s/he had encountered in his nearly 25 years of database management, estimating that Frontier's technology was languished least 20 years behind the rest of the industry. Similarly, a former National Operations Support Manager who transitioned from Verizon as part of the CTF Acquisition, FE-13, also described Frontier's technology as "decades" behind Verizon's—even accounting for the fact that Verizon had stopped performing system enhancements on its CTF assets for the year prior to the CTF Flash Cut. These outdated, ineffective, and inefficient systems caused severe problems. FE-14, a former network engineer who transitioned from Verizon to Frontier with the CTF Acquisition, explained, for example, that Frontier was still utilizing Excel spreadsheets to track its data, which FE-14 found surprising, as the rest of the industry had discontinued the use of Excel spreadsheets for this purpose within the last decade.

### 3.     Defendants Knew That The CTF Acquisition Required More Than Double The Integration Costs Announced

86.     In first announcing the CTF Acquisition on February 5, 2015, Defendants said that they would deliver a "smooth transition" with an "estimated OpEx and CapEx integration cost of approximately $450 million in 2015/2016." However, according to FE-8, Defendants had

absolutely no basis for this estimate at this time. As FE-8 explained, an accurate cost estimate for the CTF Acquisition required that management consult with FE-8 and Frontier's other senior IT staff, because only the senior IT staff had reliable data concerning the capacity of Frontier's network and thus what hardware Frontier would need to purchase for the CTF Acquisition. However, prior to publicly announcing the CTF Acquisition and the "expected" costs, management did not contact FE-8, nor did they contact any other relevant senior IT staff (with whom FE-8 worked closely) prior to entering the CTF Acquisition agreement. FE-8 said this violated industry best practice and, consequentially, meant that any estimate was management just making costs up. FE-8 also explained that "an awful lot" of senior IT staff left in frustration after learning that, without even consulting them, the Company was embarking on yet another acquisition while it was still putting out fires from the Connecticut Acquisition.

87.     While FE-8 explained that Defendants had no basis for the "estimated" costs provided on February 5, 2015, other former employees revealed that Frontier senior management in fact learned that integrating the CTF Acquisition as promised would cost ***more than double*** this amount. In Frontier's "Case Study" of its "[s]uccessful" West Virginia Flash Cut discussed above (¶28), Frontier senior executives describe having "[c]onducted very thorough Gap Analysis to identify differences between the two environments," Verizon and Frontier. The Case Study also states that a "cost/benefit" was "conducted" for "every gap," with "some" gaps even "elevated to CEO."

88.     Consistent with the Case Study, FE-9 explained that Frontier likewise created a gap analysis for the CTF Acquisition (the "Gap Analysis"). FE-9 recalled that the Gap Analysis estimated costs of ***$900 million*** to get Frontier's systems to a satisfactory level to complete the acquisition—***double*** the $450 million in costs announced by Defendants. (¶¶42, 51.) FE-9 also

recalled that McCarthy initiated the Gap Analysis at least one year before the CTF Flash Cut but that the Company refused to follow the recommendations contained in the Gap Analysis. According to FE-9, while the Gap Analysis contained one list of what "needed to happen," senior leadership provided its own project list that contained just a fraction of the projects identified in the Gap Analysis and ultimately amounted to just $190 million of the projects identified in the Gap Analysis. FE-9 described that if s/he or a team member raised an issue to a superior about the inadequacy of the Company's project list, he or she was told, "No. This is what we are going to do." FE-9 added, "It was more dictatorial than any time I've had in the military. It was Game of Thrones run by nerds." Similarly, FE-10 recalled learning of the existence of the Gap Analysis, though s/he was never provided it. Instead, when FE-10 began working for Frontier in March 2015, s/he was provided with a task list that s/he believed was derived from the Gap Analysis, but which omitted such obvious, basic, and critical tasks that it was clear then that the CTF Flash Cut would fail.

89.     Other former employees have confirmed the existence—and senior management's awareness—of the Gap Analysis and its contents. FE-15, a senior IT professional at Frontier from 2008 to 2017, corroborated the existence of the Gap Analysis, and further recalled that it revealed ***approximately 400 gaps*** in functionality. Further, though FE-15 was not involved in the preparation of the Gap Analysis, his/her understanding was that the document provided a total estimate of close to ***$1 billion*** to fill the gaps. FE-15 further said that his understanding was that Defendant McCarthy and CTO Gable would have been involved with the Gap Analysis, including making decisions about what to address. Similarly, FE-5 recalled that, within 90 days of the CTF Acquisition being announced, the existence of a Gap Analysis showing a "significant" amount of gaps in functionality was common knowledge inside Frontier. FE-5 and FE-9 each also recalled

participating in weekly meetings concerning the Gap Analysis, beginning when the CTF Acquisition was announced to employees, and they recalled that Steve Ward attended those meetings in order to bring reports to senior leadership.

90.     Nonetheless, even after learning the true costs of providing to Verizon customers the seamless functionality that they had assured the public of, on June 2 and 8, 2015, Defendants filed prospectus supplements for the Offerings, described at ¶¶2, 51, signed by Defendants Wilderotter, McCarthy, and Jureller, which *reaffirmed* their earlier "estimate," stating that "the Company currently expects that it will incur approximately $450 million of operating expenses and capital expenditures in total related to acquisition and integration activities in 2015 and 2016 associated with the [CTF Acquisition]."

### 4.     Defendants Knew The CTF Acquisition Would Not Be A "Smooth Transition"—By Design

91.     Defendants promised the public until the eve of the Flash Cut that they would provide a "seamless" and "smooth transition"—which Jureller confirmed meant "[o]bviously, we want to make sure that people have that same experience when they turn on their set-top box, their TV . . . *[at] 12:01 a.m. on April 1, they're having that same experience*." In fact, Defendants knew well in advance of the CTF Flash Cut that Frontier could not fulfill its promise to provide full functionality to its new customers. FE-9 stated that prior to the CTF Flash Cut s/he attended status meetings on weekends, which lasted for about six hours each day, at which the heads of integration teams addressed the test cases logged in Frontier's quality management system, Quality Lifecycle Manager ("QLM"). According to FE-9, at the last of these meetings—between two to four weeks prior to the Flash Cut—the QLM queue contained "in the realm" of 200,000 outstanding tickets; *90 out of Frontier's 100 systems* were not ready for the cutover, including crucial accounting systems; fifty percent of the tracked bugs remained unresolved; and virtually

every team involved in the integration was still reporting serious issues or errors with their assigned systems. Similarly, FE-13 described that, when he transitioned to Frontier as part of the CTF Acquisition, he received a list of 250 issues that were supposed to have—but had not—been fixed prior to the cutover, including "major" issues such as the inability to provide customers with the same channel lineup as they had before the cutover.

92.     Frontier's former employees and contractors described a number of major "gaps" in functionality that were knowingly left unaddressed by the time of the CTF Flash Cut. For example, Frontier deliberately left major gaps in its database management systems before the CTF Flash Cut. FE-10 explained that s/he was hired to integrate and upgrade Frontier's database management systems—a crucial project, given that, as discussed above, the Company was utilizing multiple, disparate databases, accumulated from various acquisitions, to track and manage its customers. FE-10 further explained that upper management had provided a list of things that needed to be completed for the CTF Flash Cut to succeed on April 1, but s/he and other contractors recognized that this list was "really short of where they needed to be to actually make things work"—a large chasm existed between what the Company said they needed to have done and what actually needed to be complete. FE-10 described that s/he reported to his superior that the Company was not ready yet, but was told to "shut up" because delaying the CTF Flash Cut was not an option. Instead, the Company's plan—as defined by senior leadership and conveyed to FE-10—was to "just bring all the systems online," whether they were functional or not, and then to "juggle all the balls in the air and buy time" until the bugs could be worked out. FE-10 explained that his superiors—including Matthew Miller, Director of IT Operations—told executives what needed to happen to get the databases and systems to work, but at that point, they were "building the airplane while flying it." The Company forged ahead despite lacking fully functional processes.

93.     Further, FE-5 explained that the Company proceeded with the CTF Flash Cut despite knowing from the beginning that its video-on-demand functionality—which Defendants repeatedly identified as a key aspect to a "seamless" transition—was destined to fail because Frontier would not have access to the video content until the day of the CTF Flash Cut. According to FE-5, this created a gap in functionality that nonetheless management decided to move forward with after considering the risk/reward. FE-9 corroborated that at a preparation meeting two weeks before the CTF Flash Cut, attended by, among others, Vice Presidents and Senior Vice Presidents, as well as representatives from IT systems teams, video-on-demand was known to be a major issue. Ultimately, video-on-demand services would fail for months following the CTF Flash Cut, and FE-17, a former Director of Operations at Verizon who became Frontier's Director of Operations for Florida on the day of the CTF Flash Cut, personally heard McCarthy tell CTO Gable, "We knew [video-on-demand] was going to be bad but didn't think it was going to be this bad".

94.     In fact, even beyond known flaws, Defendants knew the CTF Acquisition could not succeed because the Company had no understanding of the network it was acquiring from Verizon. FE-10 revealed that those working on the CTF Flash Cut had explicitly warned Frontier management that the CTF Flash Cut would fail because Frontier had failed to fully map Verizon's network in advance of the cutover. "Mapping" the network referred to translating the data from Verizon's systems—a necessary step to learn fundamental information about the network, including the devices and databases on it, as well as the inter-relationships among and layers between those devices that provide network services. Here, the transformative effect of the CTF Acquisition on Frontier's network—radically expanding both its size and technical sophistication—particularly heightened the need for a complete and accurate network map. However, as FE-10 revealed, Frontier did not complete a map of the acquired network prior to the

Flash Cut, meaning that Frontier had no way of knowing what the network actually looked like and was making decisions about the flash cut largely by guessing. FE-10 said that the failure to complete a network map was so dire that s/he and others had sent memoranda to, and had meetings with, Frontier management to recommend that the Company wait another four months before the CTF Flash Cut, but management ignored these entreaties. As a result, FE-10 said that "no one internally believed the acquisition project was going to be functional."

95.     Despite myriad errors, issues, and warnings not to proceed, Defendants left themselves little choice but to close the CTF Acquisition on April 1, 2016. In the CTF Acquisition agreement, they had ***contractually agreed*** to complete the acquisition—and the largest flash cut in history—by April 5, 2016, except in certain limited circumstances.

96.     That Defendants made this astonishing commitment is not surprising, however, because several former employees—and Defendants' own words—have revealed that, despite their assurances, Defendants had ***never intended*** to provide complete functionality immediately after the CTF Flash Cut. In fact, former employees' accounts align perfectly with the Case Study's description of Defendants' true "very significant guiding principle" for conversions: "***Focus on Needs, Not Wants—DON'T address every functional gap***." Instead, "[f]ocus[] only on items affecting regulatory compliance or critical pieces of functionality. . . . [J]ust because a user had it before (e.g., system functionality), didn't mean they'd get it after cutover. Conduct[] cost/benefit on every gap." Even if Defendants believed this "guiding principle" had been effective for the predominantly rural West Virginia Flash Cut, or even the light suburban Connecticut Acquisition, attempting this approach in providing the promised "seamless" transition for the "New Frontier"— the highly competitive and technologically sophisticated urban CTF regions—was beyond reckless.

**F.     Defendants Double Down While The CTF Flash Cut Crashes And Burns**

**1.     Defendants Falsely Claim That The CTF Flash Cut Was A Success**

97.     The CTF Flash Cut occurred on April 1, 2016. Barely a month went by before, on May 3, 2016, Defendants announced the "[s]uccessful closing of [the] California, Texas, and Florida acquisition" and bragged that they had "[a]ccomplished [the] largest, most complex flash cutover in industry history." Defendants further claimed that Frontier's integration efforts were nearly complete and that Frontier would be "[r]eturning to business as usual operating rhythm over [the] coming weeks."

98.     However, Defendants' boasting glossed over the widespread coverage of service issues that consumers had faced since the CTF Flash Cut. Just as in Connecticut two years earlier, customers' complaints ranged from complete lack of video service to missing channels, from complete internet outages to an inability to access certain websites. Consumers even experienced potentially life-threatening service disruptions: just one day after Defendants touted the supposedly "successful" closing of the CTF Acquisition, on May 4, 2016, NBC's Southern California affiliate described the dire situation of an 83-year-old customer acquired by Frontier who lost her telephone service for a week after the CTF Flash Cut—preventing her from dialing 911 and disconnecting her medical alert system. Similarly, on May 9, 2016, ABC's Tampa, Florida affiliate interviewed a Frontier customer in Sarasota who had lost the landline service that she relied on to send information from her heart monitoring pacemaker to her doctor. As late as May 20, 2016, the *San Bernardino Sun* reported that, after the CTF Flash Cut, "[r]esidents have complained about being unable to call 911" and malfunctioning "home security alarms."

99.     The outcry grew so loud that even Connecticut—still suffering from its own disruptions (Section IV(E)(1)(b))—took note, with the *Stamford Advocate* reporting on the disastrous CTF Flash Cut in an April 7, 2016 article entitled "***For Frontier, lessons from***

*Connecticut didn't take*." The article took aim at Frontier's failure to correct the very errors that had plagued it in the Connecticut Acquisition:

> [S]ome of the failings the Norwalk-based giant experienced—covering everything from database omissions to overseas support staff who struggled to pronounce words in the scripts they were handed to deal with calls. . . . Coupled with the company's subsequent acknowledgement of problems linking Verizon's network to its own, it appears Frontier was little better positioned to absorb a far-flung broadband network in 2016 than it was in 2014 in taking on AT&T's operations in Connecticut, when it was hit with some of the same complaints that bedeviled it this past week.

100.    Yet, during an earnings call one month after the Flash Cut, on May 3, 2016, Defendant McCarthy assured investors that, while there had been "some negative publicity in the market . . . *[w]e now have these issues resolved and behind us*. . . . All service issues related to the conversion have been *substantially resolved*, and the level of reported outages is now trending at approximately the levels we expect for these properties." McCarthy attributed this success to Defendants having taken "lessons from previous cutovers and applied them to *strengthen our processes and minimize service interruption*," including that Defendants had "identified and addressed a number of issues with imperfect data extracts and network complexities . . . *because of our extensive preparation and the contingency procedures we had developed*." Consequentially, according to McCarthy, "there were some issues at the outset, but these affected less than 1% of our customers in total, and much less than that at any point in time."

101.    Defendants' statements drowned out the contrary news coverage, with analysts crediting Defendants' claimed success with the CTF Acquisition. For example, in a May 4, 2016 report, a J.P. Morgan analyst wrote, "Verizon deal progressing well, billing system transition complete. . . . Overall we believe the transition has gone well, and management noted that the billing systems cutover was done and working correctly. While there were hiccups in some markets *most customer issues were rectified quickly* and *the business seems to be running well*."

102.     In reality, directly contrary to Defendants' statements, former Frontier employees reveal that the Company internally understood the CTF Flash Cut was—and continued to be—a colossal disaster since the beginning. FE-4 explained that major outages across the CTF regions began at 7:00am on the day of the CTF Flash Cut, and there "were no words" to describe how bad the situation was. Similarly, FE-9 explained that on April 1, "many, many things were broken immediately." FE-4 and his/her teams spent four to five days getting switches back in service because each had to be reprovisioned entirely, meaning that large groups of customers were completely without service—particularly in the metropolitan Tampa market. FE-16, a Vice President for Corporate Marketing in the West Region from 2015 to 2017, described the CTF Flash Cut as "incredibly bad"—"especially" in California but with "major issues" in Texas and Florida as well. According to FE-16, Frontier was losing thousands upon thousands of customers after the CTF Flash Cut, as its monthly churn approached 4%: a rate so high that, for perspective, if sustained for a year would mean that ***nearly 40%*** of the Company's customers discontinued service. FE-16 described one particular problem, a vicious cycle in which customers were disconnected and reconnected—but then each subsequent update to Frontier's systems would kick that same customer off the network again. According to FE-16, this happened to hundreds of thousands of customers. Over a period of six months, FE-16 said that individual customers were kicked on and off the network up to six times, but Frontier "just kept coming back and breaking the network again and again and again and again." FE-13 similarly recalled that Frontier's own provisioning[11] system caused customers to be bumped off the network when another customer was

---

[11] "Provisioning" in telecommunications refers to enabling a customer's access to the provider's network, a complicated procedure that involves both providing physical access to the network as well as configuring the provider's network to include the customer and provide appropriate functionality.

added. FE-13 noted in particular the nightmarish impact this issue caused in high-rise buildings in places like Santa Monica, California—environments that Frontier, with its predominantly rural background, had likely never encountered.

103.     Even three weeks after the CTF Flash Cut, senior Frontier executives still described the situation as still "HOT!!!" Specifically, Lead Counsel obtained during its investigation an email dated April 21, 2016 in which Ron Poteete (Frontier Vice President – Planning & ISP Engineering) sent an email to Sanford Walker, a former senior manager with Frontier, and others with the subject line "HOT!!! FW: Help with Conversion Fall Out." This email forwarded an urgent request from Scott Mispagel (Frontier Senior Vice President, Network Planning and Engineering) for "help to dig out of the hole of trouble tickets for customers that have been taken out of service" by providing a "long" list of "[employees] that we can dedicate to helping rebuild their accounts." Moreover, Mispagel's email suggests that the request came from CTO Gable, and that Gable understood that the request would "***stop the business***" until complete.

104.     The problems were so massive that even Frontier's most senior employees and executives were tasked with resolving customer-specific issues. FE-17 recalled that, as late as August 2, 2016—***a full four months*** after the CTF Flash Cut—when s/he went out to customers' houses on service calls, s/he would call headquarters to attempt to fix a problem with code and "would end up getting transferred to [CTO] Gable." FE-17 said, "I thought it was a joke. I couldn't believe that the CTO was the one doing the coding to try to put an individual customer back into service." FE-18, who served as Frontier's Vice President of East Operations from 2010 to 2017, corroborated that Gable himself was "fixing individual customers." As another example, FE-13 described a meeting in April 2016 specifically convened for CTO Gable to instruct technicians on how to restore customer "voice over IP" service ("VOIP"), the disruption of which had been a

major issue since the cutover. At the meeting, attended by 40 technicians, CTO Gable acknowledged within five minutes of trying that, even using his higher-level access, he could not fix the VOIP issue either. According to FE-13, the VOIP disruption continued to be a major issue for three months.

105.    The fact that even FE-17, then the Director of Operations, was personally taking on service calls at customers' homes further illustrates the chaos after the CTF Flash Cut. FE-19, Frontier's former Director of Network Operations for Florida, transitioned from Verizon alongside FE-17. FE-19 recalled that s/he and FE-17, both high-level employees of Frontier, spent evenings "sitting on bridges all night testing out connections at our homes" to diagnose internet outages that lasted an entire weekend. At Verizon, FE-19 noted, outages of this nature could have been fixed in a couple of hours. At Frontier, however, the problems were so out-of-control that FE-17 explained that Frontier purchased pay-as-you-go cell phones that Frontier Southeast Region Senior Vice President Melanie Williams directed Frontier employees to give to customers whose service they could not restore. FE-17 said that s/he personally handed out up to 100 cell phones.

106.    Throughout, Frontier's senior management—including Defendant McCarthy specifically—were personally aware of the massive, immediate failures that Frontier's customers experienced following the Flash Cut. Indeed, FE-17 revealed that McCarthy and certain other executives became personally aware of the scope of the failure after he came to Florida one week after the Flash Cut. FE-17 explained that, when s/he first picked up Defendant McCarthy, McCarthy asked FE-17 how the transition was proceeding. FE-17 immediately told him that it was "horrific" and that Frontier was "hemorrhaging customers . . . there were no video assets working and [Frontier] couldn't provision digital voice for over 1,000 customers." FE-17 then personally drove McCarthy, Senior Vice President Melanie Williams, and Southeast Area President Flynn on

a tour of various sites. During that time, with McCarthy in the passenger seat, FE-17's cell phone rang constantly, as he received "at least 100" complaints about service outages. During those calls, FE-17 learned that thousands of Florida customers could not get dial tones or 911 access. FE-17 allowed Defendant McCarthy to hear some of these complaints through his/her phone's speakerphone. After McCarthy heard the depth of the problems, FE-17 listened as McCarthy called CTO Steve Gable on speakerphone and asked, "What the hell is going on?" Gable responded to McCarthy that there was "always going to be some fallout." According to FE-17, McCarthy and Gable were discussing the fact that, in the Flash Cut, Frontier irrevocably lost **5%** of the Verizon data it acquired. Consistent with what other former employees described above (¶¶91-96), FE-17 overheard McCarthy and Gable acknowledge that Defendants ***knew*** these issues would occur in advance of the CTF Flash Cut but went forward anyway: Gable stated, "We have people trying to write the code now. We didn't want to lease the software from Verizon. . . .," and McCarthy conceded, "***We knew there was going to be a problem, but we didn't know it was going to be this bad.***"

107.    In addition, Frontier senior management learned about the unfolding disaster through "war rooms" set up in the CTF regions, in which the directors, vice presidents, and other support staff of each region gathered daily to monitor the progress of the CTF Acquisition. FE-17 explained that, for the first 25 days after the Flash Cut, s/he was in the Florida war room, with colleagues including Southeast Area President Flynn, from around 3:00 AM until midnight seven days a week. FE-17 received emails from colleagues in the Texas and California war rooms, who were having the same experiences. All of the transition team leaders working out of the various war rooms filed daily reports about the status of the post-Flash Cut transition and its ongoing issues. FE-17 explained that he knew McCarthy was aware of these reports because he saw

McCarthy ask CTO Gable technical questions about how to fix specific issues mentioned in the daily reports. FE-3 said the war room in Florida lasted for up to two months after the CTF Flash Cut, and also described these daily status report calls among the "war rooms" and members of the national leadership, including at least two c-suite executives (one of which was typically CTO Gable). During those calls, according to FE-3, national leadership gave no meaningful direction, simply ignoring that Frontier's backend and systems had not been ready (*see* ¶¶91-96) and providing no solutions or extra resources. This experience led FE-3 to conclude that Frontier's business model had not equipped Frontier with the expertise to deal with all of the issues following the CTF Acquisition. FE-19 also described how s/he and other employees at the Florida "war room" manually mapped out an escalation tree of all of the incoming issues, stating that the experience "was horrible. They were not taking care of existing customers and losing them in droves. It was a nightmare. They lost a lot of business."

108.    Former employees also revealed that, even as they learned of the problems, Frontier management exhibited a cavalier indifference. For example, FE-17 also overheard another conversation between McCarthy and Gable while driving across the bridge into Tampa, Florida, during which McCarthy explicitly told Gable that "none of the video-on-demand assets were online." Gable's response—with which McCarthy was apparently content—was, "Those are first world problems. The over-the-top video stuff is nice to have, but we'll fix it when we can get it to it." FE-17 recalled that McCarthy then asked him/her to explain the extent of the video-on-demand problems, and FE-17 sent McCarthy an email attaching a photo of his/her own completely non-functioning video-on-demand service at home. FE-3 similarly recalled that, after being briefed on the failed video-on-demand, Southeast Area President Flynn responded that the Company should

"*just keep pushing . . . it doesn't matter how many customers we lose because they'll come back afterwards.*"

### 2. Defendants Misrepresent That Issues From The CTF Flash Cut Impacted Just One Percent Of Customers

109.    While Defendants' self-congratulatory press release and earnings call on May 3, 2016 concealed the full extent of the disaster of the CTF Flash Cut, the ongoing consumer outcry had been catching regulators' and lawmakers' attention. On April 25, 2016, the *Wall Street Journal* reported on the growing regulatory inquiry into the CTF Flash Cut, noting that hundreds of complaints about Frontier had already been received by the Texas Public Utility Commission and the CPUC—and didn't seem to be slowing down.

110.    On May 4, 2016, Mike Gatto, the chair of the California State Assembly's Utilities & Commerce Committee ("CAUCC"), demanded that the "alarming" "problems need to be resolved swiftly," noting that "[c]ities are unable to live stream council meetings and residents are at risk because of the inability to dial 911 in an emergency. My committee will hold hearings on the impact on our constituents and the appropriate government response if these problems persist." The CAUCC announced just days later that it would hold formal hearings concerning Frontier on May 18, 2016. As part of Lead Counsel's investigation in preparing this Complaint, Lead Counsel obtained letters sent by California cities Glendale and Thousand Oaks in connection with the CAUCC hearing. In its letter, dated May 12, 2016, the City of Glendale described "troubling problems" following the CTF Flash Cut, such as that its police department lost service (including 911 services) on May 11, 2016. Consequentially, the City of Glendale concluded that "Frontier communication was woefully unprepared for this transition and/or does not have the resources to provide a critical utility service that millions of residents and businesses depend on. *The number of scope of complaints would suggest that this is more than just the pains of transferring from*

*one carrier to another*." Likewise, the May 17, 2016 letter from City of Thousand Oaks, reported that even as of that date "many Thousand Oaks residents are ***still reporting and suffering from*** outages of phone and internet service . . . a matter of personal well-being and public safety."

111.    Likewise, on May 9, 2016, Florida Attorney General Pam Bondi wrote a damning public letter to Frontier, stating that, "[T]he transition [w]as hardly . . . a smooth one" but instead "an unacceptable situation with ***no apparent end in sight***." In her letter, Attorney General Bondi described the "steady influx of complaints" her office had received in the weeks since the CTF Flash Cut:

> Business and residential customers have complained of going days or weeks without any internet or phone service. ***We have also received several complaints from seniors who have lost essential 911 services as the result of disruptions in land line services.*** This is not acceptable.
>
> Video customers have complained of lost access to certain channels and pre-paid video on demand programming previously available to them from Verizon and have even had trouble accessing Frontier's website to set up accounts and pay bills. . . . Customer Service, we understand, has been very poor, due, among other things, to Frontier's apparent use of an overseas customer call center that presents language barriers and has resulted in long telephone wait times of as much as one or two hours. Some customers report that service appointments are being missed by Frontier's contractors or the contractors are complete no shows. And, customers seeking to cancel their Frontier services complain of stiff early termination fees that are far greater, we are told, than the fees previously charged by Verizon.

112.    To respond to the growing outcry and in an effort to conceal the failure of the CTF Flash Cut, Defendants claimed that the problems of the transition affected only ***one percent*** of customers. The April 25, 2016 *Wall Street Journal* article quoted Frontier spokesperson Peter DePasquale responding to the growing regulatory inquiry by saying that "[s]ubscribers who lost service after the switch-over represented less than 1% of its customer base[.]" During Frontier's May 3, 2016 earnings call, McCarthy repeated this claim, stating that Defendants "monitor[ed] customer call trends closely," and that "[a]s with any transfer of this scale and complexity, there were ***some issues*** at the outset, but these ***affected less than 1% of our customers in total***, and

***much less than that at any point in time***." On May 11, 2016, McCarthy stated in a signed public letter to Florida Attorney General Bondi, "Overall, less than one percent of the over 3,000,000 customers transitioned to Frontier experienced a service disruption a result of the conversion, and there was no disruption of traditional voice service or of the 911 network." Similarly, Melinda White, Frontier's West Region President, told the *Los Angeles Times* in an interview published on May 13, 2016 that "[f]ewer than 1% of Frontier's new customers have experienced problems." White repeated the claim during the May 18, 2016 CAUCC hearing.

113.    The market took note of Frontier's 1% figure. For example, Morgan Stanley noted in its report on April 29, 2016, "While there have been numerous reports of service disruptions, Frontier has commented that less than 1% of the new customers experienced lost service." Likewise, Morningstar wrote in its analyst report on May 3, 2016, "Frontier claims network outages related to the integration have affected less than 1% of the acquired customers."

114.    In truth, FE-16 reports that this "1%" figure resulted from "funny math"—that is, deliberate, misleading data manipulation—developed specifically to deflect regulators, legislators, and journalists who were seeking answers from Frontier. FE-16 participated in meetings with Frontier senior leadership including CTO Gable and West Region President White to discuss how to inflate the denominator in order to decrease the percentage of affected customers. In reality, FE-16, whose team "handled 25,000 customers . . . over a three to four month period" and who personally experienced the deluge of customer complaints firsthand, estimates that the real number of affected customers was "***somewhere between twenty and twenty-five percent.***"

115.    FE-19 also confirmed the misleading nature of the 1% figure, stating that it was based on the Company's ignoring any issues that did not completely remove a customer's services—in fact, according to FE-19, "pretty much 100% of people with television products had

some sort of problem, and many of the customers that had FiOS and digital voice had problems during cut over." FE-3 also described the 1% figure as blatantly untrue, noting that particularly in Florida, "every video customer was affected. The video-on-demand library wasn't up and running for 90 or 120 days." This lack of functionality would touch *every customer* who had purchased movies and other products, and built up a library of their own, but also anyone who wanted to watch television on demand. According to FE-3, *all video services were affected*. FE-13 similarly said that the 1% figure was "not even close," with almost 100% of FiOS customers impacted. Other former employees recalled details further contradicting the "1%" figure. For example, FE-20—a former engineering specialist at Verizon who transitioned to Frontier with the CTF Acquisition and worked in Corporate Sourcing Vendor Management from 2016 to 2017—recalled that close to 80% of the Frontier *employees* at his/her office in Florida who were Frontier customers lost their service at home, and that Frontier did not fix those issues until late June.

116.    In addition, FE-3 stated that "multiple times," senior national leadership, including Southeast Area President Flynn, instructed him/her to delete customer tickets to make it appear as though the problems were not as widespread as they were. FE-3 recalled that the first of these instructions, which became increasingly more direct and confrontational, occurred before the Florida Attorney General began its investigation into Frontier. FE-3 recalled that Flynn's instructions to delete trouble tickets so disturbed him/her that, when s/he left the Company, s/he insisted that Frontier's Human Resources department make written notes of this particular concern. This attempt by senior Frontier leadership to manipulate the number of customer complaints received further undermines the accuracy of the Company's claims that only 1% of customers were impacted.

**3.      Defendants Continue To Misrepresent That The
            CTF Flash Cut Was A Success**

117.    In the following months, Defendants begrudgingly acknowledged problems—albeit purportedly very limited in scope—stemming from the CTF Flash Cut. Even then, they continued to lie and conceal the true scope of the issue.

**a.      Data Conversion Issues**

118.    Speaking during the May 23, 2016 J.P. Morgan conference discussed above, McCarthy acknowledged that Defendants "had some imperfect data extractions from the FiOS provisioning systems in the Verizon platforms" that "translated into some very isolated impacts for customers in all three markets . . . primarily in the first several weeks after we closed." In reality, Frontier's data conversion had been so botched that, according to FE-20, the employees of the entire Florida region ***could not do their jobs for the first six months following the April 1 cutover***. Former employees described several types of critical data that Frontier failed to transfer properly during the CTF Flash Cut.

119.    First, FE-20, FE-22, a Construction Manager who transferred from Verizon and worked for Frontier for six months in 2016, and FE-23, a Senior Manager of Frontier's Circuit Coordination Center who came over from Verizon as part of the CTF Acquisition and worked at Frontier from 2016 to 2017, explained that Frontier failed to transfer various types of data concerning physical assets. Both FE-20 and FE-22 described that the Company failed to transfer over from Verizon "facility data," which was the data showing where fiber and copper lines were installed and running and which allowed technicians to determine which assets were installed at any given address. FE-22 described the "facility data" as "a living blueprint," which was "extremely necessary" to technicians' work. This data was essential because having instant

visibility to the layout of wire and other assets allowed the Company to diagnose the causes of outages and to plan repairs.

120.    In light of the lost data, both FE-20 and FE-22 described how this data transfer failure forced Frontier employees to resort to using paper files. In fact, FE-22 explained that it was only luck that his/her area even had access to the necessary paper files, as his/her former manager had been a "hoarder" and kept a storage closet stacked to the ceiling with old hard copy records. Without these records, FE-22's office would have been totally lost, but even using the paper files, his/her office slowed to a crawl as s/he and his/her team sifted through "thousands of old paper files," which frequently contained out-of-date data. With the Verizon "facility data" irreversibly gone, FE-20 and FE-22 stated that, after two months, Frontier provided its employees with access to an archaic system intended to provide similar information, but which required Frontier employees to spend a lot of time cleaning up the data—which Frontier employees were *still* doing when FE-20 left Frontier in July 2017. FE-22 explained that the Company finally outsourced the scanning of the hard copy blueprints to an offshore vendor—a process that took over *five months to complete*.

121.    Separately, FE-23, whose responsibilities at Frontier included serving as a liaison among technicians in the field, dispatchers, engineers, and circuit designers, explained that Frontier lost another significant cache of data about the physical assets it acquired from Verizon: its inventory information about central office equipment that was used to support Frontier's high-speed internet and Ethernet circuit designs. This inventory information was essential because it provided insight into the availability of the central office equipment that was required for circuits to be installed and function properly. As a result of this missing data, a technician out in the field installing a customer's service had no remote visibility into what equipment at the central office

was available for his use. Thus, the technician had to stop his job and ask an employee who was physically located in the central office to describe what equipment was available at that moment to install the customer's service. As a result, the technician had to make multiple trips to that customer until he had accurate information about what equipment was available to use for the installation. FE-23 him/herself served as a liaison among the technicians in the field, the engineers, the designers, and the dispatchers, so s/he witnessed these inefficiencies in action, and s/he stated that these problems persisted up until at least October or November 2016.

122.   Second, FE-21, FE-20, and FE-24, a Senior Auditor in Frontier's Internal Audit group from 2015 to 2017, revealed that Frontier had failed to transfer customer data correctly, which FE-20 explained meant that there was no account on record for some customers. A former Software Team Lead whose group was responsible for ensuring that Frontier's software could handle the data that was coming over from Verizon, FE-21, explained that the Frontier team responsible for mapping certain Verizon technical data (principally concerning customer configurations) into Frontier's systems had failed to finish this major task prior to the CTF Flash Cut. FE-21 explained that this failure meant that Frontier could not properly provide, or bill for, services, and also caused certain customers to lose certain functionality, such as the ability to turn off services while on vacation. FE-21 and his/her group of eight people had to spend *the next year* cleaning up the data for Frontier's systems, working over Thanksgiving and Christmas, in some instances directly contacting customers to learn what features the customer was supposed to have in order to ensure that the configuration to the network reflect that information.

123.   FE-24 described another flaw in the Company's customer data conversion: its failure to categorize customers accurately after integrating Verizon's customer data into Frontier's billing system. FE-24 explained that, rather than convert Verizon's customer data to conform to

Frontier's methodology, Frontier attempted to run Verizon's categorizations in parallel to Frontier's own—further evidence of the lack of integration of Frontier's systems with whose it acquired. However, in so doing, Frontier failed to "bucket" the customers correctly—in other words, customers were not categorized consistently across the Frontier's systems. FE-24 explained two problems that these errors caused. First, by accidentally including CTF basic cable subscribers in the premium subscriber bucket (and vice versa), Frontier billed those customers incorrectly. Second, Frontier could not accurately measure the number of customers receiving content supplied by third-party providers. Because Frontier had to pay these third-party providers based on the number of customers consuming their content, Frontier's inability to accurately track the customers consuming the content meant that Frontier was possibly understating its accounts payable liability. Indeed, Frontier's inability to measure accurately the customers caused such a discrepancy between the amounts that Frontier paid for CTF customers and what Verizon had paid for the same customers that certain third party providers—including HBO and Disney—threatened legal action and sent letters formally demanding the data.

### b.    Billing Issues

124.    During the May 23, 2016 conference discussed above (¶118), McCarthy claimed that Frontier's "billing systems" integration had "gone exceptionally well," with "all of our billing . . . out the door and . . . back on normal cycles." Similarly, at the June 2, 2016 Cowen Technology, Media & Telecom Conference just two weeks later, Gianukakis asserted that billing had been "a seamless transition for our customers."

125.    In reality, these claims were total fabrications, and former employees described a myriad of undisclosed billing issues—including simply that, according to FE-17, Frontier "couldn't generate bills for tens of thousands of customers for months after the transition." FE-17

specifically recalled learning of customers who had not received a bill in over six months. As described above, FE-21, FE-20, and FE-24 all noted that Frontier's failure to transfer customer data correctly significantly impacted Frontier's billing. (¶¶122-23.) FE-20 stated that this failure meant that Frontier did not have any account on record for some customers, causing some customers to not receive a bill for *months*, becoming "a continual topic of conversation with the customer service" at least through July 2016. In addition, FE-24 explained that Frontier's failure to convert customer data properly and "bucket" customers appropriately meant that meant that some people would get billed incorrectly.

### c. Video-on-Demand Issues

126.    Defendants had insisted that video-on-demand service was a crucial component of the CTF Acquisition: prior to the CTF Flash Cut, Defendant Jureller had assured investors that CTF customers would, on "12:01 a.m. on April 1[,] . . . see their same video-on-demand library" (¶54), and then stating in their first Form 10-Q after closing the CTF Acquisition that "the introduction of video service" was "a key strategic initiative." Yet, as described above, former employees explained that the Company moved forward *knowing* that video functionality would be seriously disrupted. (¶93.) On May 23, 2016, Defendants finally acknowledged that the transition of the Company's video-on-demand service "didn't go probably as well as we hoped," but claimed those issues related to a third-party vendor's failure to "get the titles into the library as quickly as we wanted."

127.    In reality, numerous former employees revealed that there was *no video-on-demand service whatsoever* for months. FE-17 stated that "not a single soul" in the CTF regions had access to video-on-demand until June 2016. FE-17 described how he personally sent photos of his home video-on-demand menu to Frontier engineers, including Vice President of IT Steve

Ward, demonstrating that Frontier had yet to fix the problem. FE-3 corroborated that Frontier's video-on-demand services were completely non-functioning for up to 120 days after the CTF Flash Cut. FE-19 also confirmed that it was not until June or July that Frontier was able to fix customers' video libraries and customers were able to see items for rent or purchase—including content that they had already paid for. Additionally, FE-3 recounted that, after the CTF Flash Cut, "every video customer was affected. The video-on-demand library wasn't up and running for 90 or 120 days."

128.    Even McCarthy's minimal acknowledgement of video-on-demand issues on May 23, 2016 was a lie: while McCarthy claimed that video-on-demand issues related only to a third-party vendor's failure to "get the titles into the library as quickly as we wanted," FE-17 explained that in fact the vendor did not index the video data because Frontier did not pay for its proprietary indexing software. Instead, Frontier required employees to watch the videos and manually categorize the videos for the index. As a result, FE-17 received hundreds of complaints from customers that those labels were incorrect about half the time.

### d.    Customer Service Issues

129.    On May 23, 2016, McCarthy acknowledged that the failure of the CTF Flash Cut extended beyond technical problems, but also—as the Florida Attorney General's May 9, 2016 letter noted—included widespread complaints of grossly inadequate customer service. However, McCarthy played down these complaints as occurring simply because "[c]ustomers didn't like interfacing" with "offshore" tech support.

130.    However, McCarthy's attempt to blame on overseas technical support misrepresents Defendants' own culpability in the call center problems. In advance of the CTF Acquisition, Defendants had specifically assured the market that they knew what they were doing in this respect, with Gianukakis claiming just before the CTF Flash Cut in February 2016 that

"[w]e've got our call centers fully staffed. That's one of the learnings we have on prior transactions to make sure we've got enough people answering the phone. . . . We've really overstaffed the call centers. . . ." Yet, according to FE-25, a Fiber Customer Support Analyst with the Company from 2016 to 2017, Frontier had actually **refused** to provide the staff in its offshore call centers with the permission necessary to resolve most customers' problems. FE-25 explained that Frontier had no protocol in place for assigning a customer's technical issues to the support staff equipped to solve his or her problem. Rather, Frontier randomly sent customers to any available support staff—either domestically or offshore—and the customer could only hope that the assigned staff member held the necessary permission to address his or her issue. In its letter to the CAUCC on May 17, 2016, the city of Thousand Oaks corroborated the impact of this problem on its residents, describing "often long waits when residents call Frontier customer service, long waits to get field technicians to their homes and the added frustration of having to call back to generate a new complaint ticket because Frontier phone representatives say they cannot find the original active service ticket."

131.    Further, in blaming the call centers, McCarthy also omits completely the considerable **onshore** difficulties that Frontier had after the CTF Flash Cut. According to FE-17, in the weeks after the CTF Flash Cut Frontier's customer service ticketing system was so dysfunctional that technicians were effectively blind as to where complaining customers were located or what issues they were facing. FE-17 also described that Frontier had replaced Verizon's automated bandwidth capacity monitoring with manually-updated Excel spreadsheets—an inefficient and error-prone system that caused tasks that used to take seconds to now take technicians upwards of four hours by requiring technicians to search manually through spreadsheets.

*      *      *

132.     Even as they misleadingly acknowledged—and misrepresented—certain issues, Defendants continued to assert the overall success of the CTF Acquisition in the following months. For example, at the May 23, 2016 J.P. Morgan Technology, Media & Telecom Conference, McCarthy claimed that the integration "has gone better than any one that we have done before. . . the billing systems, the ERP, payroll, HR, every part of the integration has gone exceptionally well. We have actually got through all of our billing and out the door and we're back on normal cycles with customers."

133.     By the summer of 2016, Defendants were speaking optimistically about the wrap-up of integration spending and the Company's imminent return to normal operations. During the June 2, 2016 Cowen conference described above, Gianukakis stated, "[W]e spent about $470 million of integration through our last earnings cycle. Those amounts of integration spend will tail off here in the second quarter and then *we'll fall off again dramatically again here in the third quarter as we kind of wrap up the integration spend* which includes both operating and capital spend." Then, on the Company's August 1, 2016 earnings call, McCarthy claimed the integration was "essentially done," with only "some lingering small things . . . nothing that should rise to creating the noise that we saw when we first cut over." Finally, at the September 21, 2016 Goldman Sachs Communacopia Conference, McCarthy claimed that Defendants' "normal return to operations, whether that's around service orders, trouble tickets, how customers are interacting with our centers, all that's going really, really well," with any present "challenges" having "[n]othing to do with the original issues."

134.     In reality, the CTF Acquisition continued to deteriorate as customers continued to leave Frontier in droves. As part of his/her prior position as Verizon's Director of Operations for Florida, FE-3 knew that Verizon had added approximately 5,000 *net* customers per month in the

quarter preceding the CTF Acquisition—yet Frontier's own disclosures revealed that did not go positive on its net customer adds until five months ago. Ultimately, FE-16 stated that Frontier did not stop "drowning in these complaints and issues" until April 2017—*a year after the CTF Flash Cut.*

135.     On September 12, 2016, Jureller, then Frontier's CFO, unexpectedly resigned with no reason provided. At the September 21, 2016 Goldman Sachs conference, McCarthy addressed the unexpected resignation by foreshadowing the problems soon to emerge: "I was looking for a CFO that *really was very operational*, someone who understood telecom intimately . . . and *the nitty-gritty operations of the business*."

136.     Within weeks, the public would begin to learn just how catastrophically Defendants had failed to execute on the CTF Acquisition.

## V.     THE TRUTH GRADUALLY EMERGES

### A.     Frontier's Third Quarter 2016 Results Begin To Expose The Truth About The CTF Acquisition

137.     On November 1, 2016, Defendants announced Frontier's financial results for the third quarter of 2016, which revealed that Frontier's revenue had *declined by $84 million* compared to the prior quarter, a drop driven overwhelmingly by lower revenue in the CTF regions. In a dramatic departure from the Defendants' prior upbeat assurances about the success of the CTF Acquisition, McCarthy described these results as "unacceptable," "disappointing, and illustrate how much further we have to go."

138.     Defendants also disclosed another bombshell: though prior CFO Jureller had promised on September 16, 2015 that most of Frontier's spending would be in advance of the CTF Flash Cut, Frontier's integration costs for the CTF Acquisition had now ballooned to $750 million.

Thus, just seven months after the CTF Flash Cut, the integration had already cost *66% more than* Defendants' estimate of $450 million in integration costs for 2015/2016.

139.    This revelation shocked the market, causing the price of Frontier shares to fall 13.7%, from $58.95 on November 1, 2016 to $50.85 on November 2, 2016—a loss of over $630 million in shareholder value.

140.    The news also prompted analysts to question for the first time Defendants' claims about their "seasoned integration team" and "proven integration experience." For example, during Frontier's earnings call on November 1, 2016, an analyst from UBS stated, "I believe a year ago when you closed the Connecticut deal, you had mentioned that you were taking—there was a bit of a disruption on the revenue line, and you were taking precautions not to repeat that with this acquisition. . . . [W]hat is not going as planned[?]" Likewise, Morningstar wrote in its November 2, 2016 update that Frontier "posted ugly third-quarter earnings, as the Verizon transition and integration efforts resulted in steep customer losses. . . . Net residential customer losses totaled 155,000 during the quarter, equal to 3% of the firm's customer base, *a startling number* given that the firm is now in its second quarter operating the former Verizon properties."

141.    Nonetheless, the damage would have been greater had Defendants not assured investors that, despite the bad results, Frontier had nonetheless achieved adjusted "Earnings Before Interest, Taxes, Depreciation and Amortization" ("EBITDA") of $1 billion and were "reaffirming our adjusted EBITDA guidance for the 4th quarter and outlook for 2017." In reality, however, FE-17 and FE-3 revealed that—undisclosed to the public—Defendants had by this time changed their accounting practices in a fashion that benefited their EBITDA. Specifically, senior management had issued a new instruction to staff to account for the cost of maintenance activities (such as repairing or replacing broken devices) as capital expenditures, rather than operating expenses. As

FE-3 explained, Frontier's prior accounting policy required repairs to be expensed and installations to be capitalized. FE-3 personally heard Southeast Area President Flynn relay the instruction at a meeting to capitalize *all* repairs and maintenance activities. The new directive, however, relayed by Flynn, required that "a large grouping of activities in the field that were always one hundred percent expensed" would now be logged as capital—a revision to the Company's accounting policy that Defendants did not disclose to the market or the public. FE-17, who also learned of the change, stated that no other company that s/he had worked at in his/her 23 years in the industry had done its accounting in this fashion. Because Defendants' adjusted EBITDA results netted Frontier's operating expenses but *not* its capital expenditures, Defendants' change in accounting policy caused certain expenses that had previously been included in the Company's EBITDA to now be excluded, creating the illusion of EBITDA growth and enabling higher future EBITDA than would have otherwise been reported. Defendants' failure to disclose this change violated GAAP, which requires that "once an accounting principle is adopted, it shall be used consistently in accounting for similar events and transactions" (ASC 250-10-45-11) because the use of consistent accounting principles between periods "enhances the utility of financial statements for users by facilitating analysis and understanding of comparative accounting data." (ASC 250-10-45-1.) Should a company change its accounting principles—or the use of its adopted accounting principles—it must report those changes. (ASC 250-10-45-14 - 16.) Frontier did not report this accounting change.

142.    Finally, Defendants continued to reassure investors that Frontier would be able to maintain its dividend payments notwithstanding the difficulties it was experiencing in integrating the CTF properties. Specifically, McCarthy claimed that, "on the dividend cut, we don't see that as the same risk, as others obviously factoring in. From our perspective, we have ample ability to

control our cost structure, we're executing on that even, as we speak today. . . . But more importantly, we're working to really change that revenue line item. And that's really what ultimately is going to solve that issue[.]" In fact, as described further below, Defendants' inability to stop the self-inflicted bleeding would ultimately cause Frontier to cut and then, at the end of the Class Period, eliminate altogether its dividend.

143.    Analysts credited Defendants' misrepresentations. For example, in its November 1, 2016 analyst report, Macquarie commended Frontier for being "honest about the work ahead" before writing that "management is working to exit 4Q at normal levels." Similarly, UBS noted in its November 1, 2016 report that "Mgmt expects improved 4Q metrics [in CTF] (citing an October step up comparable to all of 3Q) as the new on-shore call centers ramp and activity seasonally picks up." Cowen & Company likewise wrote in its November 2, 2016 report that "management remains confident that stabilization and near-normalcy is here and importantly remains highly confident in 2017 EBITDA guidance [and] highly committed to the dividend." In Stephens' analyst report that day, they reiterated their "Overweight" rating, writing that they expected "that CTF subscriptions will return to normal levels by the end of 1Q17." Finally, in their November 7, 2016 report, Gabelli & Company wrote that, while they "do not take FTR's current challenges lightly," they nonetheless "expect Frontier's subscriber trends to normalize [and] FTR's common dividend payout ratio to remain very manageable[.]"

**B.     Defendants Blame Undisclosed "Clean Up" Of "Non-Paying Accounts" From The CTF Acquisition As Frontier's Year-End 2016 Results Disappoint**

144.    On February 27, 2017, Frontier announced its fourth quarter and full year 2016 results, which revealed that Defendants' promised improvement had failed to materialize. Instead, Frontier failed to meet its EBITDA guidance as revenue had continued to plummet, decreasing ***more than another $100 million*** versus the prior quarter. Revenue from the CTF operations in

particular fell by $84 million alone. Frontier also revealed an astonishing loss of 175,000 total subscribers to Frontier's broadband and FiOS video services.

145.    To the surprise of investors, McCarthy blamed these disastrous results in large part on supposed "non-paying" accounts that Frontier inherited from Verizon in the CTF Acquisition. According to Defendants, $45 million of the $100 million revenue decline during the fourth quarter was attributable to a purported "account cleanup" during the fourth quarter. McCarthy elaborated on this "cleanup" during an earnings call that day, claiming that Verizon had supposedly "stopped treatment of overdue accounts" 60 days prior to the CTF Flash Cut by not pursuing collections, disconnecting the accounts altogether, or taking other efforts. In other words, by late February 2017, Defendants claimed that $45 million of Frontier's decline in revenue resulted not from new customer departures due to their failure to execute the CTF Acquisition, but instead came from a mess that Frontier inherited from Verizon that required a one-time, short-term clean-up. The revelation of an enormous "non-paying account" issue that Frontier had purportedly began addressing on July 20, 2016—and which McBride claimed "clearly dr[ove]" Frontier's failure to meet its EBITDA guidance—immediately surprised the market. A J.P. Morgan analyst noted incredulously during the Company's February 27, 2017 earnings call that Defendants "gave the $1 billion in 4Q [EBITDA] guidance in November. Was the account cleanup harder than you expected? Were there more non-pays than you thought? I would've thought [it] would be a fairly clear thing you could see happening within the business that people weren't paying you?"

146.    By the close of the following business day, the price for Frontier shares had fallen nearly 11%, from $49.35 on February 27, 2017 to $43.95 on February 28, 2017. In its February 27, 2017 report, an analyst at Deutsche Bank noted that "[s]hare loss remains elevated owing to integration issues[.]"

147.    In fact, former employees dispute the existence of an enormous number of "non-paying accounts" inherited from Verizon. FE-3 revealed that Frontier's explanation that Verizon was purposefully not disconnecting non-paying accounts prior to the CTF Flash Cut was a "provable lie." FE-3 stated that as part of his/her responsibilities as Verizon's Florida Director of Operations prior to the CTF Acquisition, s/he reviewed Verizon's reports on customer disconnects daily. Had Verizon staff been ordered to stop disconnecting accounts, FE-3 explained that s/he would have immediately seen this order reflected in those reports—and even identified the day or week that the order was given. Instead, FE-3 saw no major changes on any report up to March 31, 2016—*the eve of the CTF Flash Cut*. To the contrary, according to FE-3, Verizon had actually made a significant point to start cleaning up non-paying customer accounts a full year ahead of the CTF Acquisition.

148.    Defendants themselves corroborated FE-3' description, having repeatedly boasted that Verizon was maintaining the CTF assets up to the close. For example, at the September 16, 2015 Goldman Sachs Communacopia Conference, Defendant Jureller stated that, because "Verizon earns all of the economics out of those properties up until the day we close," Verizon would "continue to maximize value in those properties." Jureller continued, raving that Verizon is "good business partners. They are good transaction partners of ours, and they have been doing exactly as they said they were going to do." Jureller never mentioned—nor did any Defendant—that Verizon would be passing on a time-bomb in deadbeat accounts that would cause dozens of millions of dollars in revenue decline.

149.    Even if some or all of Defendants' staggering revenue losses related to supposed "non-paying accounts," analysts rightfully suspected that those losses were caused by Defendants' flawed execution of the CTF Acquisition—not by Verizon. For example, in its February 27, 2017

report, Morningstar viewed the nonpaying accounts issue very critically, writing: "Frontier reported disappointing fourth-quarter results as its broadband customer base continues to shrink at a rapid pace, although management attributed some lost customers to management's initiatives to close again or overdue accounts . . . We believe a good portion of [lost] accounts are organic loss to competitors instead of idle accounts. ***Even if we take management's explanations at face value***, this would mean that the firm overpaid for profitless accounts." Consequentially, Morningstar reduced its fair value estimate of Frontier shares by almost 10% and raised its uncertainty rating from "high" to "very high."

150.    In fact, according to FE-3, the "worst case scenario" in industry practice is to disconnect non-paying accounts after four months—typically, the limit that a Company would want to keep a new customer on after not paying his or her bill is sixty days. FE-3 explained that Verizon had controls in place existed to ensure that non-paying customers did not stay on the network for longer than sixty days, and these controls were in place when Frontier acquired Verizon's business. Thus, even if Frontier had received non-paying accounts from Verizon on April 1, 2016—the date of the CTF Flash Cut—Frontier should have purged those accounts from Frontier's systems by August 1, 2016. Yet, McCarthy acknowledged that Frontier ***itself*** ignored these overdue accounts for ***months*** after the CTF Flash Cut, stating that Defendants "continued non-treatment of these accounts through July 20, as we worked through the cut over," and only began to "disconnect[] non-paying accounts ***at the end of August***."

151.    Nonetheless, the market took comfort in Defendants' false and misleading statements, preventing the stock from an even greater fall. For example, in its February 28, 2017 report, Cowen & Company described "another messy quarter as the company clearly has trouble shaking off Verizon integration issues," with the "latest issue stem[ming] from the realization of

outsized delinquent customers within CTF," but nonetheless "management insists that after 1Q17, the delinquent customer issue will be behind the company, noted CTF net adds trends are improving, the commercial business is primed for growth, and insists that its thesis is merely delayed and not impaired." Similarly, in its February 28, 2017 report, Jefferies lowered its price target after noting that Frontier's "[r]esults disappointed as an on-going account clean-up contributed to steeper revenue declines and an EBITDA shortfall," but that "they see light beyond a lumpy 1Q with improving trends and dividend support."

### C.   Ongoing Declines In CTF Operations Force Frontier To Cut Its Prized Dividend

152.   On May 2, 2017, Frontier disclosed its results for the first quarter of 2017. Despite Defendants' prior assurances that the CTF Acquisition performance was improving, CTF operations revenue fell *another* $53 million quarter-over-quarter, and Defendants yet again failed to deliver their projected EBITDA.

153.   Defendants also disclosed that $11 million of the revenue decline related directly to the surprise "cleanup of CTF nonpaying accounts" that Defendants had disclosed for the first time in February 2017 (¶145), but also disclosed another surprise: an additional $5 million revenue loss related to "onetime impact related to automating the nonpay disconnect process," an "enhancement" Defendant McCarthy claimed "was developed for the CTF properties."

154.   Defendants also disclosed that Frontier was slashing its prized dividend by *62%*. During the earnings call, Defendant McCarthy explained that this decision was driven by Defendants' inability to deliver their projected EBITDA. Given that, in Defendants' words, Frontier's "legacy [operation] is fairly stable" and maybe even "slightly increasing," the dividend cut was a direct consequence of the CTF integration failure.

155.    These developments shocked the market. By the end of the following business day, Frontier's share price had fallen another 16.6%, from $28.95 on May 2, 2017 to $24.15 on May 3, 2017 as a result of the news.

156.    Analysts directly linked the dividend cut to Defendants' inability to integrate the CTF Acquisition as promised. In its report issued that day, UBS downgraded the stock to "Neutral" from "Buy," writing that, though UBS "had previously believed that [management] had time to execute on its turnaround strategy," it was "stepping to the sidelines" given that Frontier's "operational challenges have been worse than expected." Likewise, in its May 3, 2017 report, Cowen & Company downgraded the stock to "Market Perform" from "Outperform," noting that "Frontier has endured a series of missteps with the CTF acquisition since closing in April of 2016. Whether it be technical issues from the Flash Cut, the VOD library, inferior offshore care reps, slow ramp up of marketing, and last quarter's issues around delinquent / non-paying accounts[.]" Similarly, Deutsche Bank wrote that it was "difficult to find the silver lining from 1Q results," and explicitly rejected Defendants' other excuses for the poor results, stating that "we also believe integration-related issues . . . played a role." Finally, after initially suspending its coverage in response to the news, Morningstar relaunched its coverage on May 16, 2017, giving Frontier an "extreme fair value uncertainty rating" and concluding that Frontier's "acquisition strategy may have backfired in 2016, as the firm paid $10 billion for Verizon's Fios fiber assets but suffered large customer losses thereafter due to poor integration and customer anger from service outages and subpar customer service."

157.    Nonetheless, this news would have further driven the price down had Defendants not continued to deceive investors with promises that CTF "stabilization" was just ahead. For example, discussing elevated CTF-churn, Defendant McCarthy claimed that Defendants "still *feel*

*good* about stabilization" and played down the importance of the metric altogether by claiming that "not all churn is really bad. . . . [W]e naturally lose some customers."

158.    Analysts credited Defendants' assurances that the Company had corrected course. In a May 2, 2017 report, Macquarie concluded that Frontier had laid out a viable plan to "help drive the company to . . . stabilization" and that it "expect[s] Frontier will continue to trim its sub losses and see continued improvement." Within two months, Macquarie had become even more confident, writing on July 13, 2017, "We believe Frontier is a fundamental turnaround and deleveraging story. Much of the integration noise is now behind us, and the company has made major investments and key hires, setting up for growth in '18/'19. The strategy is laid out and recent steps look promising, although we await execution."

   **D.    Defendants Unexpectedly Announce That
          Frontier Will Miss Its EBITDA Target**

159.    On October 31, 2017, Defendants revealed yet another disappointing quarter of results, but also announced that Frontier would miss Defendants' 2017 EBITDA guidance. Defendants attributed this miss to slower than expected revenue stabilization, and now estimated that Defendants would hit their EBITDA "goal" sometime "beyond Q4" 2017.

160.    This news shocked investors because Defendants had consistently reaffirmed their EBITDA expectations throughout 2017—including during their prior period earnings call on August 1, 2017, when Defendant McCarthy boasted that Defendants were "well positioned to achieve our $3.8 billion adjusted EBITDA run rate objective." Yet now, during an October 31, 2017 earnings call to discuss the third quarter results, Defendant McBride candidly admitted that Defendants had *already known* during that August call that Frontier would not meet EBITDA expectations when he admonished a surprised analyst, "[D]on't forget, on the last call, we were

already kind of guiding people to the lower end of our range to begin with and our EBITDA -- our EBITDA shortfall[.]"

161.    The news stunned the market, causing Frontier's share price to fall from $12.11 on October 31, 2017, to $8.86 at the close on November 1, 2017—a decline of nearly 27%, on exceptionally heavy trading volume.

162.    Analysts directly connected these developments to Defendants' inability to stabilize the CTF Acquisition. In its November 1, 2017 report, Cowen and Company wrote that the Company's reduced guidance was "drive[n]" by "revenue erosion" and Frontier's "inability to stabilize revenue as quickly as hoped[.]" Similarly, in its report that same day, J.P. Morgan downgraded Frontier from "Neutral" to "Underweight," noting that "we believe what matters is the pace of business improvement and cost cutting, the results of which have missed forecasts all year." Similarly, Wells Fargo wrote that Frontier's "stock reacted likely to the weak print and outlook," and lowered its price target to $9.00 from $14.50. Likewise, in its November 9, 2017 report, Gabelli & Company downgraded Frontier to "Hold" because they were "increasingly concerned that customer and revenue trends are not improving fast enough for FTR to stabilize the business." This downgrade was particularly noteworthy given that the analyst had, just prior to the Company's earnings release, reiterated its "Buy" recommendation in light of Defendants' earlier assurances that the business was stabilizing.

163.    The decline in Frontier's share price would have been worse, however, had Defendants not disguised the true depth of the Company's failure through an accounting sleight of hand. Despite scaling back their EBITDA expectations, Defendants nonetheless reported that—as management had guided—Frontier's 3Q 2017 adjusted EBITDA had *finally* improved after quarter-after-quarter declines since the close of the CTF Acquisition. However, a closer

examination revealed that Defendants had unexpectedly adopted a ***new*** EBITDA methodology, which—as Morgan Stanley noted in its November 1, 2017 report—"diminishes comparability" with prior EBITDA statements.

### E. Defendants' Failed CTF Acquisition Forces Frontier To Cancel Its Prized Dividend Altogether

164.     After the close of the market on February 27, 2018, in a press release announcing Frontier's fourth quarter and full year 2017 results, Defendants announced that—nearly two years after Defendants had first declared the CTF Acquisition a "success" (¶¶97-101, 112, 132-33)— Frontier finally considered the integration of the CTF properties "complete." Accordingly, investors saw for the first time the final tally for the integration costs: a jaw-dropping ***$962 million***, more than ***double*** what the Company had claimed that its "seasoned integration team" would deliver. (¶¶42, 51.) Notably, the number was remarkably close to the estimate in the Gap Analysis described by former employees. (¶89.)

165.     In addition, the financial results revealed that the Company's churn in 2017 had increased nearly 10%, from 1.98% in 2016 to 2.17% in 2017, making clear that Defendants still had not stopped the bleeding from the CTF Acquisition.

166.     Finally, the press release revealed that ***Frontier was cancelling completely its prized dividend***. The market immediately understood that this news related directly to the CTF Acquisition—that, while Defendants had sold the CTF Acquisition to investors by claiming that the transaction would "sustain [Frontier's] current dividend" because of Defendants' "proven track record of successfully integrating acquired properties," Frontier was now cancelling its dividend to accelerate repayment on the astronomical debt it had incurred in connection with its "proven track record," including the $7 billion in debt that Frontier acquired for the CTF Acquisition ***alone***. For example, on February 28, 2018, the *Wall Street Journal* wrote that Frontier had "bet big on

landlines in recent years [and] shed nearly a quarter of its market value Wednesday after suspending its dividend to help it pay down debt." The paper continued, stating that Frontier had "saddled itself with about $17 billion in debt by buying networks in different markets from Verizon Communications Inc. and AT&T Inc. Frontier expected to generate steady revenue from residential internet and video services as wireless use proliferated. Instead the company has been shedding customers and scrambling to meet its debt obligations." Likewise, in its February 28, 2018 report, Jefferies downgraded Frontier from "Buy" to "Hold," writing that it "had recommended shares of FTR given its sizable dividend yield and relatively low payout ratio. However, a bloated balance sheet proved too much to overcome as EBITDA declines continued to push leverage even higher. With the dividend now suspended, we can no longer recommended shares of FTR. . . ."

167.    By the close of the following business day, on exceptionally heavy trading volume, Frontier shares had fallen to $7.03—a decline of ***nearly 24%*** from the prior day's close and ***nearly 94%*** since the start of the Class Period.

## VI.    POST CLASS PERIOD EVENTS

168.    On March 27, 2018, Frontier filed its Proxy Statement Pursuant to Section 14(a) of the Exchange Act, in which the Company disclosed that it paid no annual cash bonuses to its senior executives—including Defendants McCarthy and McBride, as well as CTO Gable—in light of the Company's 2017 performance and its resulting stock price decline. In particular, the Company noted that "performance issues in CTF . . . negatively affected revenue, profitability, and our stock price."

169.    Finally, on April 4, 2018, merger news outlet CTFN reported that Frontier had retained the financial advisory firm Evercore in an effort to ***sell*** certain of the networks and customer lists Frontier had acquired in the CTF Acquisition and the Connecticut Acquisition, including specifically the prized FiOS network in Tampa, Florida. In other words, Defendants were

now putting in the rear-view mirror the same assets that they had once sold investors would make the "New Frontier."

## VII.   THE FRONTIER DEFENDANTS' FALSE AND MISLEADING STATEMENTS

170.   As summarized below, throughout the Class Period, the Frontier Defendants each made materially false and misleading statements and omissions concerning, among other things: (i) the Company's purported "proven track record" of acquisitions (Sections IV(B), IV(E)(1)); (ii) the existence of a "seasoned integration team" (Sections IV(B), IV(E)(2)); (iii) the estimated integration costs for the CTF Acquisition (Sections IV(B), IV(C), IV(E)(3)); (iv) the Company's ability and/or intent to deliver a "seamless transition" (Sections IV(D), IV(E)(4)); (v) the success of the CTF Acquisition (Sections IV(F)(1), (3)); (vi) claims that only 1% of customers were affected by the CTF Flash Cut (Section IV(F)(2)); (vii) that Verizon had provided a significant number of "non-paying accounts" in the CTF Acquisition (Section V(B)); and (viii) that Frontier's financial statements were prepared in accordance with Generally Accepted Accounting Principles (Section V(A)).

### A.   Defendants Claim That Frontier Has A "Proven Track Record" Of Completing Flash Cuts

171.   Throughout the Class Period, Defendants repeatedly touted their "proven track record" and "experience" in integrating acquisitions in order to sell the CTF Acquisition to the public. As discussed above (Sections IV(B), IV(E)(1)), these statements were materially false and misleading because neither of Frontier's previous flash cuts, in West Virginia in 2010 and in Connecticut in 2014, was the successful integration that Frontier claimed.

172.   On February 5, 2015, Defendants filed a Form 8-K with the SEC, which contained a press release announcing the CTF Acquisition. In the press release, Defendant Wilderotter stated that the acquisition "leverages our proven skills and established track record from previous

integrations." The Form 8-K also contained an investor presentation that discussed Frontier's "Proven Integration Experience" and "proven track record of successfully integrating acquired properties":



173.    On February 5, 2015, Defendants Wilderotter and McCarthy held a conference call with investors to discuss the CTF Acquisition. On that call, Defendant Wilderotter stated:

> Because of the size of this transaction and ***our integration experience***, there is even more potential to achieve even greater economies of scale. We have a ***proven track record*** of achieving and exceeding acquisition cost savings, and we are confident in our ability to realize them in this transaction as well. . . . We will have ***the experience to create a smooth transition for customers with no disruption to service***. We will flash-cut to Frontier's systems at closing, just as we did with Connecticut last quarter and with West Virginia assets when we converted from Verizon systems in 2010. . . .

174.    On March 3, 2015, Defendant Jureller appeared at the Morgan Stanley Technology, Media & Telecom Conference and stated, "[W]e're the only ones that have successfully done carve-outs and integrated from both Verizon and from AT&T and it's no easy feat to do. These are

hard things to do [and] Connecticut . . . exceeded our expectations." Jureller further stated, "We

are the only company out there today that has successfully bought in integrated properties from

both of those carriers [AT&T and Verizon]."

175.   On March 9, 2015, Defendant Jureller appeared at the Deutsche Bank Media,

Internet and Telecom Conference and stated:

> The actual execution of what we've been able to do in Connecticut also gave us
> confidence around the ability to handle something of this magnitude as well. . . .
>
> We're the only ones that have converted and successfully integrated from both
> AT&T and Verizon in the past. These systems, these states are coming up with the
> old GTE systems where we've integrated from before. We've integrated FiOS
> already. So we've got a track record from an engineering, IT, video perspective that
> will allow us to be really successful this time around.
>
> [W]e bring the experience of having done this before, having done GTE
> conversions before, having done FiOS before. So we know exactly what we need
> to do. We have the playbook written. It is a lift. We've got three separate states that
> we're going to flash cut at one time, so knowing the value of the flash cut and
> executing on that is going to be really important.

176.   On March 11, 2015, Defendant Gianukakis appeared at the Goldman Sachs

Leveraged Finance Conference and stated:

> We're also conducting a flash-cut, as I said. So that flash-cut again enables us to
> get into those businesses early, get through the transition aspects, the billing cycles,
> and get that part of the transaction done. . . .
>
> And the other ones took quite a bit of time for us to conduct all those transitions
> before we really felt we had complete operational control of those assets. Whereas
> in this situation, we're doing flash-cuts on all three states. We've become much
> more comfortable with the flash-cut. Of course, we did it with Connecticut as well,
> so we have the playbooks.

177.   On May 28, 2015, Defendant McCarthy appeared at the Sanford C. Bernstein

Strategic Decisions Conference where he stated that Frontier had the ability to "do heart and lung

transplants in a weekend," and that "we've become at comfortable doing" integrations like the

CTF Acquisition. He stated further, "[W]e know that when we're done on the other side, we can

go to market the way we want to do, we can train our people on our systems. It helps with the cultural integration and *it really is a competitive advantage and how we drive value*."

178.    On June 2, 2015, and again on June 8, 2015, Frontier filed preliminary prospectus supplements for the Offerings, signed by Defendants Wilderotter, McCarthy, and Jureller, which incorporated by reference—and therefore stated again—the press release and investor presentation included in Frontier's Form 8-K filed on February 5, 2015.

179.    On October 5, 2015, the Company filed its Opening Brief before the Public Utilities Commission of the State of California. In this filing, Defendants stated that Frontier had a "proven ability to successfully transition customers to its network, as demonstrated by the 2010 acquisition of certain Verizon operations," and it specified that no customers would face service disruptions— including to 911 service—as a result of the CTF Acquisition.

180.    The Frontier Defendants' statements in ¶¶172-79 above were materially false and misleading because they omitted the material fact that, as discussed above (Sections IV(B), IV(E)(1)), Frontier's track record of performing flash cuts was, in fact, disastrous. Neither of Frontier's previous flash cuts, in West Virginia and in Connecticut, were the successful integrations that the Company claimed. In West Virginia, several years after touting the success of the 2010 Verizon Acquisition, Defendants entered into the WVAG Settlement, discussed above (Section IV(E)(1)(a)), which required Frontier to invest $150 million in capital expenditures to upgrade its infrastructure in West Virginia—indicating that the 2010 Verizon Acquisition was not the triumph that Defendants claimed. Additionally, the WVAG Settlement required the West Virginia Attorney General to monitor Frontier's compliance, contradicting Frontier's claims about its "proven track record of successfully integrating acquired properties." Frontier's senior management was aware of and even admitted the Company's failure to integrate West Virginia successfully. FE-3 reported

that s/he personally heard Frontier's Southeast Area President Flynn minimizing later outages by comparing them to those in West Virginia, stating, "So what . . . we have those in West Virginia all the time."

181.    The Connecticut Acquisition was an even less successful integration than West Virginia. News reports revealed that customers in the state began complaining almost immediately about service outages ranging from a complete failure of fiber-optic video service to missing channels, and from complete internet outages to an inability to access certain websites. Customers lost access to Frontier's digital video recording service and its video-on-demand programming and many began inquiring into obtaining credits on their bills or refunds for lost services within days after the Connecticut flash cut. The Connecticut PURA received more complaints about Frontier in the month after the Connecticut Acquisition than it had received over the prior year for all other cable providers in the state combined. Connecticut's Attorney General and Department of Consumer Protection requested that PURA convene a meeting at which the public could confront Frontier's officials and provide testimony regarding their complaints. At that meeting, held two months after the Connecticut Acquisition, Frontier officials outlined the "misjudgments" that resulted in an unsuccessful transition: (1) training too few acquired employees onto Frontier's systems; (2) underestimating the number of customer complaints Frontier would receive; and (3) failing to obtain the licenses required to continue providing customers with AT&T's full Video On-Demand service. Frontier issued $10 million in credits to its Connecticut customers, acknowledging that technical glitches plagued the Connecticut Acquisition and that it had not adequately staffed call centers to handle customer issues. As discussed above (Section IV(E)(1)(b)), former employees of Frontier confirm that the Connecticut Acquisition was a widespread disaster, describing problems—including crippling data loss, significant customer loss,

and skyrocketing integration costs—that rattled the Company for months following the flash cut. Former employees reported that, in the run-up to the Company's next major undertaking, the CTF Acquisition, Frontier's senior leadership including Senior Vice President of Network and Engineering Integration Golob acknowledged that the Connecticut Acquisition had been a "clusterfuck" that had "gone awry." Years later—and after they had already sold investors with their "proven track record"—Defendant McCarthy acknowledged that Connecticut had suffered outages and other issues that "impact[ed]" Frontier with "attendant revenue decline."

182.    Finally, former employees reported that Frontier's own systems and infrastructure—antiquated, outdated, inefficient, and unsupported—contradicted the Company's statements that it had a "proven track record of successfully integrating acquired properties." Instead, the Company's reliance on outdated, antiquated systems prevented the Company from successfully integrating its acquisitions—or indeed integrating anything at all. FE-8, FE-9, and FE-10 described Frontier's systems as "nightmarish," "absolutely trash," and "untechnological," respectively. FE-13 noted that Frontier's technology lagged "decades" behind the rest of the industry. FE-14 explained the problems stemming from Frontier's "surprising" use of Excel spreadsheets to track data—a practice other telecommunications companies had discontinued more than a decade earlier in favor of automation.  FE-9 explained that Frontier maintained multiple, separate databases and systems to manage the customers it had acquired in previous transactions, and Frontier never actively upgraded its infrastructure—rather, it just "limped along" from acquisition to acquisition with "band-aids" over it. Defendants' statements about Frontier's "proven track record" of successfully integrating previous acquisitions were materially false and misleading because they omitted the material facts contradicting these statements.

**B.      Defendants Claim That A "Seasoned Integration Team"
Is Leading the CTF Acquisition**

183.    Throughout the Class Period, Defendants repeatedly touted the "seasoned integration team" that would be leading the Company through the CTF Acquisition. As discussed above (Sections IV(B), IV(E)(2)), these statements were materially false and misleading because no such team existed.

184.    On February 5, 2015, Defendants filed a Form 8-K with the SEC, which contained a press release announcing the CTF Acquisition. In the press release, Wilderotter stated, "Frontier's seasoned integration team will convert California, Florida and Texas properties onto Frontier's systems at close," and McCarthy stated, "We have . . . a high level of familiarity with the systems underlying these properties." The February 5, 2015 Form 8-K also contained an investor presentation discussing Defendants' "seasoned integration team."

185.    On February 5, 2015, Defendants Wilderotter and McCarthy held a conference call with investors to discuss the CTF Acquisition. On that call, Defendant Wilderotter stated that Frontier has a "an experienced and talented integration team that is ready to dive into this, that gives us the luxury of having management remain focused on running our existing business today with no interruption to our current business operations." Defendant Wilderotter further stated:

> One other thing to add to this list is we just finished a very large conversion with AT&T in Connecticut. ***We have a full blown team of conversion and integration experts in our Company that are simply now going to move over to this project.*** So we don't have to staff up, and we can keep our basic business going with our leaders that run the business from an operating perspective on a day-to-day basis, which was different when we did the first Verizon acquisition because we had to staff up and really build a conversion and integration team then, we don't have to do that with this transaction.

186.    On March 11, 2015, Defendant Gianukakis appeared at the Goldman Sachs Leveraged Finance Conference where he stated:

We're very comfortable and operationally, we have the teams ready to go. In fact, our operating teams recently completed the Connecticut transaction. They're ready to be mobilized and convert their efforts onto integrating these next three states. So we have the teams ready to go.

They're familiar with what they have to do. These are GTE properties and so we're familiar with the GTE platforms from our prior work. So we're very comfortable with the asset that we're getting into here -- expanded on that.

187.   On June 2, 2015, and again on June 8, 2015, Frontier filed preliminary prospectus supplements for the Offerings, signed by Defendants Wilderotter, McCarthy, and Jureller, which incorporated by reference—and therefore stated again—the press release and investor presentation included in Frontier's Form 8-K filed on February 5, 2015.

188.   The Frontier Defendants' statements in ¶¶184-87 above were materially false and misleading because they omitted the material fact that, as discussed above (Section IV(E)(2)), Frontier did not have a "seasoned integration team" leading the preparations for or implementing the CTF Acquisition. FE-11 reported that a significant change in leadership at Frontier between the Connecticut Acquisition and the CTF Acquisition contradicted Defendants' claims that a "seasoned integration team" was at the forefront of planning and preparation for the CTF Acquisition. While Senior Vice President of Network and Engineering Integration Michael Golob and Senior Vice President of Network Planning and Engineering Scott Mispagel oversaw the Connecticut Acquisition, Frontier appointed CTO Steve Gable to oversee the CTF Acquisition— even though Gable had never managed *any* prior acquisition, much less one as large and complicated as the CTF Acquisition. FE-5 explained that Frontier's reliance on contractors—or "worker bees"—eroded institutional knowledge. According to FE-8, an "awful lot" of the knowledgeable senior IT staff, in virtually every of Frontier's IT areas, that Frontier *did* employ left in frustration within weeks after learning that, without even consulting them, the Company had agreed to the CTF Acquisition even as those employees were still putting out fires from the

Connecticut Acquisition. As a result, Frontier was left with a team undertaking the CTF Acquisition that had no meaningful familiarity with or technical expertise in the procedures involved in a flash cut. Defendants' statements about Frontier's "seasoned integration team" leading the CTF Acquisition were materially false and misleading because they omitted the material facts contradicting these statements.

### C.   Defendants Claim That The Estimated Integration Costs Of The CTF Acquisition Will Be $450 Million

189.    Throughout the Class Period, Defendants repeatedly provided a baseless estimate of $450 million for the total cost of integration the CTF Acquisition. As discussed above (Section IV(E)(3)), these statements were materially false and misleading because Defendants had no basis for offering this estimate, having conducted only three months of due diligence before entering into the transaction underlying the CTF Acquisition, and in fact Defendants knew that integrating the CTF Acquisition would cost more than double the estimate provided.

190.    On February 5, 2015, Frontier filed a Form 8-K with the SEC, in which Frontier stated that it "estimated OpEx and CapEx integration cost of approximately $450 million in 2015/2016" for the CTF Acquisition.

191.    On February 5, 2015, Defendants held a conference call for investors, during which McCarthy stated: "We are estimating total integration costs to be incurred in 2015 and 2016 of approximately $450 million. This will be a combination of both operating expense and capital expense."

192.    During that call, Defendant Jureller further stated, "[W]ith respect to transaction cost and our integration expenses. We talked about upfront that those will be around $450 million."

193.    On February 19, 2015, Frontier held an earnings call, on which Defendant Jureller stated, "We have previously estimated total integration costs for the Verizon transaction at

approximately $450 million. Of this, in 2015, we estimate $85 million to $135 million of operating expenses at approximately $100 million of capital expenditures. The remainder would be spent in 2016."

194.    On May 5, 2015, Frontier held an earnings call, on which Defendant Jureller stated, "Right now, we've just said in total about $450 million between OpEx and CapEx in 2015/2016 for the Verizon transaction."

195.    On June 2, 2015, and again on June 8, 2015, Frontier filed preliminary prospectus supplements for the Offerings, signed by Defendants Wilderotter, McCarthy, and Jureller, which stated, "[T]he Company currently expects that it will incur approximately $450 million of operating expenses and capital expenditures in total related to acquisition and integration activities in 2015 and 2016 associated with the [CTF Acquisition]." The preliminary prospectus supplements also incorporated by reference—and therefore stated again—the investor presentation included in Frontier's Form 8-K filed on February 5, 2015.

196.    On September 16, 2015, Defendant Jureller appeared at the Goldman Sachs Communacopia Conference and stated, "We are spending a substantial amount of money, mostly in advance of the cut over. We've said out there that we will probably spend about $450 million or so on our integration efforts with most of that being before that day one cut over in really getting everything aligned from a capital perspective, from an operating and systems perspective, to have a strong experience coming out of the gate."

197.    The Frontier Defendants' statements in ¶¶189-96 above were materially false and misleading because they omitted material information that, as discussed above (Section IV(E)(3)), that Defendants had no basis whatsoever for their cost estimate and in fact knew that fully integrating the CTF Acquisition would cost more than double the $450 million it had promised to

investors. As Frontier disclosed on February 28, 2018, the final integration costs for the CTF Acquisition were $962 million. As described more fully above, FE-8 explained that Defendants had no reasonable basis for the estimated integration costs provided on February 5, 2015 (Section IV(E)(3)). Further, former employees reported that, as discussed above (Section IV(E)(3)), the Company commissioned a Gap Analysis for the CTF Acquisition, which revealed that the promised "smooth transition" could not occur without addressing more than 400 gaps at a cost of approximately $1 billion dollars. Other witnesses have confirmed the existence—and senior management's awareness—of this Gap Analysis. As a result, Defendants statements repeating the stated estimated integration costs were false and reckless. Defendants' statements about the acquisition and integration costs of the CTF Acquisition were materially false, misleading, and reckless because they omitted the material facts contradicting these statements.

### D. Defendants Claim That The CTF Acquisition Is Progressing Towards The Promised "Seamless" Or "Smooth" Transition

198.    Throughout the Class Period, Defendants repeatedly promised investors that Frontier was progressing towards a "smooth" or "seamless" transition. As discussed above (Sections IV(D), IV(E)(4)), these statements were materially false and misleading because Defendants knew that they could never provide a "seamless" or "smooth" transition for customers because they never intended the CTF Flash Cut to achieve full functionality.

199.    On February 5, 2015, Defendants filed a Form 8-K which contained a press release announcing the CTF Acquisition, in which Defendant Wilderotter stated, "Frontier expects a smooth transition for customers in its new markets."

200.    The same day, Defendants Wilderotter and McCarthy held a conference call to discuss the CTF Acquisition with investors. On that call, Defendant Wilderotter stated, "I want to emphasize that we will have the experience to create a smooth transition for customers with no

disruption to service." Also on that call, Defendant McCarthy stated, "[W]e have spent a lot of time upgrading our operational support system and billing systems that are very compatible with the FiOS platform."

201.    On June 2, 2015, and again on June 8, 2015, Frontier filed preliminary prospectus supplements for the Offerings, which incorporated by reference—and therefore stated again—the press release and investor presentation included in Frontier's Form 8-K filed on February 5, 2015 and discussed above (Section IV(B)).

202.    On February 23, 2016, Frontier held an earnings call, during which Defendant McCarthy stated:

> The integration teams from both sides have been extremely diligent in planning a detailed cutover with the mutual objective of minimal customer disruption. . . . The system conversions are *on track*, and we are seeing conversion metrics at or above our expectations for this point in the conversion process. . . . *All indications are very positive*. . . as we execute on the Verizon I think you'll see a *very smooth transition* and no impact like we saw in Connecticut.

203.    On February 24, 2016 Defendant Jureller appeared at the Jefferies Media & Communications Conference and stated:

> Obviously, we want to make sure that people have that same experience when they turn on their set-top box, their TV . . . in that first hour. So 12:01 a.m. on April 1, they're having that same experience. They also see their same video-on-demand library, the things that they've already saved and queued up. So we have learned a lot from the successive flash cuts that we've done. [S]ome of the lessons that we've learned is we want to make sure that we've not missed anything in the process.

204.    On February 29, 2016, Defendant Gianukakis appeared at the Morgan Stanley Technology, Media & Telecom Conference and stated:

> We've got adequate workforce, we've got our call centers fully staffed. That's one of the learnings we have on prior transactions to make sure we've got enough people answering the phone . . .
>
> So, we've really overstaffed the call centers, we're doing it at the time of the year that is seasonally a bit quieter and we've done a lot of practice, right. We've gone

through these and really scrubbed through every business part of what we need to do and feel very confident that we would execute on this. . . .

Obviously, before the transaction consummates, we did a lot of work and diligence as you can imagine. But over the next year, we worked really very, very closely with the teams over at Verizon to get into the details of the operations, going through every aspect of running and managing this business and mapped over all the parts of the business.

205.    The Frontier Defendants' statements in ¶¶199-204 above were materially false and misleading because they omitted material information that, as discussed above (Sections IV(D), IV(E)(4)), Defendants knew that they could never provide a "seamless" or "smooth" transition for customers because they never intended the CTF Flash Cut to accomplish full functionality (Section IV(E)(4).) As discussed above (Section IV(E)(4)), Defendants' "guiding principle" for conversions was: "***Focus on Needs, Not Wants—DON'T address every functional gap***." Instead, "[f]ocus[] only on items affecting regulatory compliance or critical pieces of functionality. . . . [J]ust because a user had it before (e.g., system functionality), didn't mean they'd get it after cutover. Conduct[] cost/benefit on every gap." As a result, Defendants knew that a "smooth" or "seamless" transition for customers after the CTF Acquisition was unlikely at best, and impossible at worst. In fact, after the failure of the CTF Acquisition, FE-17 personally heard McCarthy say to CTO Gable, "***We knew there was going to be a problem, but we didn't know it was going to be this bad.***" Former employees of Frontier have confirmed that Defendants proceeded with the CTF Flash Cut despite knowing of hundreds of unaddressed gaps, each of which compromised the full functionality of the integrated systems. Indeed, FE-9 recalled attending meetings led by Steven Ward, Frontier's Senior Vice President of IT, with CTO Steve Gable present, beginning at least six months prior to the CTF Flash Cut, during which he saw another employee telling Ward and Gable that Frontier's systems were not ready and that the CTF Flash Cut was not going to work. FE-9 confirmed that, by the time of the CTF Flash Cut, 90 out of Frontier's 100 systems were not ready for the cutover

at the time of the CTF Flash Cut; over 100,000 test cases were still broken two weeks before the CTF Flash Cut; fifty percent of the tracked bugs and issues remained unresolved; and virtually every team involved in the integration still reported critical breaks and errors. FE-10 reported that he informed his superior that the Company was not ready for the CTF Flash Cut, but his superior told him to "shut up" because delaying the CTF Flash Cut was not an option. FE-10 further explained that s/he and others warned management that the CTF Flash Cut would fail because Frontier had failed to fully map Verizon's network in advance of the cutover, directly contradicting Defendants' claim to have "mapped over all the parts of the business."

206.   Several former employees described that the Company proceeded with the CTF Flash Cut despite knowing its video functionality was not progressing as promised. To deliver to its newfound subscribers the on-demand programming over the more than one million video lines it would acquire, Frontier needed to secure agreements with the third parties providing that video content. Yet, senior management knew that Frontier failed to secure the licensing necessary to ensure seamless video-on-demand service to customers. Defendants' statements about the "smooth" and "seamless" transition it promised its customers were materially false and misleading because they omitted the material facts contradicting these statements.

### E.   Defendants Claim That The CTF Flash Cut Was a Success

207.   After the CTF Flash Cut, Defendants repeatedly assured investors that the CTF Flash Cut was a success. As discussed above (Section IV(F)(1),(3)), these statements were materially false and misleading because the CTF Flash Cut was a disaster from the beginning.

208.   On May 3, 2016, Frontier filed a Form 8-K with the SEC, in which Defendants announced the "[s]uccessful closing of [the] California, Texas, and Florida acquisition," the "largest, most complex flash cutover in industry history." The Form 8-K also stated that the

"ongoing" integration efforts were nearly complete, and included details about the completeness or near completeness of the: "network cutover," the "ERP and HR system integration," "employee training," and "VOD library development ongoing."

209.    On May 3, 2016, Frontier held an earnings call, during which Defendant McCarthy stated that "the largest and most complex flash cut that has ever been executed in our industry . . . has been very successful." Defendant McCarthy also stated that while there had been "some negative publicity in the market. . . [w]e now have these issues resolved and behind us." Defendant McCarthy further stated, "All service issues related to the conversion have been substantially resolved, and the level of reported outages is now trending at approximately the levels we expect for these properties." McCarthy also stated, "[W]e anticipate . . . changing to a more normal rhythm as we exit the quarter and move into Q3."

210.    On May 23, 2016, Defendant McCarthy appeared at the J.P. Morgan Technology, Media & Telecom Conference and stated that the integration "has gone better than any one that we have done before. . . the billing systems, the ERP, payroll, HR, every part of the integration has gone exceptionally well. We have actually got through all of our billing and out the door and we're back on normal cycles with customers." McCarthy also stated, "[W]e're back on normal cycles with customers. And we've moved to the point now where we are moving forward with a normal business rhythm around trouble tickets and service orders in the market."

211.    On June 1, 2016, Defendant McCarthy appeared at the Sanford C. Bernstein Strategic Decisions Conference and stated:

> [W]hen I look at this transaction versus any other conversion we've done, if you look at billing, if you look at ERP systems, if you look at the human systems for payroll and all the different things that we manage, this conversion went far better [than] just about any conversion we've done. So that was really, really good. I was really happy about that. We were actually finished our second month of billing without any major issues with customers.

212.     On June 2, 2016, Defendant Gianukakis appeared at the Cowen Technology, Media & Telecom Conference and stated:

> We're making tremendous progress on the integration activities and we're well on our way towards getting into a business as usual mode of operating the business. So we're very happy about the progress we've made in just two months since the closing date of the transaction. Our billing conversion has gone over very well. We've gone through two billing cycles now with our customers and getting the bills on Frontier paper and that's going quite well and cash flow is flowing right into our bank account. So as a treasurer, very happy to see that activity going on and it's going quite well and really been from that perspective a seamless transition for our customers.

213.     On June 7, 2016, Defendant Gianukakis appeared at the Stephens Spring Investment Conference and stated:

> From an integration perspective, we made excellent progress over the first two months -- it's just been two months now, as you can appreciate, it's a very complex transition. We do what's called a flash cut where we do all of our integration work ahead of time before we actually close on the transaction, but now we are in this transition phase now. We've been in it now for two months and we're making excellent progress across all aspects of the integration as we move towards a business-as-usual mode of operating the business.

> We've completed now two billing cycles, bills going out to customers and we've made excellent progress getting those invoices out, getting the cash flows from collections paid out to Frontier, so we're making excellent progress there. There have been some transition concerns raised and we've done -- really gotten on those issues very, very quickly, and fortunately it's really impacted a small portion of the total customer base. So those areas where we've had some impacts have been in the area of data provisioning, the video on demand, as well as in some of the call center activities.

214.     At this same conference, Defendant Gianukakis also stated:

> [W]e're making excellent progress across all aspects of the integration as we move towards a business-as-usual mode of operating the business. . . . Again, as we quickly get our badged Frontier employees trained and up to speed on our systems, we're getting all that volume, that activity, that call center volume mapped back over to our resources so we can get back to a normal operating mode. So overall, while we have had some issues, we are working very diligently to get back on track here. We're moving very quickly towards a business-as-usual mode of operating the business . . . .

215.    On August 1, 2016, Frontier held an earnings call, during which Defendant McCarthy stated that the integration was "essentially done." Defendant McCarthy further stated the Company had returned to a normal marketing rhythm in new markets beginning in Q3.

216.    On September 21, 2016, Defendant McCarthy appeared at the Goldman Sachs Communacopia Conference and stated that, after the CTF Acquisition, Defendants' "normal return to operations, whether that's around service orders, trouble tickets, how customers are interacting with our centers, all that's going really, really well," with any present "challenges" having "[n]othing to do with the original issues."

217.    The Frontier Defendants' statements in ¶¶208-216 above were materially false and misleading because they omitted material information that, as discussed above (Section IV(F)(1), (3)), Defendants knew the CTF Flash Cut was not a success, which severely impaired their progress in integrating the assets obtained in the CTF Acquisition. Customers across the three states reported severe outages, including the inability to dial 911 on their landline phones, and Defendants knew that their upbeat publicity about the CTF Acquisition was untrue—by May 9, 2016, Florida Attorney General Pam Bondi had written to the Company to complain that the CTF Flash Cut was "hardly . . . smooth" and "an unacceptable situation with no apparent end in sight." She described the "steady influx of complaints" to her office in the weeks following the Flash Cut. Similarly, the CPUC, the CAUCC, and the Texas Public Utility Commission had each received hundreds of complaints about "alarming" "problems" that were putting citizens "at risk."

218.    In fact, the full extent of the disaster was only known internally at Frontier. FE-4 explained that outages across the CTF regions began at 7:00am on the day of the Flash Cut, and there "were no words" to describe how bad the situation was. Teams required four to five days to get these major switches back online, so swaths of customers were without service—particularly

in the metropolitan Tampa market—and employees simply didn't know what to say to customers. FE-17 described that s/he personally drove Defendant McCarthy and other senior staff around Frontier's Florida operations after the CTF Flash Cut, during which time the former employee's phone rang constantly as he received "at least 100" complaints about service outages. S/he let Defendant McCarthy hear some of these complaints and recalls McCarthy calling CTO Steve Gable on speakerphone, exasperated, with Gable responding that there was "always going to be some fallout," to which McCarthy responded, "We knew there was going to be a problem, but we didn't know it was going to be this bad." As discussed above (Section IV(F)(3)), former employees have described numerous causes of the disastrous CTF Flash Cut, which triggered widespread and ongoing problems throughout Frontier's operations—including in the areas of billing, data conversion, customer service, and video-on-demand—all of which Defendants were aware of and affirmatively ignored. These problems were immediate and persisted for months. For example, FE-17 explained that Frontier "couldn't generate bills for tens of thousands of customers for months after the transition," and s/he described making service calls to customers' homes to address problems from the CTF Flash Cut as late as August 2016. Ultimately, FE-16 stated that Frontier did not stop "drowning in these complaints and issues" until April 2017—***a year after the CTF Flash Cut.*** Defendants' statements about the success of the CTF Flash Cut were materially false and misleading because they omitted the material facts contradicting these statements.

## F.   Defendants Claim That The CTF Flash Cut Affected 1% Of Customers

219.    Throughout the Class Period, Defendants repeatedly claimed that the problems from the Flash Cut only affected 1% of Frontier's customers. As discussed above (Section IV(F)(2)), these statements were materially false and misleading because Defendants knew the CTF Acquisition affected far more than 1% of the Company's customers in the CTF regions, and

Defendants were fraudulently concealing the true extent of the disruption that the CTF Acquisition caused.

220.    On April 25, 2016, the *Wall Street Journal* reported that Frontier spokesperson Peter DePasquale said, "Subscribers who lost service after the switch-over represented less than 1% of its customer base. . . ."

221.    On May 3, 2016, Frontier held an earnings call, during which Defendant McCarthy stated that Defendants "monitor[ed] customer call trends closely," and that "[a]s with any transfer of this scale and complexity, there were some issues at the outset, but these affected less than 1% of our customers in total, and much less than that at any point in time."

222.    In an interview with the *Los Angeles Times* published on May 13, 2016, Frontier West Region President White stated that "[f]ewer than 1% of Frontier's new customers have experienced problems."

223.    As reported in a May 19, 2016 article in the *Long Beach Post*, during a hearing the previous day before the CAUCC, White stated that service interruptions impacted "less than one percent of the 3.7 million accounts it assumed April 1."

224.    On May 11, 2016, McCarthy responded to Florida Attorney General Bondi, stating, "Overall, less than one percent of the over 3,000,000 customers transitioned to Frontier experienced a service disruption a result of the conversion, and there was no disruption of traditional voice service or of the 911 network."

225.    On May 18, 2016, at the CAUCC hearing regarding the fallout of the CTF Flash Cut in California, Melinda White stated that "less than one percent of the 3.7 million accounts . . . assumed" in the CTF Acquisition "experienced service interruptions."

226.     The Frontier Defendants' statements in ¶¶220-25 above were materially false and misleading because they omitted material information that, as discussed above (Section IV(F)(2)), Defendants knew the failed CTF Acquisition affected far more than 1% of the Company's customers in the CTF regions, and Defendants were fraudulently concealing the true extent of the disruption that the CTF Acquisition caused. Former employees have revealed that Defendants' "1%" figure was the result of "funny math" and deliberate data manipulation. FE-16 participated in meetings with Frontier senior leadership including CTO Gable and West Region President White to discuss how to inflate the denominator in order to decrease the percentage of affected customers. FE-19 stated that the 1% figure was based on the Company's ignoring any issues that did not completely remove a customer's services—in fact, according to FE-19, "pretty much 100% of people with television products had some sort of problem, and many of the customers that had FiOS and digital voice had problems during cut over." According to FE-16, the real number of affected customers was "somewhere between twenty and twenty-five percent." FE-3 described receiving instructions from senior national leadership including Southeast Area President Flynn to delete customer tickets to make it appear as though the problems were not as widespread as they were. FE-20 recalled that close to 80% of the Frontier employees at his/her office in Florida who were Frontier customers lost their service at home. The astonishing increase in Defendants' monthly churn from 1.91% as of second quarter 2016 (when the CTF Acquisition was completed) to 2.17% by year-end 2017—with monthly churn for CTF operations reaching as high as 3.01%, more than triple the industry standard—further shows the falsity of Defendants' claims that only 1% of customers were affected. Defendants' statements that the Flash Cut only disrupted the service of one percent of Frontier's customers were materially false and misleading because they omitted material facts contradicting these statements.

G.   **Defendants Claim That "Non-Paying Accounts" Acquired From Verizon Are To Blame For Severe Revenue Decline**

227.   Throughout the Class Period, Defendants blamed Frontier's severe revenue decline on a significant number of "non-paying accounts" that it acquired from Verizon. As discussed above (Section V(B)), these statements were materially false and misleading because Defendants knew that non-paying accounts acquired from Verizon were not the true cause of, or to blame for, the Company's disastrous financial results following the CTF Acquisition.

228.   On November 3, 2016, Frontier filed a Form 10-Q with the SEC, in which Frontier stated that it "maintain[s] an allowance for doubtful accounts based on an estimate of our ability to collect accounts receivables," that its "bad debt expense for [new retail customers acquired in the CTF Acquisition] was $20 million higher" in the third quarter 2016 than the prior quarter, but that it nonetheless "believes that it is ***adequately reserved.***"

229.   The Frontier Defendants' statements in ¶228 above were materially false and misleading. As discussed above (Section V(B)), in the next reporting period, Defendants attributed more than $45 million in revenue losses to a purported "account cleanup" of "overdue accounts" that had begun during the second quarter of 2016 and continued throughout the third quarter of 2016. Accordingly, taking Defendants at their word, they would have known by the conclusion of the third quarter 2016 that their allowance for doubtful accounts was ***not*** adequately reserved.

230.   On February 27, 2017, Frontier filed a Form 8-K with the SEC, which contained an investor presentation that stated, "CTF account cleanup impacted results."

231.   On February 27, 2017, Frontier held an earnings call, during which Defendant McCarthy stated:

> In the quarter, we intensified the cleanup of acquired California, Texas, and Florida accounts. . . . The cleanup had a negative impact on the quarterly financial results. . . . We have provided a time line of the account cleanup issue. As you can see, in

anticipation of the deal close, Verizon stopped treatment of overdue accounts on February 1, 2016. We continued non-treatment of these accounts through July 20, as we worked through the cut over. We have been working through the account cleanup process since July 20. CTF account cleanup had a $45 million impact on fourth-quarter revenue, and we estimate less than a $25 million impact in first-quarter revenue. We do not expect any further account cleanup impact beyond the first quarter, and we are now operating normally with respect to the acquired customer receivable. We completed this cleanup process this month. . . . We are taking steps to more aggressively manage costs in light of the longer timeframe needed to clean up this account group.

232.    On May 2, 2017, Frontier filed a Form 8-K, which contained an investor presentation that stated, "Impact of account cleanup as previously disclosed is now complete."

233.    On May 2, 2017, Frontier held an earnings call, during which Defendant McBride stated:

Approximately $16 million of the sequential decline in revenue was a result of the previously disclosed cleanup of CTF nonpaying accounts and the automation of legacy nonpay disconnects. . . . As previously disclosed, first quarter revenue was impacted by the final cleanup of the CTF nonpaying accounts and the automation of the legacy nonpay disconnect process. The CTF account cleanup reduced Q1 revenue by $11 million, and the onetime impact related to automating the nonpay disconnect process for the legacy properties reduced Q1 revenue by $5 million. As stated earlier, these are now complete.

234.    Defendant McCarthy also stated, "In legacy, customer trends reflect a one-time impact from the automation of processes to identify and deactivate nonpaying customers. This enhancement was developed for the CTF properties and improve the effectiveness and efficiency of the same processes in our legacy operations." Defendant McCarthy further stated that the Company "still feel[s] good about stabilization" and claimed that "not all churn is really bad."

235.    The Frontier Defendants' statements in ¶¶228-234 above were materially false and misleading because they omitted material information that, as discussed above (Section V(B)), Defendants knew that non-paying accounts acquired from Verizon were not the true cause of, or to blame for, the Company's disastrous financial results following the CTF Acquisition. FE-3 revealed that Frontier's explanation that Verizon was purposefully not disconnecting non-paying

accounts prior to the CTF Flash Cut was a "provable lie." FE-3 stated that as part of her job responsibilities as Verizon's Florida Director of Operations prior to the CTF Acquisition, s/he reviewed Verizon's reports on customer disconnects daily. Had Verizon staff been ordered to stop disconnecting accounts, FE-3 explained that s/he would have immediately seen this order reflected in those reports—and even identified the day or week that the order was given. Instead, FE-3 saw "zero fluctuations in the number of disconnects" on every report up to March 31, 2016—the eve of the CTF Flash Cut. Defendants never disclosed that Frontier would be inheriting a huge swath of unpaid accounts from Verizon. Even if they had, FE-3 related that, pursuant to industry custom, the burden would have been on Frontier to disconnect these accounts within four months of acquiring them (*i.e.*, August 1, 2016). Defendants admitted that they only began to disconnect non-paying accounts at the end of August of 2016, having ignored them for months following the Flash Cut. Former employees disputed the existence of "non-paying accounts" inherited from Verizon and several believed that these accounts were actually Frontier customers who stopped paying their bills because their phones were not working. Defendants' statements that its cleanup of "non-paying accounts" was to blame for its severe revenue decline following the CTF Acquisition and its expectations for "improved customer service" were materially false and misleading because they omitted material facts contradicting these statements.

### H.    Defendants Claim To Have Prepared Frontier's Financial Statements In Accordance With Generally Accepted Accounting Principles

236.    Throughout the Class Period, Defendants certified in filings with the SEC that they prepared Frontier's financial statements in accordance with GAAP. As discussed above (Section V(A)), these statements were materially false and misleading because Defendants violated GAAP by failing to disclose revisions to its accounting policies.

237.     On November 3, 2016, Defendants filed a Form 10-Q with the SEC, in which Frontier stated that the financial statements within had been prepared in accordance with GAAP. In the Form 10-Q, Defendants McCarthy and Jureller certified the same.

238.     Defendants Frontier, McCarthy, and McBride made substantially similar statements in Frontier's Forms 10-K filed with the SEC on March 1, 2017, and March 1, 2018; and in Frontier's Forms 10-Q filed on May 4, 2017, August 3, 2017, and November 2, 2017.

239.     The statements made by Defendants Frontier, McCarthy, Jureller, and McBride in ¶¶237-38 above were materially false and misleading because they violated GAAP by failing to disclose that, as discussed above (Section V(A)), Defendants had changed Frontier's accounting procedures to account for the cost of maintenance activities as capital expenditures rather than operating expenses. FE-17 and FE-3 revealed that—undisclosed to the public—Defendants had by November 2016 changed their accounting practices, as senior management had issued a new instruction to staff to account for the cost of maintenance activities (such as repairing or replacing broken devices) as capital expenditures, rather than operating expenses. GAAP requires that "once an accounting principle is adopted, it shall be used consistently in accounting for similar events and transactions" and that a company must report any change in its accounting principles—or the use of its adopted accounting principles. (ASC 250-10-45-11, 14 - 16.) Accordingly, Defendants' statements in the Forms 10-Q and 10-K were materially false and misleading because the financial statements violated GAAP by failing to disclose the change in policy described above.

## VIII.     LOSS CAUSATION

240.     The Frontier Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiffs and the Class to suffer substantial losses

241.     During the Class Period, Lead Plaintiffs and the Class purchased or otherwise acquired Frontier Securities at artificially inflated prices, and were damaged thereby when the

price of Frontier Securities declined when the truth was revealed and when the risks Defendants concealed with their false statements materialized. The price of Frontier Securities declined significantly (causing investors to suffer losses) when the Frontier Defendants' misrepresentations, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by the Frontier Defendants materialized.

242.    Specifically, the Frontier Defendants' materially false and misleading statements misrepresented, among other things: the Company's purported "proven track record" of acquisitions (Sections IV(B), IV(E)(1)); the existence of a "seasoned integration team" (Sections IV(B), IV(E)(2)); the estimated integration costs for the CTF Acquisition (Sections IV(B), IV(C), IV(E)(3)); the Company's ability and/or intent to deliver a "seamless transition" (Sections IV(D), IV(E)(4)); and the success of the CTF Acquisition (Sections IV(F)(1), (3)). When those statements were corrected and the risks concealed by them materialized, investors suffered losses as the price of Frontier Securities declined. As a result of the disclosure of the truth of the Frontier Defendants' fraud, Frontier's common stock price suffered statistically significant declines, and ultimately fell nearly 94%, from a closing price of $115.50 on February 5, 2015, to a closing price of $7.03 at the close of February 28, 2018. Similarly, the price of the Preferred Stock suffered statistically significant declines, and ultimately fell over 87%, from an offering price of $100.00 per share on June 8, 2015 to a closing price of $12.67 on February 28, 2018.

243.    The disclosures that corrected the market price of Frontier Securities and reduced the artificial inflation caused by the Frontier Defendants' materially false and misleading statements and omissions are detailed below. The disclosures are also summarized in the following chart, which identifies each corrective disclosure event, the price declines in Frontier common

stock resulting from the event, and, for purposes of comparison, the percentage change in the S&P

500 Index on each event date:

| Date* | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| 11/1/2016 **(11/2/2016)** | After the close of the market, Frontier announced its financial results for the third quarter of 2016, revealing that: (1) Frontier's revenue declined *$84 million*, driven primarily by the CTF regions, and (2) integration costs for the CTF Acquisition had grown to *$750 million*. | $50.85 | **-13.7%** | -0.65% |
| 2/27/2017 **(2/28/2017)** | After the close of the market, Frontier announced its financial results for the fourth quarter and full year of 2016, revealing another *$100 million* decrease in revenue from the previous quarter, driven by purported *"cleanup" of "non-pay" accounts* acquired in the CTF Acquisition. | $43.95 | **-10.9%** | -0.25% |
| 5/2/2017 **(5/3/2017)** | After the close of the market, Frontier announced its financial results for the first quarter of 2017, revealing that: (1) its revenue declined another *$53 million* from the previous quarter, (2) *$11 million* of that decline related to the *"cleanup of CTF nonpaying accounts,"* and (3) Frontier was *cutting its dividend by 62%,* driven by its inability to deliver its EBITDA target. | $24.15 | **-16.6%** | -0.13% |
| 10/31/2017 **(11/1/2017)** | After the close of the market, Frontier announced its financial results for the third quarter of 2017, revealing that would miss its EBITDA guidance for 2017 as a result of slower than expected revenue stabilization. | $8.86 | **-26.8%** | 0.16% |
| 2/27/2018 **(2/28/2018)** | After the close of the market, Frontier announced its fourth quarter and full year results for 2017, revealing that: (1) the total cost of integrating the CTF Acquisition was *$962 million*, with *$59 million in 2017 alone*, (2) churn had increased nearly *10%* since 2016, and (3) Frontier was *canceling its dividend* completely. | $7.03 | **-23.9%** | 1.10% |
| *\*Date of stock price drop in parentheses* | | | | |

244.    Accordingly, as a result of their purchases or acquisitions of Frontier's publicly traded Frontier common stock and/or Mandatory Convertible Preferred Stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss and damages.

## IX.    PRESUMPTION OF RELIANCE

245.    At all relevant times, the market for Frontier Securities was an efficient market for the following reasons, among others:

a)  Frontier Securities met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

b)  Frontier Securities traded at high weekly volumes. With respect to Frontier common stock, an average of over 9.5 million shares traded each week during the Class Period, with an average weekly turnover as a percentage of shares outstanding of approximately 12.32% (median of 9.66%), well surpassing the higher 2% threshold level of average weekly trading volume indicative of an efficient market. With respect to Frontier Mandatory Convertible Preferred Stock, an average of over 0.8 million shares traded each week after being issued during the Offerings, with an average weekly turnover as a percentage of shares outstanding of approximately 4.22% (median of 2.99%), also well surpassing the higher 2% threshold level of average weekly trading volume indicative of an efficient market;

c)  As a regulated issuer, Frontier filed periodic public reports with the SEC;

d)  Frontier was eligible to file registration statements with the SEC on Form S-3;

e)  The Frontier Defendants regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and

through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

f)   The market reacted promptly to public information disseminated by Frontier; and

g)   Frontier Securities were covered by numerous securities analysts employed by major brokerage firms, including UBS, Deutsche Bank, Credit Suisse, Morgan Stanley, RBC Capital Markets, S&P Capital IQ, and Cowen & Company. Each of these reports was publicly available and entered the public marketplace.

246.   Accordingly, the market for Frontier Securities promptly digested current information with respect to Frontier from all publicly-available sources and reflected such information in the prices of those securities. Under these circumstances, all purchasers of the Company's publicly traded common stock and Mandatory Convertible Preferred Stock during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.

247.   Lead Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Frontier Defendants are predicated upon omissions of material fact that there was a duty to disclose. Specifically, particularly given the enormous importance of the CTF Acquisition— Frontier's largest-ever acquisition, which was, according to Defendants, "transformative" (Section IV(B))—reasonable investors would have considered the following facts, among others, important in making investment decisions: that (i) Defendants had no reasonable basis for their cost estimate and in fact Defendants' internal Gap Analysis revealed that the CTF Acquisition would cost close

to $1 billion to integrate (Section IV(E)(3)); and (ii) Defendants' integration plan involved a deliberate failure to provide full functionality to the acquired customers (Section IV(E)(4)).

## X.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

248.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

249.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Frontier Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Frontier who knew that the statement was materially false or misleading when made. For example, the Frontier Defendants' statements that the estimated integration cost for the CTF Acquisition was $450 million were directly contradicted by the Gap Analysis prepared for the CTF Acquisition, which revealed that the true cost of integration would be nearly $1 billion. (Section IV(E)(3)) Likewise, the Frontier Defendants' assurances that the CTF Acquisition would be a "smooth" or "seamless" transition were directly contradicted by information provided to the Frontier Defendants that revealed that Frontier's systems and infrastructure were incapable of such an acquisition and that Defendants did not actually expect or plan for a seamless transition. (Section IV(E)(4)) These and similar arguably forward-looking statements cannot be protected under the PSLRA safe harbor.

## XI.   SUMMARY OF SCIENTER ALLEGATIONS

250.   As alleged herein, numerous facts give rise to the strong inference that, throughout the Class Period, the Frontier Defendants knew or recklessly disregarded that their statements and omissions, as set forth in Section VII, were materially false and misleading when made. The information in this section is a summary of certain of the allegations detailing the Frontier Defendants' scienter that are set forth more fully above, though all allegations must be considered holistically in evaluating Defendants' scienter. The cumulative knowledge of all members of the Company's senior management team, including the Individual Frontier Defendants, regarding the matters addressed herein is properly imputed to Frontier.

### A.   Unreleased Internal Information Directly Contradicted The Frontier Defendants' Public Statements

251.   The Frontier Defendants' possession and awareness of unreleased internal information that directly contradicted their public statements—regarding Frontier's preparedness to undertake the CTF Acquisition; the Company's ability or intent to provide a "smooth" or "seamless" transition; and the true cost of the integration of the CTF Acquisition—supports scienter. First, FE-15, a senior IT professional, and FE-9, a former Senior Technical Analyst for Commercial Business Technical Support, described the existence, and senior management's awareness, of a "Gap Analysis" prepared for the CTF Acquisition that revealed hundreds of gaps in functionality between Frontier and Verizon's systems. FE-15 and FE-9 further explained that this Gap Analysis estimated costs of at least $900 million. Defendant McCarthy himself explicitly acknowledged his awareness of the Gap Analysis no later than May 5, 2015, when he told investors during an earnings call that the Frontier Defendants were "working on *functional gap identification and remediation*." The Case Study, described above at ¶28, further corroborates the existence of the Gap Analysis. The Case Study described Frontier's "standard," "general

106

approach" to flash cuts—including the West Virginia Flash Cut, which Defendants specifically referenced in discussing the CTF Flash Cut—as involving the preparation of a "very thorough Gap Analysis to identify differences between the two environments" and the direct consideration of certain gaps by the CEO (who was Wilderotter at the time of the West Virginia Flash Cut and the Connecticut Acquisition, and McCarthy for the CTF Acquisition). Nonetheless, the Frontier Defendants never disclosed the Gap Analysis, which directly contradicted the statements made to investors by Defendants Frontier, Wilderotter, McCarthy, Jureller, and Gianukakis that Frontier would deliver a "smooth transition" with an "estimated OpEx and CapEx integration cost of approximately $450 million in 2015/2016." In fact, by the end of the Class Period, Defendants admitted that integrating the CTF Acquisition cost approximately $900 million—nearly double the amount estimated in the Gap Analysis and the guidance provided to investors.

252.    Second, the undisclosed Gap Analysis also supports the scienter of Defendants Frontier, McCarthy, Jureller, and Gianukakis in continuing to promise that the CTF Acquisition transition would be "seamless." Even the day before the CTF Flash Cut, Frontier's south area president Rhonda Lutze told the *Fort Worth Star-Telegram* that customers would "just see a logo change. All the products and services will stay the same." In fact, FE-9, FE-10, and FE-5 have confirmed that throughout preparations for the CTF Flash Cut, senior officials were aware that gaps in functionality would remain at the time of the CTF Flash Cut. FE-9 and FE-10 specifically recalled ***hundreds*** of such gaps. The Case Study corroborates that Frontier's "standard," "general approach" to flash cuts was explicitly "DON'T address every functional gap." Instead, the Case Study stated, "focus[] only on items affecting regulatory compliance or critical pieces of functionality . . . just because a user had it before (e.g., system functionality), didn't mean they'd get it after the cutover."

253.    Third, the widespread awareness within the Company that Frontier's systems were antiquated—particularly compared to the much more advanced Verizon systems—supports the scienter of Defendants Frontier, McCarthy, Jureller, and Gianukakis, who falsely claimed that Frontier could execute the CTF Flash Cut successfully and had a "high level of familiarity" with Verizon's systems as a result of the 2010 Verizon Acquisition. FE-8, FE-10, FE-14, FE-13, and FE-25 have revealed that the Company in fact used a hodgepodge of outdated, inefficient infrastructure, which bore no resemblance to Verizon's considerably more advanced systems.

### B.    Defendant McCarthy Had Personal Knowledge That More Than 1% Of CTF Customers Were Impacted By The CTF Flash Cut And That The Flash Cut Was Not Successful

254.    Defendant McCarthy had personal knowledge of the disastrous CTF Flash Cut, supporting his scienter in falsely claiming that the CTF Acquisition was a success and that only 1% of the CTF Acquisition customers were impacted by the CTF Flash Cut. As described above, while on a tour of Frontier's Florida operations after the CTF Flash Cut, FE-17 told McCarthy that the CTF Flash Cut had been "horrific" and that Frontier was "hemorrhaging customers . . . there were no video assets working and [Frontier] couldn't provision digital voice for over 1,000 customers." FE-17 allowed Defendant McCarthy to hear some of customers' complaints — including regarding lost dial tones and their inability to dial 911—through his/her phone's speakerphone. In response, McCarthy called CTO Gable, who told McCarthy that there was "always going to be some fallout," to which McCarthy replied, "We knew there was going to be a problem, but we didn't know it was going to be this bad."

### C.    The Critical Importance Of The CTF Acquisition

255.    The critical importance to the financial success of the Company of the topic that formed the basis of the misstatements and omissions supports the Frontier Defendants' scienter. In

announcing the CTF Acquisition Defendants Frontier, Wilderotter, McCarthy, Jureller, and Gianukakis repeatedly stressed the "transformational" nature of the CTF Acquisition and claimed it would lead to the "New Frontier." The Frontier Defendants continued to emphasize the importance of the CTF Acquisition throughout the Class Period. For example, in Frontier's March 31, 2016 proxy statement, Frontier stated that the CTF Acquisition "furthers three critical objectives for Frontier: to be a driving force in states with growing populations, to transform our revenue mix and to focus on our core competencies." Thus, the Frontier Defendants knew, or were reckless in not knowing, that Frontier would not be able to integrate the CTF Acquisition as stated.

256.    Relatedly, the Individual Frontier Defendants' repeated discussions about and presentations to investors on the CTF Acquisition further supports their scienter. On every earnings conference call and at numerous investor conferences during the Class Period, at least one of the Individual Frontier Defendants spoke about, fielded questions concerning, and stressed the importance of the CTF Acquisition—frequently with specific technological discussion so as to bolster their misleading claims to be "seasoned integration experts." For example, responding to an analyst's "surprise[]" that Frontier entered into the CTF Acquisition, Jureller stated, "[W]e're the only ones that have successfully done carve-outs and integrated from both Verizon and from AT&T and it's no easy feat to do. These are hard things to do [and] Connecticut . . . exceeded our expectations." The Frontier Defendants were therefore aware of and sensitive to the highly material nature of this information, and held themselves out as knowledgeable about this topic. Therefore, investors reasonably expected them to have knowledge about the truth or falsity of their statements. The only other plausible inferences that can be drawn from these repeated and specific pronouncements is that the Frontier Defendants either fabricated the information that they

provided to investors and the market or that they acted with deliberate recklessness in ignoring information they possessed regarding such matters.

**D.     Defendants' Involvement In A Highly Regulated Industry**

257.     That Defendants made the above material false and misleading statements and omissions in the context of their participation in a highly regulated industry further supports an inference of Defendants' scienter. Specifically, as a telecommunications provider, numerous governmental agencies regulated Frontier at all relevant times, including—as Defendants acknowledged—in connection with the CTF Acquisition and the other acquisitions discussed herein. For example, in their February 5, 2015 presentation announcing the CTF Acquisition, Defendants noted that regulatory and governmental approval of the transaction was an essential "deliverable" on the Company's "roadmap to completion."

258.     In fact, during the Class Period, Defendants sought—and obtained—approval for the CTF Acquisition from, among others: the Federal Communications Commission; the Public Utilities Commission of Texas; and the CPUC. In connection with those efforts, Defendants—including certain Individual Frontier Defendants—made direct representations to regulators about the specific technical requirements of the Acquisition and the Company's capacity to fulfill them. For example, Frontier's application to the FCC, which contained testimony from Frontier's senior executives, stated that "Frontier has committed to . . . fulfilling the requirements associated with the infrastructure study ordered by the Commission." and that Frontier had "established approximately 140 working teams" and a "300+ page Cutover Plan . . . [that] describes in detail how data will be extracted from Verizon's systems and transferred to Frontier's." In addition, McCarthy and Jureller both personally participated in the CPUC's review of the CTF Acquisition. During a public hearing in Claremont, California on July 21, 2015, McCarthy stated that

Defendants were "intimately familiar with the Verizon architecture and how to take that plant . . . and transform it." Likewise, Jureller testified to the CPUC that Frontier "undertook detailed due diligence" in preparation for the CTF Acquisition and that it had "extensive experience in integrating its customer service, billing, repair, and maintenance, and wholesale systems with operations from acquired entities." Ultimately, Defendants Wilderotter, McCarthy, and Jureller received bonuses of $2.531 million, $1.165 million, and $500,000 (respectively) for their 2015 performance explicitly in part for "exceeding the goals set" for the CTF Acquisition by "*securing all necessary regulatory approvals*."

259.    Thus, given Defendants' participation in a highly regulated industry—and the significance of regulatory approval to the CTF Acquisition in particular—Defendants must have conducted extensive due diligence to understand the true facts concerning the subjects on which they spoke, in which case they either knew that their substantively identical statements to the market were false and misleading or they were severely reckless in not knowing so.

### E.    The Direct Oversight By Certain Individual Frontier Defendants Of Frontier's "Proven Track Record"

260.    The direct oversight by certain of the Individual Frontier Defendants over Frontier's prior flash cuts supports their scienter in falsely claiming that Frontier had a "proven track record of successfully integrating acquired properties." Specifically, Defendants Wilderotter and McCarthy—as CEO and COO / Executive Vice President (respectively)—had direct oversight of the 2010 Verizon Acquisition, including the West Virginia Flash Cut. Likewise, Defendants Wilderotter, McCarthy, and Jureller—as CEO, President / COO, and CFO (respectively)—had direct oversight of the Connecticut Acquisition. Each of these Defendants spoke authoritatively concerning those acquisitions. For example, Wilderotter described the West Virginia Flash Cut as "the best systems conversion we've ever done." In addition, the Case Study discussed senior

management's personal involvement in the West Virginia Flash Cut, revealing that some of the 400 identified gaps from the "very thorough Gap Analysis" were "elevated to CEO [Wilderotter] and still declined." Accordingly, Defendants Wilderotter, McCarthy, and Jureller had personal, hands-on knowledge that the acquisitions were not the successes that Defendants claimed them to be. In fact, McCarthy acknowledged his awareness that the Connecticut Acquisition had not been the success that Defendants claimed when he admitted, on May 23, 2016, that the Connecticut Acquisition had not been a success but rather had "issues" that led to "attendant revenue decline."

261.    Further, Defendants Wilderotter, McCarthy, and Jureller received sizable bonuses for the 2010 Verizon Acquisition, and/or the Connecticut Acquisition. Specifically, as a reward for the "successful closing" of the 2010 Verizon Acquisition (including the West Virginia Flash Cut), Wilderotter and McCarthy received cash and stock bonuses totaling $2.75 million and $800,000 (respectively). Then, as a reward for the "achiev[ement] of key milestones" (including the "due diligence, financing, system cut-overs, and regulatory approvals") and the "successful closing . . . and conversion" of the Connecticut Acquisition, Wilderotter, McCarthy, and Jureller received "special one-time transaction bonuses" bonuses of $500,000, $250,000, and $200,000 (respectively). These bonuses further demonstrate these Defendants' direct oversight of the "proven track record" and accordingly the inference of scienter therefrom.

### F.    The West Virginia Settlement

262.    Frontier's $160 million settlement with the West Virginia Attorney General in December 2015 further supports the Frontier Defendants' scienter. Frontier entered into the WVAG Settlement nine months after the announcement of the CTF Acquisition, at a period in time when all of the Frontier Defendants would have been well aware of the existence of the Settlement, if not intimately involved in negotiating it. Indeed, as discussed above, in selling the market on their

ability to execute the CTF Acquisition, the Frontier Defendants had repeatedly referenced in particular their prior experience in performing the West Virginia Flash Cut. However, the WVAG Settlement—entered into only *after* the Frontier Defendants had already conducted the Offering—indicated that in fact Frontier had failed to deliver on the promises it had made regarding the West Virginia Flash Cut, and would have to spend $150 million in capital expenditures to do so. The WVAG Settlement further indicated that the Frontier Defendants could not be trusted to implement their integration promises, and instead had to be monitored by the West Virginia Attorney General. Indeed, as described above, Frontier's failure to integrate West Virginia successfully was accepted by senior management at Frontier, as FE-3 described personally overhearing Frontier's Southeast Area President Flynn shrugging off the outages that followed the CTF Flash Cut by stating, "*So what . . . we have those in West Virginia all the time.*"

### G.    Defendants' Compensation Uniquely Incentivized The Fraud

263.    That Defendants expected to—and in fact did—receive lavish bonuses as a result of the CTF Acquisition, *irrespective of whether it actually succeeded*, further supports scienter. As noted above, certain Defendants had received sizable bonuses as a result of the 2010 Verizon Acquisition and/or the Connecticut Acquisition, even though—as described above—neither acquisition was the success that Defendants claimed. (Sections IV(A)(1), (2)) Indeed, in a December 17, 2013 note, a Morningstar analyst concluded that the bonuses related to the 2010 Verizon Acquisition had been "premature given the challenges of integrating the business." Defendants Wilderotter, McCarthy, and Jureller later received lavish rewards for the CTF Acquisition even *before closing the CTF Acquisition*. Specifically, as part of their 2015 compensation, Defendants Wilderotter, McCarthy, and Jureller received bonuses of $2.531 million, $1.165 million, and $500,000 (respectively) in part due to their "150%" performance of

the "key deliverables goals" related to the CTF Acquisition that year, "exceed[ing] the goals set for [the CTF Acquisition] financing, approvals and integration deliverables by obtaining a total of $10.85 billion in debt and equity financing, securing all necessary regulatory approvals and completing integration preparations in order to close the [CTF] Acquisition on time." Accordingly, the Individual Frontier Defendants had an expectation of further financial reward should the CTF Acquisition take place, *irrespective* of whether Defendants actually executed on the integration as promised. In fact, Frontier disclosed in 2016 that its Compensation Committee had likewise determined to award bonuses to certain Frontier employees (including Defendant McCarthy) in connection with the close of the CTF Acquisition.

## H.    The Suspicious Timing Of Jureller's Departure

264.    The suspicious timing and circumstances of Jureller's departure further supports scienter. As CFO during both the Connecticut Acquisition and the CTF Acquisition, Jureller had played key roles in, and spoken frequently and authoritatively concerning, those acquisitions. However, on September 12, 2016, Jureller unexpectedly "stepp[ed] down to pursue other opportunities." During the September 27, 2016 Deutsche Bank Leveraged Finance Conference, Gianukakis explicitly linked Jureller's departure to the Connecticut Acquisition and CTF Acquisition, stating that "in the last three years of [Jureller's] tenure we executed on two transformative acquisitions" and therefore that it was "a natural time, a natural breakpoint for him to take a break and a natural point for us to transition to a new CFO." Suspiciously, however, this "natural breakpoint" occurred as Defendants grappled with still-undisclosed fallout from the CTF Acquisition, and just before the truth began gradually to emerge on November 1, 2016: despite McCarthy and Jureller's assurance just before Jureller's departure that Frontier was "essentially done from an integration perspective," in Frontier's very next earnings release it disclosed that

integration costs had ballooned to *$750 million* and counting. The suspicious timing of Jureller's departure supports an inference of Jureller's scienter. Either Defendant Jureller left the Company because he was responsible for the financial disaster brought on by the CTF Acquisition, or he left the Company in order to avoid being associated with the disaster he knew to be coming as a result of the risks concealed by Defendants' fraud. In either event, the timing of his resignation suggests that Jureller was aware of, and intimately involved, in the Company's fraudulent conduct—the truth emerged about the Company's financial volatility mere weeks after Jureller resigned.

## XII.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF
### For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5
### (Against the Frontier Defendants)

265.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

266.    During the Class Period, the Frontier Defendants disseminated or approved the false statements specified herein, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and they contained material misrepresentations.

267.    The Frontier Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Frontier common and preferred stock during the Class Period. As detailed herein, the misrepresentations contained in, or

the material facts omitted from, the Frontier Defendants' public statements, concerned, among other things: (i) the Company's purported "proven track record" of acquisitions (Sections IV(B), IV(E)(1)); (ii) the existence of a "seasoned integration team" (Sections IV(B), IV(E)(2)); (iii) the estimated integration costs for the CTF Acquisition (Sections IV(B), IV(C), IV(E)(3)); (iv) the Company's ability and/or intent to deliver a "seamless transition" (Sections IV(D), IV(E)(4)); (v) the success of the CTF Acquisition (Sections IV(F)(1), (3)); (vi) claims that only 1% of customers were affected by the CTF Flash Cut (Sections IV(F)(2)); (vii) that Verizon had provided a significant number of "non-paying accounts" in the CTF Acquisition (Section V(B)); and (viii) that Frontier's financial statements were prepared in accordance with Generally Accepted Accounting Principles (Section V(A)).

268.    The Frontier Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, (i) the Company's purported "proven track record" of acquisitions (Sections IV(B), IV(E)(1)); (ii) the existence of a "seasoned integration team" (Sections IV(B), IV(E)(2)); (iii) the estimated integration costs for the CTF Acquisition (Sections IV(B), IV(C), IV(E)(3)); (iv) the Company's ability and/or intent to deliver a "seamless transition" (Sections IV(D), IV(E)(4)); (v) the success of the CTF Acquisition

(Sections IV(F)(1), (3)); (vi) claims that only 1% of customers were affected by the CTF Flash Cut (Section IV(F)(2)); (vii) that Verizon had provided a significant number of "non-paying accounts" in the CTF Acquisition (Section V(B)); and (viii) that Frontier's financial statements were prepared in accordance with Generally Accepted Accounting Principles (Section V(A)); (b) artificially inflate and maintain the market price of Frontier stock; and (c) cause members of the Class to purchase Frontier securities at artificially inflated prices.

269.    The Individual Frontier Defendants, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Company, each of the Individual Frontier Defendants was able to and did control the content of the public statements disseminated by Frontier. The Individual Frontier Defendants had direct involvement in the daily business of Frontier and participated in the preparation and dissemination of the false and misleading statements.

270.    In addition, the Individual Frontier Defendants are liable for, among other material omissions and false and misleading statements, the false and misleading statements they made and/or signed as follows:

    a) Wilderotter signed the following SEC filings: Frontier's April 20, 2015 Registration Statement; April 20, 2015 Prospectus; June 2, 2015 Preliminary Prospectus Supplement; and June 8, 2015 Preliminary Prospectus Supplement. She also made statements in or was directly responsible for statements made in Frontier's quarterly filings with the SEC on Forms 10-Q and press releases filed with the SEC on Forms 8-K, including on: February 5, 2015. She also made statements during Frontier's earnings calls and investor conferences and other

public statements during the Class Period, including on: February 5, 2015 and February 19, 2015.

b) McCarthy signed the following SEC filings: Frontier's April 20, 2015 Registration Statement; April 20, 2015 Prospectus; June 2, 2015 Preliminary Prospectus Supplement; June 8, 2015 Preliminary Prospectus Supplement; November 3, 2016 Form 10-Q; March 1, 2017 Form 10-K; May 4, 2017 Form 10-Q; August 3, 2017 Form 10-Q; November 2, 2017 Form 10-Q; and March 1, 2018 Form 10-K. He also made statements in and was directly responsible for other statements made in Frontier's quarterly filings and press releases filed with the SEC on Forms 8-K, including on: February 5, 2015, May 3, 2016, February 27, 2017, and May 2, 2017. He also made statements during conference calls and conferences and other public statements during the Class Period, including on: February 5, 2015, February 19, 2015, May 5, 2015, May 28, 2015, August 3, 2015, February 23, 2016, May 3, 2016, May 11, 2016, May 23, 2016, June 1, 2016, August 1, 2016, September 21, 2016, February 27, 2017, and May 2, 2017.

c) Jureller signed the following SEC filings: Frontier's April 20, 2015 Registration Statement; April 20, 2015 Prospectus; June 2, 2015 Preliminary Prospectus Supplement; June 8, 2015 Preliminary Prospectus Supplement; November 3, 2016 Form 10-Q. He also made statements in and was directly responsible for other statements made in Frontier quarterly filings and press releases filed with the SEC on Forms 8-K, including on: February 5, 2015, May 3, 2016, May 23, 2016. He also made statements during conference calls and conferences and

other public statements during the Class Period, including on: February 5, 2015, February 19, 2015, March 3, 2015, March 9, 2015, May 5, 2015, September 16, 2015, February 23, 2016, February 24, 2016, May 3, 2016, and August 1, 2016.

d) McBride signed the following SEC filings: Frontier's March 1, 2017 Form 10-K; May 4, 2017 Form 10-Q; August 3, 2017 Form 10-Q; November 2, 2017 Form 10-Q; and March 1, 2018 Form 10-K. He also made statements in and was directly responsible for other statements made in Frontier quarterly filings and press releases filed with the SEC on Forms 8-K, including on: February 27, 2017 and May 2, 2017. He also made statements during conference calls and conferences and other public statements during the Class Period, including on: February 27, 2017 and May 2, 2017.

e) Gianukakis made statements during conference calls and conferences and other public statements during the Class Period, including on: March 11, 2015, February 29, 2016, June 2, 2016, and June 7, 2016.

271. As described above, the Frontier Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

272. Plaintiffs and the Class have suffered damages in that they paid artificially inflated prices for Frontier securities. Plaintiffs and the Class would not have purchased Frontier securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the Frontier Defendants' misleading statements.

273.    As a direct and proximate result of the Frontier Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Frontier securities during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violations Of Section 20(a) Of The Exchange Act
### (Against the Individual Frontier Defendants)

274.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

275.    This count is asserted against the Individual Frontier Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

276.    As alleged herein, the Individual Frontier Defendants caused Frontier to violate Section 10(b) and Rule 10b-5 promulgated thereunder by making material misstatements and omissions in connection with the purchase and sale of securities throughout the Class Period. This conduct was undertaken with the scienter of the Individual Frontier Defendants who knew of or recklessly disregarded the falsity of the Company's statements and the nature of its scheme during the Class Period.

277.    During their tenures as officers and/or directors of Frontier, the Individual Frontier Defendants were controlling persons of Frontier within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Frontier, the Individual Frontier Defendants had the power and authority to cause Frontier to engage in the wrongful conduct complained of herein. As set forth in detail above, the Individual Frontier Defendants named in this claim were able to and did control, directly and indirectly, and exert control over Frontier, including the content of the public statements made by Frontier during

the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

278.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Frontier Defendants had direct involvement in the day-to-day operations of the Company and in Frontier's financial reporting and accounting functions. Each of these Individual Frontier Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Frontier during the Class Period. Further, as detailed above, the Individual Frontier Defendants had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.

279.    Defendant Wilderotter served as Frontier's CEO from the start of the Class Period until April 3, 2015. As a senior manager of the Company during that time, Defendant Wilderotter had ultimate control over the actions of Frontier. Thereafter, as Executive Chairman until April 2016, Wilderotter continued to have control over the actions of Frontier.

280.    Defendant McCarthy served as Frontier's President and Chief Operating Officer at the start of the Class Period, and became CEO and President on April 3, 2015 for the remainder of the Class Period. At all times during the Class Period, McCarthy was a senior manager of the Company, and accordingly had ultimate control over the actions of Frontier.

281.    Defendant Jureller served as Frontier's CFO from January 2013 to November 4, 2016. As a senior manager of the Company during those times, Defendant Jureller had ultimate control over the actions of Frontier.

282.    Defendant McBride served as Frontier's CFO from November 4, 2016 through the end of the Class Period. As a senior manager of the Company during those times, Defendant McBride had ultimate control over the actions of Frontier.

283.    Defendant Gianukakis served as Frontier's Vice President and Treasurer throughout the Class Period until his departure in April 2017. In this capacity as a senior manager of the Company, Defendant Gianukakis had ultimate control over the actions of Frontier.

284.    By reason of their positions as officers of Frontier, and more specifically as controlling officers—as can be seen by their corresponding ability to influence and control Frontier—each of these Individual Frontier Defendants is a "controlling person" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions, these Individual Frontier Defendants had access to adverse nonpublic financial information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same. Moreover, each of the Individual Frontier Defendants also culpably participated in providing false information and certifying and/or approving the false statements disseminated by Company during the Class Period. Each of the Individual Frontier Defendants was provided with or had access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

285.    As set forth above, the Individual Frontier Defendants caused Frontier to violate Section 10(b) of the Exchange Act by making material misstatements and omissions in connection with the purchase and sale of securities and by participating in a scheme and course of business or

conduct throughout the Class Period. This conduct was undertaken with the scienter and culpable participation of the Individual Frontier Defendants who knew of or recklessly disregarded the falsity of the Company's statements and the nature of its scheme during the Class Period.

286. As a direct and proximate result of these Individual Frontier Defendants' conduct, Plaintiffs and the Class suffered damages in connection with their purchase or acquisition of Frontier securities.

## XIII.    CLAIMS BROUGHT PURSUANT TO THE SECURITIES ACT

287. In this part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class (as defined in ¶ 360 below, except that Plaintiffs explicitly disclaim subparts [d] and [h] of ¶ 362 from these Securities Act allegations). Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims, except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made and at the time of the Offerings.

288. On June 2, 2015, Frontier announced two simultaneous offerings that would be used "to finance a portion of the cash consideration payable in connection with Frontier's previously announced acquisition of the wireline operations of Verizon Communications Inc. in California, Florida and Texas and to pay related fees and expenses": 1) an offering of 17,500,000 shares of Mandatory Convertible Preferred Stock, Series A, for $1.75 billion; and 2) an offering of 150,000,000 shares of common stock, for $750 million. On June 2, 2015 and June 8, 2015, Frontier filed for each of the Offerings a prospectus supplement to its April 20, 2015 registration statement and prospectus filed on Form S-3. The Offerings were underwritten by Securities Act Defendants J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated;

Citigroup Global Markets Inc.; Barclays Capital Inc.; Credit Suisse Securities (USA) LLC; Morgan Stanley & Co. LLC; Mizhuo Securities USA Inc.; Deutsche Bank Securities Inc.; Goldman Sachs & Co.; and UBS Securities LLC (collectively, the "Underwriter Defendants").

289.   On June 10, 2015, Frontier announced that it was closing the Offering, having raised a total of $2.5 billion from public investors. In addition, pursuant to the Offerings, Frontier had granted the Underwriter Defendants a 30-day overallotment option to purchase from Frontier up to an additional 15,000,000 shares of common stock and up to an additional 1,750,000 shares of Preferred Stock, in each case at the same prior public offering price per share. On or about June 19, 2015, the Underwriter Defendants exercised the overallotment option, and closed the overallotment sale on or about June 24, 2015, generating additional proceeds of $75 million from sales of common stock, as well as an additional $175 million from sales of Preferred Stock. In all, during June 2015, Frontier obtained a total of $2.75 billion through the Offerings, all pursuant to the same April 20, 2015 registration statement.

290.   As described in further detail below, the Offering Documents contained or incorporated by reference (and thereby made anew) materially untrue or misleading statements and/or omissions concerning: the Company's purported "proven track record" of acquisitions; the existence of a "seasoned integration team;" and the estimated integration costs for the CTF Acquisition.

### A.   Securities Act Defendants

291.   Each of the following Defendants (referred to collectively as the "Securities Act Defendants") is statutorily liable under Sections 11, 12, and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated (and thereby made anew) in the Offering Documents.

292.     Securities Act Defendant Frontier is described in full at (¶18).

### 1.     The Securities Act Individual Defendants

293.     Securities Act Defendants McCarthy and Jureller (described above at ¶¶20, 21) were each officers of Frontier at the time of the filing of the Offering Documents. Defendants McCarthy and Jureller both signed the registration statement filed with the SEC on April 20, 2015. Defendant McCarthy was also a member of the Board at the time of the filing of the Offering Documents.

294.     Securities Act Defendant Wilderotter (described above at ¶19) served as Executive Chairman of Frontier from April 2015 to April 2016. As Executive Chairman, Wilderotter signed the registration statement filed with the SEC on April 20, 2015.

295.     Securities Act Defendant Donald W. Daniels ("Daniels") was, at all relevant times, the Company's Senior Vice President and Controller. Daniels was appointed to serve in this position on July 7, 2014 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As Senior Vice President and Controller, Daniels signed the registration statement filed with the SEC on April 20, 2015.

296.     Securities Act Defendant Leroy T. Barnes, Jr. ("Barnes") was, at all relevant times, a member of Frontier's Board of Directors. Barnes joined the Board of Directors on May 26, 2005 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Barnes signed the registration statement filed with the SEC on April 20, 2015.

297.     Securities Act Defendant Peter C.B. Bynoe ("Bynoe") was, at all relevant times, a member of Frontier's Board of Directors. Bynoe joined the Board of Directors on October 1, 2007 and continued to serve as a director through the end of the Class Period, including at the time

Frontier conducted the Offerings. As a director of Frontier, Bynoe signed the registration statement filed with the SEC on April 20, 2015.

298.     Securities Act Defendant Diana S. Ferguson ("Ferguson") was, at all relevant times, a member of Frontier's Board of Directors. Ferguson joined the Board of Directors on September 19, 2014 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Ferguson signed the registration statement filed with the SEC on April 20, 2015.

299.     Securities Act Defendant Edward Fraioli ("Fraioli") was, at all relevant times, a member of Frontier's Board of Directors. Fraioli joined the Board of Directors on July 7, 2010 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Fraioli signed the registration statement filed with the SEC on April 20, 2015.

300.     Securities Act Defendant Pamela D.A. Reeve ("Reeve") was, at all relevant times, a member of Frontier's Board of Directors. Reeve joined the Board of Directors on July 7, 2010 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Reeve signed the registration statement filed with the SEC on April 20, 2015.

301.     Securities Act Defendant Virginia P. Ruesterholz ("Ruesterholz") was, at all relevant times, a member of Frontier's Board of Directors. Ruesterholz joined the Board of Directors on July 31, 2013 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Ruesterholz signed the registration statement filed with the SEC on April 20, 2015.

302.     Securities Act Defendant Howard L. Schrott ("Schrott") was, at all relevant times, a member of Frontier's Board of Directors. Schrott joined the Board of Directors on July 26, 2005 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Schrott signed the registration statement filed with the SEC on April 20, 2015.

303.     Securities Act Defendant Larraine D. Segil ("Segil") was, at all relevant times, a member of Frontier's Board of Directors. Segil joined the Board of Directors on March 7, 2005 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Segil signed the registration statement filed with the SEC on April 20, 2015.

304.     Securities Act Defendant Mark Shapiro ("Shapiro") was, at all relevant times, a member of Frontier's Board of Directors. Shapiro joined the Board of Directors on July 7, 2010 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Shapiro signed the registration statement filed with the SEC on April 20, 2015.

305.     Securities Act Defendant Myron A. Wick, III ("Wick") was, at all relevant times, a member of Frontier's Board of Directors. Wick joined the Board of Directors on March 7, 2005 and continued to serve as a director through the end of the Class Period, including at the time Frontier conducted the Offerings. As a director of Frontier, Wick signed the registration statement filed with the SEC on April 20, 2015.

306.     Each of the Securities Act Individual Defendants, by virtue of his or her management or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. The Securities Act Individual

Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations and financial reporting of Frontier. By virtue of such duties, these officers and directors were required to supervise the preparation and dissemination of the Offering Documents.

307.   All of the Securities Act Individual Defendants were control persons of Frontier within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of Frontier and/or as senior executives and/or directors of Frontier. The Securities Act Individual Defendants, at the time they held positions with Frontier, were able to, and did, exercise substantial control over the operations of Frontier, including control of the materially untrue and misleading statements, omissions and course of conduct complained of herein.

308.   It is appropriate to treat all of the Securities Act Individual Defendants as a group for pleading purposes and to presume that the untrue and misleading information conveyed in the Offering Documents as alleged herein is the collective action of the narrowly defined group of defendants identified above.

309.   As officers, directors, and/or controlling persons of a publicly held company and under the federal securities laws, the Securities Act Individual Defendants had a duty: (a) to disseminate promptly complete, accurate, and truthful information with respect to Frontier; (b) to correct any previously issued statements from any source that had become materially misleading or untrue; and (c) to disclose any trends that would materially affect earnings and the present and future operating results of Frontier, so that the market price of Frontier's publicly traded securities would be based upon truthful and accurate information.

### 2.     The Underwriter Defendants

310.    Securities Act Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is a Delaware limited liability company with headquarters in New York, NY. J.P. Morgan is a wholly owned subsidiary of JPMorgan Chase & Co., and an SEC-registered broker-dealer that engages in investment banking activities in the U.S. J.P. Morgan served as a joint book-running manager for the Offerings. J.P. Morgan was paid at least $37,500,000 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

311.    Securities Act Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a Delaware corporation with its principal place of business in New York, New York. Merrill Lynch is the Wealth Management division of Bank of America. Merrill Lynch served as a joint book-running manager for the Offerings. Merrill Lynch was paid at least $9,187,500 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

312.    Securities Act Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York corporation with its principal place of business in New York, New York. It is a wholly owned subsidiary and investment banking and financial advisory division of Citigroup, Inc. Citigroup served as a joint book-running manager for the Offerings. Citigroup was paid at least $9,187,500 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

313.    Securities Act Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability corporation with headquarters in New York, NY. Credit Suisse operates as an investment bank in the United States. Credit Suisse served as a co-manager for the Offerings. Credit Suisse was paid at least $3,525,000 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

314.    Securities Act Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with headquarters in New York, NY. Barclays operates as a brokerage firm and investment advisor in the United States. Barclays served as a co-manager for the Offerings. Barclays was paid at least $3,525,000 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

315.    Securities Act Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability corporation with headquarters in New York, NY. Morgan Stanley operates as an investment bank in the United States. Morgan Stanley served as a co-manager for the Offerings. Morgan Stanley was paid at least $3,525,000 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

316.    Securities Act Defendant Mizuho Securities USA LLC ("Mizuho") is a Delaware limited liability corporation with headquarters in New York, NY. Mizuho operates as an investment bank in the United States. Mizuho served as a co-manager for the Offerings. Mizuho was paid at least $3,525,000 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

317.    Securities Act Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a Delaware corporation with headquarters in New York, NY. Deutsche Bank operates as an investment bank in the United States. Deutsche Bank served as a co-manager for the Offerings. Deutsche Bank was paid at least $3,187,500 for its service in connection with the Offerings s, plus additional fees in connection with its purchases in the overallotment.

318.    Securities Act Defendant Goldman, Sachs & Co. LLC ("Goldman Sachs") is a New York limited liability corporation with headquarters in New York, NY. Goldman Sachs operates as an investment management company in the United States. Goldman Sachs served as a co-manager

for the Offerings. Goldman Sachs was paid at least $918,750 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

319.   Securities Act Defendant UBS Securities LLC ("UBS") is a Delaware limited liability corporation with headquarters in New York, NY. UBS operates as an investment bank in the United States. UBS served as a co-manager for the Offerings. UBS was paid at least $918,750 for its services in connection with the Offerings, plus additional fees in connection with its purchases in the overallotment.

**B.   The Offering Documents Included Material Misstatements And Omissions**

320.   As referenced above, the Offering Documents contained and also incorporated (and thereby made anew) numerous material misstatements and omissions regarding: (i) the Company's purported "proven track record" of acquisitions (Section IV(B), IV(E)(1)); (ii) the existence of a "seasoned integration team" (Section IV(B), IV(E)(2)); and (iii) the estimated integration costs for the CTF Acquisition (Section IV(B), IV(C), IV(E)(3)).

**1.   Proven Track Record**

321.   On February 5, 2015, Frontier filed a Form 8-K, later incorporated by reference into the Offering Documents, which contained a press release announcing the CTF Acquisition. In this press release Wilderotter stated that the acquisition "leverages our proven skills and established track record from previous integrations." The Form 8-K also contained an investor

presentation in support of the CTF Acquisition that presented Frontier's "Proven Integration Experience" and a "proven track record of successfully integrating acquired properties":



322.    The Securities Act Defendants' statements contained in the Form 8-K, which was incorporated by reference into the Offering Documents, in ¶321 above, materially misstated that, as discussed in detail above in (Section IV(E)(1)), Frontier had ever "successfully integrated" the West Virginia Flash Cut or the Connecticut Acquisition. First, as discussed above (Section IV(E)(1)(a)), the West Virginia Flash Cut was not successful. As FE-1 explained, Frontier failed to acquire most of Verizon's data before the cutover, preventing Frontier from billing customers for the first six months following the West Virginia Flash Cut. FE-1 estimated that the Company lost 25% of its West Virginia customers after the West Virginia Flash Cut, and at least a year and a half passed before the Company stopped losing customers month over month. Frontier's own reporting corroborates this estimate, having disclosed a 5% net decline between 2010 and 2011 in

its aggregate number of access lines and high-speed internet subscribers for all of West Virginia (not particularized just to the customers acquired in West Virginia Flash Cut). Second, as described above (Section IV(E)(1)(b)), the Connecticut Acquisition was even less successful than West Virginia. According to FE-4 and FE-6, the Connecticut Acquisition resulted in data loss, customer loss, and increased integration costs that lasted for months. After the Offering, McCarthy acknowledged that the Connecticut Acquisition "impact[ed]" Frontier with "attendant revenue decline." Finally, as described above (Section IV(E)(1)(c)), FE-8, FE-9, FE-10, and FE-7 each explained that Frontier never integrated these prior acquisitions. FE-10 and FE-9 explained that, rather than integrating its prior acquisitions, the Company violated industry practice by maintaining multiple, separate databases and systems to track and manage customers acquired in past transactions. FE-9 explained that Frontier assigned its customers unique identification codes based on the customer's landline phone numbers rather than designated account numbers—and continued to use this system even as fewer customers maintained landline phones. As a result, Frontier invented mock landline phone numbers to account for these customers, sometimes assigning different "phone numbers" to the same customer across systems, preventing the Company from tracking that customer or linking multiple accounts together. Accordingly, the Securities Act Defendants' statements about Frontier's "proven track record" of successfully integrating previous acquisitions were materially untrue and misleading because they omitted these material facts.

### 2.      Seasoned Integration Team

323.    On February 5, 2015, the Securities Act Defendants filed a Form 8-K, which was incorporated by reference into the Offering Documents, which contained a press release

announcing the CTF Acquisition. This press release stated, "Frontier's seasoned integration team will convert California, Florida and Texas properties onto Frontier's systems at close."

324.   The Securities Act Defendants' statements in ¶323 above materially misstated, as discussed in detail above in (Section IV(B), IV(E)(2)), the existence of a "seasoned integration team." FE-11 reported that the Company relocated or terminated many employees in the period between the 2010 Verizon Acquisition and the Connecticut Acquisition. FE-11 also described that, while Senior Vice President of Network and Engineering Integration Michael Golob and Senior Vice President of Network Planning and Engineering Scott Mispagel had overseen the Connecticut Acquisition, Frontier promoted to CTO Steve Gable, who had never managed an acquisition, and assigned him responsibility for overseeing the CTF Acquisition. Further, Frontier's reliance on contractors contradicted the Securities Act Defendants' claims that a "seasoned integration team" was in charge. According to FE-8, many knowledgeable senior IT employees left the Company within weeks of the announcement of the CTF Acquisition, having not been consulted in advance of Frontier's decision to enter into the CTF Acquisition agreement. As a result, Frontier's team undertaking the CTF Acquisition that had no familiarity with or expertise in the procedures involved in a flash cut. Thus, the Securities Act Defendants' statements about Frontier's "seasoned integration team" leading the CTF Acquisition were materially untrue and misleading because they omitted the material facts contradicting these statements.

### 3.   Estimated Integration Costs

325.   Each of the prospectus supplements incorporated in the Offering Documents contained the following untrue and misleading statement:

> [T]he Company currently expects that ***it will incur approximately $450 million of operating expenses and capital expenditures in total related to acquisition and integration activities in 2015 and 2016 associated with the Verizon Transaction***, the amount of such operating expenses and capital expenditures may increase based

on a variety of factors.

326.    The Company's February 5, 2015 Form 8-K current report, incorporated by reference into the Offering Documents, also contained a presentation stating that the Company "estimated OpEx and CapEx integration cost [would be] approximately $450 million in 2015/2016."

327.    Frontier disclosed on February 28, 2018 that the final integration costs for the CTF Acquisition were $962 million.

328.    The Securities Act Defendants' statements in ¶¶325-26 above omitted material information that, as discussed above (Section IV(B), IV(C), IV(E)(3)), the Company had no reasonable basis for the $450 million estimate, and the Company's contemporaneous internal analysis contradicted it. As described more fully above (Section IV(E)(3)), FE-8 explained that no reasonable basis existed for the estimated integration costs they provided on February 5, 2015, because Frontier management had not consulted with the Company's senior IT staff prior to agreeing to the CTF Acquisition, which would be necessary to estimate accurately the costs for the CTF Acquisition. Further, as discussed above (Section IV(E)(3)), the Company commissioned a Gap Analysis for the CTF Acquisition, which projected that the transition required the Company to address more than 400 gaps at a cost of approximately $1 billion dollars. Accordingly, the Securities Act Defendants' statements about the acquisition and integration costs of the CTF Acquisition were materially untrue and misleading because they omitted these material facts.

## C.    The Securities Act Defendants' Failure To Exercise Reasonable Care Or To Conduct A Reasonable Investigation In Connection With The Offering

329.    None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects.

330.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information. Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

331.    Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

332.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the Offering Documents and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. In particular, the Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the statements regarding: (i) the Company's purported "proven track record"

of acquisitions (Sections IV(B), IV(E)(1)); (ii) the existence of a "seasoned integration team" (Sections IV(B), IV(E)(2)); and (iii) the estimated integration costs for the CTF Acquisition (Sections IV(B), IV(C), IV(E)(3)).

333.   The Underwriter Defendants could not simply rely on the work of Frontier's outside auditors because the investing public relies on the underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. Moreover, the untrue and misleading statements and omissions described above were disclosed in unaudited filings. Thus, the Underwriter Defendants must conduct their own, independent (and reasonable) investigation. Had the Underwriter Defendants conducted a reasonable investigation, they would have known that the Offering Documents contained material misstatements and omissions concerning (i) the Company's purported "proven track record" of acquisitions (Sections IV(B), IV(E)(1)); (ii) the existence of a "seasoned integration team" (Sections IV(B), IV(E)(2)); and (iii) the estimated integration costs for the CTF Acquisition (Sections IV(B), IV(C), IV(E)(3)). The failure of the Underwriter Defendants to conduct a reasonable investigation into the accuracy and completeness of the Company's statements is all the more apparent in light of the fact that several of these Underwriter Defendants had played key roles in the debt issued by the Company to fund its calamitous acquisition strategy discussed above. For example, J.P. Morgan, Citigroup, Barclays, Credit Suisse, and Deutsche Bank had been the underwriters for some or all of Frontier's issuance of $1.55 billion in notes to fund in part the Connecticut Acquisition. In addition, J.P. Morgan had acted as an adviser to the Company in connection with the Connecticut Acquisition.

334.   Similarly, the Securities Act Individual Defendants who signed the Registration Statement and failed to conduct a reasonable investigation of the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess

reasonable grounds for believing that the statements therein were true and not materially misstated. Had these Securities Act Individual Defendants conducted a reasonable investigation, they would have known that the Offering Documents contained material misstatements and omissions concerning (i) the Company's purported "proven track record" of acquisitions (Sections IV(B), IV(E)(1)); (ii) the existence of a "seasoned integration team" (Sections IV(B), IV(E)(2)); and (iii) the estimated integration costs for the CTF Acquisition (Sections IV(B), IV(C), IV(E)(3)).

335.    These Securities Act Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the Company's misstatements and omissions notwithstanding numerous "red flags," including the Company's history of disastrous flash cuts and failed integrations, which had occurred prior to the Offering (as set forth in Section IV(E)(1) above).

**THIRD CLAIM FOR RELIEF**
**For Violations of Section 11 of the Securities Act**
**(Against Frontier, the Securities Act Individual Defendants**
**and the Underwriter Defendants)**

336.    Plaintiffs repeat and reallege each and every allegation contained above.

337.    This claim is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Frontier, the Securities Act Individual Defendants and the Underwriter Defendants, and does not sound in fraud.

338.    The Offering Documents for the Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

339.    The Company is the registrant for the Offerings. As signatories of the Offering Documents, the Securities Act Individual Defendants were responsible for their contents and dissemination.

340.    As issuer of the shares, Frontier is strictly liable to Plaintiffs and to the members of the Class for the material misstatements and omissions contained in the Offering Documents.

341.    The Underwriter Defendants served as the underwriters for the Offerings and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents.

342.    None of the Securities Act Individual Defendants or Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

343.    The Securities Act Defendants named in this claim issued, caused to be issued and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Securities Act Defendant violated Section 11 of the Securities Act.

344.    Plaintiffs and other members of the Class acquired Frontier common stock and/or Preferred Stock pursuant to, or traceable to, the defective Offering Documents.

345.    Plaintiffs and the Class have sustained damages. The value of Frontier's common stock and Preferred Stock has declined substantially subsequent to and due to the violations described herein.

346.     At the times they purchased Frontier common stock and/or Preferred Stock, Plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to Frontier's subsequent announcements.

**FOURTH CLAIM FOR RELIEF**
**For Violations of Section 12(a)(2) of the Securities Act**
**(Against Frontier and the Underwriter Defendants)**

347.     Plaintiffs repeat and reallege each and every allegation contained above.

348.     This claim is brought by Plaintiffs pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all purchasers of Frontier common stock and Preferred Stock in connection with, and traceable to, the Offerings and does not sound in fraud.

349.     Frontier and the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the Offering Documents in connection with the Offerings.

350.     The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Frontier and the Underwriter Defendants' actions of solicitation included participating in the preparation of the untrue and misleading Offering Documents.

351.     Frontier and the Underwriter Defendants owed to the purchasers of Frontier common stock and Preferred Stock, including Plaintiffs and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Frontier and the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents as set forth above.

352.     Plaintiffs and other members of the Class purchased or otherwise acquired Frontier securities pursuant to and traceable to the defective Offering Documents. Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

353.     Plaintiff, individually and representatively, hereby offers to tender to Frontier and the Underwriter Defendants those securities that Plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

354.     By reason of the conduct alleged herein, Frontier and the Underwriter Defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Class who hold Frontier securities purchased in the Offerings have the right to rescind and recover the consideration paid for their Frontier shares and, hereby elect to rescind and tender their Frontier securities to Frontier and the Underwriter Defendants sued herein. Class members who have sold their Frontier common stock and/or Preferred Stock are entitled to rescissionary damages.

**FIFTH CLAIM FOR RELIEF**
**For Violations of Section 15 of the Securities Act**
**(Against the Securities Act Individual Defendants)**

355.     Plaintiffs repeat and reallege each and every allegation contained above.

356.     This claim is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Securities Act Individual Defendants and does not sound in fraud.

357.     Each of the Securities Act Individual Defendants was a control person of Frontier by virtue of his position as a director and/or as senior officer of the Company. Each of the Securities Act Individual Defendants were control persons of Frontier within the meaning of Section 15 of

the Securities Act by reason of their own involvement in the daily business of Frontier and/or as senior executives or directors of Frontier. The Securities Act Individual Defendants, at the time they held positions with Frontier, were able to, and did, exercise substantial control over the operations of Frontier, including control of the materially untrue and misleading statements, omissions and course of conduct complained of herein.

358.   Each of the Securities Act Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in claims III and IV above, based on having signed the Offering Documents and having otherwise participated in the process that allowed the Offerings to be successfully completed.

359.   As a result of the foregoing, Plaintiffs and the other members of the Class have suffered damages.

## XIV.   CLASS ACTION ALLEGATIONS

360.   Lead Plaintiffs bring this lawsuit pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and on behalf of a Class of persons who: (i) purchased or otherwise acquired Frontier securities during the Class Period; and/or (ii) purchased or otherwise acquired the common or Preferred Stock of Frontier either in or traceable to the Offerings, and were damaged thereby. Excluded from the Class are: Defendants; members of the immediate family of each Defendant; any person who was an officer or director of Frontier or any of the Underwriter Defendants during the Class Period; any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; any person who participated in the wrongdoing alleged herein; and the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any such excluded party.

361.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. Throughout the Class Period, Frontier's common stock was actively traded on NASDAQ, an efficient market. As of March 12, 2018, Frontier had more than 78 million shares of common stock outstanding. In addition, the Company issued 17,500,000 shares of Mandatory Convertible Preferred Stock in the Offering. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of thousands of members in the Class.

362.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

    a) Whether Defendants violated the federal securities laws;
    b) Whether Defendants misrepresented material facts concerning Frontier;
    c) Whether Defendants' statements omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made;
    d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;
    e) Whether Defendants engaged in perpetrating a manipulative and deceptive device and/or scheme and/or otherwise engaged in a fraudulent course of conduct;
    f) Whether the Offering Documents contained material misstatements or omissions;
    g) Whether the Frontier SEC filings issued during the Class Period which contained financial information (i.e., its Forms 10-K, 10-Q, 8-K, and S-3) contained untrue or materially misleading statements;
    h) Whether the prices of Frontier's common stock were artificially inflated; and
    i) The extent of damage sustained by Class members and the appropriate measure of damages.

363.    The claims of Plaintiffs are typical of those of the Class.

364.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

365.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XV.   PRAYER FOR RELIEF

366.   WHEREFORE, Plaintiffs pray for judgment individually and on behalf of the Class, as follows:

a)   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;
b)   Awarding Plaintiffs and the Class members damages, including interest;
c)   Awarding Plaintiffs reasonable costs, including attorneys' and experts' fees; and
d)   Awarding such equitable/injunctive or other relief for the benefit of the Class as the court may deem just and proper.

## XVI.   JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury on all issues.

Dated: April 30, 2018                    Respectfully submitted,

*/s/ Katherine M. Sinderson*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Katherine M. Sinderson (phv09412)
Jesse L. Jensen (phv09430)
Kate W. Aufses (phv09437)
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
katiem@blbglaw.com
jesse.jensen@blbglaw.com
kate.aufses@blbglaw.com

*Counsel for Lead Plaintiffs Arkansas Teacher Retirement System and Carlos Lagomarsino, and Lead Counsel for the Class*

**MOTLEY RICE LLC**

William H. Narwold (ct 00133)

Mathew P. Jasinski (ct 27520)
One Corporate Center, 17th Floor
20 Church Street
Hartford, Connecticut 06103
Tel.: (860) 882-1675
Fax: (860) 882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

*Liaison Counsel for Lead Plaintiffs Arkansas
Teacher Retirement System and Carlos
Lagomarsino*

**APPENDIX A**
**Former Employee[12] Key**

| FE No. | Tenure | Relevant Position(s) or Role(s) |
|---|---|---|
| 1 | 2010 – 2014 | Sales & Project Manager |
| 2 | 2010 – 2013 | Network Manager, Frontier's North Carolina Central Office |
| 3 | 2016 – 2016 | Florida Director of Operations |
| 4 | 2009 – 2017 | National Manager, Ethernet Engineering |
| 5 | 2011 – 2017 | Senior Project Manager, IT |
| 6 | 2014 – 2016 | Director of Commercial Marketing, West Region |
| 7 | 2015 – 2017 | Senior Network Software Engineer |
| 8 | 2013 – 2015 | Senior IT Administrator |
| 9 | 2015 – 2016 | Senior Technical Analyst, Commercial Business Technical Support |
| 10 | 2015 – 2016 | IT System Management, Managing Engineer |
| 11 | 2011 – 2015 | Director of Network Infrastructure |
| 12 | 2015 – 2016 | IT Project Management Specialist |
| 13 | 2016 | Manager, National Operations Support |
| 14 | 2016 | Network Engineer |
| 15 | 2008 – 2017 | Senior IT Professional |
| 16 | 2015 – 2017 | Vice President, Corporate Marketing |
| 17 | 2016 – 2017 | Florida Director of Operations; Associate Vice President, Engineering |
| 18 | 2010 – 2017 | Vice President of East Operations |
| 19 | 2016 – 2017 | Director of Network Operations for Florida |

---

[12] As stated in the Complaint, "Former Employee" and "FE" refers to both former employees and contractors of Frontier.

| FE No. | Tenure | Relevant Position(s) or Role(s) |
|---|---|---|
| 20 | 2016 – 2017 | Corporate Sourcing Vendor Management |
| 21 | 2015 – 2017 | Software Team Leader |
| 22 | 2016 | Construction Manager |
| 23 | 2017 – 2017 | Senior Manager, Circuit Coordination Center |
| 24 | 2015 – 2017 | Senior Auditor, Internal Audit Department |
| 25 | 2016 – 2017 | Fiber Customer Support Analyst |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of April 2018, a copy of the foregoing Consolidated Class Action Complaint for Violations of the Federal Securities Laws was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Katherine M. Sinderson*
Katherine M. Sinderson (phv09412)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel.: (212) 554-1392
Fax: (212) 554-1444
katiem@blbglaw.com

148