# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| *In re* FRONTIER COMMUNICATIONS, CORP. STOCKHOLDERS LITIGATION | No. 3:17-cv-1617 (VAB) |

## RULING AND ORDER ON MOTIONS TO DISMISS

On April 30, 2018, Arkansas Teacher Retirement System ("ATRS") and Carlos Lagomarsino ("Mr. Lagomarsino" or, in conjunction with ATRS, "Lead Plaintiffs"), filed an amended class action Complaint ("Am. Class Compl.") on behalf of shareholders who "purchased or otherwise acquired the publicly traded common stock of Frontier Communications Corporation ("Frontier") between February 6, 2015 and February 28, 2018, inclusive ("Class Period"); and/or (ii) purchased or otherwise acquired Frontier common stock or Mandatory Convertible Preferred Stock (collectively, "Frontier Securities") either in or traceable to the Company's offerings of common and preferred stock conducted on or about June 2, 2015 and June 8, 2015." Consol. Class Action Compl. for Violations of the Federal Securities Laws ("Am. Class Compl."), ECF No. 134 ¶ 1.[1]

Lead Plaintiffs are suing numerous Defendants, described below, for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o); Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 of The Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. Am. Class Compl. ¶¶ 1, 12.

---

[1] The Court presumes the parties' familiarity with the facts as set forth in its January 18, 2018 Ruling and Order on the Motions to Consolidate, Appoint Lead Plaintiffs, and Approve Lead Counsel, ECF No. 99. The Court sets forth only those facts deemed necessary to an understanding of the issues raised and decision on this motion.

Defendants have moved to dismiss the case, arguing that Plaintiffs have failed to: (1) state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6); (2) satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), and 15 U.S.C. §§ 77k, 77l(a)(2), 77o, 78t(a), 78u-4(b)(1)(A–B), 78u-4(b)(2)(A), 78u-4(b)(4); or (3) file this lawsuit within the statute of limitations period imposed by 15 U.S.C. § 77m and 28 U.S.C. § 1658(b)(1). Notice of Defs. Mot. to Dismiss the Consol. Class Action Compl., ECF No. 143, 146; Mem. of Law in Support of Defs. Mot. to Dismiss the Consol. Class Action Compl. ("Def. Mem. of Law"), ECF No. 144.

For the reasons set forth below, the Court now **GRANTS** Defendants' motions to dismiss, ECF Nos. 143, 146.

To the extent that the deficiencies in this ruling can be addressed, Plaintiffs may file a motion for leave to amend the Amended Class Action Complaint, along with a proposed amended pleading, by **May 10, 2019**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

This lawsuit focuses on Frontier's planned acquisition of Verizon's California, Texas, and Florida wireline operations ("CTF Acquisition") and related efforts to raise capital in 2015–16. *See e.g*., Am. Class Compl. ¶ 2; Def. Mem. of Law at 2.[2]

#### 1.  The Defendants

Plaintiffs have sued three groups of Defendants: (1) the Frontier Defendants, (2) Additional Securities Act Defendants, and (3) the Underwriter Defendants.

---

[2] ECF pagination for all documents unless otherwise specified.

### a. The Frontier Defendants

Plaintiffs allege violations of Section 10(b) of the Exchange Act, SEC Rule 10b-5, and Section 11 of the Securities Act, against Frontier, a Delaware corporation based in Connecticut, Am. Class Compl. ¶ 18, and violations of Section 10(b) of the Exchange Act, SEC Rule 10b-5, and 20(a) of the Exchange Act against five corporate officers (together with Frontier, "the Frontier Defendants"):

- Mary Agnes Wilderotter ("Ms. Wilderotter"), who allegedly served as Frontier's Chief Executive Officer ("CEO") from November 2004 to April 2015, and as a member of the Company's Board of Directors "at all relevant times until April 2016," *id.* ¶ 19, and as the Company's Executive Chairman from April 2015 to April 2016, *id.*;

- Daniel J. McCarthy ("Mr. McCarthy"), who allegedly served as Frontier's Executive Vice President ("EVP") and Chief Operating Officer ("COO") from January 2006 to April 2012, as Frontier's President and COO from April 2012 to April 2015, as Frontier's President and CEO from April 3, 2015 to the present, and as a member of Frontier's Board of Directors during all relevant times, *id.* ¶ 20;

- John M. Jureller ("Mr. Jureller"), who allegedly served as the company's EVP and Chief Financial Officer ("CFO") from January 2013 to November 4, 2016, *id.* ¶ 21;

- Ralph Perley McBride ("Mr. McBride"), who allegedly served as Frontier's CFO from November 4, 2016 through the end of the class period, *id.* ¶ 22; and

- John Gianukakis ("Mr. Gianukakis"), who allegedly served as Frontier's Vice President and Treasurer from May 27, 2014 to April 2017, *id.* ¶ 23.

Mr. Jureller, Mr. McCarthy, and Ms. Wilderotter allegedly filed false statements with the SEC. ¶¶ 293–296.

### b. Additional Securities Act Defendants

Eleven additional individual Defendants allegedly violated Sections 11 and 15 of the Securities Act:

- Donald W. Daniels ("Mr. Daniels"), who allegedly served as Frontier's Executive Chairman from April 2015 to April 2016, *id.* ¶ 295;

- Leroy T. Barnes, Jr. ("Mr. Barnes"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 296;

- Peter C.B. Bynoe ("Mr. Bynoe"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 297;

- Diana S. Ferguson ("Ms. Ferguson"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 298;

- Edward Fraioli ("Mr. Fraioli"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 299;

- Pamela D.A. Reeve ("Ms. Reeve"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 300;

- Virginia Ruesterholz ("Ms. Ruesterholz"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 301;

- Howard L. Schrott ("Mr. Schrott"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 302;

- Larraine D. Segil ("Ms. Segil"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 303;

- Mark Shapiro ("Mr. Shapiro"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 304; and

- Myron A. Wick, III ("Mr. Wick"), who allegedly served as a member of Frontier's Board of Directors at all relevant times, *id.* ¶ 305.

### c.    The Underwriter Defendants

Ten underwriter Defendants also allegedly violated Sections 11 and 12(a)(2)of the

Securities Act:

- J.P. Morgan Securities LLC ("J.P. Morgan"), allegedly a Delaware limited liability company (LLC) with headquarters in New York, New York. J.P. Morgan was allegedly paid at least $37,500,000 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id.* ¶ 310;

- Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), allegedly a Delaware corporation with a principal place of business in New York, New York. Merrill was allegedly paid at least $9,187,500 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id.* ¶ 311;

- Citigroup Global Markets Inc. ("Citigroup"), allegedly a New York corporation with a principal place of business in New York, New York. Citigroup was allegedly paid at least $9,187,500 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id.* ¶ 312;

- Credit Suisse Securities USA LLC ("Credit Suisse"), allegedly a Delaware LLC with headquarters in New York, New York. Credit Suisse was allegedly paid at least $3,525,000 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id.* ¶ 313;

- Barclays Capital Inc. ("Barclays"), allegedly a Connecticut corporation with headquarters in New York, New York. Barclays was allegedly paid at least $3,525,000 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id.* ¶ 314;

- Morgan Stanley & Co. LLC ("Morgan Stanley"), allegedly a Delaware LLC with headquarters in New York, New York. Morgan Stanley was allegedly paid at least $3,525,000 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id.* ¶ 315;

- Mizuho Securities USA LLC ("Mizuho"), allegedly a Delaware corporation with headquarters in New York, New York. Mizuho was allegedly paid at least $3,525,000 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id.* ¶ 316;

- Deutsche Bank Securities Inc. ("Deutsche Bank"), allegedly a Delaware corporation with headquarters in New York, New York. Deutsche Bank was allegedly paid at least $3,187,500 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id.* ¶ 317;

- Goldman Sachs & Co. LLC ("Goldman Sachs"), allegedly a New York LLC with headquarters in New York, New York. Goldman Sachs was allegedly paid at least $918,750 for services in connection with the Offerings described below, plus

additional fees in connection with its purchases of overallotment Frontier stock, *id*. ¶ 318; and

- UBS Securities LLC ("UBS"), allegedly a Delaware corporation with headquarters in New York, New York. UBS was allegedly paid at least $918,750 for services in connection with the Offerings described below, plus additional fees in connection with its purchases of overallotment Frontier stock, *id*. ¶ 319.

### 2.    Relevant Events Leading up to the CTF Acquisition Announcement

In July 2010, Frontier "embarked on what was then [allegedly] the Company's largest purchase to date: the 2010 Verizon Acquisition. The . . . Acquisition tripled Frontier's size by adding nearly five million wireline customers across fourteen states." Am. Class Compl. ¶ 32. In one of the acquired states, West Virginia, Frontier allegedly departed from the "industry-standard 'lease back' method" of gradually merging the acquired and acquiring company's equipment, systems, and accounts, *id*. ¶¶ 29, 33, to a faster "flash cut" method in which the "acquired company's assets turn over to the acquirer in one immediate transfer at the close of the acquisition . . . without any phase-in periods." *Id*. ¶¶ 30, 33. Following the acquisition, Frontier Defendants allegedly "quickly labeled the West Virginia Flash Cut a triumph." *Id*. ¶ 34. Allegedly, Frontier's West Virginia flash cut was not a triumph. *See*, *e.g*., *id*. ¶ 63. While the Frontier Defendants maintained that the flash cut was a success, *id*. ¶ 34, they nonetheless described the process as complex, or "the corporate equivalent of brain surgery . . . . " *Id*. ¶ 28.

On December 17, 2013, Frontier allegedly announced its next flash cut project: "all of AT&T's wireline business and [] statewide fiber optics network in Connecticut[.]" *Id*. ¶ 35. The Connecticut acquisition allegedly "brought Frontier to denser suburban and even light urban markets for the first time in the Company's history." *Id*. ¶ 3. Ms. Wilderotter allegedly claimed, "We are very confident in our ability to integrate this property successfully and efficiently on this rapid schedule just as we did the flash cut of West Virginia back in 2010." *Id*. ¶ 35.

Nevertheless, on the day of the announcement, a Morningstar analyst allegedly wrote that Frontier was still having challenges integrating its past acquisitions. *Id*. ¶ 263. The analyst allegedly characterized the performance bonuses awarded to Ms. Wilderotter, Mr. McCarthy, and Mr. Jureller as "premature." *Id*.

On October 14, 2014, Frontier customers in West Virginia filed a putative class action complaint alleging that Frontier's Internet service was much slower than promised. *Id*. ¶ 63; *Sheridan v. Citizens Telecomm. Co. of W. Va.*, No. 14-cv-115 (W.Va. Cir. Ct., Lincoln Cnty. 2014); *rev'd, Citizens Telecomm. Co. of W. Va. v. Sheridan*, 239 W. Va. 67, 71, 799 S.E.2d 144, 154 (2017) ("For the foregoing reasons, we reverse the November 30, 2015 order of the Circuit Court of Lincoln County [denying the motion to compel arbitration] and remand with instructions to enter an order compelling arbitration on an individual basis.").

Eleven days later, on October 25, 2014, the Connecticut flash cut allegedly occurred. *Id*. ¶ 38. Within two days, Frontier's East Region President allegedly claimed that "the overwhelming majority of customers, approximately 99 percent, experienced a seamless transition from AT&Ts service to Frontier." *Id*. ¶ 38. That statement allegedly was not true. ¶ 68. Additionally, in the month following the flash cut, Connecticut's Public Utilities Regulatory Authority ("PURA") allegedly "received more complaints about Frontier . . . than it had received over the prior year for all other cable providers in the state combined." *Id*. ¶ 68.

On November 14, 2014, Connecticut's Attorney General and Department of Consumer Protection allegedly "filed a request that PURA convene a meeting at which the public could confront Frontier's officials and provide testimony regarding their complaints." *Id*. That meeting was allegedly held on December 22, 2014. *Id*. "At that meeting, Frontier executives [allegedly] appeared before Connecticut's disgruntled customers and, as the *New Haven Register* [allegedly]

described, outlined 'the most glaring misjudgments' that plagued the Connecticut Acquisition: (1) Frontier's training only '70 of a possible 322 AT&T customer service employees . . . on the new company's systems'; (2) '[u]nderestimating the volume of customer complaints Frontier would receive by 12 percent'; and (3) '[p]roblems with loss of video-on-demand services and associated licensing agreements.'" *Id.*

Nevertheless, on December 8, 2014, Mr. Jureller, then Frontier's CFO, allegedly claimed that "probably 99%-plus of our [Connecticut] customers had a great experience." *Id.* ¶ 38. Three days later, Ms. Wilderotter, then Frontier's CEO, allegedly "announced that Frontier's board had voted to increase its dividend, 'reflect[ing] the Board's confidence in Frontier's business and financial strength and our solid execution performance in integrating the Connecticut acquisition.'" *Id.*

### 3. Announcement of and Fundraising for the CTF Acquisition

On February 5, 2015, Frontier allegedly announced the plan to acquire the California, Texas, and Florida wireline operations of Verizon Communications, Inc. *Id.* ¶¶ 2, 97; Def. Mem. of Law at 2. That day, Frontier held a press call for investors and filed a Form 8-K with the SEC, "in which Frontier [allegedly] stated that it 'estimated OpEx [Operating Expenses] and CapEx [Capital Expenditures] integration cost of approximately $450 million in 2015/2016' for the CTF Acquisition." Am. Class Compl. ¶ 190.[3]

During the press call, Mr. McCarthy, then Frontier's COO, allegedly stated that the $450 million would cover "total integration costs . . . . [including] both operating expense and capital

---

[3] *See* Form 10-K, the Securities and Exchange Commission, available at https://www.sec.gov/fast-answers/answers-form10khtm.html (last visited 3/8/2019) ("The federal securities laws require public companies to disclose information on an ongoing basis. For example, domestic companies must submit . . . current reports on Form 8-K for a number of specified events and must comply with a variety of other disclosure requirements.").

expense," *id*. ¶ 191; CEO Wilderotter allegedly added that Frontier had a "proven track record of achieving and exceeding acquisition cost savings . . . . [while] creat[ing] a smooth transition for customers with no disruption to service," *id*. ¶ 173. On February 5, 2015, Frontier's common stock price allegedly closed at $115.50. *Id*. ¶ 242.

The class period for this case begins on February 6, 2015. *Id*. ¶ 1. Less than three weeks later, on February 25, 2015, Frontier allegedly disclosed continuing service issues and cost overruns of ten percent on the Connecticut flash cut in a Form 10-K filing with the SEC. *Id*. ¶ 71.[4]

On March 3, 2015, Frontier allegedly announced the resignation of Ms. Wilderotter as the company's CEO. *Id*. ¶ 19. That same day, Frontier's CFO, Mr. Jureller, allegedly spoke at a Morgan Stanley Technology, Media & Telecommunication Conference. *Id*. ¶ 49. The analyst interviewing Mr. Jureller allegedly expressed surprise that the company was undertaking the CTF Acquisition so soon after the Connecticut flash cut; Mr. Jureller allegedly replied: "[W]e're the only ones that have successfully done carve-outs . . . and it's no easy feat to do. These are hard things to do [and] Connecticut . . . exceeded our expectations." *Id*. ¶¶ 49, 174, 256.

Several days later, on March 9, 2015, Mr. Jureller allegedly delivered a similar presentation at the Deutsche Bank Media, Internet and Telecommunication conference, stating: ". . . having done this before . . . . We have the playbook written. It is a lift. We've got three separate states that we're going to flash cut at one time, so knowing the value of the flash cut and

---

[4] *See* Form 10-K, the Securities and Exchange Commission, available at https://www.sec.gov/fast-answers/answers-form10khtm.html (last visited 3/8/2019) ("The federal securities laws require public companies to disclose information on an ongoing basis. For example, domestic companies must submit annual reports on Form 10-K[.] The annual report on Form 10-K provides a comprehensive overview of the company's business and financial condition and includes audited financial statements. Although similarly named, the annual report on Form 10-K is distinct from the 'annual report to shareholders,' which a company must send to its shareholders when it holds an annual meeting to elect directors.").

executing on that is going to be really important." *Id.* ¶ 175. On March 11, 2015, Mr. Jureller allegedly used the "playbooks" metaphor again at a Goldman Sachs Leveraged Finance Conference. *Id.* ¶ 176.

On April 28, 2015, Frontier and Verizon allegedly filed the proposed flash cut with the Federal Communications Commission, claiming that: "Existing retail and wholesale customers will continue to receive substantially the same services." *Id.* ¶ 50.

On May 15, 2015, Mr. McCarthy, now Frontier's CEO, allegedly told conference[5] attendees that the CTF Acquisition would "expand Frontier's business into 'fairly urban properties in Tampa and Dallas Fort-Worth and in Southern California[]' [and that t]hese areas . . . 'typically are more competitive than the more rural markets' Frontier had historically served, further compounding the demand for Frontier to deliver technical sophistication—sophistication that it never before had to deliver." *Id.* ¶ 47.

On May 28, 2015, Mr. McCarthy "appeared at the Sanford C. Bernstein Strategic Decisions Conference where he stated that Frontier had the ability to 'do heart and lung transplants in a weekend,' and that 'we've become comfortable at doing' integrations like the CTF Acquisition." *Id.* ¶ 177.

In contrast to these public statements, a number of Frontier employees allegedly had reservations about the company's ability to execute the CTF flash cut.[6] "[A] former senior technical analyst with Frontier . . . . [felt] that the Company operated with 'very little coherent thought' and unlike anything else he had seen in his/her career. As an example, FE-9 noted that

---

[5] Plaintiffs have not alleged the name or location of the May 15, 2015 conference.

[6] The unnamed sources cited by Plaintiff allegedly worked at the company for differing amounts of time and over varied years. Plaintiffs allege that staff learned about the CTF Acquisition along with the public, on February 5, 2015. *See, e.g*, Am. Class Compl. ¶ 74.

the Company did not even begin to create an operative organizational chart until approximately October 2015." *Id.* ¶ 81. A senior IT professional "described the existence, and senior management's awareness, of a 'Gap Analysis' prepared for the CTF Acquisition that revealed hundreds of gaps in functionality between Frontier and Verizon's systems." *Id.* ¶ 251. A senior technical analyst for Commercial Business Technical Support and Frontier's former ITSM Managing Engineer[7] alleged that Frontier "violated industry practice by maintaining multiple, separate databases and systems to track and manage customers acquired in past transactions," *id.* ¶ 77, and "described Frontier's systems as 'nightmarish,' 'absolutely trash,' and 'untechnological[,]'" *id.* ¶ 182. A former National Operations Support Manager who allegedly transitioned from Verizon as part of the CTF Acquisition described Frontier's technology as "'decades' behind Verizon's—even accounting for the fact that Verizon had stopped performing system enhancements on its CTF assets for the year prior to the CTF Flash Cut." *Id.* ¶ 85.

These and other Frontier employees allegedly predicted that the CTF flash cut would not go well. *See*, *e.g.*, *id.* ¶¶ 86–93. Some employees alleged that "Defendants knew the CTF Acquisition could not succeed because the Company had no understanding of the network it was acquiring from Verizon." *Id.* ¶ 94. The former ITSM Managing Engineer claims:

> those working on the CTF Flash Cut had explicitly warned Frontier management that the CTF Flash Cut would fail because Frontier had failed to fully map Verizon's network in advance of the cutover . . . . Frontier had no way of knowing what the network actually looked like and was making decisions about the flash cut largely by guessing . . . . [T]he failure to complete a network map was so dire that [I and my coworkers] had sent memoranda to, and had meetings with, Frontier management to recommend that the Company wait another four months before the CTF Flash Cut, but management ignored these entreaties."

*Id.* ¶ 94.

---

[7] Plaintiffs have not alleged the meaning of the acronym, "ITSM."

On June 2, 2015, Frontier announced two offerings that would "finance a portion of the cash consideration payable in connection with Frontier's previously announced [CTF Acquisition]." *Id.* ¶ 288. The stock offerings would allegedly include: "1) an offering of 17,500,000 shares of Mandatory Convertible Preferred Stock, Series A, for $1.75 billion; and 2) an offering of 150,000,000 shares of common stock, for $750 million." *Id.* On June 8, 2015, Frontier allegedly offered the Preferred Stock at $100.00 per share. *Id.* ¶ 242.

On June 10, 2015, Frontier allegedly announced that it "was closing the Offering[s], having raised a total of $2.5 billion from public investors[. Thereafter,] Underwriter Defendants [allegedly had] a 30-day overallotment option to purchase from Frontier up to an additional 15,000,000 shares of common stock and up to an additional 1,750,000 shares of Preferred Stock, in each case at the same prior public offering price per share." *Id.* ¶ 289.

"On or about June 19, 2015, the Underwriter Defendants [allegedly] exercised the overallotment option, and closed the overallotment sale on or about June 24, 2015, generating additional proceeds of $75 million from sales of common stock, as well as an additional $175 million from sales of Preferred Stock. In all, during June 2015, Frontier [allegedly] obtained a total of $2.75 billion through the Offerings[.]" *Id.* Frontier's largest flash cut allegedly occurred roughly nine months later. *Id.* ¶¶ 95, 97.

### 4. Events Following the Closing of the 2015 Offering

In the months between the closing of its offering and the CTF flash cut, Frontier's corporate officers continued to claim that the CTF flash cut would be a success. On September 16, 2015, Mr. Jureller, the CFO, allegedly assured attendees at the Goldman Sachs Communacopia Conference that Verizon would "continue to maximize value" in the CTF accounts until the day of the flash cut, when Frontier would acquire the accounts. *Id.* ¶ 148.

He also told attendees: "We are spending a substantial amount of money, mostly in advance of the cut over. We've said out there that we will probably spend about $450 million or so on our integration efforts with most of that being before that day one cut over in really getting everything aligned from a capital perspective, from an operating and systems perspective, to have a strong experience coming out of the gate." *Id.* ¶ 196.

On October 5, 2015, Frontier allegedly submitted the proposed flash cut to the Public Utilities Commission of the State of California, allegedly claiming that the company "had a 'proven ability to successfully transition customers to its network, as demonstrated by the [2010 Verizon Acquisition],' and emphasiz[ing] that customers 'should not experience any disruption in service' as a result of the CTF Acquisition, including but not limited to disruption to all-important 911 service, [because Frontier would] 'train[] current Verizon employees on Frontier's systems to ensure a seamless transition for customers.'" *Id.* ¶ 50.

In December 2015, Frontier allegedly reached a $160 million settlement with the West Virginia Attorney General for the 2010 flash cut. *Id.* ¶¶ 63, 262. The settlement was allegedly "the largest independently-negotiated consumer protection settlement in the state's history, and occurred after state regulators had received thousands of complaints from consumers that caused serious doubt that Frontier's 'seasoned integration team' had ever actually 'successfully integrat[ed]' the state." *Id.* ¶ 63. On February 29, 2016, Mr. McCarthy, the CEO, told an audience of conference attendees that flash cuts are "a heavy lift" and that Frontier was probably the only player in the industry really who goes for a flash cut." *Id.* ¶ 30.

Also, on February 29, 2016, Mr. Gianukakis, then Frontier's Vice-President and Treasurer, spoke positively about the upcoming CTF Acquisition at the Morgan Stanley Technology, Media & Telecommunications Conference:

[E]verything is going quite well, so we're ready to conclude the transaction on April 1. . . . I think the thing is we've done these flash-cuts in a number of instances before. Back in 2010, we had done a flash-cut on one of the states and then we did Connecticut in 2014 as a flash-cut, and so now we're going forth with our next flash-cut . . . . [T]hese are systems that we know very well. We have a set of playbooks and checklist and work product that we've done in the past. And of course, in any one of these flash-cuts integrations, you learn. And we certainly have learned in our prior transactions and we've gotten better. We've become more refined, we develop our own expertise on how to implement these transactions. They're quite complex. These are not simple transactions to integrate. . . .

*Id*. ¶ 55.

On April 1, 2016, the CTF Acquisition and flash cut allegedly occurred. *Id*. ¶ 97. Six days later, on April 7, 2016, Connecticut's *Stamford Advocate* allegedly published an article on problems with the CTF flash cut, stating: "Frontier was little better positioned to absorb a far-flung broadband network in 2016 than it was in 2014 in taking on AT&T's operations in Connecticut, when it was hit with some of the same complaints that bedeviled it this past week." *Id*. ¶ 55.

In the weeks and months after the flash cut, Frontier management and employees allegedly knew that the "CTF Flash Cut was . . . a colossal disaster," *id*. ¶ 102, but many of the Frontier Defendants allegedly kept touting its success, *see*, *e.g*., *id*. ¶¶ 100–01, 109. Then, "[o]n May 4, 2016, Mike Gatto, the chair of the California State Assembly's Utilities & Commerce Committee ("CAUCC"), demanded that the "alarming" "problems . . . be resolved swiftly," noting that "[c]ities are unable to live stream council meetings and residents are at risk because of the inability to dial 911 in an emergency. My committee will hold hearings on the impact on our constituents and the appropriate government response if these problems persist." A few days later, the CAUCC allegedly announced that it would hold formal hearings concerning Frontier on May 18, 2016." *Id*. ¶ 110.

On November 1, 2016, Frontier allegedly informed investors, after the close of the market, that the CTF integration had cost "66% more than Defendants' estimate of $450 million in integration costs for 2015/16 . . . ." *Id.* ¶ 139. That announcement allegedly caused the price of Frontier shares to fall 13.7% from $58.95 on November 1, 2016 to $50.85 on November 2, 2016—a loss [allegedly amounting to] $630 million in shareholder value." *Id.* ¶ 139.

On February 27, 2018, Frontier allegedly issued a press release, after the close of the market, "announcing its fourth quarter and full year 2017 results . . . nearly two years after Defendants had first declared the CTF Acquisition a 'success.'" *Id.* ¶ 164. Allegedly due to that press release and Frontier's challenges with the CTF acquisition, *id.* ¶¶ 164–66, Frontier's stock price allegedly fell 10.9% the next day. *Id.* ¶¶ 166, 242.

On May 2, 2017, Frontier allegedly announced, after the close of the market, a revenue decline of $53 million from the previous quarter, in part due to "cleanup of CTF nonpaying accounts." *Id.* ¶ 243. Simultaneously, Frontier allegedly announced that it was cutting its dividend by 62%. *Id.* Allegedly due to that announcement, Frontier's stock price allegedly fell 16.6% the next day. *Id.*

On October 31, 2017, Frontier allegedly announced, after the close of the market, that it would miss earnings before interest, tax, depreciation and amortization ("EBITDA") guidance for 2017. *Id.* Allegedly due to that announcement, Frontier's stock price fell 26.8% the next day. *Id.*

On February 27, 2018, Frontier allegedly announced, after the close of the market, that: "(1) the total cost of integrating the CTF Acquisition was $962 million, with $59 million in 2017 alone, (2) churn had increased nearly 10% since 2016, and (3) Frontier was canceling its dividend completely." *Id.*

On February 28, 2018, the close of this case's class period, *id.* ¶ 1, Frontier's common stock allegedly fell 23.9% to $7.03, *id.* ¶¶ 242–43, and Frontier's Preferred Stock allegedly closed at $12.67, *id.* at ¶ 242.

**B.      Procedural Background**

On September 26, 2017, Chris Bray filed a class action Complaint for violation of the federal securities laws on behalf of himself and all others similarly situated. Class Action Compl. for Violations of Fed. Securities Laws, ECF No. 1. On November 27, 2017, John DuBois, a separate Plaintiff, filed a motion to consolidate related actions, appoint lead Plaintiff, and approve lead plaintiff's selection of counsel. Mot. of John DuBois to (1) Consol. Related Actions; (2) Approve Lead Pl., and (3). Approve Lead Pl. Counsel, ECF No. 23. Thereafter, ten additional Plaintiffs moved to consolidate cases and be appointed lead plaintiff. *See Bray v. Frontier Commc'ns Corp.*, No. 3:17-cv-1617 (VAB), 2018 WL 525485, at *3 (D. Conn. Jan. 18, 2018).

On January 18, 2018, the Court granted consolidation, and granted Arkansas Teacher Retirement System and Carlos Lagomarsino's motions to serve as lead Plaintiffs and to appoint Bernstein Litowitz as lead counsel. *Id.*

On February 28, 2018, the Court revised the scheduling order for the consolidated class action. Scheduling Order, ECF No. 128.

On April 30, 2018, Lead Plaintiffs filed an Amended Class Action Complaint. Am. Class Compl.

On June 29, 2018, Defendants moved to dismiss the Amended Class Action Complaint. Notice of Defs. Mot. to Dismiss the Consol. Class Action Compl., ECF No. 143, 146; *see also* Def. Mem. of Law.

On August 28, 2018, Plaintiffs opposed the motion to dismiss. Mem. of Law in Opp. to Defs. Mot. to Dismiss the Consol. Class Action Compl. ("Pl. Mem. of Law in Opp."), ECF No. 151.

On October 12, 2018, Defendants replied in support of the motion to dismiss. Reply in Supp. of Defs. Mot. to Dismiss the Consol. Class. Action Compl. ("Def. Reply"), ECF No. 155.

On February 7, 2019, the Court held a hearing on the pending motion to dismiss. Minute Entry, ECF No. 162.

In support of their motion, Defendants provided six different types of information: (1) information on Frontier's routinely disappointing financial performance; (2) publicity regarding problems with the West Virginia and Connecticut acquisitions; (3) warnings that cost estimates were forward-looking projections; (4) KPMG confirmation of Frontier's financials; (5) publicity regarding cost overruns and technical problems with the CTF acquisition; and (6) additional material in support of dismissal. ECF No. 143–46.

## 1. Information on Frontier's Routinely Disappointing Financial Performance

Defendants argue  that "Frontier's stock price declined *slowly* and *steadily* over a period of several years due to the *publicly known* struggles [the company] was facing in a declining industry." Def. Mem. of Law at 1 (emphasis in original).

In support, Defendants submitted a graph depicting Frontier's alleged long-term stock price declines, *id*. at 2;[8] Frontier's 2015 First Quarter Results announcement of a stock loss of $.05 and customer loss of 0.4%, ECF No. 145-7; SEC Form 8-K filings for November 1, 2016, May 2, 2017, and October 31, 2017, each indicating a net loss of tens of millions of dollars, ECF Nos. 145-16, 145-18, 145-20; a February 27, 2017 investor presentation showing revenue loss,

---

[8] *See* Def. Mem. Of Law at 2 (featuring chart covering period  from January 2, 2015 to March 8, 2018).

ECF No. 145-17; a May 23, 2016 Raymond James report noting that the company's service interruptions and outages could "increase churn and impact business and financial results over the next 12 months," ECF No. 145-12, *see also* ECF 145-8–12; and a September 5, 2017 article from "The Motley Fool" characterizing Frontier as "a sinking ship fight to stay afloat", ECF No. 145-19 at 2; and other exhibits, *see e.g.*, ECF No. 145-12–13.

### 2. Publicity Regarding Problems with the West Virginia and Connecticut Acquisitions

Defendants argue that Frontier's problems with the West Virginia and Connecticut acquisitions were widely publicized. Def. Mem. of Law at 7.

In support, Defendants submitted negative press coverage from West Virginia, ECF Nos. 145-2–3, and Connecticut, ECF Nos. 145-4–5; and a class action complaint filed against Frontier in West Virginia in 2014 for the company's alleged "overcharging and simultaneous fail[ure] to provide the high-speed, broadband level of services it advertises[,]" ECF No. 145-6.

### 3. Warnings that Cost Estimates were Forward-Looking Projections

Defendants argue that Frontier warned potential investors that its projections for the CTF integration were "forward-looking" estimates (i.e., "bespeak[ing] caution" to investors). Def. Mem. of Law at 18–19.

In support, Defendants submitted Frontier's February 5, 2015 SEC Form 8-K filing, stating "[e]stimated OpEx and CapEx integration cost of approximately $450 million in 2015/2016", Frontier Commc'ns Corp., Form 8-K (Feb. 5, 2015), ECF No. 145-24; the June 2, 2015 stock Prospectus supplement, warning generally that "[o]ur forward-looking statements involve risks and uncertainties. Our actual results may differ significantly from those projected or suggested in any forward-looking statements" and specifically that "[w]hile the Company currently expects that it will incur approximately $450 million of operating expenses and capital

expenditures in total related to acquisition and integration activities in 2015 and 2016 associated with the Verizon Transaction, the amount of such operating expenses and capital expenditures may increase based on a variety of factors[.]" Frontier Commc'ns Corp., Prospectus Suppl. [Registration No.: 333-203537] ("June 2, 2015 Preferred Stock Offering," June 2, 2015), ECF No. 145-27; Frontier Commc'ns Corp., Prospectus Suppl. [Registration No.: 333-203537] ("June 2, 2015 Common Stock Offering," June 2, 2015), ECF No. 145-26; and other exhibits, *see*, *e.g.*, ECF No. 145-27–30 [prospectus supplements], ECF No. 145-31–32 [investor call materials].

#### 4.    KPMG Verification of Frontier Financials

Defendants argue that "registered public accounting firm, KPMG, reviewed and approved the company's financials", including during the time leading up to the CTF Acquisition, but is "not accused of wrongdoing." Def. Mem. of Law at 27.

In support, Defendants submitted Frontier's SEC Form 10-Q quarterly filing for March 31, 2015, which states that "critical accounting estimates have been reviewed with our independent registered public accounting firm[,]" ECF No. 145-35 at 34;[9] and Frontier's SEC Form 10-K annual filing for the fiscal year ending on December 31, 2016, ECF no 145-36. That annual filing lists KMPG LLP as Frontier's "independent registered public accounting firm." *Id*. at 49, *see also id*. at 61–63; *see also* Def. Reply at 14, supported by ECF No. 155-4.

---

[9] *See* Form 10-K, the Securities and Exchange Commission, available at https://www.sec.gov/fast-answers/answers-form10khtm.html (last visited 3/8/2019) ("The federal securities laws require public companies to disclose information on an ongoing basis. For example, domestic companies must submit . . . quarterly reports on Form 10-Q[.]"). The Court notes that the document does not identify KPMG as the registered accounting firm utilized by Frontier. Defendants also submit Frontier's September 30, 2016 SEC Form 10-Q filing, ECF No. 145-35; it does not contain language regarding review by a registered public accounting firm. Rather, the 2016 filing states: "These critical accounting estimates have been reviewed with the Audit Committee of our Board of Directors." *Id*. at 43.

### 5. Publicity Regarding Cost Overruns and Technical Problems with the CTF Acquisition

Defendants argue that cost overruns from the CTF Acquisition were "repeatedly discussed in various publicly available . . . reports." Def. Mem. of Law at 11.

In support, Defendants submitted documents allegedly used in a May 3, 2016 "Earnings Call," acknowledging $470 million in first quarter spending, as opposed to the allegedly forecast $450 million total cost for the CTF integration, ECF No. 145-11 at 10; a July 11, 2016 Macquarie Research report stating: "The . . . FIOS-Frontier transaction has been off to a rocky start with cost overruns above the US$450m expectations for acquisition/integration and customer complaints. . . . ," ECF No. 145-13 at 1, a September 12, 2016 CITI Research report stating that Frontier had spent "about $600 million on integration costs . . . versus an estimate of 'approximately $450 million' when the transaction was announced," ECF No. 145-14 at 2; and other exhibits, *see e.g.*, ECF No. 145-38–53. Defendants also allege that "technical problems with the CTF flash cut became public immediately after it occurred on April 1, 2016." Def. Mem. of Law at 10, *citing* Am. Class Compl. ¶¶ 109–11; *see also* ECF No. 145-12.

### 6. Additional Material in Support of Dismissal

Defendants also submitted a June 15, 2011 case study presentation from the B/OSS Live! Conference, ECF No. 145-33, for the proposition that Frontier believed that addressing too many of the gaps identified by a gap analysis was a common problem in the telecommunications industry, Def. Mem. of Law at 21. Defendants submitted an SEC Form 8-K filing for December 6, 2016, stating "Mr. McCarthy volunteered to forego being considered for a transaction bonus" for the proposition that Mr. McCarthy was not motivated to commit fraud on account of bonus compensation, Def. Mem. of Law at 31; ECF No. 145-37 at 2. Defendants also submitted Frontier's 2016 Schedule 14-A Proxy Statement, ECF No. 145-3, for the proposition that

Defendants Wilderotter, McCarthy, and Jureller's 2015 bonus calculations "afforded a weight of only 5% to the CTF Acquisition 'Financing/Approvals/Integration Deliverables[,]" Def. Reply at 21. Finally, Defendants submitted a July 13, 2016 *Business Wire* article, ECF No. 145-2, for the proposition that Michael Golob was "'instrumental to the CTF Acquisition" and was not appointed to a new position within Frontier until after the CTF flash cut, Def. Reply at 9.

## II. STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537 U.S. 1089 (2002); FED. R. CIV. P. 12(b)(6). This requirement, however, "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must offer more than "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

For most claims brought under sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b), imposes heightened pleading requirements governed by the PSLRA or Rule 9(b) of the Federal Rules of Civil Procedure. *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("As the district court observed, the particularity requirement of Rule 9(b) applies to securities fraud claims brought under Section 10(b) and Rule 10b–5 . . . . The district court concluded that the same heightened pleading standard applies to securities claims brought under Section 11 and Section 12(a)(2) when premised on averments of fraud. We agree."); *see also Fresno Cty.*

*Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 535 (S.D.N.Y. 2017) ("A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA")[.]"); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 334–35 (S.D.N.Y. 2003) ("Congress intended that the PSLRA supersede the Federal Rules only as to those elements which the PSLRA explicitly mentions (i.e., scienter and material misstatements and omissions). See S.Rep. No. 104–98, at 15. In all other respects, the Rules govern these pleadings.").

Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d 564, 570 (S.D.N.Y. 2013), *aff'd* 566 Fed. App'x 93 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) ); *see also* FED. R. CIV. P. 9(b) (requiring that a complaint that alleges fraud plead "the circumstances constituting fraud . . . with particularity.").

On the loss causation element of securities fraud claims, however, Plaintiffs must meet only Rule 8 pleading requirements. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005) ("We concede that the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. Rule Civ. Proc. 8(a)(2). And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.").

Claims brought under sections 11, 12(a)(2), and 15 of the Securities Act are subject to one of two pleading requirements. *Rombach*, 355 F.3d at 170. Fraud claims brought under these

sections are subject to the pleading standards described above. *Id*. Negligence and strict liability claims brought under the Securities Act, however, need only meet Rule 8 pleading requirements. *Rombach*, 355 F.3d at 170–71. ("We hold that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud.");[10] *Fresno Cty. Employees' Ret. Ass'n*, 268 F. Supp. 3d at 557–58. ("Relying on *Rombach*, the Merger defendants argue that all of the claims must sound in fraud because some of the claims against some of the defendants sound in fraud. The Merger defendants misread *Rombach*. Unlike the plaintiffs in *Rombach*—whose Section 11 claims incorporated by reference the allegations supporting their Section 10(b) fraud claims—the plaintiffs here went beyond 'nominal efforts' to distinguish their fraud allegations from their strict liability and negligence allegations under Section 11 . . . .").

## III. DISCUSSION

Lead Plaintiffs assert five claims for relief: (1) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule Rule 10b-5, 17 C.F.R. § 240.10b-5, against the Frontier Defendants, Am. Class Compl. ¶¶ 265–73; (2) violations of section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Individual Frontier Defendants, Am. Class Compl. ¶¶ 274–86; (3) violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, against Frontier, the Securities Act Individual Defendants, and the Underwriter Defendants, Am. Class Compl. ¶¶ 336–46; (4) violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against Frontier and the Underwriter Defendants, Am. Class Compl. ¶¶ 347–54; and (5) violations of

---

[10] In *Rombach*, the Second Circuit explained why fraud, but not negligence and strict liability claims, are subject to heightened pleading requirements: "The particularity requirement of Rule 9(b) serves to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Rombach*, 355 F.3d at 171 (internal quotations and citation omitted).

Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Securities Act Individual

Defendants, Am. Class Compl. ¶¶ 355–59. The Court will address each of them.

### A.  Alleged Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for "any person, directly or

indirectly. . . [t]o use or employ, in connection with the purchase or sale of any security . . . or

any securities-based swap agreement any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may prescribe as necessary or

appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

SEC Rule Rule 10b-5 makes it unlawful for "any person, directly or indirectly . . .":

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In monetary damages suits against non-controlling persons, plaintiffs must first specify

each allegedly misleading statement or omission. 15 U.S.C. §§ 78u-4(b)(1)(A–B). *Lentell v.*

*Merrill Lynch & Co*., 396 F.3d 161, 168 (2d Cir.2005) (internal citation omitted), *cert. denied*,

546 U.S. 935 (2005). Plaintiffs must then demonstrate that each misstatement is material. *In re*

*Initial Pub. Offering Sec. Litig.*, 399 F.Supp. 2d at 306 (S.D.N.Y. 2005) ("A plaintiff must allege

a material misstatement . . . and that misstatement must be the cause of the plaintiff's loss . . . .").

"For an undisclosed fact to be material, 'there must be a substantial likelihood that the disclosure

of the omitted fact would have been viewed by the reasonable investor as having significantly

altered the 'total mix' of information made available." *Castellano v. Young & Rubicam, Inc.*, 257

F.3d 171, 180 (2d Cir. 2001), *citing Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

Lead Plaintiffs allege that the Frontier Defendants made misleading statements regarding:

(1) the Company's purported 'proven track record' of acquisitions; (2) the existence of a 'seasoned integration team'; (3) the estimated integration costs for the CTF Acquisition; (4) the Company's ability and/or intent to deliver a 'seamless transition' (5) the success of the CTF Acquisition; (6) claims that only 1% of customers were affected by the CTF Flash Cut; (7) that Verizon had provided a significant number of 'non-paying accounts' in the CTF Acquisition; and (8) that Frontier's financial statements were prepared in accordance with Generally Accepted Accounting Principles.

Am. Class Compl. ¶ 267 (alterations from original).

### 1. Alleged Misstatements

#### a. Statements about Frontier's proven track record, seasoned integration team, and ability to deliver a seamless or smooth transition

The Frontier Defendants argue that Plaintiffs have failed to plead sufficiently as

material misstatements three categories of pre-acquisition statements related to Frontier's

proven track record, seasoned integration team, and ability to deliver a seamless or

smooth transition for CTF customers. Def. Mem. of Law at 15–18.

The Court agrees.

A securities fraud plaintiff must plausibly allege that a statement would be misleading to

a reasonable investor given the "total mix" of available information. *Castellano*, 257 F.3d at 180;

*see also* 15 U.S.C. § 78u-4(b)(1)(A–B) (on PLSRA's heightened pleading requirements for

misstatements). Within that mix, "expressions of puffery and corporate optimism do not give rise

to securities violations." *Rombach*, 355 F.3d at 174. "People in charge of an enterprise are not

required to take a gloomy, fearful or defeatist view of the future; subject to what current data

indicates, they can be expected to be confident about their stewardship and the prospects of the

business that they manage." *Id.*; *see also Singh v. Cigna Corp.*, No. 17-3484-CV, 2019 WL 1029597, at *4 (2d Cir. Mar. 5, 2019) ("Like the District Court, we think that the statements in Cigna's Code of Ethics are a textbook example of 'puffery.' We have observed that 'general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them.'"); *cf In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317–18 (S.D.N.Y. 2013) ("While MF Global and the Officers repeatedly represented that the Company had a 'strong' liquidity position . . . Plaintiffs allege that MF Global faced substantial strain on its capital and liquidity and met its requirements only through daily intra-company transfers, and collapsed when RTM counterparties demanded additional margin. These facts plausibly allege material misstatements under the Exchange Act and the Securities Act.").

Throughout the offering period, the Frontier Defendants claimed that they had a proven track record, a seasoned integration team, and the ability to deliver a seamless transition, but also warned potential investors that telecommunications acquisitions were complex and that Frontier's Connecticut acquisition had just occurred. *See*, *e.g.*, Maggie Wilderotter, Dan McCarthy, John Jureller, and Luke Szymczak ("Mr. Szymczak"), Thomson Reuters StreetEvents [edited trans.] ("Thomson Reuters pitch call", Feb. 5, 2015), ECF No. 145-31; Frontier Commc'ns Corp., Form 8-K ("Feb. 2015 8-K", Feb. 5, 2015), ECF No. 145-24 at 116, 127; June 2, 2015 Preferred Stock Offering.

For example, on a February 5, 2015 call with potential investors, Mr. McCarthy claimed that Frontier had a "track record of proven integration experience." Thomson Reuters pitch call at 4. He also acknowledged that the company was "just 90 days" out from the Connecticut flash cut. *Id*. In the same call, Ms. Wilderotter discussed Frontier's challenges with past acquisitions,

but expressed optimism about delivering a "smooth transition for customers", *id*. at 4, particularly given the "well maintained and upgraded networks" Frontier would be acquiring from Verizon, *id*. at 6.

Similarly, Frontier's Form 8-K filing contained a press release touting Frontier's "proven skills and established track record", Feb. 2015 8-K at 116, and a slide deck from another February 5, 2015 investor call (i.e., with Ms. Wilderotter, Mr. McCarthy, and Mr. Jureller, but not Mr. Szymczak) touting the company's "proven integration experience," *id*. at 127, and "seasoned integration team." *Id*. But those statements must be placed in context; indeed, they were taken from a 131-page document replete with cautionary language. *See*, *e.g.*, *id*. at 4, 119 (cautions against "forward-looking" statements).

Defendants' filings for both the June 5, 2015 and June 8, 2015 Offerings specifically warned investors that Frontier might not be able to "complete the Verizon transaction", "fully realize expected cost synergies" from the "recently-concluded Connecticut acquisition" or "maintain relationships with customers, employees, or suppliers" following the CTF acquisition. June 2, 2015 Preferred Stock Offering at 6.

As a result, the Frontier Defendants' claims about their proven track record, seasoned integration team, and ability to deliver a seamless transition, while optimistic, did not amount to fraud, *see Rombach*, 355 F.3d at 174, because Frontier Defendants tempered them with warnings about the risks inherent in telecommunications acquisitions, flash-cut integrations, and reliance on the results of Frontier's most recent flash-cut in Connecticut. *See, e.g. In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16-cv-7840 (RJS), 2018 WL 2081859, at *5, 12 (S.D.N.Y. Mar. 30, 2018) (granting motion to dismiss where Defendant made pre-acquisition statements that it was insulated from commodity fluctuations but also issued warnings in its 8-K, then made post-

acquisition statements that the integration was "smooth and seamless" but also issued contradictory financial information in its 10-Q).

While Plaintiffs claim that the Frontier Defendants completely concealed earlier integration issues from prospective investors, Pl. Mem. of Law in Opp. at 5–6, this allegation must be placed in the context of the "total mix" of available information to prospective investors, particularly Frontier Defendants' qualifying statements about the recency of the Connecticut acquisition. *See e.g.,* June 2, 2015 Preferred Stock Offering at 6.

Plaintiffs also argue that staff departures before the CTF flash cut wholly deprived Frontier of seasoned integration staff. Pl. Mem. of Law in Opp. at 7–9. But this claim also must be placed in the context of the "total mix" of available information to prospective investors. Mr. McCarthy and Ms. Wilderotter were, indeed, long-time employees who led the company through its prior flash cuts, Am. Class Compl. ¶¶ 19–20, former employee four (FE-4) was Manager of Ethernet Engineering during the three relevant flash cuts, *id*. ¶ 70, and former employee eleven (FE-11) served as a senior IT Executive during the Connecticut and CTF acquisitions, *id*. ¶¶ 79, 188. Thus, Plaintiffs' Amended Class Complaint identifies at least five "seasoned" employees involved in the CTF Flash cut.

In addition to the Frontier Defendants' numerous warnings about past and future flash cut performance and the existence of seasoned staff, the "total mix" of available information should have put reasonable investors on notice that the CTF acquisition was a risky venture. *See Castellano*, 257 F.3d at 180 ("For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (internal quotations omitted)). In the years preceding the CTF acquisition, Frontier's problems with prior

flash cuts were in the news. *See e.g.*, George Hohmann, *Customers Still Having Trouble with Phone Switch*, CHARLESTON GAZETTE & DAILY MAIL (July 7, 2010), ECF No. 145-2; Eric Eyre, *Advocate Wants Hearing on Frontier Phone Problems*, CHARLESTON GAZETTE & DAILY MAIL (July 31, 2010), ECF No. 145-3; *AT&T Move to Frontier Not Seamless as Promised*, THE HOUR [Southwest Connecticut news] (Oct. 28, 2014), ECF No. 145-4; Alexander Soule, *'We Have Lessons to Learn:' Frontier Apologizes for AT&T Switch Problems*, NEW HAVEN REGISTER (Dec. 25, 2014), ECF No. 145-5.

Indeed, in 2014, West Virginia customers filed a class action suit against the company. *Sheridan*, No. 14-cv-115. Also, mere months before the CTF announcement, Connecticut's Public Utilities Regulatory Authority convened a forum to discuss Frontier's alleged training of too few customer service employees, underestimation of the volume of customer complaints it would receive, and problems providing a seamless video-on-demand transition. Am. Class Compl. ¶ 68.

Given this public information and the Frontier Defendants' various warnings, the Lead Plaintiffs have failed to allege plausibly that reasonable investors attuned to the total mix of information would have been duped or defrauded by Frontier Defendants' optimism or puffery. *Rombach*, 355 F.3d at 174; 15 U.S.C. §§ 78u-4(b)(1)(B).

As a result, all claims stemming from Defendants' alleged misstatements regarding Frontier's proven track record, seasoned integration team, and ability to deliver a seamless or smooth transition will be dismissed.

### b. Estimated Costs of the CTF Integration

The Frontier Defendants argue that issues regarding the cost projections for the CTF acquisition fall short of securities fraud. Def. Mem. of Law at 18–23.

The Court agrees.

Both PSLRA and the common law provide protection from liability for certain forward-looking statements, such as cost estimates. The PSLRA affords "safe harbor" for futuristic statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). Forward-looking statements are "immaterial as a matter of law" when reasonable investors would not consider them "important in light of adequate cautionary language set out in the same offering." *Halperin v. eBanker USA.com, Inc*., 295 F.3d 352, 357 (2d Cir. 2002). As the Second Circuit further noted in *Halperin*:

> We and other courts have referred to this rule of law as the 'bespeaks caution' doctrine. Consequently, when cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

*Id.* (internal quotations and citations omitted); *see also Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 (2d Cir. 2010). ("A forward-looking statement (accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction."); *see also Singh*, 2019 WL 1029597 at *4 ("[E]ach of Cigna's statements was framed by acknowledgements of the complexity and numerosity of applicable regulations. Such framing suggests caution (rather than confidence) regarding the extent of Cigna's compliance. Similarly, Cigna's assertion that it 'expect[s] to continue to allocate significant resources' to regulatory compliance suggests a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even

substantial) effectiveness. If anything, these statements seem to reflect Cigna's uncertainty as to the very possibility of maintaining adequate compliance mechanism in light of complex and shifting government regulations.").

Statements are not considered forward-looking if "they either state a present or historical fact alone or incorporate forward-looking aspects into statements of present or historical fact." *Patriot Expl., LLC v. SandRidge Energy, Inc*., 951 F. Supp. 2d 331, 357 (D. Conn. 2013), *citing Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 478 (S.D.N.Y.2010). Such statements are not afforded safe harbor. *Id*.

Plaintiffs argue that the $450 million cost projection for the CTF acquisition, Am. Class Compl. ¶ 190, should not be afforded safe harbor for two reasons: (1) Frontier knew that the true cost for the integration would be double the estimate, and (2) Frontier did not consult with senior IT personnel to arrive at the $450 million figure. Pl. Mem. of Law in Opp. at 17–18. The Court disagrees.

Plaintiffs allege that Frontier knew that the CTF acquisition would cost roughly $1 billion because a company gap analysis arrived at that figure. Am. Class Compl. ¶ 88. In support, Plaintiffs provided the recollection of several former employees. *Id*. "[A] senior IT professional at Frontier from 2008 to 2017 . . . recalled that [the gap analysis] revealed approximately 400 gaps in functionality. Further, though [that employee] was not involved in the preparation of the Gap Analysis, his/her understanding was that the document provided a total estimate of close to $1 billion to fill the gaps." *Id*. ¶ 89. Plaintiffs also allege that Frontier's "senior leadership provided its own project list that contained just a fraction of the projects identified in the Gap Analysis and ultimately amounted to just $190 million[.]" *Id*. ¶ 88.

In other words, Plaintiffs argue that Frontier executives did not plan to address most of the gaps identified by the gap analysis or spend $1 billion on the CTF acquisition. *Id.* ¶ 88. Even if ignoring gaps amounts to cutting corners, however, these alleged shortcuts would not constitute concealment of current information or fraud, as discussed further below.

Second, Plaintiffs allege that Frontier did not consult with its senior IT personnel to arrive at the $450 million figure for the CTF integration. Pl. Mem. of Law in Opp. at 17–18. But Plaintiffs allege that Frontier's senior management publicly outlined its costing and gap analysis processes following the West Virginia flash cut. Am. Class Compl. ¶ 87 ("The Case Study also states that a 'cost/benefit' was 'conducted' for 'every gap,' with 'some' gaps even 'elevated to CEO.'").[11]

Plaintiffs also contend that the Frontier Defendants "'[c]onducted [a] very thorough Gap Analysis to identify differences between' . . . Verizon and Frontier . . . . at least one year before the CTF Flash Cut but that the Company refused to follow the recommendations contained in the Gap Analysis." *Id.* ¶¶ 87–88. Former employees allegedly alerted "superior[s] about the inadequacy of the Company's project list" and were told "No. This is what we are going to do." *Id.*

While Frontier Defendants may have surprised senior IT staff by announcing the CTF acquisition on February 5, 2015, *id.* ¶ 74, Plaintiffs have not credibly alleged that Frontier Defendants failed to speak with senior IT staff in the months and years before the CTF acquisition. Plaintiffs' Complaint thus does not support an inference that Frontier Defendants

---

[11] The Court does not rely on Defendants' gap analysis exhibit as part of its analysis, as the Court does not engage in fact-finding on the specifics of Frontier's gap analyses at this stage. *See Fresno Cty. Employees' Ret. Ass'n*, 268 F. Supp. 3d at 563 (S.D.N.Y. 2017) ("While the Rentrak defendants point to a number of efforts they took to assure themselves that comScore's financials were sound, those efforts raise issues of fact that cannot be resolved at the pleading stage.").

fabricated the $450 million CTF integration estimate. In any event, the offering documents available to investors provided sufficient caution about the CTF acquisition cost estimates.

On February 5, 2015, Frontier allegedly estimated OpEx and CapEx integration costs of approximately $450 million for the CTF acquisition in an investor call and 8-K filing that included an investor slide deck. Am. Class Compl. ¶¶ 42, 190; Frontier Commc'ns Corp., Form 8-K (Feb. 5, 2015) at 127. Frontier allegedly reiterated the cost estimate in its June 2, 2015 and June 8, 2015 prospectus supplements. Am. Class Compl. ¶¶ 51, 90; June 2, 2015 Preferred Stock Offering at 30. Frontier also reiterated the estimates in calls with investors throughout the spring and summer of 2015. Am. Class Compl. ¶¶ 194–97.

But the 8-K contained over sixty references to costs, Frontier Commc'ns Corp., Form 8-K (Feb. 5, 2015), including boilerplate cautions about credit market fluctuations and litigation expenses, *id*. at 5, 83, and specific warnings about the recent Connecticut flash cut and CTF acquisition, *id*. at 119, 122, 124–126. Frontier thus specifically warned potential investors that the company might not "successfully integrate [CTF] operations" or "realize anticipated cost savings." *Id*. at 119.

Frontier's June 2015 prospectus supplements similarly offered myriad boilerplate and specific warnings that the CTF acquisition could cost more than $450 million, *see* June 2, 2015 Preferred Stock Offering at 30, if Frontier was unable "to successfully integrate operations," "realize anticipated cost savings," "migrate Verizon's operations from Verizon owned and operated systems and processes to our owned and operated systems and processes successfully," and more. *Id*. at 6.

Frontier's cautions to investors were "meaningful" because they were identified as forward-looking statements and because they related to Frontier's past and future flash cut

acquisitions and the anticipated cost savings that formed the basis of Frontier's $450 million cost estimate (e.g., saving costs by not filling gaps, minimizing expenses by acquiring high-quality assets from Verizon). June 2, 2015 Common Stock Offering at 7; *see* 15 U.S.C. § 78u-5(c)(1)(A) (Safe harbor is available for a forward-looking statement if it is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial.").

Furthermore, Frontier's $450 million cost estimate was contained within the offering documents and their various cautionary warnings, *see* Frontier Commc'ns Corp., Form 8-K (Feb. 5, 2015) at 127; June 2, 2015 Preferred Stock Offering at 30 (containing numerous, specific cautions about Frontier's migration and integration assumptions); *see* June 2, 2015 Preferred Stock Offering at 6 (cautioning about the assumption of Frontier's "ability to effectively manage service quality in our territories and meet mandated service quality metrics" and "successfully introduce new product offerings"), *id.* at 30 ("The balance of the financing in connection with the Verizon Transaction could take any of several forms . . . . Neither this offering nor the concurrent offering is conditioned on the consummation of the Verizon Transaction, and there can be no assurance that the Verizon Transaction will be consummated on the terms described herein or at all. If the Verizon Transaction is not consummated, we intend to use the proceeds of this offering . . . for general corporate purposes, which may include share repurchases, acquisitions or debt repayment.").

Given the number and specificity of Frontier's warnings, reasonable investors would have been cautioned and would not have been misled to believe that the CTF acquisition could not cost more—even significantly more—than $450 million. Frontier's $450 million estimate

was thus "immaterial as a matter of law" and unimportant "in light of adequate cautionary language set out in the same offering." *Halperin,* 295 F.3d at 357; *see also* 15 U.S.C. § 78u-5(c)(1).

As a result, the cost estimate is entitled to safe harbor and the Court will dismiss all claims stemming from the $450 million estimate for the cost of the CTF integration.

> ### c. Statements Regarding the Success of the CTF Integration, Percentage of Customers Facing Service Interruptions, Number of Non-Paying Verizon Accounts, and Post-Acquisition Accounting Policies

The Frontier Defendants argue that Plaintiffs have failed to plead sufficiently as material misstatements four categories of post-acquisition statements related to the success of the CTF acquisition, the percentage of CTF customers facing service interruptions, the number of non-paying Verizon accounts and cost of account clean-up, and GAAP violations. Def. Mem. of Law at 17–18, 23–29, 35–36.

The Court agrees.

Misstatements of corporate success come in two varieties: vague and inactionable puffery, and material misrepresentations of existing facts. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true . . . . these statements were plainly false and misleading."). "[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to support a claim of securities fraud. *Id.*

By contrast, "defendants may be liable for misrepresentations of existing facts." *Id.*, *citing In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 74–75 (S.D.N.Y. 1996). To withstand a motion to dismiss, Plaintiffs must plead more than a laggardly response to

problems or lack of corporate skepticism. *Malin v. XL Capital Ltd*., 499 F. Supp. 2d 117, 161 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (dismissal of a second amended complaint where the defendants "should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud."). Rather, Plaintiffs must plead material misrepresentations, such as a failure "to timely disclose material data which resulted in misrepresentations of the defendant compan[y's] current finances where it was clearly pled that the defendants knew or should have known better." *In re DRDGOLD Ltd. Sec. Litig.,* 472 F. Supp. 2d 562, 572 (S.D.N.Y. 2007), *citing Novak*, 216 F.3d at 311.

Plaintiffs also must meet PSLRA's heightened pleading standard by "stat[ing] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . stat[ing] with particularity all facts on which that belief is formed." 15 U.S.C. §§ 78u-4(b)(1)(B). If Plaintiffs' allegations are based on confidential sources, those individuals must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314.

The CTF acquisition and flash cut integration occurred on April 1, 2016. *Id*. ¶ 97. In the weeks following the CTF flash cut, numerous customers allegedly had problems "rang[ing] from complete lack of video service to missing channels, from complete internet outages to an inability to access certain websites." Am. Class Compl. ¶ 98; *see also id*. ¶¶ 99, 101–103, 105– 107. Frontier allegedly set up "war rooms . . . in in the CTF regions, in which the directors, vice presidents, and other support staff of each region gathered daily to monitor the progress of the CTF Acquisition." *Id*. ¶ 107. On May 3, 2016, the Frontier Defendants allegedly "announced the '[s]uccessful closing of [the] California, Texas, and Florida acquisition' and bragged that they

had '[a]ccomplished [the] largest, most complex flash cutover in industry history.'" *Id.* ¶ 97.

Thereafter, Plaintiffs allege that the Florida war room might have been operational for several

more weeks, *id.* ¶ 107, and that some customers continued to have problems for months

following the CTF flash cut. *Id.* ¶ 98.

Defendants argue that Plaintiffs have failed to allege fraud sufficiently because the CTF

acquisition and flash cut did take place, and Frontier's "success" statements constitute vague

optimism.

The Court agrees.

Frontier did acquire Verizon's California, Texas, and Florida wireline operations and

executed a flash cut on April 1, 2016. *Id.* ¶ 97. The Frontier Defendants' "success" statement

seems to communicate little more than that undisputed fact. As a result, it is a true statement, not

a misstatement. Even construing the words "successful" and "accomplished" in their broadest

sense, the words reflect non-verifiable—and inactionable—puffery. *Cf Novak v. Kasaks*, 216

F.3d 300, 315 ("Here, the complaint alleges that the defendants did more than just offer rosy

predictions; the defendants stated that the inventory situation was 'in good shape' or 'under

control' while they allegedly knew that the contrary was true."). No reasonable investor would

treat a corporate spokesperson's boast of success—mere weeks following a major technology

integration—as a reason to invest in a company. *Id.* at 314 fn 1 ("Our reading of the provision

focuses on whether the facts alleged are sufficient to support a reasonable belief as to the

misleading nature of the statement or omission."). Further, even if Defendants should have

expressed more skepticism about their success, mere sanguinity is insufficient to substantiate a

fraud claim. *Malin*, 499 F. Supp. 2d at 161 ("[T]he [Second Amended Class Action Complaint]

strongly suggests that the defendants should have been more alert and more skeptical, but

nothing alleged indicates that management was promoting a fraud."). As a result, the Court will dismiss all claims stemming from Defendants' alleged statements of success in acquiring and integrating Verizon's CTF assets.

The Court finds the remainder of Plaintiffs' post-acquisition allegations closer calls.

In the weeks following the CTF flash cut, Defendants allegedly asserted that only 1% of customers "had issues" "experienced problems" or "lost service." Am. Class Compl. ¶¶ 112, 220–224. On April 25, 2016, Frontier's Peter DePasquale allegedly told the *Wall Street Journal* that less than 1% of CTF customers lost service. *Id*. ¶¶ 112, 220. On May 3, 2016, Mr. McCarthy, by then Frontier's CEO, allegedly told earnings call participants that while there were "some issues at the outset . . . these affected less than 1% of our customers in total, and much less than that at any point in time." *Id*. ¶¶ 100, 112, 221. On May 11, 2016, Mr. McCarthy allegedly reiterated the 1% claim in a signed letter to Florida Attorney General Bondi. *Id*. ¶¶ 112, 224. In a May 13, 2016 interview with the *Los Angeles Times*, Frontier regional president White allegedly stated that "[f]ewer than 1% of Frontier's new customers have experienced problems." *Id*. ¶¶ 112, 222. Regional president White allegedly reiterated the claim at a May 18, 2016 hearing of the California State Assembly's Utilities & Commerce Committee. *Id*. ¶¶ 112, 223.

If untrue, the Frontier Defendants' 1% statements would fall into the second category of corporate success misstatements: material misrepresentations of existing facts. *Novak*, 216 F.3d at 315; *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. at 74–75. Further, as "ascertainable or verifiable" facts, misstatements about the percent of affected customers would not be afforded the safe harbor given to optimistic forecasts about the future. *Iowa Pub. Employees' Ret. Sys.*, 620 F.3d at 143. ("[T]here is a discernible difference between a forecast and a fact, and courts are competent to distinguish between the two[.]").

Plaintiffs allege that the denominator for the one percent calculation should have been the "millions" of customers acquired through the CTF acquisition, *id.* at 4, and that the Frontier Defendants manipulated that denominator "in order to decrease the percentage of affected customers," *id.* at 114, 226. If Defendants knowingly falsified outage and service interruption data, those misstatements could rise to the level of fraud. *See Novak*, 216 F.3d at 315; *Iowa Pub. Employees' Ret. Sys.*, 620 F.3d at 143.

Plaintiffs allegations of "funny math," Am. Class Compl. ¶ 114, however, cannot survive a motion to dismiss under the heightened pleading standards. *See Rombach*, 355 F.3d at 170; *Fresno Cty. Employees' Ret. Ass'n*, 268 F. Supp. 3d at 535. These allegations are not pled with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. To calculate the percentage of customers who "had issues" "experienced problems" or "lost service," Am. Class Compl. ¶¶ 112, 220–224, a confidential informant would need two pieces of information: (1) the total number of accounts acquired by Frontier through the CTF acquisition (i.e., the denominator for all states); and (2) the total number of customers who reported that they had "had issues" "experienced problems" or "lost service" (i.e., the numerator for unique customers with issues). Plaintiffs neither allege this information nor sufficiently plead that their confidential informants possessed this information.

The Amended Class Complaint does not include estimates of the number of accounts acquired through the CTF acquisition (i.e., more specific than "millions", Am. Class Compl. ¶ 4) or the number of customers experiencing issues following the flash cut. While Plaintiffs are not required to submit precise mathematical data at the motion to dismiss stage, they must plead with

enough specificity to enable the Court to determine that their sources would probably possess such estimates.

The Court cannot determine that Plaintiffs' confidential informants could provide the requisite estimates because: (1) the former employees' access to company data is not described with sufficient particularity, *see* Def. Mem. of Law at 31; (2) the former employees' statements, in and of themselves, do not suggest knowledge of aggregate California, Florida, and Texas data (e.g., FE-16, a Vice President for Corporate Marketing in the West Region, might only have had access to California data), *id*. at 24–27; and (3) the former employees do not allege that they shared contradictory aggregate data with Frontier Defendants that called into question Frontier's estimates for the total number of affected customers across the acquired territories (i.e., not just in the West, Am. Class Compl. ¶ 114; not just for 1,000 digital voice customers, *id*. ¶ 254).

While the Amended Class Complaint does not appear to state a plausible claim for relief sufficiently for the Frontier Defendants' estimates of affected customers, the Court must steer clear of fact-finding at the motion to dismiss stage. *See Fresno Cty. Employees' Ret. Ass'n*, 268 F. Supp. 3d at 563 (S.D.N.Y. 2017) ("While the Rentrak defendants point to a number of efforts they took to assure themselves that comScore's financials were sound, those efforts raise issues of fact that cannot be resolved at the pleading stage.").

For that reason, the Court dismisses all claims stemming from Defendants' alleged estimates of affected customers. If Plaintiffs can remedy these specific deficiencies, relating to the 1% service issue, and seek leave to amend the Amended Class Complaint, the Court may grant leave if Plaintiffs can remedy the remainder of the deficiencies described below (e.g., loss causation, scienter, and the statute of limitations).

Claims regarding the Frontier Defendants' post-acquisition financial performance, specifically Frontier Defendants' statements regarding the company's alleged change in accounting practices and clean-up costs for non-paying Verizon accounts, fail for the same reasons.

At some point in 2016, the Frontier Defendants allegedly "changed their accounting practices in a fashion that benefited their EBITDA." *Id*. ¶ 141. Two former employees allegedly heard or learned "a new instruction to staff to account for the cost of maintenance activities (such as repairing or replacing broken devices) as capital expenditures, rather than operating expenses." *Id*. The Frontier Defendants allegedly failed to notify the SEC or investors of these changes, in violation of generally accepted accounting principles ("GAAP"). *Id*. ¶¶ 141, 236. Plaintiffs contend that those omissions amounted to materially false and misleading statements. *Id*. ¶ 97.

In February 2017, "Defendants [allegedly] announced an even more dramatic plunge of $100 million in revenue, alongside an astonishing loss of over 128,000 customers, which Defendants . . . blamed on non-paying customers purportedly acquired from Verizon." Am. Class Compl. ¶ 9. Former employee three, who allegedly served as Verizon's Florida Director of Operations prior to the CTF Acquisition, characterized Defendants' non-paying accounts statement(s) as a "provable lie", *id*. ¶ 147, because Verizon had allegedly actively cleaned up its non-paying accounts prior to their transfer to Frontier, *id*., and revenue losses were allegedly due to Frontier's "flawed execution of the CTF Acquisition," *id*. ¶ 149, rather than account clean-up.

Again, the Amended Class Complaint does not include relevant data, such as estimates of: (1) the impact of "capitaliz[ation of] all repairs and maintenance activities", *id*. ¶ 141, on

EBITDA; (2) the number of non-paying accounts acquired through the CTF acquisition; or (3) the typical cost to clean up a non-paying account.

With respect to the alleged GAAP violation, the Court cannot determine if Plaintiffs' two confidential informants could provide the alleged information because: (1) the former employees only indirectly learned about the alleged new policy (e.g., FE-17 "learned of the change" from some unnamed source, whereas FE-3 heard the "Southeast Area President . . . relay the instruction at a meeting", *id.* ¶ 62); and (2) the former employees did not provide dates for the adoption or implementation of the new policy or for when they learned about the new policy. Furthermore, the Court cannot fully evaluate whether KPMG's partial audit of Frontier's finances should be: (1) taken as evidence that Frontier did not violate GAAP even if it did alter its accounting policies, (2) deemed immaterial because KPMG's oversight did not include a full review of Frontier's accounting policies and statements to the SEC, or (3) some other conclusion related to the alleged GAAP violation. *See* Def. Mem. of Law at 35 n8; Pl. Mem. of Law in Opp. at 35 n19,

With respect to the non-paying Verizon accounts, the Court cannot determine if Plaintiffs' single confidential informant, who oversaw one state's operations, *id.* ¶ 62, could provide the alleged information because: (1) the former employee's access to company-wide data is not described with sufficient particularity; (2) the former employee's statements, in and of themselves, do not suggest knowledge of aggregate California, Florida, and Texas data; and (3) the former employee does not allege that s/he shared contradictory aggregate data with Frontier.

Accordingly, the Court dismisses all claims stemming from Defendants' alleged statements regarding the company's alleged change in accounting practices and costs for clean-up of non-paying Verizon accounts.

If Plaintiffs can remedy these specific deficiencies, relating to the alleged change in accounting practices or the costs for clean-up of non-paying Verizon accounts, as well as any of the deficiencies described below (e.g., loss causation, scienter, and the statute of limitations), then they may seek leave to amend the Amended Class Complaint, as discussed below.

2.    **Loss Causation**

Although the Court has already found an adequate basis to dismiss the Complaint—that Plaintiffs have failed to allege a material misstatement—the Court also finds that Plaintiffs have failed to adequately plead loss causation.

"A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharm., Inc.*, 544 U.S. at 338; *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010); *In re Initial Pub. Offering Sec. Litig.*, 399 F.Supp. 2d at 306; *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 547 (S.D.N.Y. 2007). ("Where there are warnings about the steady decline of a publicly owned company, its shareholders cannot innocently claim ignorance about the true status of the company's financial health.").

Bare allegations of market loss are insufficient to survive a motion to dismiss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. at 345 ("The securities statutes seek to maintain public confidence in the marketplace. They do so by deterring fraud, in part, through the availability of private securities fraud actions. But the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.") (internal citations omitted)). Rather, Plaintiffs must "allege and prove the traditional elements of causation and loss." *Id.* at 346. ("The statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery

where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.").

"Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014). Nevertheless, plaintiffs must "allege sufficient facts to raise a reasonable inference that [defendants' misstatements or fraudulent conduct] caused an ascertainable portion of its loss." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015).

Plaintiffs have failed to plead sufficiently "proximate causation and economic loss." *Dura Pharm., Inc.*, 544 U.S. 338 (2005) ("Our holding about plaintiffs' need to prove proximate causation and economic loss leads us also to conclude that the plaintiffs' complaint here failed [as] 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"). The Amended Class Complaint is insufficient for two reasons: (1) all of the alleged corrective events revealed broad company-wide losses and negative information about the CTF integration, and (2) the causal connection between the corrective events and Frontier's stock declines is too tenuous.

First, "[i]n the years leading up to the Class Period, Frontier [allegedly] pursued an acquisition-based growth strategy, purchasing millions of customers and billions of dollars' worth of wireline infrastructure from other telecommunications companies[.]" Am. Class Compl. ¶ 27. As a result, Frontier had millions of customers across more than fifteen states, *id*. ¶¶ 33, 35, before its acquisition of Verizon's California, Florida, and Texas wireline operations. Frontier inarguably was a complex nationwide company before, during, and after the class period. Each

of the five alleged corrective events revealed both company-wide losses and negative information about the CTF integration:

(1)     The November 1, 2016 announcement allegedly "reveal[ed] that . . . Frontier's revenue declined $84 million, [allegedly] driven primarily by the CTF regions, and . . . integration costs for the CTF Acquisition had grown to $750 million";

(2)     The February 27, 2017 announcement allegedly "reveal[ed] another $100 million decrease in revenue from the previous quarter, [allegedly] driven by purported 'cleanup' of 'nonpay' accounts acquired in the CTF Acquisition";

(3)     The May 2, 2017 announcement allegedly "reveal[ed] . . . its revenue declined another $53 million from the previous quarter", that "Frontier was cutting its dividend by 62%, [allegedly] driven by its inability to deliver its EBITDA target", and "$11 million of the [revenue] decline [was allegedly] related to the 'cleanup of CTF nonpaying accounts'";

(4)     The October 31, 2017 announcement allegedly "reveal[ed] that [Frontier] would "miss its EBITDA guidance for 2017 as a result of slower than expected revenue stabilization"; and

(5)     The February 27, 2018 announcement allegedly "reveal[ed] that . . . Frontier was canceling its dividend completely", that "churn had [allegedly] increased nearly 10% since 2016", and that "the total cost of the CTF Acquisition was [allegedly] $962 million."

*Id.* ¶ 243.

Plaintiffs' loss causation argument requires the Court to assume that Frontier investors sold their stocks due to revelations regarding CTF integration issues rather than the company's

broader financial losses, which were announced simultaneously. Plaintiffs, however, have not

alleged sufficient facts to support an inference that "an ascertainable portion" of this complex,

nationwide company's stock loss can be traced to disclosures regarding the CTF integration. *Cf*

*Fin. Guar. Ins. Co.*, 783 F.3d at 404 ("At this preliminary stage, accepting all factual allegations

as true and drawing all reasonable inferences in FGIC's favor, the [Second Amended Complaint]

alleges a causal connection between Putnam's fraudulent misrepresentations and FGIC's losses

under the Pyxis Guaranty such that FGIC would have been spared all or an ascertainable portion

of that loss absent the fraud.") (internal quotation omitted)).

For example, the May 2, 2017 announcement allegedly contained three pieces of

information: (1) a $53 million revenue decline, (2) a 62 percent cut to Frontier's dividend, and

(3) a $11 million revenue decline related to nonpaying account cleanup. Am. Class Compl.

¶ 243. Plaintiffs have not plausibly alleged that investors ignored the first two pieces of

information and sold their stocks on the basis of the third piece of information, which accounted

for less than 20 percent of that quarter's revenue decline.

Second, the causal connection between the corrective events and Frontier's stock declines

is too tenuous for three reasons.

First, "Frontier's stock price declined nearly 50% before the first 'corrective disclosure'",

Def. Reply at 20, for unexplained reasons that might have continued to contribute to the stock's

decline throughout the class period.

Second, Frontier's stock price fluctuated in between the corrective events. For example,

the stock closed at $8.86 following the alleged October 31, 2017 corrective event, then dropped

23.9 percent to $7.03 following the alleged February 27, 2018 corrective event. *Id.* ¶ 243. The

23.9 percentage drop to $7.03 yields a February 27, 2018 stock price of $9.24.[12] In other words, Frontier's stock dropped to $8.86 after the alleged fourth corrective event, then rose to $9.24 before the alleged fifth corrective event, then dropped to $7.03; this fluctuation is unaccounted for in the Amended Class Complaint.

Third, as discussed previously, Frontier faced ongoing negative press coverage, litigation, and regulatory scrutiny of its acquisitions and flash cuts across a host of states before, during, and after the class period. While none of these issues, on its own, is fatal to Plaintiffs' claims, these collective, negative public events seem to render Plaintiffs' causation arguments too tenuous to survive a motion to dismiss, even under ordinary pleading requirements. *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d at 547 ("Where there are warnings about the steady decline of a publicly owned company, its shareholders cannot innocently claim ignorance about the true status of the company's financial health."); see also *Iqbal*, 556 U.S. at 678 ("mere conclusory statements . . . do not suffice"); *Twombly*, 550 U.S. at 555.

Thus, if Plaintiffs seek leave to amend the Amended Class Complaint and address the deficiencies identified by the Court as likely not to be futile, they must also address the loss causation issues identified by the Court.

### 2.    Scienter

Because the Court has dismissed Plaintiffs' material misstatement claims and addressed Plaintiffs' loss causation arguments, the Court need not rule on whether Plaintiffs have adequately pled scienter. In any event, if Plaintiffs' claims were not otherwise dismissed, Plaintiffs have not adequately pled scienter.

---

[12] Operationally, the post-decrease amount divided by the remainder of 100 percent minus 23.9 percent, or 7.03/.761.

"To plead scienter so as to survive a motion to dismiss, a plaintiff must state 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[.]'" *Westchester Teamsters Pension Fund*, 604 Fed. App'x 5 at *7 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Scienter "may be established by facts '(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *City of Pontiac Policemen's and Firemen's Retirement Sys.*, 752 F.3d at 184, quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Sodhi*, 2015 WL 273724, at *7 ("A securities plaintiff can plead scienter by alleging that the defendant had a motive and an opportunity to commit securities fraud."), *citing In re Scholastic Corp.*, 252 F.3d 63, 74 (2d Cir. 2001) ("Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness.").

Recklessness means "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.*, quoting *Novak*, 216 F.3d 300, 308 (2d Cir. 2000). "The requisite 'strong inference' of scienter is one which is 'at least as likely as any plausible opposing inference.'" *Id.* (emphasis omitted), quoting *Tellabs, Inc.*, 551 U.S. at 328, 127 S.Ct. 2499. The mere fact of defendants' senior positions within a company is insufficient to support an inference of recklessness. *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 273 (S.D.N.Y. 2009) ("The Complaint's general allegations

that, by virtue of their senior positions at Gildan, the Individual Defendants necessarily had access to nonpublic information, are insufficient to show recklessness under the law of this Circuit."). However, "[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 76 (2d Cir. 2001), *citing Novak*, 216 F.3d at 308.

Defendants argue that the Frontier Defendants did not have motive to conceal material information about CTF integration issues because: (1) their "bonuses afforded a weight of only 5% to the CTF Acquisition 'Financing/Approvals/Integration Deliverables,'" Def. Reply at 15; (2) Plaintiffs have alleged no insider trading or Defendant stock sales, Def. Mem. of Law at 30; (3) Mr. McCarthy volunteered to forego a CTF transaction bonus, *id*. at 31; and (4) Frontier's participation in a highly regulated industry would likely serve as a deterrent to fraud, *id*. Defendants also contend that the Amended Class Complaint fails to sufficiently plead conscious misbehavior or recklessness because it does not demonstrate that the Frontier Defendants possessed specific real-time non-public information, or that either the West Virginia settlement or John Jureller's departure as CFO support an inference of scienter. *Id*. at 31–34.

Plaintiffs argue that the size of the CTF project, past flash cut bonuses, and Frontier's involvement in a heavily regulated industry provided motive for the Frontier Defendants to lie, particularly about interruptions to 9-11 emergency services. Pl. Mem. of Law in Opp. 31–34. Furthermore, Plaintiffs argue that the Frontier Defendants were personally involved in orchestrating the CTF flash cut and dealing with customer issues following the CTF integration. *Id*. at 29–33.

The Court disagrees.

As described above, the Frontier Defendants did not engage in material misrepresentation. Furthermore, Plaintiffs allegations do not permit "a strong inference" that Defendants had motive and opportunity to act with the required state of mind. *See Westchester Teamsters Pension Fund*, 604 Fed. App'x at 7 ("That is, there are no facts alleged that demonstrate Defendants had an intent to deceive, manipulate, or defraud investors when Defendants described their ostensibly robust risk management systems and internal controls."). Frontier seemed to have a neutral bonus structure for the CTF acquisition. Def. Reply at 21 (Alleging that Defendants Wilderotter, McCarthy, and Jureller's 2015 bonus calculations were "afforded a weight of only 5% to the CTF Acquisition 'Financing/Approvals/Integration Deliverables.'"). There is no alleged insider trading. Moreover, Frontier faced constant oversight by regulators, and there is no causal connection between the West Virginia settlement or John Jureller's departure and fraud.

Frontier Defendants' alleged recklessness is a closer call, regarding Mr. McCarthy's mathematically precise claim of one percent service issues. Am. Class Compl. ¶¶ 112, 224. Plaintiffs suggest but do not adequately plead having had access to data on the total number of customers gained through the CTF acquisition and the number who faced problems. If the one percent figure was wildly incorrect, that fact would support an inference of mathematical manipulation or reckless disregard for the truth "at least as likely as any plausible opposing inference." *In re Scholastic Corp.*, 252 F.3d at 74.

The same does not appear to be true of the alleged GAAP violation or non-paying accounts statements. Plaintiffs have not alleged when new accounting policies were adopted or implemented, or, importantly, whether KPMG's partial audit found no GAAP violations or

would have supported a reasonable belief that no GAAP violations existed. *See* Def. Mem. of Law at 35 n8; Pl. Mem. of Law in Opp. at 35 n19. With regard to the number of non-paying Verizon accounts, as detailed above, Plaintiffs' single confidential informant did not describe company-wide data with sufficient particularity to support an inference of wrongdoing. Furthermore, that employee does not allege that s/he shared contradictory aggregate data with Frontier.

Accordingly, even if Plaintiffs claims should not otherwise be dismissed, they have failed to plead scienter adequately. If Plaintiffs seek leave to amend the Amended Class Complaint and address the deficiencies identified by the Court as likely not to be futile, they must also address the issue of scienter.

### 3. Statute of Limitations

To the extent that Plaintiffs' claims have not otherwise been dismissed, many of those claims likely would be barred by the statute of limitations for Exchange Act violations.

Actions brought under section 10(b) of the Exchange Act are time-limited by 28 U.S.C. § 1658(b), which requires claims to be brought "not later than the earlier of (1) [two] years after the discovery of the facts constituting the violation; or (2) [five] years after such violation." 28 U.S.C. § 1658(b)(1–2). The limitations period does not commence until facts concerning each element of the violation, including Defendants' culpable mental state, are discovered or could reasonably be discovered. *Merck & Co. v. Reynolds*, 559 U.S. 633, 649 (2010) ("The statute says that the limitations period does not begin to run until 'discovery of the facts constituting the violation' . . . . Scienter is assuredly a 'fact' . . . . So long as a defendant concealed for two years that he made a misstatement with an intent to deceive, the limitations period would expire before

the plaintiff had actually 'discover[ed]' the fraud. We consequently hold that facts showing scienter are among those that "constitut[e] the violation.").

Chris Bray initially filed his class action Complaint on September 26, 2017. Class Action Compl. for Violations of Fed. Securities Laws, ECF No. 1. Thus, any undiscovered Exchange Act violations occurring before September 26, 2012—by which time the West Virginia flash cut was complete and preparations for the Connecticut flash cut had likely begun, *id*. ¶ 34–35—would be barred by 28 U.S.C. § 1658(b)(2). Any discovered violations would be subject to a two-year statute of limitations under 28 U.S.C. § 1658(b)(1). While the Court need not calculate the statute of limitations for each of Plaintiffs' allegations, the Court notes that a number of key events occurred before September 26, 2015, including:

(1) Frontier's February 5, 2015 announcement of the CTF acquisition, Am. Class Compl. ¶¶ 2, 97;

(2) Ms. Wilderotter's March 3, 2015 resignation as CEO, *id*. ¶ 19;

(3) Mr. Jureller's various March 2015 speeches on Frontier's proven track record, *id*. ¶¶ 175–176;

(4) Frontier and Verizon's April 28, 2015 FCC filing, *Id*. ¶ 50; and

(5) Mr. McCarthy's May 28, 2015 speech on Frontier's success with CTF acquisitions, ¶ 177.

This non-exhaustive list suggests the sort of statute of limitations issues that Plaintiffs would have to overcome, even if they could remedy the deficiencies outlined here.

In sum, the Court dismisses Plaintiffs' first claim for relief, Am. Class. Compl. ¶¶ 265–273, in its entirety, as discussed above.

**B. Alleged Violations of Section 20(a) of the Exchange Act**

Section 20(a) of the Exchange Act imposes liability on control persons. 15 U.S.C. §

78t(a). Section § 77o defines a control person as:

> Every person who, by or through stock ownership, agency, or otherwise, or who,
> pursuant to or in connection with an agreement or understanding with one or more
> other persons by or through stock ownership, agency, or otherwise, controls any
> person liable under sections 77k or 77l of this title . . . unless the controlling
> person had no knowledge of or reasonable ground to believe in the existence of
> the facts by reason of which the liability of the controlled person is alleged to
> exist.

15 U.S.C. §§ 77o(a). To establish the requisite state of mind for a control person, a plaintiff must

plead "facts giving rise to a strong inference" that the control person "knowingly or recklessly

failed (i) to conduct a reasonable investigation of the rated security with respect to the factual

elements relied upon by its own methodology for evaluating credit risk; or (ii) to obtain

reasonable verification of such factual elements . . . from other sources . . . ." 15 U.S.C. § 78u-

4(b)(2)(B). The control person will not be liable if he or she "acted in good faith and did not

directly or indirectly induce the act or acts constituting the violation or cause of action." 15

U.S.C. § 78t(a).

Defendants argue that Plaintiffs' Section 20(a) claim must be dismissed because

Plaintiffs have failed to state a primary violation of a securities law, and therefore any claim

under Section 20(a) against the Individual Frontier Defendants as control persons must fail. Def.

Mem. of Law at 38, citing *Rombach*, 355 F.3d at 177–78 (explaining that a control person claim

"is necessarily predicated on a primary violation of securities law" and finding that because the

"district court properly dismissed the primary securities claims against the individual defendants,

these secondary claims must also be dismissed").

The Court agrees.

Because the Court has dismissed Plaintiffs' claims for primary violations of a securities law, their derivative Section 20(a) claim must also be dismissed. *See One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 Fed. App'x 75, 82 (2d Cir. 2010) (*quoting Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) ) ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show, among other things, 'a primary violation by a controlled person.'").

The Court therefore dismisses Plaintiffs' second claim for relief, Am. Class Compl. ¶¶ 274–286, in its entirety.

### C. Alleged Violations of Section 11 and 12(a)(2) of the Securities Act

The third and fourth claims for relief, under Section 11 and 12(a)(2) of the Securities Act will be addressed together.

Section 11 of the Securities Act provides a cause of action to any person who buys a security under a materially false or misleading registration statement. 15 U.S.C. §§ 77k. Section 12(a)(2) provides a cause of action against any person who sold a security by means of a materially false or misleading prospectus. Under 15 U.S.C. § 77k(a)(5), a plaintiff who acquired a "security after the issuer . . . made [it] generally available to its security holders" (i.e., an aftermarket purchaser) may bring suit upon "proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person." 15 U.S.C. § 77k(a)(5); *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003) ("we hold that aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act.").

Claims brought under sections 11 and 12(a)(2) of the Securities Act are limited by time under 15 U.S.C. § 77m, which states:

> No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m.

As discussed above, fraud claims brought under sections 11 and 12(a) are subject to heightened pleading standards, but negligence and strict liability claims brought under the Securities Act need only meet Rule 8 pleading requirements. *Rombach*, 355 F.3d at 170–71.

The Court has dismissed all of Plaintiffs' pre-acquisition claims (e.g., regarding the seasoned integration team), which serve as the basis for Plaintiffs' Section 11 and 12(a) claims. The Court would not reach a different result under an ordinary pleading standard (i.e., for Plaintiffs' negligence or strict liability claims). Any optimistic or vague statements regarding Frontier's proven track record, seasoned integration, or estimates for the CTF integration would not constitute a material fact, for the reasons described above.

In addition, Defendants' common and preferred stock offerings warned investors that Frontier might not be able to "complete the Verizon transaction", "fully realize expected cost synergies" from the "recently-concluded Connecticut acquisition" or "maintain relationships with customers, employees, or suppliers" following the acquisition. June 2, 2015 Common Stock Offering at 5; June 2, 2015 Preferred Stock Offering at 6. With regard to the estimate for the CTF integration costs, Defendants provided an additional, specific warning that "[w]hile the

Company currently expects that it will incur approximately $450 million of operating expenses and capital expenditures in total related to acquisition and integration activities in 2015 and 2016 associated with the Verizon Transaction, the amount of such operating expenses and capital expenditures may increase based on a variety of factors[.]" June 2, 2015 Preferred Stock Offering; June 2, 2015 Common Stock Offering. Further, as described above, Frontier planned to spend less than its highest cost estimates by leaving some gaps unfilled. Def. Mem. of Law at 21.

For these reasons, Plaintiffs have failed to state a claim for Section 11 or 12(a) liability for Offerings that were "inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above." Am Class. Compl. ¶ 338; *see id*. ¶ 350; *see* also *Iqbal*, 556 U.S. at 678 ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotations omitted)); *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal quotations omitted)). The Court further notes that, since the CTF offerings were made in 2015, the Plaintiffs may not meet the one-year statute of limitations under 15 U.S.C. § 77m.[13]

The Court therefore dismisses Plaintiffs' third and fourth claims for relief, Am. Class Compl. ¶¶ 336–354, in their entirety.

---

[13] By contrast, Lead Plaintiffs likely have standing to sue given that Arkansas Teachers allegedly "purchased 47,390 shares of Preferred Stock for $100/share." Am. Class Compl. ¶¶ 288–89; *see also In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010) ("Accordingly, where the actionable part of the registration statement is alleged to be common to all purchasers from the same shelf, then a plaintiff has standing to represent them because they have all suffered from the same alleged injury.").

## D. Alleged Violations of Section 15 of the Securities Act

Defendants argue that Plaintiffs' Section 15 claim must be dismissed because Plaintiffs have failed to state a primary violation of a securities law, and therefore any claim under Section 15 against control persons must fail. Def. Mem. of Law at 38, citing *Rombach*, 355 F.3d at 177–78.

The Court agrees.

Because the Court has dismissed Plaintiffs' claims for primary violations of a securities law, their derivative Section 15 claim must also be dismissed for the reasons stated above (i.e., regarding liability under Section 20(a), which is analogous to Section 15).

The Court therefore dismisses Plaintiffs' fifth claim for relief, Am. Class Compl. ¶¶ 355–59, in its entirety.

## E. Leave to Amend the Amended Class Complaint

As stated above, Plaintiffs may seek leave to amend the Amended Class Complaint to address the deficiencies identified in this ruling. The Court, however, will grant leave to amend only if Plaintiffs demonstrate that their claims are not futile.

Rule 15 of the Federal Rules of Civil Procedure governs the determination of whether to permit a motion to amend; it advises that the Court "should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Courts retain the discretion, however, to deny leave to amend where proposed claims are futile, or incapable of remedy. *Krys v. Pigott*, 749 F.3d 117, 134–35 (2d Cir. 2014) ("Although Maggio ventured an opinion that anyone with 'half a brain' would know that the RTLs had no legitimate purpose for Refco . . . . he also testified that in fact Refco made efforts to conceal, not only from the public at large but also from the customers who entered into the RTL transactions, both the purpose of the RTL transactions and the very

existence of the RGHI Receivable . . . . Thus, the Maggio testimony helps to demonstrate why further amendment of the Amended Complaint could not cure the absence of factual allegations as to actual knowledge on the part of appellees sufficient to state a claim against them for aiding and abetting Refco's fraud and breach of fiduciary duty. We see no abuse of discretion in the district court's dismissal of those claims without leave to amend.").

A proposed amended claim would be futile if it: (1) did not cure the deficiencies identified in this Ruling and Order; (2) rested on "mere conclusory statements" in support of new assertions, *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; or (3) failed to adequately plead each element of the claim (e.g., material misrepresentation, loss causation, scienter, statute of limitations) to the level of the required pleading standard(s).

As a result and consistent with this Court's inherent authority to manage its docket with a "view toward the efficient and expedient resolution of cases," *Deitz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016), the Court will deny a motion to amend if it does not cure the deficiencies discussed above. *See Krys*, 749 F.3d 134–35 (2d Cir. 2014) ("[T]he Maggio testimony helps to demonstrate why further amendment of the Amended Complaint could not cure the absence of factual allegations as to actual knowledge on the part of appellees sufficient to state a claim against them for aiding and abetting Refco's fraud and breach of fiduciary duty. We see no abuse of discretion in the district court's dismissal of those claims without leave to amend.").

## IV.    CONCLUSION

For the reasons set forth above, the Court now **GRANTS** Defendants' motions to dismiss, ECF No. 143, 146. Plaintiffs' Exchange Act claims, Am. Class Compl. ¶¶ 265–86, are dismissed. Plaintiffs' Securities Act claims, Am. Class Compl. ¶¶ 336–59, also are dismissed.

Should Plaintiffs' choose to file an Amended Complaint to remedy any of the deficiencies addressed in this Ruling and Order, Plaintiffs must seek leave to amend the Amended Complaint, along with a proposed amended pleading, by **May 10, 2019**.

Otherwise, the Court will instruct the Clerk of Court to close this case.

SO ORDERED at Bridgeport, Connecticut, this 8th day of March, 2019.

   /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE