# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

<table>
<tr><td>IN RE FRONTIER COMMUNICATIONS, CORP. STOCKHOLDERS LITIGATION</td><td>No. 3:17-cv-1617 (VAB)</td></tr>
</table>

### RULING AND ORDER ON MOTION FOR LEAVE TO AMEND THE COMPLAINT

On May 10, 2019, Arkansas Teacher Retirement System ("ATRS") and Carlos Lagomarsino ("Mr. Lagomarsino" or, in conjunction with ATRS, "Lead Plaintiffs"), filed a motion to amend their class action Complaint on behalf of shareholders who "purchased the publicly traded common stock and Mandatory Convertible Preferred Stock . . . of Frontier Communications Corporation" during a specified period of time "and were damaged thereby." Proposed Am. Consol. Class Action Compl. for Violations of the Federal Securities Laws ¶ 1, ECF No. 167-1 (May 10, 2019) ("Prop. Second Am. Class Compl."); Mot. to Amend, ECF No. 167 (May 10, 2019).

The Lead Plaintiffs filed their proposed Second Amended Complaint after this Court's Ruling and Order granting Defendants' motion to dismiss. Ruling and Order on Mots. to Dismiss, ECF No. 166 (Mar. 8, 2019) ("Ruling and Order"). The Court granted Plaintiffs leave to file an amended pleading in order to address deficiencies identified by the Court, to the extent that such deficiencies could be addressed. *Id.* at 2. Lead Plaintiffs accordingly "only seek to amend claims concerning certain of Defendants' [allegedly] false and misleading statements." Prop. Second Am. Class Compl. ¶ 1 n.1.

1

For the following reasons, Plaintiffs' motion for leave to amend the Complaint is

**DENIED.**

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Familiarity with the background of this case is assumed. *See* Ruling and Order, ECF No. 166 (Mar. 8, 2019).

In brief, this lawsuit revolves around Frontier's allegedly false or misleading statements to investors following its April 1, 2016, acquisition of Verizon's California, Texas, and Florida wireline operations ("CTF Acquisition"). *See* Prop. Second Am. Class Compl. ¶ 2. Frontier allegedly undertook this acquisition using a technique known as a "flash cut" (the CTF Flash Cut"), wherein "the acquiring company transfers the acquired assets in one immediate—and irreversible—'cutover' that is complete in a matter of hours." *Id.* ¶ 3. Frontier's CTF Flash Cut allegedly was the largest telecommunications flash cut in history, "involving states comprising over 27% of the United States population." *Id.* Plaintiffs allege that "the CTF Acquisition was a disaster, [allegedly] plagued by service issues that drove customers away, caused revenue to plummet, and propelled acquisition and integration costs to nearly $1 billion—twice the estimate [allegedly] given to investors." *Id.* ¶ 2.

In January 2018, the Court consolidated multiple cases alleging violations of federal securities laws related to the CTF Acquisition into this lawsuit. Order Granting Mot. to Consolidate Cases, ECF No. 99 (Jan. 18, 2018).

On April 30, 2018, the Lead Plaintiffs filed an Amended Class Action Complaint. Consol. Class Action Compl. for Violations of the Federal Securities Laws, ECF No. 134 (Apr. 30, 2018) ("Am. Class Compl."). The Amended Class Complaint brought claims against three groups of Defendants: (1) the Frontier Defendants, comprising Frontier Communications

Corporation ("Frontier") and five corporate officers; (2) Additional Securities Act Defendants, comprising eleven members of Frontier's Board of Directors; and (3) the Underwriter Defendants, comprising ten financial services corporations. *See* Ruling and Order at 2–6 (detailing Defendants). Plaintiffs alleged various violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o); Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 of The Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. Ruling and Order at 1.

On June 29, 2018, Defendants moved to dismiss the Amended Class Action Complaint. Mots. to Dismiss Consol. Class Action Compl., ECF Nos. 143, 146 (June 29, 2018); Mem. of Law in Supp. of Mot. to Dismiss Consol. Class Action Compl., ECF No. 144 (June 29, 2018). Defendants argued that Plaintiffs failed to: (1) state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure; (2) satisfy the heightened pleading requirements of Rule 9(b), and 15 U.S.C. §§ 77k, 77l(a)(2), 77o, 78t(a), 78u-4(b)(1)(A–B), 78u-4(b)(2)(A), 78u- 4(b)(4); or (3) file this lawsuit within the statute of limitations period imposed by 15 U.S.C. § 77m and 28 U.S.C. § 1658(b)(1). Ruling and Order at 2.

On March 8, 2019, the Court granted Defendants' motions to dismiss, but also granted Plaintiffs leave to file a motion to amend the Amended Class Action Complaint to address the deficiencies identified in the Court's ruling. *Id.*

On May 10, 2019, Plaintiffs moved to amend the Amended Class Action Complaint. Mot. to Amend, ECF No. 167 (May 10, 2019). Plaintiffs filed the motion along with both a clean version and a redlined version of a proposed amended class action complaint. Prop. Second Am. Class Compl.; Proposed Am. Consol. Class Action Compl. for Violations of the Federal

Securities Laws – Redline, ECF No. 167-2 (May 10, 2019) ("Prop. Second Am. Class Compl. –

Redline"). Plaintiffs also filed a memorandum of law in support of their motion to amend. Mem.

in Supp. of Mot. to Amend, ECF No. 168 (May 11, 2019) ("Pls.' Mem.").

On July 15, 2019, Defendants filed a memorandum in opposition to Plaintiffs' motion to

amend. Defs.' Mem. Opp'n to Mot. for Leave to Amend, ECF No. 173 (July 15, 2019) ("Defs.'

Mem."). In support of their opposition, Defendants filed a declaration of their counsel, Ingber

Decl., ECF No. 172 (July 15, 2019), along with eight exhibits:

- Frontier's quarterly report to the SEC for the period ending June 30, 2016, Ingber Decl. Ex. 1, ECF No. 172-1 (Form 10-Q, U.S. Sec's and Exchange Comm'n (Aug. 8, 2016)) ("Frontier Quarterly Report for Period End June 30, 2016");

- Frontier's quarterly report to the SEC for the period ending September 30, 2016, Ingber Decl. Ex. 2, ECF No. 172-2 (Form 10-Q, U.S. Sec's and Exchange Comm'n (Nov. 3, 2016)) ("Frontier Quarterly Report for Period End Sept. 30, 2016");

- A J.P. Morgan equity research report on Frontier dated November 1, 2016, Ingber Decl. Ex. 3, ECF No. 172-3 (Philip Cusick, Sebastiano C. Petti, Richard Choe, *Frontier: Revenue Weaker, EBITDA In-Line. Well Covered Dividend Keeps Us Overweight Despite Underlying Noise. PT to $5.*, J.P. Morgan (Nov. 1, 2016)) ("J.P. Morgan Report");

- A Citi Research equities report on Frontier dated November 1, 2016, Ingber Decl. Ex. 4, ECF No. 172-4 (Michael Rollins, Adam Ilkowitz, Neth Wiedemann, *Frontier Communications Corp (FTR) Subscribers and Revenue Down, LQA Leverage Up; Reit. Sell*, Citi (Nov. 1, 2016)) ("Citi Report");

- A Cowen and Company equity research report on Frontier dated November 2, 2016, Ingber Decl. Ex. 5, ECF No. 172-5 (Gregory Williams, Colby Synesael, Jonathan Charbonneau, Anuj Parikh, *Frontier Communications Earnings Update: Another Integration Qtr as We Finally Look to Stability*, Cowen and Co. (Nov. 2, 2016)) ("Cowen Report");

- A Deutsche Bank markets research report on Frontier dated November 2, 2016, Ingber Decl. Ex. 6, ECF No. 172-6 (Matthew Niknam, Whitney Fletcher, Benjamin Soff, *Frontier Communications: It all comes back to revenue growth, or lack thereof; downgrading to HOLD*, Deutsche Bank (Nov. 2, 2016)) ("Deutsche Bank Report");

- A Jefferies equity research report on Frontier dated November 2, 2016, Ingber Decl. Ex. 7, ECF No. 172-7 (Scott Goldman, Mike McCormack, Marah Formanek, *Frontier Communications (FTR) Challenges Remain, But Dividend is Not One of Them*, Jefferies Group (Nov. 2, 2016)) ("Jefferies Report"); and

- A Goldman Sachs research report on Frontier dated November 2, 2016, Ingber Decl. Ex. 8, ECF No. 172-8 (Brett Feldman, Jiorden Sanchez, Stephen Laszczyk, *Commentary: Frontier (FTR, Neutral): 3Q16 miss highlights a difficult turnaround*, Goldman Sachs Research (Nov. 2, 2016)) ("Goldman Sachs Report").

On August 12, 2019, Plaintiffs filed a reply to Defendants' opposition. Reply in Further Supp. of Mot. for Leave to Amend, ECF No. 180 (Aug. 12, 2019) ("Pls.' Reply").

On November 20, 2019, Plaintiffs filed a notice of additional authority concerning *In re Avon Securities Litigation*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at \*3 (S.D.N.Y. Nov. 18, 2019). Pls.' Notice of Suppl. Auth., ECF No. 181 (Nov. 20, 2019).

On November 25, 2019, Defendants responded to Plaintiffs' notice of supplemental authority. Defs.' Resp. to Pls.' Notice of Suppl. Auth., ECF No. 182 (Nov. 25, 2019).

## II. STANDARD OF REVIEW

### A. Motions to Amend

Federal Rule of Civil Procedure 15(a) provides that parties may either amend pleadings once as a matter of course within twenty-one days after serving the pleading or, after twenty-one days, move for leave to amend. Fed. R. Civ. P. 15(a). The "court should freely give leave when justice so requires." *Id.* If the underlying facts or circumstances relied upon by a party may be a proper subject of relief, that party should be given the opportunity to test its claims on the merits. *Foman v. Davis*, 371 U.S. 178, 182 (1962). In the absence of any apparent or declared reason for denying leave, the leave sought should be "freely given." *Id.*

"The grant or denial of an opportunity to amend is within the discretion of the District Court," but the court must give some "justifying reason" if it denies leave. *Id.* at 182. Reasons a

court might deny leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment." *Id.*

Courts retain discretion to deny leave to amend where amendment is "unlikely to be productive," such as when an amendment is "futile" and "could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)" (internal citations omitted)). *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *see also Krys v. Pigott*, 749 F.3d 117, 134–35 (2d Cir. 2014) ("[T]he Maggio testimony helps to demonstrate why further amendment of the Amended Complaint could not cure the absence of factual allegations as to actual knowledge on the part of appellees sufficient to state a claim against them for aiding and abetting Refco's fraud and breach of fiduciary duty. We see no abuse of discretion in the district court's dismissal of those claims without leave to amend.").

A proposed amended claim would be futile if it: (1) does not cure the deficiencies identified by the Court; (2) rests on "mere conclusory statements" in support of new assertions, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); or (3) fails to adequately plead each element of the claim (e.g., material misrepresentation, loss causation, scienter, statute of limitations) to the level of the required pleading standard(s). Ruling and Order at 58.

### B. Pleading Standards for Exchange Act claims

For most claims brought under sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(b), imposes heightened pleading requirements governed by the PSLRA or Rule 9(b) of the Federal Rules of Civil Procedure. *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) ("As the district court observed, the particularity requirement of Rule 9(b) applies to securities fraud

claims brought under Section 10(b) and Rule 10b–5 . . . . The district court concluded that the same heightened pleading standard applies to securities claims brought under Section 11 and Section 12(a)(2) when premised on averments of fraud. We agree.”); *see also Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 535 (S.D.N.Y. 2017) (“A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the . . . . []PSLRA[.]); *In re Initial Pub. Offering Sec. Litig*., 241 F. Supp. 2d 281, 334–35 (S.D.N.Y. 2003) (“Congress intended that the PSLRA supersede the Federal Rules only as to those elements which the PSLRA explicitly mentions (i.e., scienter and material misstatements and omissions). See S. Rep. No. 104–98, at 15. In all other respects, the Rules govern these pleadings.”).

Under Rule 9(b), the complaint must “(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.” *In re Bank of Am. AIG Disclosure Sec. Litig*., 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 99 (2d Cir. 2007)), *aff'd* 566 F. App'x 93 (2d Cir. 2014); *see also* Fed. R. Civ. P. 9(b) (requiring that a complaint that alleges fraud plead “the circumstances constituting fraud . . . with particularity.”).

On the loss causation element of securities fraud claims, however, Plaintiffs must meet only Rule 8 pleading requirements. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005) (“We concede that the Federal Rules of Civil Procedure require only ‘a short and plain statement of the claim showing that the pleader is entitled to relief.’ Fed. Rule Civ. Proc. 8(a)(2). And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.”).

## III.    DISCUSSION

In their first Amended Class Action Complaint, Plaintiffs asserted five claims for relief against the three groups of Defendants, all of which the Court dismissed. Ruling and Order at 23.

Plaintiffs now seek leave to amend only as to their first two Exchange Act claims against the Frontier Defendants: (1) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Frontier Defendants, Prop. Second Am. Class Compl. ¶¶ 191–99; and (2) violations of section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against individual Frontier Defendants, Prop. Second Am. Class Compl. ¶¶ 200–11. Plaintiffs have also narrowed the Class Period to between April 25, 2016 and October 31, 2017 inclusive.[1] *Id.* ¶ 1. Plaintiffs no longer assert any claims against one of the individual Frontier Defendants, any of the Additional Securities Act Defendants, or any of the Underwriter Defendants. *Id.* ¶¶ 1–2.

The remaining individual Frontier Defendants ("Individual Defendants") named in the proposed second Amended Class Action Complaint are as follows:

- Daniel J. McCarthy, who allegedly served as Frontier's Executive Vice President ("EVP") and Chief Operating Officer ("COO") from January 2006 to April 2012, as Frontier's President and COO from April 2012 to April 2015, as Frontier's President and CEO from April 3, 2015 to the present, and as a member of Frontier's Board of Directors during all relevant times, *id.* ¶ 20;

- John M. Jureller, who allegedly served as the company's EVP and Chief Financial Officer ("CFO") from January 2013 to November 4, 2016, *id.* ¶ 21;

- Ralph Perley McBride, who allegedly served as Frontier's CFO from November 4, 2016 through the end of the class period, *id.* ¶ 22; and

- John Gianukakis, who allegedly served as Frontier's Vice President and Treasurer from May 27, 2014 to April 2017, *id.* ¶ 23.

---

[1] Plaintiffs previously asserted a Class Period between February 6, 2015, and February 28, 2018. Ruling and Order at 1.

The Court will address each of the Plaintiffs' alleged claims in turn.

## A. Count I: Section 10(b) of the Exchange Act and SEC Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for

> any person, directly or indirectly. . . [t]o use or employ, in connection with the purchase or sale of any security . . . or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

SEC Rule 10b-5 makes it unlawful for "any person, directly or indirectly . . .":

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x 72, 74 (2d Cir. 2016) (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996)).

In monetary damages suits against non-controlling persons, plaintiffs must first specify each allegedly misleading statement or omission. 15 U.S.C. §§ 78u-4(b)(1)(A-B). *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005) (internal citation omitted), *cert. denied,*

546 U.S. 935 (2005). Plaintiffs must then demonstrate that each misstatement is material. *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 306 (S.D.N.Y. 2005) ("A plaintiff must allege a material misstatement . . . and that misstatement must be the cause of the plaintiff's loss . . . ."). "For an undisclosed fact to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

Misstatements of corporate success may be vague and inactionable puffery, or material misrepresentations of existing facts. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true . . . . these statements were plainly false and misleading."). "[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to support a claim of securities fraud. *Id.*

But "defendants may be liable for misrepresentations of existing facts." *Id.* (citing *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 74-75 (S.D.N.Y. 1996)). To withstand a motion to dismiss, Plaintiffs must plead more than a delayed response or a lack of attention to ongoing problems. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 161 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (dismissing a second amended complaint where the defendants "should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud"). Rather, Plaintiffs must plead material misrepresentations, such as a failure "to timely disclose material data which resulted in

misrepresentations of the defendant compan[y's] current finances where it was clearly pled that the defendants knew or should have known better." *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 572 (S.D.N.Y. 2007) (citing *Novak*, 216 F.3d at 311).

Plaintiffs also must meet PSLRA's heightened pleading standard by "stat[ing] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . stat[ing] with particularity all facts on which that belief is formed." 15 U.S.C. §§ 78u-4(b)(1)(B). If Plaintiffs' allegations are based on confidential sources, those individuals must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 314).

The Court dismissed Plaintiffs' claims against the Frontier Defendants under Section 10(b) of the Exchange Act and SEC Rule 10b-5, which related to eight categories of allegedly false or misleading statements made by the Frontier Defendants. *See* Ruling and Order at 25.

Plaintiffs now reassert claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against the Frontier Defendants arising from four categories of alleged statements, regarding:

> (i) claims that only 1% of CTF customers were affected by service issues . . . ; (ii) service and other issues arising from the CTF Acquisition . . . ; (iii) supposed "non-paying accounts" . . . ; and (iv) that Frontier's financial statements were prepared in accordance with Generally Accepted Accounting Principles . . . .

Prop. Second Am. Class Compl. ¶ 193.

### 1. Alleged Misstatements

#### (i) Statements Regarding the Percentage of Customers Facing Service Interruptions

Plaintiffs allege that Defendants' statements in 2016, which claimed that less than 1% of customers experienced service issues, "understated the true number of service issues by at least 400%, and . . . Defendants were well aware of the full scope of these issues." Prop. Second Am. Class Compl. ¶ 39. Plaintiffs allege that former employees ("FEs"), speaking confidentially, provided information demonstrating that Defendants "misstated and manipulated both the denominator (that is, the total number of CTF customers) and the numerator (that is, the total number of CTF customers that experienced service issues)." *Id.* ¶ 40.

The Court previously dismissed Plaintiffs' claims regarding the percentage of customers affected by service issues because Plaintiffs had not met the applicable heightened pleading standards. Ruling and Order at 39 ("Plaintiffs['] allegations of 'funny math' . . . are not pled with 'sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" (quoting *Novak*, 216 F.3d at 314)). "While Plaintiffs are not required to submit precise mathematical data at the motion to dismiss stage, they must plead with enough specificity to enable the Court to determine that their sources would probably possess such estimates." *Id.* at 39–40. Specifically:

> The Court cannot determine that Plaintiffs' confidential informants could provide the requisite estimates because: (1) the former employees' access to company data is not described with sufficient particularity; (2) the former employees' statements, in and of themselves, do not suggest knowledge of aggregate California, Florida, and Texas data (e.g., FE-16, a Vice President for Corporate Marketing in the West Region, might only have had access to California data); and (3) the former employees do not allege that they shared contradictory aggregate data with Frontier Defendants that called into question Frontier's estimates for the total number of

> affected customers across the acquired territories (i.e., not just in the West; not just for 1,000 digital voice customers).

*Id.* at 40 (internal citations omitted).

Plaintiffs allege, as they did in their first Amended Class Complaint, that "widespread reports of service issues emerged immediately" after the CTF Flash Cut on April 1, 2016. Prop. Second Am. Class Compl. ¶ 33. Despite these alleged service issues, Defendants allegedly falsely asserted that "service problems arising from the transition . . . affected only one percent of the acquired customers experienced service issues." *Id.* ¶ 34.

On April 25, 2016, Frontier's Peter DePasquale allegedly told the Wall Street Journal that "subscribers who lost service after the switch-over represented less than 1% of its customer base." *Id.* ¶ 35 (alterations omitted).

On May 3, 2016, Mr. McCarthy, by then Frontier's CEO, allegedly told earnings call participants that while there were "some issues at the outset . . . these affected less than 1% of our customers in total, and much less than that at any point in time." *Id.*

On May 11, 2016, Mr. McCarthy allegedly reiterated the 1% claim in a signed letter to Florida Attorney General Pam Bondi, stating that "[o]verall, less than one percent of the over 3,000,000 customers transitioned to Frontier experienced a service disruption a result [sic] of the conversion . . . ." *Id.* ¶ 37.

On May 13, 2016, Melinda White, then Frontier's West Region President, allegedly said that "[f]ewer than 1% of Frontier's new customers have experienced problems." *Id.* Ms. White allegedly repeated this claim at a May 18, 2016, hearing of the California State Assembly's Utilities & Commerce Committee. *Id.*

As the Court previously noted, if these 1% statements were untrue at the time they were made, they would fall into the second category of corporate success misstatements: material

13

misrepresentations of existing facts. Ruling and Order at 38 (citing *Novak*, 216 F.3d at 315; *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. at 74–75). As "ascertainable or verifiable" facts, misstatements about the percent of affected customers would not be afforded the safe harbor given to optimistic forecasts about the future. *Id.* (citing *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 (2d Cir. 2010) ("[T]here is a discernible difference between a forecast and a fact, and courts are competent to distinguish between the two[.]")).

Plaintiffs argue that their proposed Second Amended Complaint "more than adequately alleges the falsity of Defendants['] 1% statements by describing with particularity service impacts that exceed 37,000 (1% of 3.7 million) by a staggering margin." Pls.' Mem. at 9. They argue that their enhanced allegations, based on former employees' reports and Frontier's own SEC filings, "establish[] the actual falsity of the 1% statements." *Id.* at 10. They argue further that these statements "are independently actionable as misleading because" they "are based on information that Defendants knew or should have known was unreliable." *Id.* (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991) ("[C]onclusory terms in a commercial context," such as a claim that a merger's terms are "fair" to investors, "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.")).

Defendants argue that Plaintiffs' "confidential witnesses still do not make sufficient allegations to plead the numerator," the number of customers who experienced service issues. Defs.' Mem. at 13. They argue that Plaintiffs' allegations consist of "highly ambiguous statements" that "fall far short of the Second Circuit's standards—most importantly because they do not identify whether the purported 'issues' and 'problems' were service disruptions related to

the CTF cutover, or whether they were issues related to Frontier's physical plant (e.g. storm damage)." *Id.* at 14.

Plaintiffs argue in their Reply that, contrary to Defendants' claim, their proposed Second Amended Complaint "describes the service outages resulting from just one undisclosed issue, a "provisioning" failure, that arose directly from the CTF Flash Cut and affected hundreds of thousands of new CTF customers—far more than the 26,000 customers with service outages that, alone, would render Defendants' statements false." Pls.' Reply at 5 (citing Prop. Am. Class Compl. ¶¶ 42–45). Additionally, Plaintiffs argue that their amended allegations "independently demonstrate[] falsity through other acquisition-related service outages that affected all 1.1 million video customers acquired in the CTF regions." *Id.* at 5–6.

The Court agrees.

Plaintiffs allege that Defendants inflated the denominator (the total number of acquired CTF customers) in order to decrease the percentage of impacted customers (the numerator). Prop. Second Am. Class Compl. ¶ 41. "According to Defendants' widely publicized statements at the time, Frontier acquired 'over 3 million' customers or '3.7 million accounts.' However, buried in schedules attached to Frontier's subsequent SEC filings is the true number: '2,586,000 total customers.'" *Id.* Thus, Defendants' allegedly inflated denominator would reflect 37,000 customers experiencing service issues as opposed to 25,860 (1% of the total customers in Frontier's SEC filings). *Id.* ¶ 42.

More importantly, however, Plaintiffs allege that "[f]ormer Frontier employees reported that hundreds of thousands of customers experienced service problems"—well beyond even the 37,000 figure that would constitute 1% of Defendants' stated acquired customers. *Id.*

"A complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 305 (quoting *Novak*, 216 F.3d at 314).

Seven former employees allegedly provided information specifically supporting this allegation. *Id.* ¶¶ 41-49. Plaintiffs describe four employees' work during or immediately after the CTF Acquisition (April 1, 2016) with sufficient particularity to show their alleged access to data regarding customer service issues at the time that Defendants made their alleged misstatements (the latest statement taking place on May 18, 2016):

(1)      FE-4 allegedly was a National Manager of Ethernet Engineering and the chief engineer for Frontier's national Ethernet network at the time of the CTF Flash Cut. *Id.* ¶ 44. She allegedly stated that in the first few weeks after the Flash Cut, "provisioning issues[2] in Florida caused waves of 30,000-50,000 customers at a time to be out of service for more than 72 hours— 'over and over again.'" *Id.* FE-4 and her teams allegedly "spent four to five days getting switches back in service because each had to be reprovisioned entirely, meaning that large groups of customers were completely without service—particularly in the metropolitan Tampa market, in which FE-4 stated that every customer was affected by an outage." *Id.* Plaintiffs allege that FE-4 had access to information about the scope of service issues "because she was present in the Florida war room where she was told what was going on." *Id.*

(2)      FE-27 allegedly "was the Field Operations Manager for much of the acquired Texas territory" and allegedly "recalled in the first month after the CTF Flash Cut seeing 80,000

---

[2] According to Plaintiffs' proposed second Amended Class Complaint, "'Provisioning' in telecommunications refers to enabling a customer's access to the provider's network. It is a complicated procedure that involves both providing physical access to the network as well as configuring the provider's network to include the customer and provide appropriate functionality." Prop. Second Am. Class. Compl. ¶ 42 n.16.

unique customer names on a spreadsheet that tracked trouble tickets across all of Texas that related to the same routing and provisioning issue that plagued the CTF systems for months." *Id.* ¶ 45. FE-27 allegedly further stated that "the nature of the system problems meant that her technicians were unable to help restore service and were . . . 'held hostage to the people in Connecticut,' Frontier's headquarters." *Id.* FE-27 estimated, "based on the number of trouble tickets she viewed in the ticket management system, along with the spreadsheets exported from this database for circulation," that "approximately 75% of all acquired customers in Texas—not just customers in her territory alone—experienced multi-day outages, which she described as a 'total loss of internet and/or television activity.'" *Id.*

(3)     FE-3 allegedly was Director of Operations for Florida during the CTF Acquisition and "was immersed in daily briefings in the CTF 'war rooms' and oversaw a team of technicians who were attempting repairs or installations for customers suffering issues after the Flash Cut." *Id.* ¶ 47. FE-3 allegedly stated that "'[t]he video-on-demand library wasn't up and running for 90 or 120 days'" and that "this lack of functionality would touch every customer who had purchased movies and other products, and built up a library of their own, but also anyone who wanted to watch television on demand." *Id.*

(4)     FE-17 allegedly was a Florida Director of Operations and Associate Vice President, *id.* ¶ 48, who allegedly was in the Florida "war room" for the first 25 days after the Flash Cut, *id.* ¶ 56. "War rooms" were allegedly set up in the CTF regions, and "directors, vice presidents, and other senior staff gathered daily [there] to monitor the progress of the CTF acquisition." *Id.* FE-17 recalled that "the new customer base in Florida alone lodging 'upwards of 50,000 to 100,000' trouble tickets, . . . with Texas reporting similar levels of disruption and California reporting even worse." *Id.* She also recalled that "'not a single soul' in the CTF

regions had access to video-on-demand until June 2016." *Id.* ¶ 48. FE-17 stated further that "there were thousands of additional customers experiencing issues that were never logged because Frontier's third-party vendor call centers had not been creating trouble tickets." *Id.* ¶ 59.

Plaintiffs have alleged that these employees had direct access to company data regarding service issues that customers were experiencing and with the systems producing those issues "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314.

Plaintiffs also allege with particularity that at least two former employees had knowledge of data from all the CTF regions: while in the Florida "war room" during the first 25 days after the Flash Cut, FE-17 allegedly worked with a team handling "tens of thousands of tickets involving customers that were either totally out of service or experiencing major service issues" and "received emails from colleagues in the Texas and California war rooms, . . . with Texas reporting similar levels of disruption and California reporting even worse." Prop. Second Am. Class Compl. ¶ 56. FE-3 allegedly "was immersed in daily briefings in the CTF 'war rooms,'" *id.* ¶ 47, and "described daily status report calls among the 'war rooms' and members of Frontier national leadership," *id.* ¶ 57.

Plaintiffs also allege with particularity that the number of customers experiencing service disruptions at any of several single sites exceeds the 1% figure in Defendants' public statements: They allege based on documentary evidence—Frontier's SEC filings—that 2,586,000 total customers were acquired in the CTF acquisition, which would mean that 25,860 constituted 1% of the total customers in Frontier's SEC filings. *Id.* ¶¶ 41-42. Plaintiffs allege further that multiple former employees reported numbers of customers experiencing service issues which would, each taken individually, far exceed 24,860. *See, e.g.*, *Id.* ¶ 44 (FE-4 stating that

"provisioning issues in Florida caused waves of 30,000-50,000 customers at a time to be out of service for more than 72 hours—'over and over again'"); *id.* ¶ 45 (FE-27 "recall[ing that] in the first month after the CTF Flash Cut seeing 80,000 unique customer names on a spreadsheet that tracked trouble tickets across all of Texas that related to the same routing and provisioning issue that plagued the CTF systems for months"); *id.* ¶ 56 (FE-17 recalling that "the new customer base in Florida alone lodg[ed] 'upwards of 50,000 to 100,000' trouble tickets, . . . with Texas reporting similar levels of disruption and California reporting even worse").

Furthermore, Plaintiffs allege that "Frontier Senior Management . . . were aware of the massive, immediate failures." *Id.* ¶ 51. FE-17 allegedly stated that Frontier CEO McCarthy "visited the Florida operations one week after the CTF Flash Cut," and that she drove him and two other executives "on a tour of various sites." *Id.* ¶ 52. FE-17 told Mr. McCarthy that "the transition . . . was '"horrific' and that Frontier was 'hemorrhaging customers,'" and she overheard Mr. McCarthy receiving numerous phone calls, including "'at least 100' complaints about service outages." *Id.* FE-17 allegedly learned from these calls "that thousands of Florida customers could not get dial tones or 911 access." *Id.* During the car ride, she also allegedly overheard CEO McCarthy speak with CTO Steve Gable on speakerphone discussing how Frontier had "irrevocably lost 5% of the Verizon data it acquired," and CEO McCarthy stating: "We knew there was going to be a problem, but we didn't know it was going to be this bad." *Id.*

FE-4 also allegedly stated that CEO McCarthy "was personally involved in addressing the provisioning issue," including "'lighting a fire underneath people' to address the widespread outages." *Id.* ¶ 53. Both FE-4 and FE-17 allegedly stated that CTO Gable was directly responsible for the software—called Triad—that caused the provisioning issues that were causing "customers to be dropped off the network in batches of 30,000-50,000 at a time." *Id.* ¶¶

53-54. FE-17 allegedly overheard CEO McCarthy discussing these issues with CTO Gable during Mr. McCarthy's car trip in Florida. *Id.* ¶ 54.

FE-17 allegedly stated that senior leadership, in particular CEO McCarthy, would have been aware of the scope of the service issues because they received daily reports from the "war rooms" "about the status of the post-Flash Cut transition and its ongoing issues" including reports "on all of the inbound trouble tickets." *Id.* ¶ 56. She stated that CEO McCarthy received these reports directly during his visit to Tampa. *Id.* FE-3 (described above) allegedly stated further that "national leadership," including CTO Gable, "gave no meaningful direction" during daily status report calls from the war rooms." *Id.* ¶ 57. Even further, FE-3 recalled that "Frontier senior leadership explicitly instructed employees to delete customer tickets to make it appear as though the problems were not as widespread as they were," and that she received such instructions multiple times. *Id.* ¶ 60. These "instructions to delete trouble tickets so disturbed [FE-3] that, when she left the Company, she insisted that Frontier's Human Resources department make written notes of this particular concern." *Id.*

Because Plaintiffs have alleged with particularity that Frontier senior leadership—in particular CEO McCarthy—repeatedly was apprised of the numbers of customers allegedly experiencing service issues, and that leadership was involved in responding to those customers' issues, Plaintiffs have adequately alleged that Defendants were aware that the 1% statements were not accurate. *See* Novak, 216 F.3d at 311 (misstatements may be actionable where "knew facts or had access to information suggesting that their public statements were not accurate"); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *19 (finding statements actionable where "Defendants were frequently updated about the consequences of" a corporate decision; an Executive Vice President for Brazil "received daily updates on delinquency rates in each region of Brazil, as well

as internal reports summarizing the delinquencies accrued during each 3-week campaign" and "attended at least one of the meetings . . .  when . . . delinquency and debt collection issues" were discussed, other senior leadership "received monthly forecasts of current and projected bad debt throughout the Class Period and attended regional sales meetings during which they reviewed issues in each regional market" (internal quotation marks and citations omitted)).

In sum Plaintiffs have alleged with particularity that confidential informants had access to information which could enable them to provide estimates of customers whose service was disrupted and that the Frontier Defendants had access to such data showing their public statements to be false.

Accordingly, Plaintiffs have sufficiently alleged that Defendants' 1% statements constituted material representations of existing facts. *See Novak*, 216 F.3d at 315.

### (ii) Statements regarding "service and other issues arising from the CTF acquisition"

Plaintiffs allege that, while "Defendants begrudgingly acknowledged problems stemming from the CTF Acquisition" in the following months, they "still continued to conceal the true scope of those issues." Prop. Am. Class Compl. ¶ 64. They allege (a) that "Defendants made repeated false claims about Frontier's billing progress" proceeding "without any major issues," *id.* ¶ 67; (b) that Defendants downplayed video-on-demand issues and blamed a third-party vendor for any issues they did acknowledge, *id.* ¶¶ 71–75; and (c) that Defendants "misrepresented their progress in resolving the above issues and others, instead speaking optimistically about the wrap-up of integration spending and the Company's imminent return to normal operations," *id.* ¶ 76.

Plaintiffs similarly alleged in their original Complaint that Defendants made numerous statements misrepresenting the CTF Acquisition as a success. First Am. Compl. ¶¶ 117–136. The

Court previously "dismiss[ed] all claims stemming from Defendants' alleged statements of success in acquiring and integrating Verizon's CTF assets," Ruling and Order at 38, because these statements "reflect[ed] non-verifiable—and inactionable—puffery," *id.* at 37 (citing *Novak*, 216 F.3d at 315). The Court noted that "even if Defendants should have expressed more skepticism about their success, mere sanguinity is insufficient to substantiate a fraud claim." *Id.* (citing *Malin*, 499 F. Supp. 2d at 161 ("[T]he [Second Amended Class Action Complaint] strongly suggests that the defendants should have been more alert and more skeptical, but nothing alleged indicates that management was promoting a fraud.")).

Plaintiffs argue that they have now "removed the 'success' statements and only seek to amend to address Defendants' specific statements about the status and progress of integration on the CTF Acquisition after the close," which they argue "are assertions of 'ascertainable or verifiable' facts." Pls.' Mem. at 16 (internal citation omitted).

Defendants argue that Plaintiffs are attempting to replead their "success" statement claims "now . . . under the rubric of 'status' and 'progress.'" Defs.' Mem. at 14. They argue that these claims should be dismissed for the same reasons that the Court previously dismissed Plaintiffs' "success" statement claims: "[D]efendants' statements about the quality of the billing conversion, video-on-demand issues, and the progress of the integration are all statements of corporate opinion because '[n]o reasonable investor would treat a corporate spokesperson's boast of success—mere weeks following a major technology integration—as a reason to invest in a company.'" *Id.* at 15 (quoting Ruling and Order at 37).

In their Reply, Plaintiffs assert again that the proposed Second Amended Complaint "alleges as false only statements addressing verifiable descriptions of the CTF Acquisition that

do not mention the word 'success,'" which are thus "concrete 'misrepresentations of existing facts,'" in Plaintiffs' view. Pls.' Mem. at 7 (quoting *Novak*, 216 F.3d at 315).

The Court disagrees.

"[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient, [but] defendants may be liable for misrepresentations of existing facts." *Novak*, 216 F.3d at 315; *see also Rombach*, 355 F.3d at 174 ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations."). Statements of "puffery" are generally forward-looking: "'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" *Rombach*, 355 F.3d at 174 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994)).

"The hallmark of [statements of puffery] is that they are not capable of objective verification." *Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 359 (D. Conn. 2013) (quoting *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 336 (S.D.N.Y. 2007)). A court, however, may find public statements of corporate optimism to be material misstatements if they are not "consistent with reasonably available data." *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 395 (S.D.N.Y. 2014) (quoting *Novak*, 216 F.3d at 309), *aff'd*, 605 F. App'x 52 (2d Cir. 2015). Statements of corporate optimism may be actionable securities violations if "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re IBM Sec. Litig.*, 163 F.3d at 107 (citations omitted).

Additionally, "[a] duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *In re Int'l Bus. Machs. Corp. Sec.*

*Litig.*, 163 F.3d 102, 110 (2d Cir. 1998). There is, however, "no duty to update vague statements of optimism or expressions of opinion," "statements [that] are not material," or statements that are "not forward looking and do[ ] not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation." *Id.*

### (a) Statements about Billing Issues

Although Plaintiffs assert that "Defendants made repeated false claims about Frontier's billing progress," they only reference two specific statements, so the Court will consider only whether those two statements constituted material misstatements. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (Under Rule 9, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, . . ." (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99)), *aff'd* 566 F. App'x 93 (2d Cir. 2014).

On June 1, 2016, CEO McCarthy allegedly stated: "We were actually finished our second month of billing [sic] without any major issues with customers." Prop. Second Am. Class Compl. ¶ 67. The next day, Vice President and Treasurer Gianukakis allegedly stated that "billing conversion has gone over very well. We've gone through two billing cycles now with our customers . . . [A]s a treasurer, very happy to see that activity going on and it's going quite well and really been [sic] from that [billing] perspective a seamless transition for our customers." *Id.*

These statements fail to support a viable claim for three reasons.

First, Plaintiffs do not allege where these statements were made, as required under Rule 9's heightened pleading standard. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (Under Rule 9, a complaint must ". . . (3) state where and when the statements were made, . . ." (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99)), *aff'd* 566 F. App'x 93 (2d Cir. 2014).

Second, Plaintiffs do not make any allegations with particularity that would show these statements to be objectively false—nor could they, because the Defendants' vague statements do not suggest that any particular underlying circumstances exist. "The hallmark of [statements of puffery] is that they are not capable of objective verification." *Patriot Expl., LLC*, 951 F. Supp. 2d at 359 (quoting *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 336).

Plaintiffs allege that former employees reported "some customers [ ] not receiv[ing] a bill for months, becoming a 'continual topic of conversation with the customer service;' that Frontier 'couldn't generate bills for tens of thousands of customers for months after the transition; that "Frontier 'couldn't generate bills for tens of thousands of customers for months after the transition;'" and that some customers "had not received a bill in over six months." Prop. Second Am. Class Compl. ¶ 68. Plaintiffs also include allegations based on former employees' statements about internal issues with Frontier's billing processes. *Id.* ¶¶ 69–70.

But none of these allegations establish that whatever billing issues may have existed at the time Defendants made these two statements constituted "major issues with customers." Plaintiffs have not alleged—and cannot allege—that any particular facts exist that show Defendants' broad statements of corporate opinion about billing to be objectively false or misleading. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (Under Rule 9, a complaint must ". . . (4) explain why the statements were fraudulent." (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99)), *aff'd* 566 F. App'x 93 (2d Cir. 2014).

Third, Plaintiffs' allegations do not suggest that knowledge of billing issues would have made a difference to a reasonable investor at the time these statements were made. *See Castellano*, 257 F.3d at 180 ("For an undisclosed fact to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available." (quoting *Basic Inc.*, 485 U.S. at 231-32)). Defendants' statements were allegedly made after only two billing cycles. Even if investors had known about some issues with billing during the first two billing cycles after the CTF acquisition, it is not clear that reasonable investors would have been concerned about billing issues after only two billing cycles.

For these reasons, all claims based on alleged misstatements about billing issues following the CTF acquisition will be dismissed.

### (b) Statements about Video on Demand

Plaintiffs allege that CEO McCarthy made two statements and Vice President and Treasurer Gianukakis made one statement "ma[king] false claims about Frontier's video-on-demand service." Prop. Second Am. Class Compl. ¶ 71.

On May 23, 2016, CEO McCarthy allegedly stated that "the Company's video-on-demand service 'didn't go probably as well as we hoped,' but claimed those issues related to a third-party vendor's failure to 'get the titles into the library as quickly as we wanted.'" *Id.* ¶ 72. Then, on June 1, 2016, he allegedly acknowledged that "'video on demand is very important to customers,' and he blamed a 'third party' hired to 'populate a video on demand library' for 'caus[ing] us to miss on customer expectations on how 'quickly we would have that video-on-demand library.'" *Id.*

The next day, June 2, 2016, Vice President Gianukakis allegedly

> claimed that Frontier had "quickly been able to adapt, get the video library rapidly up, all the titles that are actively used we got all those titles loaded into the system. And we're very quickly getting on to more of the seldomly used titles and getting those up to speed to ensure that the full complete library is available for our customers."

*Id.*

Plaintiffs allege that these statements are false because "former employees revealed that there was no video-on-demand service whatsoever for months." *Id.* ¶ 73. Plaintiffs allege further that "[e]ven Defendants' minimal acknowledgement of video-on-demand issues was a lie." *Id.* ¶ 74. They allege that Defendants improperly blamed third-party vendors for failing to index video data when, in reality, Defendants had not paid for the vendor's indexing software and instead "required employees to watch the videos and manually categorize the videos for the index." *Id.*

Plaintiffs' allegations regarding Defendants' video indexing processes and the third-party vendor are based only on information from a single confidential former employee: FE-17. *See id.* But Plaintiffs do not allege any facts with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 305 (quoting *Novak*, 216 F.3d at 314). Even if these allegations are true, it is still not clear that CEO McCarthy's statement would be false or misleading. Plaintiffs have not alleged that FE-17 has knowledge of the entire scope of the third-party vendor's involvement with video-on-demand services. For both of these reasons, Plaintiffs' claims based on CEO McCarthy's statements regarding a third-party vendor will be dismissed.

 Plaintiffs' allegations as to Vice President Gianukakis's statement are more robust, but they also ultimately lack the particularity required to be actionable. Plaintiffs' assertion that this statement was false or misleading is based on reports from three confidential former employees: FE-17, who was present in the Florida "war room" for the first twenty-five days of the Flash Cut (or until April 25), Prop. Second Am. Class Compl. ¶ 56; FE-3, who was present in the Florida "war room" for an unspecified period of time surrounding the Flash Cut, *id.* ¶ 47; and FE-19, who was Director of Network Operations for the state of Florida after the CTF Acquisition, *id.* ¶ 46, and was allegedly present in the Florida "war room" for an unspecified period, *id.* ¶ 58.

These former employees allegedly stated that all customers were completely without video-on-demand functionality until June or July 2016. *Id.* ¶ 73.

But Plaintiffs' allegations again lack "sufficient particularity to support the probability that a person in" their positions "would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 305 (quoting *Novak*, 216 F.3d at 314). Although all three former employees were allegedly in the Florida "war room" for some period of time after the CTF Flash Cut, Plaintiffs have not alleged with particularity that information about all video-on-demand functionality was available to this "war room." Moreover, it is not clear that any of them were even still in the "war room" when Vice President Gianukakis made his statement on June 2, 2016. Indeed, Plaintiffs specifically allege that FE-17 was no longer in the "war room" as of April 26, 2016.

Plaintiffs also allege that FE-17 received a text message on May 22, 2016, in which "Southeast Area President Michael Flynn stated "'steve g [CTO Steve Gable] tells me 6/6 for USA TV FX on demand.'" Prop. Second Am. Class Compl. ¶ 75. FE-17 allegedly believed that message "indicate[d] the awareness of Frontier senior management that, at a minimum, video-on-demand content would not be resolved until June 6." *Id.* But the message does not necessarily carry such a meaning on its face, and Plaintiffs have not alleged with particularity any other facts supporting FE-17's alleged reading of the message. This text message therefore cannot support the allegation that Vice President Gianukakis's statement was false or misleading.

For these reasons, Plaintiffs' claims based on Vice President Gianukakis's statement also will be dismissed.

### (c) Statements about Progress of CTF Integration

Plaintiffs allege that Defendants "misrepresented their progress in resolving the above issues and others, instead speaking optimistically about the wrap-up of integration spending and the Company's imminent return to normal operations," Prop. Second Am. Class Compl. ¶ 76, pointing specifically to three statements. The Court will address each statement in turn.

First, on June 2, 2016, Vice President Gianukakis allegedly made the following statement at a conference:

> [W]e spent about $470 million of integration through our last earnings cycle. Those amounts of integration spend will tail off here in the second quarter and then we'll fall off again dramatically again here in the third quarter as we kind of wrap up the integration spend which includes both operating and capital spend.

*Id.* Plaintiffs do not, however, make any allegations that would disprove Vice President Gianukakis's statements regarding the amount the company spent or would spend on integration. Thus, Plaintiffs have failed to allege that this statement is fraudulent.

Second, on a company earnings call on August 1, 2016, CEO McCarthy allegedly

> responded to an analyst's question about whether "there are any unresolved integration issues to be aware of, and whether we should expect any sort of lingering churn elements into the third quarter for the CTF markets" by stating that integration was "essentially done," with only "some lingering small things . . . nothing that should rise to creating the noise that we saw when we first cut over.

*Id.* Plaintiffs allege that this statement is false or misleading because "CTF problems remained so massive that Frontier's most senior employees and executives were still tasked with resolving customer-specific issues." *Id.* ¶ 77. Three senior former employees, FE-17, FE-18, and FE-19, allegedly reported that they were personally involved in fixing issues, including "'sitting on bridges all night testing out connections at our homes' to diagnose internet outages that lasted an

entire weekend." *Id.* FE-17 allegedly stated that she was making service calls to customers' houses "as late as August 2, 2016." *Id.*

But Plaintiffs have not described with particularity how any of these former employees had access to sufficient information to know that the issues they personally dealt with were representative of overall issues in CTF regions. Nor have they made allegations showing that these issues were connected to the CTF cut and not other outage problems. As a result, the Plaintiffs have not alleged with sufficient particularity that CEO McCarthy's statement was false or misleading, and any claims based on this statement will be dismissed. *See Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 305 (allegations based on confidential informant reports must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" (quoting *Novak*, 216 F.3d at 314)).

Third, on September 21, 2016, CEO McCarthy allegedly told investors at a conference that "all was 'going really, really well' for Defendants' 'normal return to operations, whether that's around service orders, trouble tickets, [and] how customers are interacting with our centers,' and that any present 'challenges' had '[n]othing to do with the original issues.'" *Id.* ¶ 79.

Plaintiffs allege that "Defendant McCarthy was lying," based on alleged reports from four former employees. *Id.* ¶¶ 80-81. FE-13 allegedly was "still working to fix" provisioning issues which had "impacted hundreds of thousands of customers . . . over a period of six months after the CTF Flash Cut . . . "when she left Frontier in November 2016." *Id.* ¶ 80. FE-17 allegedly "explained that it took six months—i.e., until October 2016—for full restoration of the Company's video services." *Id.* FE-21 allegedly spent "the next year cleaning up the data for

Frontier's systems, working over Thanksgiving and Christmas." *Id.* And FE-16, "who [allegedly] led a customer-facing team that alone worked to restore service for tens of thousands of customers impacted by the CTF Flash Cut—stated that Frontier did not stop 'drowning' in complaints from the CTF Flash Cut until April 2017—a year after the close of the CTF Acquisition." *Id.* ¶ 81. FE-16 also allegedly reported that "Frontier was losing thousands upon thousands of customers as its monthly churn approached 4%." *Id.*

Plaintiffs' allegations again lack the specificity necessary to indicate that CEO McCarthy's statement was false or misleading when he made it on September 21, 2016. CEO McCarthy's broad statement that "all was 'going really, really well' for Defendants' 'normal return to operations'" is too vague to constitute a material misstatement, but rather is a statement of corporate optimism. *See Rombach*, 355 F.3d at 174 ("[E]xpressions of puffery and corporate optimism do not give rise to securities violations.").

His further alleged statement that "any present 'challenges' had '[n]othing to do with the original issues'" could conceivably give rise to a securities action if Plaintiffs alleged, with particularity, that the challenges did have to do with the original issue. *See Novak*, 216 F.3d at 315 (finding that defendants' statements "that the inventory situation was 'in good shape' or 'under control' while they allegedly knew the contrary was true" were "plainly false and misleading" where plaintiffs' allegations described the entirety of defendants' inventory status based on documentary evidence).

But Plaintiffs again rely wholly on reports from confidential former employees to support their allegations, and Plaintiffs have again failed to allege with particularity that those former employees had access to sufficient information to show that CEO McCarthy's statement was

false at the time it was made. *See Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 305 (quoting *Novak*, 216 F.3d at 314)).

As a result, Plaintiffs' claims based on Defendants' alleged statements about the progress of CTF integration will be dismissed.

To the extent that Plaintiffs rely on former employees' reports about circumstances that occurred after each of these statements, they cannot. Plaintiffs argue in their notice of supplemental authority that "Defendants possessed information that contradicted their public statements, obliging them to 'update their public disclosures' accordingly." Notice of Suppl. Auth. at 3 (quoting *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20)). While corporate defendants have a duty to update in some circumstances, there is, however, "no duty to update vague statements of optimism or expressions of opinion," "statements [that] are not material," or statements that are "not forward looking and do[ ] not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d at 110. Since the Plaintiffs' allegations lack the particularity required to show that they are fraudulent, largely because they have not shown that their confidential informants had access to sufficient information to disprove Defendants' statements, they have not alleged enough to show a duty to update.

For the foregoing reasons, all of Defendants' alleged statements regarding "service and other issues arising from the CTF acquisition," including statements regarding billing issues, video-on-demand issues, and the progress of CTF integration, cannot serve as a basis for a viable claim.

### (iii)    Statements Regarding Non-Paying Verizon Accounts

On February 27, 2017, Frontier allegedly "announced its fourth quarter and full year 2016 results," which revealed that its revenue had fallen from the prior quarter "more than $100 million," with revenue from CTF operations alone falling by $84 million. Prop. Second Am. Class Compl. ¶ 93. Frontier allegedly had lost "175,000 total subscribers to Frontier's broadband and FiOS video services—amidst monthly customer churn of 2.08%—an amount far in excess of industry standards." *Id.*

Plaintiffs allege that "Defendants blamed these disastrous results in large part on supposed 'non-paying' accounts that Frontier inherited from Verizon in the CTF Acquisition." *Id.* ¶ 94. Defendants allegedly claimed that "$45 million of the $100 million revenue decline during the fourth quarter was attributable to a purported one-time 'account cleanup' during the fourth quarter." *Id.* During an earnings call that day, CEO McCarthy and Defendant Mr. McBride, who became Frontier's CFO on November 4, 2016, *id.* ¶ 22, allegedly blamed Verizon for the earnings loss, claiming that Verizon "'stopped treatment of overdue accounts' 60 days prior to the CTF Flash Cut by not pursuing collections, disconnecting the accounts altogether, or taking other actions,'" *id.* ¶ 94. CFO McBride also allegedly told investors "to expect 'another incremental $25 million of cleanup that will work its way in Q1 related to these account write-offs on the CTF properties.'" *Id.* ¶ 94.

Frontier's stock price then allegedly fell dramatically the next day, February 28, 2017. *Id.* ¶ 96. This drop allegedly was "statistically significant and unrelated to any larger trends in Frontier's share price, the share prices of Frontier's peer companies, or the stock market at large." *Id.* ¶ 97. But Plaintiffs allege that "Frontier's stock price would have declined much further had Defendants disclosed the full truth concerning the integration of the CTF

Acquisition." *Id.* ¶ 99. Two former employees—FE-3 and FE-26—allegedly reported that Verizon had been cleaning up non-paying accounts well before the CTF Acquisition and that any non-paying accounts transferred to Frontier during the Flash Cut were consistent with the industry average. *Id.* ¶¶ 100–102. FE-3 also allegedly stated that "Verizon had controls in place to ensure that non-paying customers did not stay on the network for longer than sixty days, and these controls were in place when Frontier acquired Verizon's business," so Frontier should have purged any non-paying accounts it did acquire by August 1, 2016. *Id.* ¶ 102.

The Court previously dismissed Plaintiffs' claims regarding statements about non-paying accounts because their first Amended Class Complaint

> d[id] not include relevant data, such as estimates of: (1) the impact of capitalization of all repairs and maintenance activities, on [their "Earnings Before Interest, Taxes, Depreciation and Amortization," or] EBITDA; (2) the number of non-paying accounts acquired through the CTF acquisition; or (3) the typical cost to clean up a non-paying account.

Ruling and Order at 41–42. Additionally, the first Amended Class Complaint relied on a single confidential informant who oversaw one state's operations, and the Court found that "(1) the former employee's access to company-wide data is not described with sufficient particularity; (2) the former employee's statements, in and of themselves, do not suggest knowledge of aggregate California, Florida, and Texas data; and (3) the former employee does not allege that s/he shared contradictory aggregate data with Frontier." *Id.* at 42.

Plaintiffs argue that their proposed Second Amended Class Complaint now remedies all of these deficiencies. They have added more allegations about the former employee and more still based on a second former employee's confidential reports. Pls.' Mem. at 12–13.

FE-3 allegedly was Director of Operations for Florida during the CTF Acquisition and before that had been Verizon's Florida Director of Operations. Prop. Second Am. Class Compl. ¶

101. FE-3 allegedly was "responsible for Florida customer data analytics" prior to the CTF Acquisition, and, in that role, she allegedly reviewed daily reports which "tracked, among other things, disconnected accounts," and which "were reported weekly to senior leadership." *Id.* FE-3 allegedly stated that, if Verizon had "stopped treatment of overdue accounts" 60 days before the CTF Flash Cut like Defendants claimed, FE-3 "would have immediately seen a decline in the number of forced disconnects" on the daily reports. *Id.* But, FE-3 allegedly reported, she "saw zero fluctuations in the number of disconnects" up until March 31, 2016, "the eve of the CTF Flash Cut." *Id.* "To the contrary, according to FE-3, Verizon had actually made a significant point to start cleaning up non-paying customer accounts a full year ahead of the CTF Acquisition." *Id.*

FE-26 allegedly joined Frontier as a Senior Vice President in August 2016. FE-26 allegedly "had access to and was personally involved in the creation of analytics reports that aggregated CTF (and, no later than January 2017, Company-wide) churn data concerning the payment status of customer accounts, including information on 'never pay' accounts." *Id.* ¶ 100. These reports allegedly were provided to Frontier senior leadership. *Id.* FE-26 allegedly asserted that "these reports should have indicated the existence of the massive number of non-paying Verizon accounts that Defendants described, but instead the 'never-pay' numbers were consistent with industry standards—and nowhere near the level required to account for the unexpected $45 million in revenue loss that Defendants announced in February 2017." *Id.*

In Plaintiffs' view, "the accounts of both FE-26 and FE-3 demonstrate falsity of the non-paying statements and sufficiently address the Court's request for information concerning 'the number of non-paying accounts acquired through the CTF acquisition.'" Pls.' Mem. at 14. Plaintiffs also argue that "the Court's concerns regarding FE-3's information are misplaced." *Id.*

at 13. In their view, "it is unnecessary for FE-3 to have reviewed 'aggregate [CTF] data' because Defendants did not state that the non-paying accounts were a regional issue, but instead the result of Verizon's CTF-wide decision to [stop[]] treatment of overdue accounts' months in advance of the CTF Acquisition close." *Id.* at 13–14.

Defendants argue that Plaintiffs still fail to allege with particularity that the former employees had access to information disproving Defendants' statements regarding non-paying accounts. Defs.' Mem. at 11. "With respect to FE-3," Defendants assert that Plaintiffs' argument "makes no sense": "To determine whether the [D]efendants' explanation for the CTF-wide revenue was *false*, FE-3 needed access to CTF-wide data." *Id.* at 12. Defendants also argue that "the proposed complaint does not allege with 'particularity' that FE-26 was in a position that would make him or her likely to 'possess' information about Frontier's accounting practices, much less for a large group of accounts," *id.* (quoting Novak, 216 F.3d at 314); nor does it allege that FE-26 was "'privy to the company's bookkeeping practices, let alone the specific accounting that went into the company's financial reporting,'" *id.* (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 152 (3d Cir. 2004)).

Plaintiffs argue that "[t]he non-existence of thousands of non-paying accounts claimed by [CEO] McCarthy is the exact subject of FE-26's aggregated reports—and is not merely 'an accounting reserves matter.'" Pls.' Reply at 6.

The Court disagrees.

Defendants' statements regarding non-paying accounts concern the cost of non-paying accounts, not the number of non-paying accounts. Plaintiffs do not allege that Defendants made specific statements claiming that there were "thousands of non-paying accounts." Rather, they

allege that Defendants claimed that $45 million was attributable to "cleanup" of non-paying accounts. Prop. Second Am. Class Compl. ¶ 94.

But as in their first Amended Class Complaint, Plaintiffs still have not made any allegations regarding the typical cost to clean up a non-paying account. FE-26 allegedly stated that the number of non-paying accounts was "nowhere near the level required to account for" a loss of $45 million, *id.* ¶ 100, but they allege no facts to support such an assertion; nor do they allege that either FE-3 or FE-26 had access to data about the cost of cleaning up non-paying accounts.

As a result, Plaintiffs have not sufficiently remedied the deficiencies in their allegations regarding non-paying accounts, and these statements cannot serve as the basis for a valid claim.

### (iv)     Statements Regarding Verizon's Accounting Policies

Plaintiffs allege, as they did in their first Amended Class Complaint, that at some point before November 2016, Defendants "changed their accounting practices in a fashion that benefited their EBITDA." Prop. Second Am. Class Compl. ¶ 91. On November 3, 2016, Defendants allegedly filed a Form 10-Q with the SEC, in which Frontier stated that the financial statements within had been prepared in accordance with" Generally Accepted Accounting Principles (GAAP). *Id.* ¶ 151. In this form, Defendants CEO McCarthy and CFO Jureller allegedly "certified the same." *Id.* Defendants Frontier, CEO McCarthy, and CFO McBride allegedly "made substantially similar statements in Frontier's Forms 10-K filed with the SEC on March 1, 2017, and March 1, 2018; and in Frontier's Forms 10-Q filed on May 4, 2017, August 3, 2017, and November 2, 2017." *Id.* ¶ 152.

Plaintiffs allege that two former employees reported that, by November 2016, Defendants "had issued a new instruction to staff to account for the cost of maintenance activities (such as

repairing or replacing broken devices) as capital expenditures, rather than operating expenses."
*Id.* ¶¶ 91, 153. Plaintiffs contend that Defendants' statements in Frontier's forms were false and
misleading because they failed to disclose this revision to their accounting policy, as required by
GAAP, and this omission artificially inflated Frontier's EBITDA. *Id.* ¶¶ 91, 150, 153.

The Court previously dismissed Plaintiffs' claims regarding Defendants' accounting
practices because Plaintiffs had failed to allege with particularity that Defendants' statements
were fraudulent, and because Plaintiffs had failed to show that the confidential informants "could
provide the alleged information." Ruling and Order at 42. Specifically, the Court noted (1) that
"the former employees only indirectly learned about the alleged new policy (e.g., FE-17 'learned
of the change' from some unnamed source, whereas FE-3 heard the 'Southeast Area
President . . . relay the instruction at a meeting,'); and (2) that "the former employees did not
provide dates for the adoption or implementation of the new policy or for when they learned
about the new policy." *Id.* Additionally, Plaintiffs did not include relevant data, such as estimates
of "the impact of capitalization of all repairs and maintenance activities, on EBITDA." *Id.* at 41–
42. The Court also stated that it could not fully evaluate what conclusion to draw from KPMG's
partial audit:

> [T]he Court cannot fully evaluate whether KPMG's partial audit of
> Frontier's finances should be: (1) taken as evidence that Frontier did
> not violate GAAP even if it did alter its accounting policies, (2)
> deemed immaterial because KPMG's oversight did not include a full
> review of Frontier's accounting policies and statements to the SEC,
> or (3) some other conclusion related to the alleged GAAP violation.

*Id.* at 42.

Plaintiffs now argue that they have provided new information regarding one of their
confidential informants, FE-17, who allegedly stated that "the new corporate guidance came out
in the third or fourth quarter of 2016 and that he personally had conversations about the

instructions with" various corporate leaders. Pls.' Mem. at 15. FE-17 also allegedly stated that, while at Verizon, "he had numerous interactions with Verizon's auditor . . . including spot checks and deeper dives for the classifications of repairs versus capital expenditures." Prop. Second Am. Class Compl. ¶ 91; *see also* Pls.' Mem. at 15. But when FE-17 held the same role at Frontier, he "never saw KPMG do the checks or deeper dives that [he] had previously experienced, and in fact FE-17 never once had any interaction with KPMG." Prop. Second Am. Class Compl. ¶ 91; *see also* Pls. Mem. at 15.

Defendants argue that Plaintiffs still do "not allege by 'how much' Frontier's EBITDA 'was inflated [or] that th[e] amount was material.'" Defs.' Mem. at 9. Defendants thus contend that there is "no basis to determine that there was a 'substantial likelihood that a reasonable shareholder' would have considered the information 'important in deciding how to act.'" *Id.* (quoting *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012)); *see also ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted).

"Indeed," Defendants argue, "there is every reason to believe that the alleged inflation of EBITDA would *not* have been material, because there is no dispute that Frontier disclosed the amount of its capital expenditures in its SEC filings." *Id.* (emphasis in the original). Defendants argue further that Plaintiffs have not cured their deficiencies with regard to confidential sources' access to information: "[N]either confidential witness alleges that he or she discussed the change in policy with any of the defendants or that the defendants were even aware of the purported change . . . . Nor do the confidential witnesses give any detail about the 'conversations' that they purportedly had with the executives." *Id.* at 9-10.

Additionally, Defendants argue that Plaintiffs mischaracterize FE-17's allegations in the proposed amended complaint: the allegations do not state that the new accounting policy was implemented in "the third or fourth quarter of 2016," Pls.' Mem. at 15, but rather that Defendants changed the policy "by November 2016," Prop. Second Am. Class Compl. ¶ 153, repeating the same allegation that the Court previously dismissed. Defs.' Mem. at 10.

The Court agrees.

Plaintiffs do not address the concerns the Court identified. They still fail to allege with particularity that the former employees on whose reports they rely had access to specific information disproving Defendants' statements, and they have not added allegations as to where or when the former employees learned about such a policy change. It is still unclear what inferences could be drawn from KPMG's alleged auditing actions or inaction.

Furthermore, as Defendants point out, the allegations also lack sufficient particularity to show that their alleged omissions were material. "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Plaintiffs do not make any allegations estimating by how much Frontier's EBITDA was inflated. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (observing that, at the pleading stage, "a court must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality").

While "it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made," "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *Ganino*, 228 F.3d at 162). Given that

there is no dispute that Frontier disclosed its capital expenditures in its SEC filings, there is no basis for the Court to infer that omission of this accounting change was material.

For the foregoing reasons, Plaintiffs' factual allegations regarding Defendants' alleged omission of a change in accounting policy cannot result in a viable claim.

### 2. Scienter

To plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 311. This "inference may arise where the complaint sufficiently alleges that the defendants 1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor." *Novak* at 311; *see also ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) ("At least four circumstances may give rise to a strong inference of the requisite scienter:" quoting the categories articulated in *Novak*).

The Second Circuit has held that scienter may be established by facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99).

Recklessness means "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Novak*, 216

F.3d 300, 308 (2d Cir. 2000)). In determining whether the requisite "strong inference" exists, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "In other words, it is not enough 'to set out facts from which, if true, a reasonable person could infer that the defendant acted with the required intent.'" *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (internal quotation marks, citations, and alterations omitted)). "The inference of scienter must be 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re Advanced Battery Techs., Inc.*, 781 F.3d at 644 (quoting *Tellabs*, 551 U.S. at 324).

A plaintiff sufficiently states a claim based on recklessness if the complaint "specifically alleges defendants' knowledge of facts or access to information contradicting their public statements." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Novak*, 216 F.3d at 308); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." (quoting *Novak*, 216 F.3d at 308)). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Shetty v. Trivago N.V.*, No. 19-0766, 2019 WL 6834250, at *3 (2d Cir. Dec. 16, 2019) (summary order) (quoting *Novak*, 216 F.3d at 309).

A plaintiff can plead corporate scienter "by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with

the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know" that those statements were misleading.'" *Id.* (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008)) (internal quotation marks and alterations omitted).

Plaintiffs have sufficiently alleged that Defendants' 1% statements were material misstatements, but they have failed to allege that any other statements were material misstatements. The Court thus will only address scienter as to Defendants' 1% statements.

Plaintiffs argue that they have "raise[d] an inference of conscious misbehavior or recklessness that is 'at least as compelling as any opposing inference.'" Pls.' Mem. at 17. They argue that their allegations show that "Defendants 'knew facts or had access to non-public information contradicting their public statements,'" *id.* at 17 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 76), and that the information Defendants allegedly "misrepresented was a 'key to measuring . . . performance and . . . a subject about which investors and analysts often inquired,'" *id.* (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011)).

Plaintiffs argue, with respect to their claims about Defendants' 1% statements, that their Proposed Second Amended Class Complaint "demonstrates the falsity of Defendants' 1% statements through specific allegations showing that Defendants did not have a reasonable basis to make these statements," and that the number of acquired customers who lost service was "wildly greater than 1% of any conceivable measure of Frontier's acquired customers." Pl.'s Mem. at 2–3.

Defendants argue that Plaintiffs have not shown that Defendants acted with "conscious misbehavior or recklessness" when making its 1% statements. Defs.' Mem. at 16–17. They argue

that Plaintiffs have not adequately alleged that the 1% estimate was wrong, nor have they alleged, even if the estimate was wrong, that Defendants knew it was wrong at the time the statements were made. *Id.* at 19. Specifically, Defendants argue that Plaintiffs' allegations regarding the number of trouble tickets reported by former employees have "nothing to do" with Defendants' 1% statements, and that there are no allegations that instructions to delete such tickets "came from the defendants, or even that the defendants were aware of the instructions." *Id.* at 17. In Defendants' view, Plaintiffs' argument amounts to stating that "the estimate was so wrong that the defendants must have known about it." *Id.* at 19.

In their Reply, Plaintiffs argue that their "[a]llegations regarding the astonishing number of customers affected by service outages, and the resulting impact on Frontier's revenue, contribute to a strong inference that Defendants knew their public statements about the Acquisition were false," and moreover that their allegations regarding CEO McCarthy in particular show that he was actually aware of "the provisioning issues [that] affected hundreds of thousands of customers" due to his presence in the Florida war room, as reported by FE-17. Pls.' Reply at 8.

The Court agrees.

The Court previously stated that Plaintiffs had not "adequately ple[]d having had access to data on the total number of customers gained through the CTF acquisition and the number who faced problems." Ruling and Order at 50. But the Court stated, "[i]f the one percent figure was wildly incorrect, that fact would support an inference of mathematical manipulation or reckless disregard for the truth 'at least as likely as any plausible opposing inference.'" *Id.* (quoting *In re Scholastic Corp.*, 252 F.3d at 74). As explained above, Plaintiffs have now alleged

with particularity that the 1% figure was wildly incorrect. Plaintiffs therefore have adequately alleged scienter as to the 1% claims.

### 3. Loss Causation

"A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." *Dura Pharm., Inc.*, 544 U.S. at 338. In the Second Circuit, a plaintiff must allege that there is a direct "relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). "If that relationship is sufficiently direct, loss causation is established; but if the connection is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered,' a fraud claim will not lie." *Id.* (internal citations and quotation marks omitted).

Bare allegations of market loss are insufficient to survive a motion to dismiss. *Dura Pharm., Inc.*, 544 U.S. at 345. "The securities statutes seek to maintain public confidence in the marketplace." *Id.* These statutes do so "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* (internal citations omitted)). Thus, Plaintiffs must "allege and prove the traditional elements of causation and loss." *Id.* at 346. ("The statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.").

In order to allege loss causation, a plaintiff must allege "that the market reacted negatively to a corrective disclosure regarding the falsity of" defendants' statements. *Lentell*, 396 F.3d at 175. "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price." *Carpenters Pension Tr.*

*Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014). But plaintiffs must "allege sufficient facts to raise a reasonable inference that [defendants' misstatements or fraudulent conduct] caused an ascertainable portion of its loss." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, LLC, 783 F.3d 395, 404 (2d Cir. 2015).

Here, the only remaining factual basis for a viable legal claim is Plaintiffs' claims regarding Defendants' 1% statements; thus, the Court will analyze loss causation with respect to this possible claim.

Plaintiffs allege that Defendants' disclosures correcting material misstatements caused stock prices to drop substantially. Specifically regarding Defendants' 1% statements, Defendants allegedly "made two critical announcements of new information regarding the CTF Acquisition" on November 1, 2016. Prop. Second Am. Class Compl. ¶ 85. First, Defendants allegedly announced that "the Company's revenue had declined by $84 million" from the previous quarter, admitting that the decline was "driven overwhelmingly by lower revenue in the CTF regions." *Id.* Second, Defendants allegedly disclosed that "the cost of integrating the CTF Acquisition had already ballooned to $750 million," $300 million more than Defendants had previously estimated. *Id.* ¶ 86. "[A]ddressing the massive service outages and other issues . . . had ballooned the costs to be 66% higher than Defendants' previous guidance." *Id.*

Following this disclosure, Frontier's "shares dropped dramatically" within one day, with its stock price declining 13.7% on November 2, 2016. *Id.* ¶¶ 86-88. "[A]nalysts and market commentators explicitly linked Frontier's disappointing financial results to the new news of Frontier's difficulties with the CTF Acquisition." *Id.* ¶ 89. Cowen & Company, for example, allegedly "noted on November 1, 2016 that Frontier's negative results 'related to the integration

of the Verizon CTF assets' and explained that '[i]ntegration has been prolonged/painful, driving stock weakness . . . .'" *Id.* ¶ 89.

The Court previously found that Plaintiffs failed to plead loss causation sufficiently "for two reasons: (1) all of the alleged corrective events revealed broad company-wide losses and negative information about the CTF integration, and (2) the causal connection between the corrective events and Frontier's stock declines is too tenuous." Ruling and Order at 44. The Court found that Plaintiffs had "not alleged sufficient facts to support an inference that 'an ascertainable portion' of this complex, nationwide company's stock loss can be traced to disclosures regarding the CTF integration." *Id.* at 46. The Court found that the causal connection was too tenuous for three reasons:

> First, "Frontier's stock price declined nearly 50% before the first 'corrective disclosure'", for unexplained reasons that might have continued to contribute to the stock's decline throughout the class period.
>
> Second, Frontier's stock price fluctuated in between the corrective events. . . .
>
> Third, . . . Frontier faced ongoing negative press coverage, litigation, and regulatory scrutiny of its acquisitions and flash cuts across a host of states before, during, and after the class period. While none of these issues, on its own, is fatal to Plaintiffs' claims, these collective, negative public events seem to render Plaintiffs' causation arguments too tenuous to survive a motion to dismiss, even under ordinary pleading requirements.

*Id.* at 46–47.

Plaintiffs argue that their proposed Second Amended Class Complaint has added "additional commentary by Defendants and analysts" which clearly link Defendants' corrective disclosures to their stock price decline. Pls.' Mem. at 21–22. Plaintiffs also point to their allegations that, "for each decline in Frontier's stock price after a corrective event . . . the decline

dramatically outpaced comparative performance by both the S&P 500 and of Frontier's peers specifically." *Id.* at 24.

They also argue that the declines in stock price were statistically significant with a 95% confidence level, "a determination that . . . courts routinely accept to prove a cause-and-effect relationship." *Id.* (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (sustaining judgment against defendant company after ruling an expert's opinion based on an event study to be reliable, noting that event studies have "become standard operating procedure in federal securities litigation, . . . [to] help an expert determine whether, and the extent to which, the release of certain information caused a stock price to fall" (internal citations and quotation marks omitted)).

Defendants argue that "[P]laintiffs still have not done the bare minimum to get their causation theory off the ground: They have not pointed to *any* corrective disclosure with respect to the alleged GAAP violation, the non-paying accounts, or the 1% figure." Defs.' Mem. at 4 (emphasis in the original). "Thus," Defendants argue, "[P]laintiffs have not even attempted to allege a statement that 'reveal[s] some then-undisclosed fact with regard to the specific misrepresentations' at issue." *Id.* (quoting *In re Omnicrom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)).

Defendants also argue that Plaintiffs have failed to "strengthen the connection between [Defendants' corrective] disclosures and Frontier's stock declines." *Id.* at 5. In their view, Frontier already had been experiencing a decline in stock price before Defendants' corrective disclosures, and Plaintiffs have failed to show the specific causal connection between these disclosures and subsequent price drops in the context of already declining prices. *Id.* at 5–6.

Defendants also argue that Plaintiffs' argument based on statistical significance of the price drop as compared to peer companies "misses the point[:] There is no dispute that Frontier's stock suffered steep declines as a result of industry struggles and 'company-specific information.' In their view, this information did not 'correct' any of Frontier's alleged misrepresentations; the declines had nothing to do with the subject of defendants' alleged fraud." *Id.* at 7.

In response, Plaintiffs argue that there "is no dispute" that Frontier's stock declines were a result of "company-specific information" supports their loss causation theory. Pls.' Reply at 2. With specific regard to Defendants' 1% statements, Plaintiffs point to the November 1, 2016, corrective event:

> [A]nalysts described the November 1, 2016 corrective event as first revealing that "the Verizon transition and integration efforts resulted in steep customer losses . . . equal to 3% of the firm's customer base, a startling number."

*Id.* at 3. Plaintiffs argue that the "analysts' 'startl[ed]' reaction confirms that the newly revealed losses in the customer base relate back to Defendants' reassurances that service problems affected only 1% of the acquired CTF customers . . . ." *Id.* Plaintiffs also argue that no court has ruled that "a pre-disclosure 'slow, steady decline' in stock price defeats loss causation.'" *Id.* at 3–4. Plaintiffs argue that they have sufficiently pled loss causation because the alleged corrective statements relate back to Defendants' alleged misstatements regarding the CTF Acquisition.

The Court disagrees.

Under the Rule 8 pleading standards for loss causation in securities fraud cases, plaintiffs must allege that Defendants' corrective disclosures, at least, "reveal to the market the falsity of the prior recommendations." *Lentell*, 396 F.3d at 175 n.4; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40–41 (2d Cir. 2009) (holding that plaintiffs failed to plead loss

causation where they "ha[d] not presented sufficient evidence on which the lower court could conclude that any of the events revealed the truth about the subject of any of Defendants' alleged misstatements."). To prove loss causation, a plaintiff must demonstrate "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173.

While Defendants' corrective disclosures refer to the CTF Acquisition in general, none of these disclosures refer to the number or percent of customers that experienced service issues following the Flash Cut. And Plaintiffs have not alleged that Defendants ever made a corrective disclosure showing their prior 1% statements to be false, or that such a disclosure directly contributed to Plaintiffs' loss. As a result, although Plaintiffs adequately pleaded material misstatement and scienter with regard to Defendants' 1% statements, Plaintiffs have failed to allege loss causation.

Accordingly, Plaintiffs' claims based on Defendants' 1% statements must be dismissed.

B. **Count II: Section 20(a) of the Exchange Act**

Section 20(a) of the Exchange Act imposes liability on control persons. 15 U.S.C. § 78t(a). Section § 77o defines a control person as:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. §§ 77o(a). To establish the requisite state of mind for a control person, a plaintiff must plead "facts giving rise to a strong inference" that the control person "knowingly or recklessly failed (i) to conduct a reasonable investigation of the rated security with respect to the factual

elements relied upon by its own methodology for evaluating credit risk; or (ii) to obtain reasonable verification of such factual elements . . . from other sources . . . ." 15 U.S.C. § 78u-4(b)(2)(B). The control person will not be liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

Because the Court has dismissed Plaintiffs' claims for primary violations of a securities law, their derivative Section 20(a) claim must also be dismissed. See *One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 Fed. App'x 75, 82 (2d Cir. 2010) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)) ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show, among other things, 'a primary violation by a controlled person.'"). The Court therefore dismisses Plaintiffs' second claim for relief in its entirety.

### C.      Leave to Amend

Having already granted Plaintiffs leave to amend their original Complaint a third time, and having still found their claims not viable, the Court will dismiss this case with prejudice. *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 n.4 (2d Cir. 1998) (denying leave to re-plead because "the district court already gave [plaintiff] an opportunity to file an amended complaint designed to cure the very defect that remains."); *see also Ganley v. City of New York*, 734 F. App'x 784, 786 (2d Cir. 2018) (noting that the district court granted "leave to amend when it dismissed his original complaint, and it provided a detailed explanation of the deficiencies he should address" and therefore "was not required to give [plaintiff] another opportunity to address the same deficiencies").

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for leave to amend their Class Action

Complaint is **DENIED**, and their claims are dismissed **with prejudice**.

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 24th day of March, 2020.

    /s/ Victor A. Bolden            
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE