# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| IN RE FRONTIER COMMUNICATIONS CORPORATION STOCKHOLDERS LITIGATION | No. 3:17-cv-01617-VAB |

## DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF: (A) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (B) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

## **TABLE OF CONTENTS**

**Page**

I.   HISTORY OF THE ACTION ...................................................... 3

    A.   The Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel ...................................................... 3

    B.   The Investigation and Filing of the Consolidated Complaint ................................ 4

    C.   Defendants' Motion to Dismiss ...................................................... 7

    D.   Lead Plaintiffs Re-Open Their Investigation and File an Extensive Proposed Amended Complaint ...................................................... 12

    E.   Lead Plaintiffs Appeal to the Second Circuit and Defendant Frontier Files For Bankruptcy ...................................................... 16

    F.   The Parties' Negotiations and the Settlement of the Action ................................ 21

    G.   The Court Grants Preliminary Approval of the Settlement .................................. 22

    H.   Work with Experts ...................................................... 23

II.   RISKS OF CONTINUED LITIGATION ...................................................... 24

    A.   General Risks In Prosecuting Securities Class Actions ...................................... 25

    B.   Specific Risks Concerning This Action ...................................................... 26

        1.   Risks Concerning Liability ...................................................... 27

            a.   Falsity ...................................................... 27

            b.   Scienter ...................................................... 27

            c.   Loss Causation and Damages ...................................................... 28

    C.   Risks To Ability To Pay ...................................................... 29

III.   THE PERCENTAGE RECOVERY OF THE SETTLEMENT REPRESENTS AN EXCELLENT RESULT FOR THE CLASS GIVEN THE RISKS OF CONTINUED LITIGATION ...................................................... 30

IV.   LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ...................................................... 32

i

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT................................. 35

VI.     THE FEE AND EXPENSE APPLICATION .................................................. 37

        A.      The Fee Application........................................................................ 38

                1.      Lead Plaintiffs Have Authorized and Support the Fee Application ........ 38

                2.      The Time and Labor Devoted to the Action by Plaintiffs' Counsel ........ 38

                3.      The Experience and Standing of Lead Counsel ........................................ 40

                4.      The Standing and Caliber of Defendants' Counsel.................................. 40

                5.      The Risks of the Litigation and the Need to Ensure the Availability
                        of Competent Counsel in High-Risk Contingent Securities Cases........... 41

                6.      The Reaction of the Settlement Class to the Fee Application ................. 42

        B.      The Litigation Expense Application ..................................................... 43

VII.    CONCLUSION........................................................................................ 46

KATHERINE M. SINDERSON declares as follows:

1.       I am an attorney admitted pro hac vice to this Court. I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"). Bernstein Litowitz was appointed Lead Counsel for Lead Plaintiffs the Arkansas Teacher Retirement System ("ATRS") and Carlos Lagomarsino (collectively, "Lead Plaintiffs") in the above-captioned Action (the "Action"). I submit this declaration in support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses. I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this action and could and would testify competently thereto.[1]

2.       The proposed Settlement before the Court provide for resolution of all claims in the Action in exchange for a cash payment of $15.5 million, plus interest, for the benefit of the Settlement Class. The Settlement Amount has been paid into an escrow account and is earning interest. As detailed below, the Settlement provides a benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

3.       The proposed Settlement is the result of extensive efforts by Lead Plaintiffs and Lead Counsel, which included, among other things: (i) conducting an investigation into the alleged

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated December 23, 2021 (ECF No. 192-2) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) defendant Frontier Communications Corporation ("Frontier" or the "Company") and defendants Daniel J. McCarthy, John M. Jureller, Ralph Perley McBride, and John Gianukakis (the "Individual Defendants" and, with Frontier, "Defendants").

fraud, including interviews of 124 former employees of Frontier throughout two investigations, and a thorough review of public information such as filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles; (ii) drafting a detailed consolidated complaint based on Lead Counsel's investigation; (iii) opposing Defendants' motion to dismiss through briefing and argument; (iv) continuing to investigate the alleged fraud and drafting a detailed proposed amended complaint; (v) briefing Lead Plaintiffs' motion for leave to amend the complaint; (vi) briefing Lead Plaintiffs' appeal before the Second Circuit Court of Appeals; and (vi) engaging in months of arm's-length settlement negotiations with counsel for Defendants. As a result of these efforts, Lead Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement.

4.       ATRS and Mr. Lagomarsino are sophisticated institutional and private equity investors, respectively, who actively participated in the Action, closely supervised the work of lead Counsel, and endorse the approval of the Settlement. *See* Declaration of Rod Graves, Deputy Director of Arkansas Teacher Retirement System, In Support Of: (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Graves Decl."), attached hereto as Exhibit 1, at ¶¶3, 7, 8, and Declaration of Carlos Lagomarsino In Support Of: (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Lagomarsino Decl."), attached hereto as Exhibit 2, at ¶¶3, 5, 6.

5.       As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiffs' damages expert, provides for the equitable

distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a pro rata basis, fairly based on losses attributable to the alleged fraud.

6.      Plaintiffs' Counsel prosecuted this case on a fully contingent basis. For its efforts in achieving the Settlement, Lead Counsel is applying for an award of attorneys' fees for 25% of the Settlement Fund for Plaintiffs' Counsel and for payment of Litigation Expenses that they incurred in connection with the institution, prosecution, and settlement of the Action in the amount of $267,688.00 ("Fee and Expense Application"). As discussed in the accompanying Memorandum of Law filed in support of the Fee Application ("Fee Memorandum"), the requested fee percentage of 25% is reasonable and well within the range of fees that courts in this Circuit and elsewhere have awarded in securities and other complex class actions with comparable recoveries on a percentage basis. Moreover, the requested fee represents a multiplier of approximately 1.05 on Plaintiffs' Counsel's total lodestar, which is on the low end of the range of multipliers typically awarded in class actions with contingency risks.

I.      **HISTORY OF THE ACTION**

    A.      **The Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel**

7.      On September 26, 2017, a class action complaint styled *Bray v. Frontier Communications Corp., et al.* (No. 3:17-cv-01617) (the "Initial Complaint"), was filed in the United States District Court for the District of Connecticut (the "Court") alleging violations of the federal securities laws. (ECF No. 1.) The Initial Complaint asserted violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 against Frontier and the Individual Defendants, and of Section 20(a) of the Exchange Act against the Individual Defendants.

8.     Three additional class action complaints were then filed in the District Court for the District of Connecticut: *Rozenberg v. Frontier Communications Corp. et. al.* (No 3:17-cv-01672); *St. Lucie County Fire District Firefighters' Pension Trust Fund v. Frontier Communications Corp. et. al.* (No. 3:17-cv-01825); and *Morrow v. Frontier Communications Corp. et. al.* (No. 3:17-cv-01759).

9.     In accordance with the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"), notice was published in a national newswire service on September 26, 2017 advising potential class members of the pendency of the action, the claims asserted, and the deadline by which putative class members could move the Court for appointment as lead plaintiff.

10.     On November 27, 2017, ATRS and Mr. Lagomarsino, represented by Lead Counsel, along with ten other parties, filed competing motions before the Court to consolidate the several actions and for appointment as lead plaintiff on behalf of the putative class in the action. (ECF Nos. 23, 28, 31, 33, 36, 37, 40, 44, 46, 48, 50.)

11.     On January 16, 2018, the Court held an hour-long hearing on the motions to consolidate and for appointment as lead plaintiff, during which each of the eleven movants was fully vetted.

12.     By order dated January 18, 2018, the Court granted the motions to consolidate; appointed ATRS and Mr. Lagomarsino to serve as Lead Plaintiffs for the action; and approved Lead Plaintiffs' selection of Bernstein Litowitz as Lead Counsel for the putative class. (ECF No. 99.)

**B.     The Investigation and Filing of the Consolidated Complaint**

13.     Beginning immediately following the filing of the Initial Complaint and continuing through preparation of the consolidated complaint on behalf of Lead Plaintiff, Lead Counsel undertook an extensive investigation into the alleged fraud and potential claims that could be

asserted in this Action. Lead Counsel's investigation included a review and analysis of: (a) Frontier's public filings with the SEC; (b) research reports by securities and financial analysts; (c) transcripts of Frontier's conference calls with analysts and investors; (d) Frontier's presentations, press releases, and reports; (e) news and media reports concerning Frontier and other facts related to this action, including Frontier's prior acquisitions; (f) documents filed in and testimony given by Frontier's executives in regulatory proceedings; (g) price and volume data for Frontier securities; and (h) information from consultations with experts.

14.     In addition, in connection with its investigation, Lead Counsel and its in-house investigators conducted an extensive search to locate former employees of Frontier and industry participants who might have relevant information pertaining to the claims asserted in the Action. This included developing a database of over 4,000 potential witnesses and contacting over 450 former Frontier employees who were believed to have potentially relevant information. Lead Counsel's in-house investigators spoke to over 120 of these individuals.

15.     In connection with the preparation of the consolidated complaint, Lead Counsel also consulted with Mark Hedstrom of Global Economics, LLC, a Chartered Financial Analyst with substantial experience in providing expert analysis and testimony regarding loss causation and damages in securities class actions. Lead Counsel consulted with Mr. Hedstrom concerning the impact of Defendants' alleged misstatements and omissions on the market price of Frontier securities, and the damages suffered by Frontier shareholders.

16.     On April 30, 2018, Lead Plaintiffs filed the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"). (ECF No. 134.) The detailed Complaint asserted claims against Frontier and the Individual Defendants under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and against the Individual Defendants

under Section 20(a) of the Exchange Act. The Complaint also asserted claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against Frontier, the Securities Act Individual Defendants,[2] and the Underwriter Defendants[3] stemming from alleged material misstatements and omissions in connection with Frontier's June 2, 2015 offering of 17,500,000 shares of Mandatory Convertible Preferred Stock, Series A, for $1.75 billion, and June 8, 2015 offering of 150,000,000 shares of common stock, for $750 million (the "Offerings").

17.     The Complaint alleged that, beginning on February 6, 2015 in the run-up to Frontier's acquisition of $10.5 billion worth of Verizon's assets in California, Florida, and Texas (the "CTF Acquisition"), Defendants falsely assured investors that its "seasoned integration team"—with its "proven track record" of "successfully integrating acquired properties"—would ensure a "smooth" transition for Verizon customers over to Frontier's services. Then, immediately after closing of the CTF Acquisition (which the Company accomplished through a technique known as a "flash cut" to transition the Verizon assets and customers to Frontier overnight), Defendants deemed the acquisition a success, assuring investors that only one percent of its customer base experienced any service issues (the "1% Statements"). These statements, the Complaint alleged, were false and misleading because, in fact, Frontier's integration team was inexperienced and unprepared to conduct a "cutover" of this magnitude, and the integration of Verizon's assets onto Frontier's infrastructure caused months of service issues for tens of

---

[2] The Securities Act Individual Defendants are: Daniel J. McCarthy, John M. Jureller, Mary Agnes Wilderotter, Donald W. Daniels, Leroy T. Barnes, Jr., Peter C.B. Bynoe, Diana S. Ferguson, Edward Fraioli, Pamela D.A. Reeve, Virginia P. Ruesterholz, Howard L. Schrott, Larraine D. Segil, Mark Shapiro, and Myron A. Wick, III.

[3] The Underwriter Defendants are: J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets, Inc., Credit Suisse Securities (USA) LLC, Barclays Capital Inc., Morgan Stanley & Co. LLC, Mizhuo Securities USA LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co. LLC, and UBS Securities LLC.

thousands of customers—far more than the one percent of customers that Defendants falsely claimed were affected. The Complaint further alleged that the prices of Frontier's common and preferred stock were artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined substantially when the truth was gradually revealed through a series of Frontier's earnings releases on November 1, 2016, February 27, 2017, May 2, 2017, October 31, 2017, and February 27, 2018.

**C.      Defendants' Motion to Dismiss**

18.      On June 29, 2018, Defendants filed and served their motion to dismiss the Complaint, in which the Securities Act Defendants joined. (ECF Nos. 143-146.) Defendants' motion to dismiss was 40 pages long and accompanied by 53 exhibits totaling over 3,100 pages. (ECF Nos. 144-145.)

19.      Defendants argued that Lead Plaintiffs' Complaint should be dismissed for numerous reasons, including:

   a.      ***Puffery***. Defendants argued that their pre-Acquisition statements concerning, *inter alia*, Frontier's "proven track record," "seasoned integration team," "smooth transition," and "success" were non-actionable statements of corporate optimism on which no reasonable investor would rely;

   b.      ***PSLRA Safe Harbor for Forward Looking Statements or Opinions***. Defendants argued that their estimated $450 million in integration costs for the CTF Acquisition was non-actionable because it fell within the PSLRA's safe harbor for forward-looking statements and the "bespeaks caution" doctrine, and because the Complaint failed to allege that the estimate was both objectively inaccurate and not honestly believed when made;

   c.      ***Information Provided by Former Employees***. Defendants argued that the information in the Complaint that was provided by former employees (which the Complaint relied on in alleging, among other things, the actionability of Defendants' 1% Statements as well as Defendants' statements concerning their compliance with Generally Accepted Accounting Principles ("GAAP")) did not satisfy the Second Circuit's pleading requirements by failing to describe the witnesses with "sufficient particularity to support the probability that a person in the position occupied

by the source would possess the information," failing to allege that the former employees had shared their supposedly contradictory information with Defendants, and failing to indicate that any Defendant knew of the information that contradicted their public statements;

d.    ***Materiality***. Defendants argued that certain alleged false statements, including Defendants' GAAP violations, were not material to investors;

e.    ***No Inference of Scienter***. Defendants argued that the Complaint failed to raise a strong inference of Defendants' scienter because it did not sufficiently allege a motive to commit fraud or conscious misbehavior or recklessness. Among other things, Defendants argued specifically that the Complaint's "motive" allegations are those shared by all corporate officials and cannot support the scienter inference; that Defendants' prior oversight of flash cuts and Frontier's prior settlement with the state of West Virginia fail to support the inference that they knew their statements about the CTF Acquisition were false; and that the Complaint alleges no facts suggesting anything suspicious about CFO John Jureller's departure;

f.    ***Loss Causation***. Defendants argued that the Complaint could not plausibly allege loss causation because, among other things, Frontier's stock price consistently declined throughout the Class Period after an initial 125% increase after the CTF Acquisition; because Frontier's stock price declined in between the dates of each of the Complaint's alleged corrective disclosures; and because none of the alleged corrective disclosures directly revealed the truth about any of the alleged false and misleading statements and omissions;

g.    ***Standing***. Defendants argued that Lead Plaintiffs lacked standing to bring claims under Section 11 of the Securities Act because they alleged no facts plausibly suggesting that their common stock is traceable to the June 2015 secondary offering, and lacked standing to bring claims under Section 12 of the Securities Act because they did not allege that they purchased any of their securities directly from defendants in the Offerings;

h.    ***Control Person Liability***. Defendants argued that the control person claims asserted under Section 20(a) of the Exchange Act and Section 15 of the Securities Act fail because Lead Plaintiffs failed to allege "culpable participation"—the third prong of the control person liability test—which Defendants contended was subject to heightened pleading standards similar to scienter; and

i.    ***Statute of Limitations***. Defendants argued that the certain of the Complaint's claims under Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act were barred by the statute of limitations because, prior to the Offerings in June 2015, investors had access to information about Frontier's earlier problematic acquisitions, which

undermined claims about Frontier's, inter alia, "seasoned integration team" and "proven track record." Thus, Defendants argued, investors should have brought Securities Act claims based on those statements by June 2016 and Exchange Act claims by no later than June 2017, three months before the first complaint was filed in September 2017. In addition, Defendants claimed, claims challenging Defendants' estimates of integration costs should have been brought no later than August 8, 2016, when Frontier disclosed in its Q2 2016 10-Q report that the CTF integration costs exceeded $600 million and would continue to rise.

20.     On August 28, 2018, Lead Plaintiffs filed their memorandum of law in opposition to the motions to dismiss the Complaint. (ECF No. 151.) Lead Plaintiffs argued that Defendants' motion to dismiss should be denied, including because:

a.     ***Puffery***. Defendants' puffery argument is based on selective quotation of statements taken out of context, and the Complaint's full allegations not only show how those statements were concrete—and not merely vague, corporate optimism—but also that Frontier's investors relied on these statements, demonstrating their materiality;

b.     ***PSLRA Safe Harbor for Forward Looking Statements***. The PSRLA Safe Harbor does not apply to estimates of the costs of integration because, first, those statements were not accompanied by meaningful cautionary language, and second, because Frontier's Offering Documents only warned investors about potential "uncertainties" that "may" increase overall costs, while Defendants knew that the CTF Acquisition would require them to double their total integration estimates;

c.     ***Opinions***. The Complaint's allegations about the total integration estimates are actionable because they track the Supreme Court's guidance concerning opinion statements. First, the Complaint alleges that Defendants omitted material facts about their inquiry from their statements to investors, and second, the statements issued to investors did not align with information in the issuer's possession;

d.     ***Information Provided by Former Employees***. The false statements supported by statements of former employee witnesses are alleged with sufficient particularity. Specifically, the former employees served in high-ranking supervisory or managerial positions in the Company, in connection with which he or she would have reviewed reports of disruptions; interacted with customers suffering from service outages; relayed complaints to management; and/or participated in meetings to discuss the aftermath of the CTF Acquisition;

e. ***GAAP Violation***. The Complaint's GAAP allegations do not rely on a former employee's knowledge of GAAP itself—but on that former employee's knowledge that Frontier's accounting policies changed, which the Company failed to disclose to investors;

f. ***Material Misstatement***. The missing context, which Defendants omitted from their brief, of the statements alleged under the Exchange Act claims—including the "smooth" transition statements and statements about the "success" of the CTF Acquisition flash cut—shows that those statements provided specific, material information about the CTF Acquisition, which investors relied upon. Defendant ignored other statements outright, conceding their falsity and materiality;

g. ***Scienter.*** The Complaint adequately alleged myriad facts to support the strong inference of Defendants' scienter, including Defendants' personal knowledge of facts contradicting their public statements, the critical importance of the CTF Acquisition to Frontier's business, Frontier's involvement in a highly regulated industry, Defendant Jureller's suspiciously-timed resignation, and Defendant McCarthy, Wilderotter, and Jureller's motive and opportunity to commit fraud—i.e., their compensation depended on the success of the CTF Acquisition;

h. ***Loss Causation.*** The Complaint adequately pleaded loss causation by alleging that Frontier's stock price was inflated by Defendants' material misstatements and omissions, and that Frontier's stock price declined immediately by a statistically significant amount following each corrective disclosure that revealed material new information concerning the CTF Acquisition, all that is required at the pleading stage;

i. ***Standing.*** Lead Plaintiffs had standing to pursue their Securities Act claims because the Complaint alleged that the Underwriter Defendants sold Frontier stock in the Offerings, ATRS purchased Frontier stock in one of the Offerings, that Frontier and the Underwriters were "sellers, offerors, and or solicitors of sales of the securities" sold in the Offerings, and that other members of the Class purchased Frontier securities pursuant or traceable to the Offering;

j. ***Statute of Limitations.*** Defendants' statute of limitations argument was a thinly-veiled "truth on the market" defense, which is not permissible at the motion to dismiss stage; and

k. ***Control Person Liability***. Plaintiffs sufficiently alleged primary violations of both the Exchange and Securities Act and, where required, Defendants' scienter. Defendants do not contest their actual control and contend that "culpable participation is essentially the same as scienter," so the Complaint sufficiently alleges control person liability.

21.     On October 12, 2018, Defendants served a 30-page reply brief in further support of their motion to dismiss, accompanied by four supplemental exhibits totaling over 70 pages. (ECF No. 155.) In their reply brief, Defendants largely restated their opening arguments.

22.     On February 7, 2019, the Court held a two-hour oral argument on Defendants' motion to dismiss. Katie Sinderson argued on behalf of ATRS and Mr. Lagomarsino. (ECF Nos. 163, 164.)

23.     On March 8, 2019, the Court entered an order granting Defendants' motion to dismiss, but affording Lead Plaintiffs the opportunity to move for leave to amend the Complaint. (ECF No. 166.) Among other things, the Court ruled:

    a.    **Puffery**. The Court agreed with Defendants that the Complaint "failed to plead sufficiently as material misstatements three categories of pre-acquisition statements related to Frontier's proven track record, seasoned integration team, and ability to deliver a seamless or smooth transition for CTF customers," holding that these statements were largely immaterial puffery;

    b.    **PSLRA Safe Harbor**. The Court agreed with Defendants that the alleged misstatements "regarding the cost projections for the CTF acquisition fall short of securities fraud," finding that these forward-looking statements were protected by the PSLRA safe harbor;

    c.    **Material Misstatements**. The Court agreed with Defendants that the Complaint "failed to plead sufficiently as material misstatements four categories of post-acquisition statements related to the success of the CTF acquisition, the percentage of CTF customers facing service interruptions, the number of non-paying Verizon accounts and cost of account clean-up, and GAAP violations," holding that these statements were either puffery or not, in fact, misstatements of material fact;

    d.    **1% Statements**. The Court found certain of "Plaintiffs' post-acquisition allegations [to be] closer calls"—specifically, the statements asserting the "only 1% of [Frontier's] customers 'had issues,' 'experienced problems,' or 'lost service'" following the CTF Acquisition (the "1% Statements"). The Court found, however, that the Complaint alleged the falsity of the 1% Statements based largely on the accounts of anonymous former employees, which the Court found to be lacking for three reasons: the former employees' access to company data was not described with sufficient particularity; the former employees' statements did not suggest their

knowledge of aggregate California, Florida, and Texas data; and the former employees are not alleged to have shared with Defendants data that contradicted their public statements to investors;

e.   ***Loss Causation***. The Court held that the Complaint's loss causation allegations were insufficient for two reasons: "(1) all of the alleged corrective events revealed broad company-wide losses and negative information about the CTF integration, and (2) the causal connection between the corrective events and Frontier's stock declines is too tenuous." In other words, the Court agreed with Defendants' assertion that the Complaint could not plausibly allege loss causation because Frontier's stock price consistently declined throughout the Class Period after an initial 125% increase after the CTF Acquisition; because Frontier's stock price declined in between the dates of each of the Complaint's alleged corrective disclosures; and because none of the alleged corrective disclosures revealed the truth about any of the misrepresentations alleged in the Complaint;

f.   ***Scienter***. The Court held that the Complaint failed to raise a strong inference of Defendants' scienter, particularly because Defendants had no motive to defraud investors. While the Court noted that "Defendants' alleged recklessness is a closer call, regarding Mr. McCarthy's mathematically precise claim of one percent service issues," the Court decided that "Plaintiffs suggest but do not adequately plead [McCarthy's] having had access to data on the total number of customers gained through the CTF acquisition and the number who faced problems.";

g.   ***Statute of Limitations***. Finally, the Court held that the Complaint's allegations were time-barred because "a number of key events occurred before September 26, 2015"—i.e., two years before the initial complaint was filed in the action; and

h.   ***Securities Act***. The Court also dismissed the Securities Act claims, noting that Lead Plaintiffs failed to allege a material misstatement in Frontier's offering documents, and additionally, that those claims "may not meet the one-year statute of limitations" imposed by the Securities Act.

**D.   Lead Plaintiffs Re-Open Their Investigation and File an Extensive Proposed Amended Complaint**

24.   In the two months following the Court's motion to dismiss order, Lead Plaintiffs re-opened their investigation into Frontier, including contacting over 90 former employees who provided additional information that further supported the Complaint's allegations.

25.     On May 10, 2019, Lead Plaintiffs filed a motion for leave to amend the Complaint, which included a proposed amended complaint (the "PAC") that addressed the deficiencies the Court identified in its March 8, 2019 ruling. Lead Plaintiffs significantly narrowed the scope of their claims in accordance with the Court's motion to dismiss ruling, seeking leave to amend only as to Exchange Act claims for a narrower Class Period, beginning after the close of the CTF Acquisition, from April 25, 2016 to October 31, 2017. (ECF Nos. 167, 168.) Lead Plaintiffs argued that the PAC included new allegations that confirmed the falsity of the false and misleading statements alleged in the Complaint and new details further supporting the inference of Defendants' scienter when making these statements. Specifically, to address the Court's concerns about the particularity of the Complaint's allegations underlying the falsity of the 1% Statements, Lead Plaintiffs alleged that, using "funny math"—i.e., figures meant to deliberately deceive investors, regulators, and the public—Frontier developed two different numbers of customers acquired in the CTF Acquisition: either 3.7 million accounts (the number Frontier publicized widely), or 2,586,000 total customers (the number Frontier disclosed in its financial statements). In either event, former employees of Frontier explained that hundreds of thousands of customers suffered service issues after the CTF Acquisition—a far cry from 1% of either 3.7 million (37,000) or 2,586,000 (25,860). The PAC also alleged that senior Frontier leadership participated in meetings to discuss how to inflate the total number of CTF customers acquired, in order to decrease the percentage (and perception) of customers affected.

26.     Lead Plaintiffs also argued that the PAC further detailed its loss causation allegations in response to the Court' concerns. Specifically, in order to correct the deficiencies identified by the Court with respect to the Complaint's loss causation allegations, Lead Plaintiffs included in the PAC highly particularized allegations concerning each of the corrective events

alleged, including charts setting forth the declines in Frontier's stock price following each alleged disclosure, as well as charts comparing the decline in Frontier's stock price to the S&P 500 and Frontier's peer index before and after each corrective event. Lead Plaintiffs' loss causation allegations were supported by the results of an event study conducted by Lead Counsel's financial expert, which demonstrated that, after each alleged corrective event, Frontier's common and preferred stock prices declined by statistically significant amounts that were attributable to new, Frontier-specific information—not to industry-wide disruptions or the movements of Frontier's peers' stock.

27.     On July 15, 2019, Defendants filed their opposition to Lead Plaintiffs' motion for leave to amend the Complaint, arguing that Lead Plaintiffs' proposed amendment is futile and leave to amend should be denied. (ECF Nos. 172, 173.) Defendants argued vigorously, among other things, that the PAC failed to allege loss causation, contending that the PAC failed to "point[] to any corrective disclosure with respect to the alleged GAAP violation, the non-paying accounts, or the 1% figure," and in fact, "[t]he corrective disclosures asserted by the proposed complaint— which concern regular quarterly reporting of revenue declines, rising integration costs, cuts to the company's dividend, and missed EBITDA targets . . . have nothing to do with these alleged misstatements."

28.     Defendants further argued that leave to amend should be denied because the PAC failed to plead an actionable misstatement or omission, again citing supposed deficiencies relating to the PAC's confidential witness allegations as well as disputing that the PAC failed to allege the falsity of the 1% Statements with sufficient specificity.

29.     Defendants also argued that Lead Plaintiffs' scienter allegations failed to raise a strong inference of Defendant's scienter. Specifically, Defendants argued that allegations relating

to the Individual Defendants' bonuses or compensation structure related to targets for the CTF Acquisition "add[] nothing to their original allegations," and that the PAC's recklessness allegations fall short of the particularity required to plead the strong inference of scienter.

30.     On August 12, 2019, Lead Plaintiffs filed reply papers in further support of the motion for leave to amend the Complaint. (ECF No. 180.) Lead Plaintiffs argued that, with respect to loss causation, the PAC quoted Defendants and analysts connecting each alleged corrective disclosure to Defendants' misrepresentations, that the corrective information disclosed does not need to be a mirror image of the alleged false statements, and that the Second Circuit does not require to plead any more than "events constructively disclosing the fraud." Lead Plaintiffs also argued that Defendants were asking the Court to make the unprecedented ruling that, as a matter of law, Frontier's "slow, steady decline" in stock price defeats loss causation. Lead Plaintiffs similarly argued that Defendants' theory that fluctuations in stock price between alleged disclosures defeat loss causation was unsupported by case law.

31.     Lead Plaintiffs further argued that, with respect to falsity, the PAC added detailed new allegations supporting the falsity of the 1% Statements, which Defendants ignore or otherwise challenge in an attempt to force the Court to make factual findings in their favor. Lead Plaintiffs also argued that the PAC's alleged false statements concerning non-paying Verizon accounts were adequately supported by particularized allegations from former Frontier employees, that the alleged false statements concerning the status of the CTF Acquisition were concrete misrepresentations, not mere puffery, and that the alleged false statements concerning Frontier's GAAP compliance were material to investors.

32.     Finally, Lead Plaintiffs argued that the PAC pleads scienter because Defendants learned that service issues relating to the CTF Acquisition were far worse than they publicly

acknowledged, that case law in the Second Circuit does not require former employees to have personally provided contradictory information to Defendants, that allegations regarding the scope of the problems stemming from the CTF Acquisition support the scienter inference, that widespread misconduct at the Company (including, for instance, the deletion of trouble tickets) supports the scienter inference, that the Minnesota Report, in which regulators uncovered broad, systemic problems mirroring those at issue in the PAC, supports the scienter inference, and that the Defendants' unique compensation plan motivated the fraud because they knew they would obtain bonuses regardless of whether the acquisition succeeded or failed.

33.    On March 24, 2020, the Court issued an order denying Lead Plaintiffs' motion for leave to amend the Complaint. (ECF No. 184.) Although the Court concluded that the PAC adequately alleged a material misrepresentation relating to the 1% Statements, the Court found that the PAC did not allege falsity and scienter with respect to the other categories of false statements alleged: statements about billing issues, statements about video-on-demand, statements about the progress of integrating the CTF Acquisition, statements about non-paying Verizon accounts, and statements about Verizon's accounting policies. The Court also held that the PAC failed to plead loss causation because the corrective events alleged in the PAC that caused statistically significant stock price declines did not explicitly "refer to the number or percent of customers that experienced service issues following" the CTF Acquisition. The Court entered final judgment and dismissed all of Lead Plaintiffs' claims with prejudice. *Id*.

E.    **Lead Plaintiffs Appeal to the Second Circuit and Defendant Frontier Files For Bankruptcy**

34.    On April 6, 2020, Lead Plaintiffs filed a Notice of Appeal seeking review by the United States Court of Appeals for the Second Circuit (the "Second Circuit") of the Court's March 24, 2020 order denying the motion for leave to amend the Complaint (the "Appeal"). (ECF

No. 185.) The Second Circuit docketed the appeal as *In re: Frontier Communications*, Docket #: 20-1161 (2d Cir. 2020).

35.   On April 16, 2020, Defendant Frontier filed a Suggestion of Bankruptcy notifying the Court that Frontier and its subsidiaries had filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. (ECF No. 187.) Pursuant to Section 362(a) of the Bankruptcy Code, Frontier's Chapter 11 petition triggered an automatic stay of the proceedings in this action as to Frontier.

36.   On April 29, 2020, the Second Circuit issued an order staying the Appeal as to all proceedings against all Defendants, including the Individual Defendants, pending the outcome of Frontier's bankruptcy proceedings. (Second Circuit ECF No. 42.)

37.   On April 30, 2020, Lead Plaintiffs filed a letter in response to the Second Circuit's stay order, arguing that the automatic bankruptcy stay applies only to Frontier and that the Second Circuit should therefore lift the stay as to individual Defendant McCarthy and allow the appeal to proceed. (Second Circuit ECF No. 44.)

38.   On May 11, 2020, Defendants filed a letter in response to Lead Plaintiffs' April 30, 2020 letter, arguing that the stay should continue as to all Defendants. (Second Circuit ECF No. 46.)

39.   In response to direction from the Court of Appeals concerning the Parties' letter submission, on May 20, 2020, Lead Plaintiffs filed a motion before the Second Circuit seeking to partially lift the automatic bankruptcy stay as to the one remaining Defendant in the case, Frontier's former Chief Executive Officer Daniel McCarthy, arguing that the automatic bankruptcy stay does not apply to non-debtor defendants such as a company's former CEO who is not involved in the company's bankruptcy proceedings. (Second Circuit ECF No. 52.)

40.     On June 1, 2020, Defendants opposed Lead Plaintiffs' motion to lift the stay, arguing that the automatic bankruptcy stay should be extended to Defendant McCarthy. (Second Circuit ECF No. 57.)

41.     On June 8, 2020, Lead Plaintiffs filed reply papers in further support of the motion. (Second Circuit ECF No. 63.)

42.     On September 29, 2020, the Second Circuit issued an order denying Lead Plaintiffs' motion to partially lift the automatic bankruptcy stay, stating it would continue the stay pursuant to the Court's inherent authority. (Second Circuit ECF No. 79.)

43.     On May 3, 2021, Frontier filed a letter before the Second Circuit notifying the Court that it had filed its Notice of Entry of Confirmation Order, Occurrence of Effective Date, and Related Bar Date. As a result, the automatic stay under Section 362 of the Bankruptcy Code terminated and was no longer in effect. (Second Circuit ECF No. 89.)

44.     On May 4, 2021, the Second Circuit issued an order lifting the stay of the Appeal and assigning the Appeal to the Court's Expedited Appeals Calendar. (Second Circuit ECF No. 92.)

45.     On June 8, 2021, Lead Plaintiffs filed their opening brief on the Appeal to the Second Circuit. (Second Circuit ECF No. 104.) Lead Plaintiffs argued that the Court erred in ruling that, despite finding that the PAC had adequately alleged falsity and scienter with respect to Defendants' 1% statements, the PAC failed to plead loss causation because the corrective disclosures alleged in the PAC did not explicitly refer to the number of Frontier customers who did, in fact, experience service issues after the CTF Acquisition. Lead Plaintiffs further argued that Court engaged in erroneous fact-finding in holding that there was no connection between Defendants' statements that less than 1% of customers had suffered service issues following

18

Frontier's CTF Acquisition and the alleged corrective events, which disclosed what an analyst called a "startling number" of customer losses and other issues from the acquisition. Finally, Lead Plaintiffs argued that Court engaged in impermissible and erroneous fact-finding in ruling that loss causation was insufficiently alleged based on supposed intervening causes of Plaintiffs' losses from "industry struggles" and declines in Frontier's stock price "before, during, and after the class period" that were unrelated to the alleged fraud.

46.     Defendants argued vigorously in opposition to the Appeal. (Second Circuit ECF No. 115.) Specifically, Defendants argued that Lead Plaintiffs were required to allege that explicitly that "that a piece of information was disclosed to the public that (1) revealed that the 1% statement was false and (2) resulted in a loss to Frontier's value. Defendants claimed that the Court correctly held that the PAC failed to plead loss causation for two reasons. First, Defendants claimed that the Court was correct to find that the PAC failed to allege that any corrective disclosure actually corrected the 1% Statements. Second, Defendants claimed that the Court correctly found that the "slow, steady declines" in Frontier's stock price throughout the Class Period belied any suggestion that Lead Plaintiffs' and the Class's losses were caused by disclosure of the truth about the 1% Statements.

47.     In the alternative, Defendants argued, the Second Circuit should uphold the Court's denial of Lead Plaintiffs' motion to amend because the Court erred in finding that Lead Plaintiffs adequately alleged a strong inference of scienter in the PAC. Specifically, Defendants argued that the Court incorrectly found that "allegations regarding the astonishing number of customers affected by service outages, and the resulting impact on Frontier's revenue, contribute to a strong inference that Defendants knew their public statements about the Acquisition were false." (*Id.*)

48.     On July 27, 2021, Lead Plaintiffs filed their reply in further support of their Appeal, in which Lead Plaintiffs addressed Defendants' arguments. (Second Circuit ECF No. 129.) Specifically, Lead Plaintiffs argued that the four alleged corrective disclosures alleged in the PAC all related to and revealed information about risks from the massive service disruptions caused by the CTF Acquisition, and indeed, that the PAC alleged that the stock-price declines following these disclosures were at least significantly caused by the revelation of the falsity of the 1% Statements. Lead Plaintiffs argued further that the PAC adequately alleged a "materialization of the risk" theory of loss causation—in other words, that that Defendants' misstatements concealed massive CTF customer-service disruptions and Defendants' inability to integrate the CTF Acquisition. The foreseeable risks of customer attrition in the CTF properties and resulting revenue declines concealed by these misstatements materialized, as disclosed in a series of shocking announcements that caused steep stock-price declines and that analysts—and the Company—specifically attributed to integration of the CTF Acquisition. Lead Plaintiffs additionally argued that the District Court improperly required the PAC to allege "mirror-image disclosures"—in other words, disclosures that mirrored the alleged false statements and amount to a confession of fraud; that, contrary to Defendants' contention, the November 1, 2016 disclosure alleged in the PAC clearly connected the decline in Frontier's stock price to problems integrating the CTF Acquisition; and that declines in Frontier's stock price before and between the PAC's alleged corrective disclosures do not negate loss causation.

49.     Finally, Lead Plaintiffs argued that the Court properly and holistically considered the PAC's scienter allegations and concluded that the PAC adequately alleged a strong inference of conscious misbehavior or recklessness.

50.     The Second Circuit calendared the oral argument on the Appeal for October 29, 2021. (Second Circuit ECF No. 136.)

### F.     The Parties' Negotiations and the Settlement of the Action

51.     While the Appeal was pending, the Parties discussed the possibility of resolving the litigation through settlement.

52.     The Parties conducted discussions of the strengths of the case and the risks to each Party that were fully informed by, among other issues, Lead Plaintiffs' extremely thorough investigation, the allegations contained in the Complaint, the Parties' comprehensive and voluminous briefing of Defendants' motion to dismiss, the Court's decision on the motion to dismiss, the Parties' briefing of Lead Plaintiffs' motion to amend the Complaint and the allegations contained in the PAC, the Court's decision on the motion to amend, Frontier's bankruptcy, the Parties' comprehensive and voluminous briefing before the Second Circuit, and the uncertainty surrounding the Second Circuit's potential decision.

53.     As a result of the Parties' arm's-length settlement negotiations, they reached an agreement-in-principle to settle the Action on September 30, 2021.

54.     On October 7, 2021, the Parties filed a letter informing the Second Circuit that the Parties wish to suspend the pending Appeal and remand the matter to this Court immediately for adjudication of the Parties' proposed class settlement motion, and that the Parties were seeking an indicative ruling from the Court that it will adjudicate the Parties' proposed class settlement motion upon remand by the Second Circuit. (Second Circuit ECF No. 139.)

55.     On October 8, 2021, the Parties filed a joint motion with the Court seeking an indicative ruling that the Court will adjudicate the Parties' proposed settlement motion upon remand by the Second Circuit. (ECF No. 189.) On October 12, 2021, the Court issued an order

granting the Parties' joint motion for an indicative ruling that it will adjudicate the Parties' proposed settlement motion upon remand by the Second Circuit. (ECF No. 190.)

56.     On October 13, 2021, the Parties filed with the Second Circuit a motion pursuant to Federal Rule of Appellate Procedure 12.1 seeking remand for the limited purpose of allowing the District Court to consider preliminary and final approval of the Settlement and, if the District Court grants final approval of the Settlement, allowing the District Court to enter a Final Judgment and other orders related to the Settlement. (Second Circuit ECF No. 142.)

57.     On October 15, 2021, the Second Circuit granted the Parties' motion. (Second Circuit ECF No. 148.) In the ensuing weeks, the Parties negotiated a term sheet (the "Term Sheet") memorializing their agreement-in-principle to settle the Action, which was executed on November 3, 2021.

58.     Following the execution of the Term Sheet, the Parties engaged in additional negotiations regarding the specific terms of their agreement and drafted the Stipulation and related papers, including the notices to be provided to potential members of the Settlement Class. On December 23, 2021, the Parties executed the Stipulation, which set forth the final terms of the Parties' agreement to settle all claims asserted in the Action for $15,500,000, subject to the approval of the Court. (ECF No. 192-2.) The same day, the Parties executed a confidential Supplemental Agreement setting forth the conditions under which Defendants can terminate the Settlement if the requests for exclusion from the Settlement Class exceed an agreed-upon threshold.

G.     **The Court Grants Preliminary Approval of the Settlement**

59.     On December 27, 2021, Lead Plaintiffs filed a motion for preliminary approval of the Settlement and for authorization to disseminate the notice of Settlement. (ECF No. 192.)

60.     On January 18, 2022, the Court entered the Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (ECF No. 193) (the "Preliminary Approval Order") which, among other things: (a) preliminarily approved the Settlement; (b) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *Investor's Business Daily* and over the *PR Newswire*; (c) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application; and (d) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application. The Preliminary Approval Order also scheduled the Settlement Hearing for May 10, 2022 at 12:00 p.m. by videoconference to determine, among other things, whether the Settlement should be finally approved.

**H.     Work with Experts**

61.     At several times throughout this litigation, Lead Plaintiffs retained and consulted with Mark Hedstrom of Global Economics Group, a highly qualified expert in loss causation and damages.   Mr. Hedstrom provided Lead Plaintiffs with expert advice on damages and loss causation issues. In particular, Mr. Hedstrom assisted Lead Plaintiffs with addressing the Court's concerns regarding the Complaint's loss causation allegations in order to bolster the loss causation allegations in the PAC. Mr. Hedstrom conducted an event study on Frontier's stock on the days surrounding each of the corrective events alleged in the PAC, which demonstrated that, after each alleged corrective event, Frontier's common and preferred stock prices declined by statistically significant amounts that were attributable to new, Frontier-specific information—not to industry-

wide disruptions or the movements of Frontier's peers' stock. Lead Plaintiffs incorporated into the PAC graphs demonstrating Mr. Hedstrom's analysis, which compared the decline in Frontier's stock price to the S&P 500 and Frontier's peer index before and after each corrective event, demonstrating that the stock-price declines were due to Frontier-specific information. (ECF No. 167-1, ¶¶160-71.) Then, after the Settlement was reached, Lead Counsel worked with Mr. Hedstrom and his team at Global Economics Group to develop the Plan of Allocation.

## II.    RISKS OF CONTINUED LITIGATION

62.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $15,500,000 cash payment. Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is a fair and favorable result for the Settlement Class.

63.    As explained below, Lead Plaintiffs faced meaningful risks with respect to proving liability and recovering full damages in this case. Absent the Settlement, Lead Plaintiffs would still need to prevail on the Second Circuit Appeal, overcome a Defendants' motion to dismiss the PAC, overcome Defendants' challenges to Lead Plaintiffs' motion to certify the class, and prevail at additional stages of the litigation, including defeating Defendants' anticipated motion for summary judgment, at trial, and on appeal. Even after any trial, Lead Plaintiffs would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiffs from successfully obtaining a recovery for the class. Finally, even in the event Lead Plaintiffs overcame all these significant risks—any one of which could have resulted in substantially less or even no recovery for investors—it was almost certain that Lead Plaintiffs would face serious constraints in their ability to actually collect any judgment in light of Frontier's bankruptcy reorganization and the limited resources available for Defendants to use to pay any judgment.

A.      **General Risks In Prosecuting Securities Class Actions**

64.      In recent years, securities class actions have faced greater risks than in prior years. Indeed, as noted above, the Court has now twice dismissed this very Action. Further, it is not uncommon for district courts to dismiss securities class actions at the summary judgment stage. *See, e.g.*, *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *1 (D. Or. May 24, 2021); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *28 (D. Nev. Jan. 3, 2017), *aff'd Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th. Cir. 2018); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd Dalberth v. Xerox*, 766 F.3d 172 (2d Cir. 2014).

65.      And even cases that have survived summary judgment are dismissed prior to trial in connection with *Daubert* motions, such as those likely to be filed by Defendants here. For example, in *In re Pfizer Inc. Securities Litigation*, the district court granted the defendants' motion in limine to exclude the testimony of the plaintiffs' proffered damages expert. 2014 WL 3291230, at *1 (S.D.N.Y. July 8, 2014). Subsequently, the court also granted the defendants' renewed motion for summary judgment based on the plaintiffs' failure to proffer admissible loss causation and damages evidence. *Id.*; *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 197-98 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of the defendants after finding that the event study offered by plaintiffs' expert was unreliable and that there was accordingly no evidence that the market reacted negatively to disclosures).

66.      Even when securities class action plaintiffs successfully overcome multiple substantive and procedural hurdles pre-trial, there remain significant risks that a jury will not find the defendants liable or award expected damages.

67.     Further, post-trial motions, based on a complete record, also present substantial risks. For example, in *In re BankAtlantic Bancorp, Inc.* (S.D. Fla. 2010), following a jury verdict in the plaintiffs' favor, the district court granted the defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. 2011 WL 1585605, at *14-22 (S.D. Fla. Apr. 25, 2011), *aff'd* 688 F.3d 713 (11th Cir. 2012) (finding that there was insufficient trial evidence to support a finding of loss causation).

68.     Intervening changes in the law may also impact a successful trial verdict. For example, a district court in Oregon reconsidered its order denying defendants' motion for summary judgment and granted the motion more than a year later based on a new decision by the Ninth Circuit. *See Precision Castparts*, 2021 WL 2080016, at *6.

69.     Securities class actions face serious risks of dismissal and non-recovery at all stages of litigation.

**B.     Specific Risks Concerning This Action**

70.     Lead Plaintiffs and Lead Counsel believe the claims asserted against Defendants in the Action are meritorious. They recognize, however, that this Action presented a number of serious risks to establishing Defendants' liability and risks concerning the case's procedural posture. Indeed, the risks inherent to this case are illustrated by the Court's initial dismissal of the entire Action and its subsequent denial of Lead Plaintiffs' motion to amend the Complaint. Even if Lead Plaintiffs prevailed on Appeal before the Second Circuit, the case would be significantly narrowed versus what had been originally pled. While in the Complaint, Lead Plaintiffs had alleged multiple categories of statements concerning the CTF Acquisition as against multiple Defendants under both the Exchange and Securities Acts, after the Court's decisions on Defendants' motion to dismiss and Lead Plaintiffs' motion to amend, only one category of statement remained viable, and as against only a single Defendant, Frontier's former CEO Daniel

McCarthy. Therefore, the risks of continuing on with the litigation were dramatically heightened, and the Class's ultimate potential for recovery was significantly diminished.

### 1. Risks Concerning Liability

71.     Moreover, as discussed further below, Defendants vigorously argued that their challenged statements about the CTF Acquisition were not false or misleading when made, that Defendants did not have any intent to mislead investors, and that the corrective disclosures alleged in the PAC did not, in fact, reveal the truth of any of the alleged misstatements to the market.

### a. Falsity

72.     Lead Plaintiffs and Lead Counsel recognize that, even if they had prevailed on appeal before the Second Circuit, they may not have been able to overcome a second round of motion to dismiss briefing before this Court, to withstand an inevitable motion for summary judgment, or to later convince the Court or a jury of Defendants' ultimate liability. Among other things, Lead Plaintiffs recognize the challenges in proving that Defendants' statements were materially false and misleading when made. Though several state government entities investigated Frontier following the CTF Acquisition, no governmental entity brought a formal investigation or asserted a parallel enforcement action concerning the claims asserted in this Action. All the while, Defendants have consistently asserted that their statements to investors were accurate based on information available at the time, and would likely continue to vigorously contend that their statements were not false or misleading at summary judgment, at trial, and on appeal.

### b. Scienter

73.     Even if Lead Plaintiffs were able to prove that Defendants' statements were false or misleading, they would still need to prove to a jury that Defendants made the alleged false statements with intent to mislead investors or with deliberate recklessness. Among other things, Defendants would likely point to their absence of insider stock sales as evidence of a lack of intent,

and they would continue to argue that the compensation they did receive for completion of the CTF Acquisition incentivized them to complete the Acquisition successfully—not to commit fraud on investors.

74.     Defendants would likely continue to contend that Lead Plaintiffs failed to adequately allege conscious misbehavior or recklessness. Although the Court credited Lead Plaintiffs' allegations at the motion to amend stage that Defendants 1% statements were made with scienter—based in part on Lead Plaintiffs' allegations concerning the large number of customers alleged to have been affected by service outages and the resulting impact of those outages on Frontier's revenue—Lead Plaintiffs and Lead Counsel recognized a risk that a trier-of-fact may accept one or more of Defendants' scienter arguments and, as result, investors would recover nothing.

### c.     Loss Causation and Damages

75.     Lead Plaintiffs also faced substantial risk from Defendants' loss-causation arguments, which, if successful, would have significantly reduced or even eliminated entirely the Class's ability to recover damages. The Court had already dismissed Lead Plaintiffs' claims on loss causation grounds twice, even after finding that the 1% statements were otherwise adequately alleged, on the basis that the alleged corrective disclosures alleged in the PAC did not, in fact, reveal the truth about the 1% statements and/or cause investors' losses.

76.     On appeal, as discussed above, Lead Plaintiffs vigorously argued for the reversal of this finding. Defendants argued similarly vigorously in favor of the Second Circuit's upholding the Court's decision.

77.     Even if Lead Plaintiffs prevailed on appeal and the Second Circuit vacated this Court's decision, this Court may still have ultimately have ruled (whether on renewed motion to dismiss, on class certification, on summary judgment, or otherwise) or a jury might have ultimately

found that Lead Plaintiffs did not adequately plead loss causation for one or more of the alleged corrective events, further diminishing investors' potential recovery. Given that the 1% Statements were uttered for only a short period of time at the beginning of the Class Period, Lead Plaintiffs likely faced a potentially difficult road to getting those disclosures sustained in the case, ultimately prevailing on certifying a class—an increasingly time-consuming and expensive step in securities litigation—and proving to a jury that the alleged corrective events, indeed, disclosed to investors the truth of the 1% Statements.

78.     The resolution of disputed issues regarding damages and loss causation likely would have boiled down to a "battle of experts," and Defendants would undoubtedly have presented a well-qualified expert who would opine that the class's damages were smaller or nonexistent. If Defendants prevailed on their loss-causation and damages arguments, recoverable damages would be eliminated or significantly reduced.

### C.     Risks To Ability To Pay

79.     The recovery here is substantial especially when weighed against Defendants' ability to pay a judgment or fund a future settlement in excess of the proposed Settlement. Even in the event Lead Plaintiffs overcame all of the significant risks outlined above—any one of which could have resulted in a substantially diminished recovery, or even no recovery at all, for investors—Lead Plaintiffs still faced serious constraints in their ability to collect any judgment from Defendants. Given Frontier's bankruptcy reorganization, Defendants' already-limited resources available to pay any judgment would certainly have diminished significantly following likely years of continued litigation.

80.     In particular, on April 30, 2021, Frontier's Chapter 11 plan of reorganization (the "Plan"), which had been confirmed by the Bankruptcy Court for the Southern District of New

York by order dated August 27, 2020 (the "Confirmation Order"), was declared effective. Frontier then emerged from bankruptcy.

81.     Because shareholder claims stemming from securities litigation are subordinated to the lowest priority for recovery after a Chapter 11 reorganization, Frontier's bankruptcy cast doubt on Lead Plaintiffs' and the Class's ability to recover anything from the Company. However, Lead Counsel retained bankruptcy counsel, Lowenstein Sandler, who assisted Lead Counsel in timely filing proofs of claim on behalf of individual Lead Plaintiffs and on behalf of the Class in Frontier's Chapter 11 proceeding. As such, Lead Counsel successfully preserved Lead Plaintiffs' and the Class's ability to prosecute their claims against Frontier with any potential recovery (limited to any available proceeds from its D&O insurance coverage).

82.     Moreover, only one Executive Defendant—Frontier's former CEO Daniel McCarthy—remained a Defendant in the case as substantially narrowed by the PAC. As an individual, McCarthy's ability to pay a settlement or judgment was likely to be also largely limited to any available proceeds from his D&O insurance coverage.

## III.   THE PERCENTAGE RECOVERY OF THE SETTLEMENT REPRESENTS AN EXCELLENT RESULT FOR THE CLASS GIVEN THE RISKS OF CONTINUED LITIGATION

83.     Given the serious litigation risks outlined herein, the $15.5 million settlement is an excellent result for the Class. If not for this Settlement, the Action would have continued to be highly contested by the parties at each significant stage, and continued litigation would be complex, costly, and lengthy for the Settlement Class. Among other things, fact discovery had not yet begun when the Settlement was reached. As such, absent the Settlement, the Parties would have been required to undertake expensive and time-consuming fact and expert discovery, including the exchange of document requests, interrogatories, requests for admission; the production and review of voluminous number of documents; numerous fact and expert

depositions; and the designation of experts and exchange of expert reports. Additionally, a motion for summary judgment would likely have to be briefed and argued. A trial could take weeks to complete, even without considering pre- and post-trial motions.

84.     The conclusion that the $15.5 million Settlement is a favorable result for the Settlement Class is further supported by a comparison of the $35 million recovery to the potential damages that might be recovered for the Settlement Class at trial, in the event Lead Plaintiffs and the Settlement Class prevailed on liability issues, including falsity and scienter, and loss causation and damages issues. Assuming Lead Plaintiffs prevailed on all liability issues (which was far from certain), Lead Counsel believes that the maximum total damages Lead Plaintiffs could realistically establish at trial, assuming complete success in proving liability, was approximately $885 million.

85.     Moreover, this recovery assumes that Lead Plaintiffs managed to keep in the case all four of the PAC's alleged corrective events against likely challenges on a renewed motion to dismiss, at class certification, and on summary judgment, and then successfully persuade a jury as to all four corrective events. In reality, the more likely scenario that Lead Plaintiffs faced, however, was the possibility that the Court or jury would further narrow the case to include only the November 1, 2016 corrective disclosure—Frontier's announcement that "the Company's revenue had declined by $84 million" from the previous quarter, that the decline was "driven overwhelmingly by lower revenue in the CTF regions," and that "'the cost of integrating the CTF Acquisition had already ballooned to $750 million,' $300 million more than Defendants had previously estimated." Assuming that only the November 1, 2016 disclosure remained at issue, Lead Plaintiffs' damages expert estimated that the maximum total damages we could realistically establish at trial, assuming complete success, was $220 million. In that circumstance, the settlement of $15.5 million represents a recovery of approximately 7%.

86.     Given the meaningful litigation risks, and the immediacy and amount of the $15,500,000 recovery, Lead Plaintiffs and Lead Counsel believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

87.     The Parties have stipulated to certification of the Settlement Class, for purposes of the Settlement only. Stipulation, ¶2. In its Preliminary Approval Order, the Court found, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure, that it "will likely be able to certify the Settlement Class for purposes of the proposed Settlement" and "will likely be able to certify Lead Plaintiffs ATRS and Carlos Lagomarsino as Class Representatives for the Settlement Class and appoint Lead Counsel Bernstein Litowitz as Class Counsel for the Settlement Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure." Preliminary Approval Order, at 3. In connection with final approval of the Settlement, the Court will be asked to finally certify the Settlement Class and finally approve the appointment of Lead Plaintiffs ATRS and Mr. Lagomarsino as Class Representatives for the Settlement Class and the appointment of Bernstein Litowitz as Class Counsel for the Settlement Class. As Lead Plaintiffs apprised the Court in its Preliminary Approval Motion and Exhibit 6 thereto (ECF No. 192-1, at 23 n.5), counsel for a competing lead plaintiff movant (which was not appointed) in an unrelated case raised questions about Bernstein Litowitz's hiring of a former employee of the lead plaintiff (SEB). Following discovery and extensive briefing, the court found that the evidence did not establish any quid pro quo, and allowed Bernstein Litowitz to continue as Class Counsel. *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996, at *1-2 (N.D. Cal. Apr. 20, 2021). The court in *Symantec* nevertheless ordered Bernstein Litowitz to bring its order to the attention of any court in which Bernstein Litowitz seeks appointment as class counsel, *see id.* at *2, as we did in connection with

Preliminary Approval and do so again here. Lead Plaintiffs note that the parties in *Symantec* agreed to settle those claims for $70 million, and the court finally approved that settlement on February 10, 2022.

88.     The Court's January 18, 2022 Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for an Award of Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to potential members of the Settlement Class. ECF No. 193. The Preliminary Approval Order also set April 19, 2022 as the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Settlement Class.

89.     In accordance with the Preliminary Approval Order, Lead Counsel instructed A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice. The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class. (ECF No. 193-1.) The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in the amount of 25% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $500,000. *Id*. at 2.

90.     To disseminate the Notice and Claim Form (together, the "Notice Packet"), A.B. Data obtained information from Frontier and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. The accompanying Declaration of Jack Ewashko Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the

Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Ewashko Decl.),

attached hereto as Exhibit 3, provides additional information about A.B. Data's distribution of the

Notice Packet. *See* Ewashko Decl. ¶¶2-8.

91.     A.B. Data began mailing copies of the Notice Packet to potential Settlement Class

Members and nominee owners on February 15, 2022. *Id*. ¶¶3-4. As of April 4, 2022, A.B. Data

has disseminated a total of 737,095 Notice Packets to potential Settlement Class Members and

nominees. *Id.* ¶8.

92.     In accordance with the Preliminary Approval Order, A.B. Data caused the

Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *PR*

*Newswire* on February 28, 2022. *Id*. ¶9.

93.     A.B.   Data   also   established   a   dedicated   settlement   website,

www.FrontierSecuritiesLitigation.com, to provide potential Settlement Class Members with

information concerning the Settlement and access to copies of the Notice and Claim Form, as well

as   copies   of   other   relevant   documents,   including   the   PAC,   the   Stipulation,   Lead Plaintiffs'

memorandum of law in support of preliminary approval of the Settlement, and the Preliminary

Approval Order. *See id*. ¶¶10-11. That website became operational on February 15, 2022. *Id*. ¶11.

Lead Counsel and A.B. Data will continue to monitor and to update the settlement website as the

settlement process continues. For example, Lead Plaintiffs' papers in support of its motion for final

approval of the Settlement and Lead Counsel's papers in support of its motion for attorneys' fees

and Litigation Expenses will be made available on the website after they are filed, and any orders

entered by the Court in connection with the motions will also be posted.

94.     As set forth above, the deadline for Settlement Class Members to file objections to

the Settlement, Plan of Allocation, or Fee and Expense Application, or to request exclusion from

the Settlement Class, is April 19, 2022. To date, 18 requests for exclusion from the Settlement Class have been received, *see id.* ¶13, and no formal objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received. Lead Counsel will file reply papers on or before May 3, 2022, that will address all requests for exclusion and any formal objections that may be received.

## V.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

95.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed), or online, no later than June 15, 2022. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

96.     Lead Counsel consulted with Lead Plaintiffs' damages expert, Mark Hedstrom, and his team, in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation"). Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

97.     The Plan of Allocation is set forth in Appendix A of the Notice. *See* Ewashko Decl., Ex. A at Appendix A. As described in the Notice, calculations under the Plan of Allocation are intended as a method to weigh the claims of Claimants against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *See id.* at ¶1.

98.     In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per share closing prices of publicly traded common stock of Frontier Communications Corporation ("Frontier Common Stock") and

Mandatory Convertible Preferred Stock of Frontier Communications Corporation ("Frontier Preferred Stock," and together with Frontier Common Stock, "Frontier Securities") during the Class Period that was allegedly caused by Defendants' alleged materially false and misleading statements and omissions. *Id.* ¶2. In calculating the estimated artificial inflation, Lead Plaintiffs' expert considered price changes in the stock in reaction to the public disclosures allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes on that day that were attributable to market or industry forces. *Id.* ¶3.

99.     Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase of Frontier Common Stock or Preferred Stock that is listed on a Claimant's Claim Form and for which adequate documentation is provided. In general, Recognized Loss Amounts are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation in in the Frontier Security at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase or acquisition price and the sale price for the shares. *Id.* ¶¶6-9.[4] In order to have a Recognized Loss Amount under the Plan, a Claimant must have suffered damages proximately caused by the disclosure of the relevant truth concealed by Defendants' alleged fraud. Specifically, shares of Frontier Common Stock or Preferred Stock purchased or otherwise acquired during the Class Period must have been held through at least one of the alleged corrective disclosures that removed alleged artificial inflation in the Frontier Security. *Id.* ¶5.

100.     The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases or other acquisitions of Frontier Securities during the Class Period is the Claimant's "Recognized Claim." *Id.* ¶10. The Net Settlement Fund will be allocated to Authorized Claimants

---

[4] The calculation of a Recognized Loss Amount also takes into account the PSLRA's statutory limitation on recoverable damages. *See* Section 21D(e)(1) of the Exchange Act.

on a *pro rata* basis based on the relative size of their Recognized Claims. Notice ¶¶20-21. If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant. *Id.* ¶22. Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

101.     The entire Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. *Id.* ¶23. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to one or more non-sectarian, not-for-profit, 501(c)(3) organizations, to be recommended by Lead Counsel and approved by the Court. *Id.*

102.     The Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases or other acquisitions of Frontier Securities that were attributable to the misconduct alleged in the Action, and to date, no objections to the proposed Plan of Allocation have been received.

## VI.    THE FEE AND EXPENSE APPLICATION

103.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees to Plaintiffs' Counsel of 25% of the Settlement Fund (the "Fee Application").[5] Lead Counsel also requests payment for Litigation

---

[5] Plaintiffs' Counsel are Lead Counsel Bernstein Litowitz and Liaison Counsel Motley Rice LLC ("Motley Rice").

Expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $267,688.00 (the "Expense Application").

104.    The legal authorities supporting the requested fee and expenses are set forth in Lead Counsel's Fee Memorandum. The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

105.    For the efforts of Plaintiffs' Counsel on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. As discussed in the Fee Memorandum, a 25% fee award is well within the range of percentages awarded in securities class actions in this Circuit with comparable settlements, and is fair and reasonable given the facts and circumstances of this case.

#### 1.    Lead Plaintiffs Have Authorized and Support the Fee Application

106.    Lead Plaintiffs ATRS and Carlos Lagomarsino are each a sophisticated investor that closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. *See* Graves Decl., attached hereto as Exhibit 1, at ¶¶3, 7, 8, and Lagomarsino Decl., attached hereto as Exhibit 2, at ¶¶3, 5, 6. Both Lead Plaintiffs evaluated the Fee Application and support the fee requested, and believe it is reasonable in light of the result obtained for the Settlement Class, the risks undertaken, and the work performed by Plaintiffs' Counsel. Graves Decl. ¶¶9-10; Lagomarsino Decl. ¶¶7-8.

#### 2.    The Time and Labor Devoted to the Action by Plaintiffs' Counsel

107.    Plaintiffs' Counsel devoted substantial time to the prosecution of the Action. As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included: (i) conducting an extensive investigation into the alleged fraud, including interviews of over 120 former employees of Frontier and a thorough review of public information such as SEC

filings, analyst reports, conference call transcripts, and news articles; (ii) drafting a detailed consolidated complaint based on Lead Counsel's investigation; (iii) opposing Defendants' motion to dismiss through briefing and argument; (iv) drafting a detailed proposed amended complaint; (v) briefing a motion for leave to amend the Complaint; (vi) fully briefing an appeal before the Second Circuit; (vi) consulting with an expert on market efficiency and class-wide damages; (vii) retaining and consulting with experienced bankruptcy counsel to protect the Settlement Class's interests in Frontier's bankruptcy proceeding; and (viii) engaging in months of arm's-length settlement negotiations.

108.    Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation. I personally monitored and maintained control of work performed by Plaintiffs' Counsel. Other experienced attorneys at Plaintiffs' Counsel were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

109.    Attached hereto as Exhibits 4A and 4B, respectively, are my declaration on behalf of Bernstein Litowitz and the declaration of William H. Narwold on behalf of Motley Rice in support of Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes information about the lodestar of the firm. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates. The first page of Exhibit 4 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar

amounts, and expenses for each Plaintiffs' Counsel's firm, and gives totals for the numbers provided.

110. As set forth in Exhibit 4, Plaintiffs' Counsel collectively expended a total of 6,200.40 hours in the investigation and prosecution of the Action from its inception through April 1, 2022. The resulting lodestar is $3,695,130.00. The vast majority of the total lodestar— approximately 98%—was incurred by Lead Counsel.

111. The requested fee of 25% of the Settlement Fund is $3,875,000 plus interest accrued at the same rate as the Settlement Fund, and therefore represents a multiplier of approximately 1.05 of Plaintiffs' Counsel's total lodestar. As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is on the low end of the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

### 3. The Experience and Standing of Lead Counsel

112. As demonstrated by the firm resume included as Exhibit 4A-3 hereto, Lead Counsel Bernstein Litowitz is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country. Further, Bernstein Litowitz has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions.

### 4. The Standing and Caliber of Defendants' Counsel

113. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, defendants were represented by experienced and extremely able counsel, Mayer Brown LLP (counsel for the Frontier Defendants) and Davis Polk & Wardwell LLP (counsel for the Underwriter Defendants), each of

which vigorously represented their respective clients. In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms that are very favorable to the Settlement Class.

**5.     The Risks of the Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

114.    This prosecution was undertaken by Lead Counsel entirely on a contingent basis and without any assurance of compensation or reimbursement of expenses. The risks assumed by Lead Counsel in prosecuting these claims to a successful conclusion.

115.    From the outset of its retention, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case such as this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and have incurred over $267,000 in Litigation Expenses in prosecuting the Action for the benefit of the Settlement Class.

116.    Lead Counsel also bore the risk that no recovery would be achieved. As discussed herein, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

117.    Lead Counsel knows from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement. To the contrary, it takes hard work

and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

### 6.    The Reaction of the Settlement Class to the Fee Application

118.    As stated above, through April 4, 2022, 737,095 Notice Packets had been mailed to potential Settlement Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund. *See* Ewashko Decl., ¶8. In addition, the Court-approved Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire. Id.* ¶9. To date, no formal objections to the request for attorneys' fees and expenses have been received by Lead Counsel. However, Lead Counsel note that they have received a one-page, anonymous letter from an individual who appears to take issue with Lead Counsel's request for a 25% fee award in this case. *See* Ex. 6. This letter is not a valid objection as it does not satisfy any of the requirements for the submission of objections set forth in the Notice, including by failing to state the individual's name or include documentation establishing that the individual is a member of the Settlement Class with standing to object to the fee application. *See* Notice, ¶66. Moreover, while the letter appears to take issue with Lead Counsel's fee application, it provides no reasoned basis why the requested fee award would not provide reasonable compensation for Plaintiffs' Counsel's efforts and the risks of non-payment they faced in bringing this Action on a contingent basis. For these reasons, this submission should be rejected by the Court.

119.    Any formal objection that may be received will be addressed in Lead Counsel's reply papers to be filed on May 3, 2022, after the deadline for submitting objections has passed.

**B.      The Litigation Expense Application**

120.     Lead Counsel also seeks payment from the Settlement Fund of $267,688.00 in Litigation Expenses that were reasonably incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

121.     From the outset of the Action, counsel was aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action. Accordingly, Lead Counsel was motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

122.     Lead Counsel has incurred a total of $267,688.00 in Litigation Expenses in connection with the prosecution of the Action. The expenses are summarized in Exhibit 5, which identifies each category of expense, *e.g.*, expert fees and on-line research, and the amount incurred for each category. These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in Plaintiffs Counsel's hourly rates.

123.     The largest category of expenses was for the retention of experts, in the amount of $182,323.62, or approximately 68% of the total Litigation Expenses. As noted above, Lead Counsel consulted with experts in the fields of loss causation and damages during its investigation and the preparation of the Complaint, and in connection with the development of the proposed Plan of Allocation.

124.     Lead Counsel also consulted with and retained experienced bankruptcy counsel. Lead Counsel's retention of Lowenstein Sandler LLP, counsel specializing in bankruptcy

43

litigation, was critical in this case given the uncertainty that Frontier's complex bankruptcy proceedings added to the Action. Under Lead Counsel's supervision, Bankruptcy counsel was retained to assist Lead Counsel in protecting Class Members' rights by, *inter alia*, monitoring Frontier's bankruptcy proceedings; reviewing and monitoring Frontier's bankruptcy filings, including the Chapter 11 plan and disclosure statement; drafting and filing proofs of claim for the Settlement Class and Lead Plaintiffs; reviewing Lead Plaintiffs' bankruptcy-related filings, including a motion to lift the bankruptcy stay with respect to Defendant McCarthy; reviewing the Settlement papers entered into in this Action; and generally providing legal advice to Lead Counsel concerning Frontier's bankruptcy.

125.     Another large component of the litigation expenses was for online legal and factual research, which was necessary to conduct the factual investigation and identify potential witnesses, prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motion to dismiss, and prepare Lead Plaintiffs' motion for leave to amend the Complaint, and brief the Appeal to the Second Circuit. The charges for on-line research amounted to $35,866.07, or approximately 13% of the total amount of expenses.

126.     The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court costs, printing and copying costs, postage and delivery expenses, and travel costs.

127.     All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiffs. *See* Graves Decl., at ¶10, and Lagomarsino Decl., at ¶8.

128. The Notice informed potential Settlement Class Members that Lead Counsel would be seeking payment for Litigation Expenses in an amount not to exceed $500,000. The total amount requested, $267,688.00, is significantly below the $500,000 that Settlement Class Members were advised could be sought. To date, no objections to the request for expenses has been received.

129. The expenses incurred by Lead Counsel and Lead Plaintiffs were reasonable and necessary to represent the Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be paid in full from the Settlement Fund.

130. Attached to this declaration are true and correct copies of the following documents previously cited in this declaration:

| | |
|---|---|
| Exhibit 1: | Declaration of Rod Graves, Deputy Director of Arkansas Teacher Retirement System, in Support of: (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, dated March 24, 2022. |
| Exhibit 2: | Declaration of Carlos Lagomarsino in Support of: (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, dated March 24, 2022. |
| Exhibit 3: | Declaration of Jack Ewashko Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date, dated April 5, 2022. |
| Exhibit 4: | Summary of Plaintiffs' Counsel's Lodestar and Expenses. |
| Exhibit 4A: | Declaration of Katie M. Sinderson in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP, dated April 5, 2022. |
| Exhibit 4B: | Declaration of William H. Narwold in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, Filed on Behalf of Motley Rice LLP, dated April 4, 2022. |

Exhibit 5:        Breakdown of Plaintiffs' Counsel's Expenses by Category.

Exhibit 6:        Letter to Lead Counsel dated February, 2022.

131.    Also attached to this declaration are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 7:        *Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, No. 3:09-cv-02083-RNC, slip op. (D. Conn. Jul. 31, 2019), ECF No. 139.

Exhibit 8:        *In re United Rentals, Inc. Sec. Litig.*, No. 3-04-cv-1615 (CFD), slip op. (D. Conn. May 29, 2009), ECF No. 150; Memo of Law in Supp. of Mot. for an Award of Attorneys' Fees and Expenses, ECF No. 141 at 18-19 (excerpt).

Exhibit 9:        *In re Evoqua Water Techs. Corp. Sec. Litig.*, No. 1:18-cv-10320-JPC, slip op. (S.D.N.Y. Nov. 1, 2021), ECF No. 152.

Exhibit 10:     *Citiline Holdings, Inc. v. iStar Fin., Inc.*, No. 1:08-cv-03612-RJS, slip op. (S.D.N.Y. Apr. 5, 2013), ECF No. 127; Memo of Law in Supp. of Mot. for an Award of Attorneys' Fees and Expenses, ECF No. 116 at 19 (excerpt).

Exhibit 11:     *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, slip op. (S.D.N.Y. Mar. 17, 2011), ECF No. 82; Memo of Law in Supp. of Mot. for an Award of Attorneys' Fees and Expenses, ECF No. 69 at 16-17 (excerpt).

Exhibit 12:     *Public Pension Fund Grp. v. KV Pharm. Co.*, No. 4:08-cv1859 (CEJ), slip op. (E.D. Mo. Apr. 23, 2014), ECF No. 199.

Exhibit 13:     *McGuire v. Dendreon Corp.*, No. C07-800 MJP, slip op. (W.D. Wash. Dec. 20, 2010), ECF No. 235.

## VII.   CONCLUSION

132.    For all the reasons set forth above, Plaintiffs respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the request for payment of total Litigation Expenses in the amount of $267,688.00, should also be approved.

I declare, under penalty of perjury that the foregoing is true and correct.

Dated: April 5, 2022                          Respectfully submitted,

                                              /s/ *Katherine M. Sinderson*
                                              Katherine M. Sinderson

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 5, 2022 a copy of the foregoing Declaration of Katherine M. Sinderson in Support of (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Katherine M. Sinderson*
Katherine M. Sinderson (phv09412)